FILED

2017 AUG -2  PM 2: 50

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

DISTRICT COURT
DISTRICT OF FLORIDA
ORLANDO, FLORIDA

WILLINE BRYANT and MAX GRACIA SR.,
as Co-Personal Representatives of
the Estate of MAX GRACIA JR. II,

      Plaintiffs,

v.

ORANGE COUNTY, FLORIDA,
ROBERT J. BUCK, III,
MARYANNE EVANS,
KAREN CLAIRMONT,
ELSA GALLOZA-GONZALEZ, and
LYNN MARIE HARTER,

      Defendants.

_____/

CASE NO.:

6:17-CV-1423-ORL-31-KRS

**PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL**

    COME NOW, WILLINE GRACIA and MAX GRACIA SR. ("Plaintiffs"), as Co-Personal Representatives of the Estate of MAX GRACIA JR. II ("Garcia or Decedent"), by and through their undersigned counsel, and hereby sue ORANGE COUNTY, FLORIDA, ROBERT J. BUCK, III, MARYANNE EVANS, KAREN CLAIRMONT, GALLOZA-GONZALEZ and LYNN MARIE HARTER ("Defendants"), and respectfully state as follows:

**INTRODUCTION**

    1.    Plaintiffs bring this civil rights and wrongful death action to redress the deprivation of rights, privileges and immunities secured to Decedent by the Due Process

Clause of the Fourteenth Amendment of the United States Constitution as well as applicable state law.

2.      Plaintiffs' claims are brought pursuant to 42 U.S.C. 1983 and Florida law and arise out of Defendants' failure to provide adequate and proper medical evaluation, treatment, care, facilities and transportation to Gracia while a pre-trial detainee at Orange County Corrections. Said failure to provide adequate and proper medical care was the result of a deliberate indifference on the part of Defendants as to the medical condition and needs of Gracia which resulted in his death on August 10, 2015.

3.      Specifically, Defendants failed to monitor, evaluate, treat and/or transport Gracia to a higher level of care facility. At all times material, Gracia was suffering from a serious dog bite injury coupled with infection, and who displayed signs of an obvious and visible deteriorating physical condition. As was fully known by Defendants at all times material, Gracia had a preexisting medical condition and serious disability which, as Defendants knew, caused Gracia to suffer a compromised immune system while in the care and custody of Defendants.

## PARTIES

4.      Plaintiffs, WILLINE BRYANT (mother) and MAX GRACIA SR. (father) are the biological parents of Decedent, who was 22 years of age at the time of his death, and were duly appointed Co-Personal Representatives of the ESTATE OF MAX GRACIA JR, II, by the General Sessions Court, Probate Division of Orange County, Florida on August 17, 2016, File No. 2015-CP-2511.

5.      Defendant ORANGE COUNTY, FLORIDA ("ORANGE COUNTY") is a municipal corporation and government entity located in Central Florida, in the Middle District of Florida, operating by virtue of the laws of the State of Florida and was responsible

2

for the care, custody, health and well-being of Gracia during his custody and confinement at Orange County Corrections.

6.      At all times material, ORANGE COUNTY maintained, operated and administered the jail facility known as Orange County Corrections ("OCC") and, upon information and belief, systematically failed to follow appropriate policies and procedures to regulate the conduct of its medical personnel at OCC. Even if such appropriate policies and procedure were in place, they were consistently either ignored or not enforced. Upon information and belief, such noncompliance with any such existing policies and procedures by OCC medical personnel was routinely tolerated by ORANGE COUNTY and, therefore, became the custom or practice of ORANGE COUNTY and contributed to the establishment of a "culture of neglect" amounting to deliberate indifference to the serious medical needs of detainees.

7.      At all times material, ORANGE COUNTY maintained, operated and administered OCC's Health Services Department known as Corrections Health Services (hereinafter "CHS") headed by ROBERT BUCK, III, M.D. ("BUCK"). ORANGE COUNTY failed to follow or enforce appropriate policies and procedures to regulate the conduct of medical personnel at OCC to ensure that detainees be given proper medical care and treatment.

8.      ORANGE COUNTY was and is responsible for the operation of OCC/CHS including, but not limited to the following:

    i.    establishing policies and procedures to regulate the conduct of employees, agents and servants of ORANGE COUNTY and enforcing same;

    ii.   establishing the appropriate budget for ORANGE COUNTY, OCC/CHS;

3

     iii.    approving specific expenses for ORANGE COUNTY, OCC/CHS, including personnel training, staffing and medical equipment and testing expenses; and

     iv.    ensuring that employees, agents and servants of ORANGE COUNTY obeyed the laws of the State of Florida and the United States.

9.   ORANGE COUNTY, through OCC/CHS, had a duty to ensure that the conditions of confinement and health and safety of persons incarcerated at OCC/CHS, including Gracia, are protected and in compliance with the United States Constitution and the laws of the United States and the State of Florida.

10.   ORANGE COUNTY is the local governmental entity that was ultimately responsible for the care, custody, health and well-being of Gracia when he presented to the jail and was held in custody.

11.   Under 42 U.S.C. 1983 as set forth in Count I below, ORANGE COUNTY is liable by virtue of its own acquiessence to the conduct and the acts of its employees, to wit, Individual Defendants BUCK, EVANS, CLAIRMONT, GONZALEZ and HARTER, which constituted a deliberate indifference to the health and safety of Decedent and which were otherwise condoned, tolerated, or authorized, despite lip service to the contrary, by ORANGE COUNTY. Under 42 U.S.C. 1983 as set forth in Counts II through VI below, said Individual Defendants are individually liable to the extent their acts and omissions constituted a deliberate indifference to the health and safety Decedent.

12.   Under applicable state law as set forth in Count VII below, ORANGE COUNTY is liable for the actions and omissions of its employee nursing staff which constituted medical malpractice under the doctrine of respondeat superior.

13.   Defendant MARYANNE EVANS ("EVANS") was at all times material an agent or employee of ORANGE COUNTY who worked at OCC/CHS as an Advanced

Registered Nurse Practitioner. At all times material hereto, EVANS was responsible for providing medical and nursing care to inmates at OCC/CHS and acted under color of state law in the course and scope of her employment with ORANGE COUNTY and with deliberate indifference to the health and safety of Decedent.

14.     Defendant KAREN CLAIRMONT ("CLAIRMONT") was at all times material an agent or employee of ORANGE COUNTY who worked at OCC/CHS as a licensed Registered Nurse. At all times material hereto, CLAIRMONT was responsible for providing medical and nursing care to inmate at OCC/CHS and acted under color of law in the course and scope of her employment or agency with ORANGE COUNTY and with deliberate indifference to the health and safety of Decedent.

15.     Defendant ELSA GALLOZA-GONZALEZ ("GONZALEZ") was at all times material an agent or employee of ORANGE COUNTY who worked at OCC/CHS as a licensed Registered Nurse.  At all times material hereto, GONZALEZ was responsible for providing medical and nursing care to inmates at OCC/CHS and acted under color of state law in the course and scope of her employment with ORANGE COUNTY and with deliberate indifference to the health and safety of Decedent.

16.     Defendant LYNN MARIE HARTER ("HARTER") was at all times material an agent or employee of ORANGE COUNTY who worked at OCC/CHS as a licensed Practical Nurse. At all times material hereto, HARTER was responsible for providing medical and nursing care to inmates at OCC/CHS and acted under color of state law in the course and scope of her employment with ORANGE COUNTY and with deliberate indifference to the health and safety of Decedent.

17.     At all times material, Gracia was a pre-trial detainee in custody at OCC/CHS under the care and control of ORANGE COUNTY when he died in his jail cell on August 10, 2015 as a result of the Defendants' deliberate indifference to his health and safety in violation of 42 U.S.C. 1983.

18.     The potential beneficiaries of any recovery in this action and the relation-ship each to Decedent are: (1) WILINE GRACIA, Decedent's natural mother; (2) MAX GRACIA SR., Decedent's natural father; (3) THE ESTATE OF MAX GRACIA JR.

## JURISDICTION AND VENUE

19.     Subject matter jurisdiction is proper under 28 U.S.C. 1331 in that the action herein arises under a federal statute, 42 U.S.C. 1983. Venue is proper in this district under 28 U.S.C. 1391 because Defendants are located or reside in the Middle District of Florida. Venue is also proper in this district where all of the events giving rise to the claim occurred.

20.     All conditions precedent to the filing of this action, including compliance with Fla. Stat. Sections 766.106, 766.203, and 768.28(6) have been performed or have been waived.

## FACTS COMMON TO ALL COUNTS

21.     Gracia was admitted to the OCC/CHS on August 6, 2015 after being treated at the Orlando Regional Medical Center for dog bites to his legs and hands incurred during his arrest earlier that day.

22.     Gracia was assigned to the Infirmary as his housing unit due to his injuries. BUCK also evaluated Gracia around this same time for his admission to the Infirmary. BUCK noted that Gracia had multiple dog bites with severe flesh involvement. The diag-noses included multiple dog bites. It is noted that Gracia was "put back on his Depakote

for seizures." Other medications ordered include Augmentin, an antibiotic; ibuprofen, a pain medication; and Tylenol #3, a pain medication.

23.     BUCK documented that OCC/CHS nursing staff needed to verify Gracia's Atripla to see if he had been compliant in the community. If he was, the Atripla was to be ordered. There is no documentation in the health record that this verification occurred, and the Atripla was never ordered for Gracia. Upon information and belief, BUCK never saw or inquired about Gracia again.

24.     On August 8, 2015 at 0707 hours CLAIRMONT documented on a Nursing Progress Note that she saw Gracia on August 7, 2015 and he was tolerating the medication without complaints. There was no recordation on the Nursing Note to indicate time of the nursing evaluation. No vital signs were obtained and no physical assessment was done.

25.     On August 7, 2015 at 1708 hours EVANS completed a Clinical List Update and changed the documentation of Gracia's problem in the health record to include the location of the wounds-left posterior thigh and calf, and added a new order of wound care. There is no physical assessment noted and no indication that EVANS actually saw Gracia.

26.     On August 7, 2015 at approximately 1720 hours GONZALEZ completed a Nursing Treatments note for wound care. No vital signs were obtained at that time. Gracia's wounds were cleaned and dressed. It is noted that the wound was reddened with scant serosanguineous drainage present.

27.     On August 8, 2015 at 0638 hours CLAIRMONT completed a Nursing Progress note that indicated Gracia was doing well with a clean, dry and intact dressing. There were no vital signs obtained and no physical assessment was done. This note is verbatim the same note that CLAIRMONT wrote on August 7, 2015 at 0707 hours.

28.     On August 8, 2015 at 1138 hours GONZALEZ completed a Nursing Pro-

gress Note about Gracia that documented that he had removed his dressings to take a

shower prior to the nurse coming to do his wound care. No vital signs were taken and no

physical assessment was done. Patient education included the risk of infection and to in-

crease his fluid intake. Gracia had no complaints per the Nursing Note. GONZALEZ' nurs-

ing plan was to continue to monitor Gracia. An addendum to the note states that there were

no signs and symptoms of infection "noted so far."

29.     On August 8, 2015 at 1659 hours GONZALEZ completed a Nursing Treat-

ment Note about Gracia's daily wound care. She noted that the wound on his left leg was

reddened with scant serosanguineous drainage. The dressing was changed and GONZA-

LEZ noted that there were no signs or symptoms of infection.

30.     On August 8, 2015 at 1713 hours GONZALEZ documented that Gracia

complained of vomiting twice. No physical assessment was conducted and no vital signs

were obtained. GONZALEZ notified a provider and odansetron was ordered and given. No

specific provider was named in the Nursing Note. GONZALEZ documented that she would

continue to monitor Gracia. Nurse Practitioner EVANS co-signed this order on August 9,

2015 at 1700 hours.

31.     On August 9, 2015 CLAIRMONT documented that Gracia's dressing

change of his left posterior thigh wound was changed at 0635 hours. She documented that

the wound was reddened with a large amount of bloody drainage. The technique used was

non-sterile, and the procedure was poorly tolerated by Gracia.

32.     That same day, at 1029 hours, GONZALEZ completed a Nursing Progress

Note in which she documented that Gracia complained of weakness and dizziness. Vital

signs were obtained that included a tachycardia of 131, a blood pressure of 111/56, respirations of 22, oxygen saturation of 98%, and a temperature of 97.4 °F. No physical assessment was done. GONZALEZ notified EVANS, who ordered an increased fluid intake. GONZALEZ stated that extra fluid was given and that she would continue to monitor Gracia.

33.     Later that same day, at 2154 hours, HARTER documented in a Nursing Note that Gracia refused to get up for his evening medications. She unilaterally documented that a "refusal" was done. No vital signs were obtained, and there is no signed refusal in the health record. Incredulously, nothing apparently was done by HARTER to determine his medical status, provide care and treatment or elevate him to a higher level of care at an outside medical facility. It is clear, as should have been obvious to HARTER and the medical staff at OCC/CHS at the time of her observation, that Gracia was declining rapidly. This conduct or failure to act by HARTER both deviated from the appropriate standard of care and evinced a deliberate indifference to the safety and health of Decedent.

34.     On August 10, 2015 at 0313 hours CLAIRMONT retrospectively documented that at 2100 hours on August 9, 2015, Gracia was observed twisting himself and moaning loudly on the bed. He stated that he "can't do it" and slid to the floor. Again there is no explanation in the medical records as to why no care or treatment was rendered to Gracia in those fateful six (6) hours.

35.     On August 10, 2016 at 0335 hours CLAIRMONT wrote a Nursing Progress Note dated August 9, 2015 regarding Gracia's alleged behavior--refusing to follow corrections officers' orders regarding a pending move to 3B due to a "DR." She claimed that Gracia continued to lie on the floor on his back, "refusing all treatment." These belatedly

documented "observations" and false characterizations by the medical staff at OCC/CHS were part of a cover-up of the total lack of care rendered to Gracia during the critical hours preceding his otherwise avoidable demise.

36. Later that same day, at 0802 hours CLAIRMONT documented in a Nursing Progress Note that an officer had notified her earlier, at approximately 0515 hours, that Gracia was not breathing. When she arrived, Gracia was lying supine in the bed without pulses and respirations. Cardiopulmonary resuscitation efforts were initiated and continued until EMS arrived and assumed care of Gracia. She documented that Gracia was transported by EMS at 0548 hours on August 10, 2015. Upon information and belief, Garcia was already dead in his prison cell before he was even transported by EMS.

37. Gracia was brought to the Orlando Regional Medical Center where he was pronounced deceased on August 10, 2015 at 0609 hours.

38. On August 10, 2015 at approximately 1100 hours an autopsy was performed by Dr. Gary Lee Utz, Chief Medical Examiner in the District Nine Office of the Medical Examiner. The autopsy report stated that the cause of death was septic shock complicating infected dog bite wounds of lower extremity with human immunodeficiency virus infection as a contributory factor. The manner of death was "homicide" due to his incarceration.

39. The care and treatment provided to decedent from August 6, 2015 to August 10, 2015 while he was incarcerated at the OCC/CHS deviated from the acceptable medical and nursing standard of care, and rose to the level of deliberate indifference given what the medical staff including, but not limited to, the identified Individual Defendants at OCC knew of Gracia's medical condition.

40.     GONZALEZ deviated from the appropriate standard of care by failing to properly monitor and/or identify the deterioration in Gracia's physical and mental status; by failing to contact a provider regarding her observations; and by failing to obtain vital signs on August 7, 2015 and August 8, 2015. In addition, on August 8th, Gracia complained of vomiting, and still GONZALEZ did not obtain vital signs. She also failed to properly assess Gracia for his complaint. GONZALEZ did not re-evaluate Gracia after she medicated him for vomiting.

41.     On the morning of August 9, 2015 GONZALEZ obtained abnormal vital signs for Gracia but failed to conduct a proper physical assessment of at that time. While she did contact a more senior and credentialed provider, she failed to follow-up with Gracia throughout the remainder of her shift to ascertain whether his condition changed. This failure rose to the level of deliberate indifference as GONZALEZ knew that Gracia was immunocompromised and was at significant risk for infection, and had a dangerously rapid heart rate that would have serious consequences if allowed to continue, and she did nothing. If she had gone back to monitor Gracia's condition as she documented in her nursing plan that she would, she would have identified Gracia's worsening condition and should have immediately reestablished with a more senior and credentialed provider. At that point, Gracia should have been transported to a higher level of care facility. Instead, Gracia was not seen until approximately 2100 hours that evening, at which time his condition had deteriorated such that he was twisting and moaning in bed and refusing all assistance.

42.     CLAIRMONT deviated from the appropriate standard of care by failing to properly monitor and/or identify the deterioration in Gracia's physical and mental status; and by failing to contact a provider regarding these observations. Her actions rose to the

level of deliberate indifference. CLAIRMONT attended Gracia on August 8, 2015, August 9, 2015 and August 10, 2015, and on all these days, she deviated from the standard of care when she failed to monitor Gracia's condition through the obtaining of vital signs. She also failed to conduct a proper physical assessment on Gracia. On August 9, 2015 when she completed Gracia's wound care early in the morning and noted increased drainage and his poor tolerance of the procedure, she deviated from the nursing standard of care when she failed to obtain vital signs, failed to conduct a proper physical assessment, and failed to notify a more senior and credentialed provider about Gracia's changing condition. Noting that there were changes in the patient's condition and his lack of response to her intervention, she should have at a minimum obtained vital signs, completed an assessment, and contacted a more senior and credentialed provider.

43. When CLAIRMONT returned for her shift on the evening of August 9, 2015, Gracia's condition had worsened to the point that he was writhing on the bed and refusing all assistance and medication. Instead of contacting a provider, she ignored Gracia's serious health condition. CLAIRMONT did not attempt to re-evaluate Gracia or even check on his condition at any time during her shift, even though she knew he was immunocompromised and was at serious risk for infection. She should have contacted a provider immediately about Gracia's deteriorating condition. She should have reviewed the health record and noted that the last vital signs obtained were patently abnormal with no contemporaneous follow-up, and should have informed a more senior and credentialed provider of those remarkable vital signs as well. More likely than not, if she had contacted a more senior and credentialed provider, Gracia would have been sent immediately to the hospital, and he

would not have been found with no pulse and respirations eight hours later. CLAIR-MONT'S actions rose to the level of deliberate indifference when she chose to ignore the clearly deteriorating condition of Gracia.

44.    EVANS deviated from the standard of care for an Advanced Registered Nurse Practitioner when she failed to evaluate Gracia when notified that he was vomiting, and then again the next day when he had a heart rate of 131 and respirations of 22. She failed to document her plan of care for Gracia when she ordered anti-emetic medication on August 8, 2105. On August 9, 2015 when she co-signed the medication order, EVANS failed to review Gracia's chart, or she failed to act upon information in the chart that noted his abnormal vital signs with no re-evaluation. If she had noted these seriously abnormal vital signs with no follow-up, she should have immediately evaluated Gracia. If she had, more likely than not, Gracia's deteriorating condition would have been identified, and he would have been sent out to the hospital for further evaluation and care. Instead, EVANS failed to evaluate Gracia, and he was found approximately 12 hours later in his jail cell with no pulse and no respirations. These acts and omissions by EVANS constituted a deliberate indifference to the health and safety of Gracia.

45.    At all times during Gracia's incarceration, ORANGE COUNTY through the Orange County Corrections Health Services (CHS), under the directorship of BUCK, was in charge of the healthcare program at OCC/CHS. As such, as a policymaker for CHS and ORANGE COUNTY, BUCK was responsible to ensure that the care provided to the individuals at OCC/CHS was appropriate and timely, and provided by staff who were properly trained. BUCK and CHS failed in these responsibilities when the care rendered to

Decedent fell significantly below the standard of care and reflected a deliberate indifference to his serious medical condition. These failures are the legal responsibility of OR-ANGE COUNTY and rose to the level of deliberate indifference to the serious and known medical condition of Decedent.

46.    ORANGE COUNTY, through CHS and BUCK, failed to provide staff that were properly trained in assessment and the identification of serious medical conditions. A complete assessment by nursing staff or by a more senior and credentialed provider was not conducted on Gracia when he was complaining of vomiting, when his vital signs deviated significantly from normal, and when the condition of his wound was clearly worsening.

47.    ORANGE COUNTY, through CHS and BUCK, failed to appropriately supervise CHS staff to ensure that they were adhering to the purported policies and procedures of CHS which, at best, were honored in their breach and not their observance.

48.  Defendants GONZALEZ, CLAIRMONT, EVANS and HARTER, along with others who were on duty during Gracia's incarceration, consistently failed to monitor his vital signs, even though they knew he was immunocompromised and was at serious risk for infection due to his wounds.

49.    GONZALEZ documented multiple abnormal findings about Gracia, including a heart rate of 131 and a respiratory rate of 22, and vomiting, but she nonetheless failed to conduct a complete assessment of Gracia, and failed to reassess Gracia after she had implemented EVANS' orders for medication and to encourage hydration.

50.   CLAIRMONT documented a serious change in Gracia's mental status and behavior, and yet, she failed to obtain vital signs and failed to notify a provider of Gracia's deteriorating condition.

51.   ORANGE COUNTY, through CHS and BUCK, failed to monitor the medication practices at the OCC/CHS, and as a result, the medication Gracia needed for his life-threatening chronic disease was never verified and ordered. If CHS had been conducting appropriate monitoring of their staff through a CQI program and peer review, they would have been aware that their nurses were not conducting appropriate assessments and interventions for their patients. CHS would have been aware that nursing staff were not verifying medication appropriately. If CHS and BUCK had been monitoring the care rendered by their providers, they would have discovered that EVANS was not evaluating patients whose clinical status was worsening, was ordering medications and other treatments without evaluating the patient, and was not reviewing the patients' charts before signing off on verbal orders. If CHS and BUCK had monitored their staff, they would have addressed these and other deficiencies through education and training before Gracia was a patient at the Orange County Jail. If these educational and training deficiency had been addressed, more likely than not, Gracia would have received appropriate and thorough care, his worsening condition would have been identified sooner, and he would have been appropriately sent to the emergency department before he was found deceased in his jail cell.

### COUNT I
### 42 U.S.C. 1983 CLAIM AS AGAINST ORANGE COUNTY

52.   Plaintiffs hereby incorporate by reference paragraphs 1-51 of this Complaint as though more fully set forth herein.

53.     At all times relevant herein, Defendant ORANGE COUNTY, acting insti-
tutionally and through the Individual Defendants, was performing a traditional local gov-
ernmental function in operating a correctional facility and was a state actor. All the actions
and omissions alleged herein were performed under color of state law.

54.     At all times relevant to the events giving rise to this cause of action, Gracia
was a pre-trial detainee at OCC/CHS.

55.     ORANGE COUNTY was responsible for Gracia's well-being while he was
in custody at the OCC/CHS since he did not have the ability to obtain medical treatment
on his own or provide for his own well-being.

56.     ORANGE COUNTY had a constitutional duty to provide Gracia with the
basic necessities of life, including, but not limited to, food, shelter, observation and proper
medical care.

57.     ORANGE COUNTY is liable under 42 U.S.C. 1983, as the primary policy-
makers, for tolerating and not correcting, a custom or practice to exist of deliberate indif-
ference to the serious medical needs of disabled and injured inmates, notwithstanding any
written protocols to the contrary. This entrenched inconsistency, between the written word
and the actual custom or practice, created a "culture of neglect."

58.     ORANGE COUNTY specifically acquiesced to its medical staff not
properly doing rounds, not properly documenting a detainees medical conditions, not
properly supervising and administering medical orders; amounting to an official dereliction
of policy.

59.     ORANGE COUNTY is directly liable for the violation of Decedent's civil rights due to the following practices or customs of ORANGE COUNTY which were in effect at the time of this incident and which were the underlying cause of Decedent's death:

    i.        ORANGE COUNTY failed to adequately and properly train and educate their employees and agents with respect to the proper evaluation of inmates suffering under disabilities or conditions which require medical stabilization before incarceration, monitoring persons with obvious medical needs, transporting persons with obvious medical needs, and handling persons with disabilities, with deliberate indifference and reckless disregard to the welfare of inmates, including Gracia;

    ii.      ORANGE COUNTY failed to adequately monitor and evaluate the performance of their agents and employees with respect to the proper evaluation of inmates suffering under disabilities or conditions which require medical stabilization before incarceration, monitoring persons with obvious medical needs, transporting persons with obvious medical needs, and handling persons with disabilities, with deliberate indifference and reckless disregard to the welfare of inmates, including Gracia;

    iii.    ORANGE COUNTY failed to properly fund and staff OCC and/or CHS of ORANGE COUNTY, to ensure an appropriate amount of licensed, trained and qualified medical professionals are present to provide proper medical treatment to high-risk patients, with deliberate indifference and reckless disregard to the welfare of inmates, including Gracia;

60.     Upon information and belief, ORANGE COUNTY reviewed the actions of its own employees from booking through the death of Decedent. In reviewing its own employees' actions, ORANGE COUNTY found that its employees failed to actually physically observe Decedent at the required intervals as purportedly required by ORANGE COUNTY and CHS policy and generally accepted correctional standards. In its investigation, ORANGE COUNTY documented potential issues with respect to policy and training regarding observation of inmates and proper recording of medical observation events.

However, notwithstanding the findings of its investigation, ORANGE COUNTY refused to significantly or meaningfully discipline or retrain any of its employees, including the Individual Defendants BUCK, EVANS, CLAIRMONT, GONZALEZ and HARTER. Accordingly, ORANGE COUNTY effectively ratified and condoned such conduct.

## COUNT II
## 42 U.S.C. 1983 CLAIM AS AGAINST BUCK

61.    Plaintiffs hereby incorporate by reference paragraphs 1-51 of this Complaint as though more fully set forth herein.

62.    Defendant BUCK, a licensed medical doctor, was at all times material served as the Medical Director of Corrections Health Services Department (CHS) which supervises inmate medical care at OCC/CHS. At all times material hereto, BUCK acted under color of state law in the course and scope of his employment or agency with ORANGE COUNTY and with deliberate indifference to the health and safety of Decedent.

63.    At all times Gracia had an objectively serious medical need.

64.    Plaintiffs' claim under 42 U.S.C. 1983 arises out BUCK's deliberate indifference to Gracia's serious medical needs as set out in this Complaint and its contents incorporated herein, which led to Decedent's death. Such deliberate indifference to the health and safety of Gracia deprived him of rights guaranteed under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

## COUNT III
## 42 U.S.C. 1983 CLAIM AS AGAINST EVANS

65.    Plaintiffs hereby incorporate by reference paragraphs 1-51 of this Complaint as though more fully set forth herein.

66.     EVANS was at all times material an agent or employee of ORANGE COUNTY who worked at OCC/CHS as an Advanced Registered Nurse Practitioner. At all times material hereto, EVANS was responsible for providing medical and nursing care to inmates at OCC/CHS and acted under color of state law in the course and scope of her employment with ORANGE COUNTY and with deliberate indifference to the health and safety of Decedent.

67.     At all times relevant hereto, Gracia had an objectively serious medical need.

68.     Plaintiffs' claim under 42 U.S.C. 1983 arises out EVANS' deliberate indifference to Gracia's serious medical needs as set out in this complaint and incorporated herein, which led to his death. Such deliberate indifference to the health and safety of Gracia deprived him of rights guaranteed under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

### COUNT IV
### 42 U.S.C. 1983 CLAIM AS AGAINST CLAIRMONT

69.     Plaintiffs hereby incorporate by reference paragraphs 1-51 of this Complaint as though more fully set forth herein.

70.     Defendant CLAIRMONT was at all times material an agent or employee of ORANGE COUNTY who worked at OCC/CHS as a licensed Registered Nurse. At all times material hereto, CLAIRMONT was responsible for providing medical and nursing care to detainees at OCC/CHS and acted under color of law in the course and scope of her employment or agency with ORANGE COUNTY and with deliberate indifference to the health and safety of Decedent.

71.     At all times relevant hereto, Gracia had an objectively serious medical need.

72.   Plaintiffs' claim under 42 U.S.C. 1983 arises out CLAIRMONT'S deliberate indifference to Gracia's serious medical needs as set out in this complaint and incorporated herein, which led to his death. Such deliberate indifference to the health and safety of Gracia deprived him of rights guaranteed under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

## COUNT V
## 42 U.S.C. 1983 CLAIM AS AGAINST GONZALEZ

73.   Plaintiffs hereby incorporate by reference paragraphs 1-51 of this Complaint as though more fully set forth herein.

74.   Defendant GONZALEZ was at all times material an agent or employee of ORANGE COUNTY who worked at OCC/CHS as a licensed Registered Nurse.  At all times material hereto, GONZALEZ was responsible for providing medical and nursing care to detainees at OCC/CHS and acted under color of state law in the course and scope of her employment with ORANGE COUNTY and with deliberate indifference to the health and safety of Decedent.

75.   At all times relevant hereto, Gracia had an objectively serious medical need.

76.   Plaintiffs' claim under 42 U.S.C. 1983 arises out GONZALEZ'S deliberate indifference to Gracia's serious medical needs as set out in this complaint and incorporated herein, which led to his death. Such deliberate indifference to the health and safety of Gracia deprived him of rights guaranteed under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

## COUNT VI
## 42 U.S.C. 1983 CLAIM AS AGAINST HARTER

77.     Plaintiffs hereby incorporate by reference paragraphs 1-51 of this Complaint as though more fully set forth herein.

78.     Defendant HARTER was at all times material an agent or employee of ORANGE COUNTY who worked at OCC/CHS as a licensed Practical Nurse. At all times material hereto, HARTER was responsible for providing medical and nursing care to detainees at OCC/CHS and acted under color of state law in the course and scope of her employment with ORANGE COUNTY and with deliberate indifference to the health and safety of Decedent.

79.     At all times relevant hereto, Gracia had an objectively serious medical need.

80.     Plaintiffs' claim under 42 U.S.C. 1983 arises out HARTER'S deliberate indifference to Gracia's serious medical needs as set out in this complaint and incorporated herein, which led to his death. Such deliberate indifference to the health and safety of Gracia deprived him of rights guaranteed under the Due Process Clause of the Fourteenth Amendment of the United States Constitution

## COUNT VII

## MEDICAL MALPRACTICE AGAINST DEFENDANT ORANGE COUNTY

81.     Plaintiffs hereby incorporated by reference paragraphs 1–51 of this complaint as though more fully set forth herein.

82.     While the Plaintiffs have alleged that the acts and omissions set forth herein constituted deliberate indifference in violation of Gracia's constitutional rights, Plaintiffs

alternatively plead that the conduct alleged herein constitutes at least ordinary negligence and medical malpractice under the laws of the State of Florida.

83.     The conduct of the Individual Defendants EVANS, CLAIRMONT, GON-ZALEZ and HARTER breached the standard of care in the community. Said Individual Defendants committed medical negligence by denying Decedent access to care and in failing to evaluate and treat him for sepsis, despite ample opportunity and evidence of this illness. A referral to a higher level of care should have occurred no later than the morning hours of August 9, 2015 when his vital signs deteriorated. A jail infirmary, even if well-staff and equipped, let alone a jail cell, is not the appropriate setting to treat an individual displaying symptoms of Gracia. This breach of the standard of care was the proximate cause of Decedent's death. Had Decedent been afforded appropriate and reasonable medical care he would have survived.

84.     Given the professional negligence of the Individual Defendants EVANS, CLAIRMONT, GONZALEZ and HARTER, all of whom were employed by ORANGE COUNTY, ORANGE COUNTY is liable for such negligence under the doctrine of respondeat superior.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in in their favor as against Defendants named in each count, as follows:

   (A)     any and all actual, compensatory damages under Counts I through VII;

   (B)     pre-and post judgment interest as may be authorized by law;

   (C)     reasonable attorney's fees and costs under Counts I through VI; and

   (D)     any such further relief as may be just and fair

22

## DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 37, Plaintiffs hereby demand a trial by jury on all such

issues so triable on this 31ˢᵗ day of July, 2017.

JASON J. RECKSIEDLER, ESQUIRE
Florida Bar No.: 092060
NEJAME LAW, P.A.
189 S. Orange Avenue, Suite 1800
Orlando, FL 32801
Telephone:  407-500-0000
Facsimile:  407-802-1445
Email for service (FL R.Jud.Admin.2.516):
Primary email:          Jason@nejamelaw.com;
Secondary email:      Bianca@nejamelaw.com;
                                   Litigation@nejamelaw.com

*s/ Stephen J. Calvacca, Esquire*
STEPHEN J. CALVACCA, ESQUIRE
Florida Bar No.: 561495
NEJAME LAW, P.A.
189 S. Orange Avenue, Suite 1800
Orlando, FL 32801
Telephone:  407-500-0000
Facsimile:  407-245-2980
Email for service (FL R.Jud.Admin.2.516):
Primary email:  civilservice@nejamelaw.com;
Secondary email:      stephen@nejamelaw.com;
                                   darlene@nejamelaw.com