UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WILLINE BRYANT and MAX GRACIA, SR.,
as Co-Personal Representatives of the ESTATE
OF MAX GRACIA JR. II,

    Plaintiffs,

v.                                                       Case No. 6:17-cv-1423-Orl-31-KRS

ORANGE COUNTY, FLORIDA, ROBERT J.
BUCK, III, MARYANNE EVANS, KAREN
CLAIRMONT, ELSA GALLOZA-GONZALEZ,
And LYNN MARIE HARTER,

    Defendants.
_____/

**DEFENDANTS ORANGE COUNTY, ROBERT J. BUCK, III,
LYNN MARIE HARTER, AND ELSA GALLOZA-GONZALEZ'S
<u>MOTION TO DISMISS</u>**

**AND ORANGE COUNTY'S
<u>MOTION FOR EXTENSION OF TIME TO ANSWER THE NEGLIGENCE COUNT</u>**

COME NOW, Defendants ORANGE COUNTY, FLORIDA (the "COUNTY"), ROBERT J. BUCK, III ("DR. BUCK"), LYNN MARIE HARTER ("HARTER"), and ELSA GALLOZA-GONZALEZ ("GONZALEZ"), by and through undersigned counsel, and hereby file these, their Motion to Dismiss the Complaint filed by WILLINE BRYANT and MAX GRACIA, SR. ("Plaintiffs"), as Co-Representatives of the ESTATE OF MAX GRACIA JR. II (the "Decedent"), and the COUNTY's Motion for Extension of Time to Answer the Negligence Count as follows:

1. This is a 42 U.S.C. § 1983 civil rights action arising out of the Decedent's death while he was a pre-trial detainee at the jail facility known as Orange County Corrections ("OCC").

1

(Doc. 1 ¶ 2.) Plaintiffs have also alleged a state law negligence theory against the COUNTY.

2. The COUNTY owns the OCC, and it employed DR. BUCK, GONZALEZ, and HARTER among other separately-represented Codefendants. (*Id.* at ¶¶ 6, 7, 15, 16.) DR. BUCK "headed" the OCC's Health Services Department, GONZALEZ was a licensed Registered Nurse, and HARTER was a licensed Practical Nurse. (*Id.*)

3. Removing the "magic words" and legal conclusions from Plaintiffs' allegations leaves us with a garden variety negligence action, albeit with severe consequences. The actual alleged facts come nowhere close to establishing the sort of culpability required to meet the § 1983 threshold.

4. Tellingly, the Complaint is rife with rhetoric that various Defendants' alleged negligence "amount[ed] to deliberate indifference." (*E.g.*, *id.* at 6.) But no amount of negligence, which by definition is the failure to act with reasonable care, can ever "amount" to the specific and subjective intent required to establish *deliberate* indifference.

5. The federal causes of action should therefore be dismissed, and the case should be remanded to state court to address the negligence claim.

6. Meanwhile, the COUNTY concedes that a state law cause of action has been stated against it, though it naturally retains the right to deny all allegations and assert appropriate affirmative defenses. Consequently, the COUNTY requests that it be permitted to defer on filing an answer and affirmative defenses until it knows whether this case will remain in the federal forum and if the individual defendants will remain as Codefendants or mere witnesses. No prejudice would be visited upon Plaintiffs during the initial period of sorting out the claims at the pleading phase.

WHEREFORE, Defendants ROBERT J. BUCK, III, ELSA GALLOZA-GONZALEZ, and LYNN MARIE HARTER hereby respectfully request that they are dismissed from this action with prejudice (Counts II, V & VI), and Defendant ORANGE COUNTY, FLORIDA hereby respectfully requests that the federal cause of action against it be dismissed with prejudice (Count I) and the case remanded to state court for lack of independent federal subject matter jurisdiction.

## MEMORANDUM OF LAW

### I. *Twombly & Iqbal* require sufficiently alleged facts, not legal conclusions, to state a claim.

Modern federal motions to dismiss for failure to state a claim are governed by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Factual allegations are taken as true; legal conclusions are not. *Iqbal*, 556 U.S. at 678. "Threadbare recitals of elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. The plausibility test is drawn from "judicial experience and common sense." *Id.* The mere possibility of misconduct is not enough to state a claim. *Id.*

The Eleventh Circuit analyzed *Twombly/Iqbal* in a deliberate indifference/pretrial detainee context like ours and found that the plaintiff's "repeated allegations the Supervisory Defendants were deliberately indifferent or their actions constituted or resulted in deliberate indifference carry no weight." *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013). "Franklin has merely recited an element of a claim without providing the facts from which one could draw such a conclusion." *Id.* This was despite specific allegations that the offending corrections officer had sexually assaulted the plaintiff, had previously sexually assaulted a prior detainee, and had previously engaged in sexual relations with a third detainee. *Id.* Here,

3

Plaintiffs' facts are devoid of even the specificity deemed insufficient in *Franklin*. Dismissal is warranted.

We will begin by asking whether DR. BUCK, GONZALEZ, or HARTER are entitled to qualified immunity from suit. As will be seen, in the context of this case, that question turns on whether the Complaint alleges any constitutional violations in the first place. We will then ask whether Plaintiff has sufficiently alleged constitutional violations at the hands of the nurses who treated the Decedent in the infirmary. Finally, we will examine whether DR. BUCK, in his supervisory role, or the COUNTY, as the governmental body, can be constitutionally liable on what amounts to failure-to-train theories against them.

## II. DR. BUCK, GONZALEZ, and HARTER are entitled to qualified immunity.

Qualified immunity protects government officials performing discretionary functions from suit in their individual capacity unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Andujar v. Rodriguez*, 486 F.3d 1199, 1202 (11th Cir. 2007) (citations omitted). The immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Jordan v. Mosley*, 487 F.3d 1350, 1354 (11th Cir. 2007) (citations omitted).

*Dang ex rel. Dang v. Sherriff, Seminole Cnty. Fla.*, 856 F.3d 842 (11th Cir. 2017), restates the standards of qualified immunity in the pretrial detainee medical care context. The first step in the analysis requires the official to show that they were "acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Id.* at 849 (citing *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). A public official acts within their discretionary authority where their actions "(1) were undertaken pursuant to the performance of [their] duties, and (2) were within the scope of [their] authority." *Id.* (citations omitted). As in *Dang*, there can

4

be little doubt that DR. BUCK and Nurses HARTER and GONZALEZ were "acting within the course and scope of their discretionary authority in providing care" to the Decedent. *Id.* (further describing the statutory framework empowering licensed nurses to render care). The first prong is easily met.

Once the discretionary function test is satisfied, the burden shifts to the plaintiff to demonstrate: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation. *E.g.*, *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). While this two-prong test can itself be approached in either order, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), in the context of the present motion the second prong is more or less irrelevant. That is to say that if the Court finds that a constitutional violation has been alleged, we agree that the violated right was clearly established.

But the allegations amount to no more than negligence. Despite the Decedent's unfortunate death, the Complaint does not plausibly allege a tort of constitutional magnitude.

### III. The facts do not give rise to any constitutional claims.

"Deliberate indifference to a prisoner's serious medical needs is a violation of the Eighth Amendment," as applied to the States through the Fourteenth Amendment. *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007). Three elements are required to establish a § 1983 claim of this nature:

> First, [a plaintiff] must satisfy the objective component by showing that she had a serious medical need. Second, she must satisfy the subjective component by showing that the prison official acted with deliberate indifference to her serious medical need. Third, as with any tort claim, she must show that the injury was caused by the defendant's wrongful conduct.

*Id.* (citations omitted); *see also Dang*, 856 F.3d at 850 (same). Moreover, "medical treatment violates the constitution only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Dang*, 856 F.3d at 850.

At this stage only, and viewing all factual allegations in a light most favorable to Plaintiffs, the moving Defendants concede that the first and third prong of this test are met. Specifically, the moving Defendants recognize that Plaintiffs have sufficiently alleged that the Decedent had a serious medical need and that the failure to adequately treat it caused death. The question is therefore whether the facts could plausibly show that any of the individual defendants[1] were deliberately indifferent to the serious medical need. The Eleventh Circuit has articulated that deliberate indifference in the serious medical need context requires "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010) (citation omitted). The allegations do not allow this conclusion.

Preliminarily, and despite permitting that a serious medical need has been properly alleged, it is critical to recognize exactly what that need was – and when it developed. "A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Dang*, 856 F.3d at 850 (citation omitted). Plaintiffs allege that the "autopsy report stated that the cause of death was septic shock complicating infected dog bite wounds of lower extremity with human immunodeficiency virus infection as a contributory factor." (Doc. 1 ¶ 38.)

---

[1] While this motion is only brought on behalf of the COUNTY, DR. BUCK, GONZALEZ, and HARTER, the COUNTY could *theoretically* be liable for constitutionally failing to train Codefendants EVANS and CLAIRMONT as well, so the claims against those two will be analyzed herein. However, it should go without saying that the presently moving Defendants do not presume to speak for or otherwise bind the separately-represented EVANS and CLAIRMONT.

However, the Complaint does *not* allege that the medical personnel were indifferent to the Decedent's HIV status. (*See id.* at ¶¶ 21-51.) In fact, the Complaint only identifies GONZALEZ and CLAIRMONT as even being aware of that status. (*Id.* at ¶¶ 41, 43.) Rather, the focus of the allegations is the Defendants' alleged failure to <u>identify</u> and respond to a quickly progressing, acute infection from the dog bite. Obviously, no human can deliberately ignore a condition they are unaware of.

Notably, Plaintiffs acknowledge that the Decedent was only admitted to the OCC infirmary "after being treated at the Orlando Regional Medical Center for dog bites to his legs and hands incurred during his arrest earlier that day." (*Id.* at ¶ 21.) It is therefore altogether <u>im</u>plausible to believe that the Decedent was in any state of medical emergency upon admittance; the hospital had just discharged him. DR. BUCK saw the Decedent at the time of admission and did not see him again. (*Id.* at ¶¶ 22-23.) DR. BUCK therefore cannot logically be considered to have acted with deliberate indifference to the Decedent's yet-to-be-developed serious medical need.

Nothing of any concern is alleged to have occurred over the Decedent's first two days in the infirmary. (*Id.* at ¶¶ 21-29.) Indeed, Plaintiffs merely accuse GONZALEZ, a Registered Nurse, of "failing to obtain vital signs on August 7, 2015 and August 8, 2015." (*Id.* at ¶ 40.) Emphatically, this at worst would constitute a failure to adhere to an appropriate standard of care. *See Dang*, 856 F.3d at 851 ("Dang argues that [Nurse] Wilt should have taken his vital signs, but does not suggest why that was necessary or should have been helpful.").[2] The first

---

[2] We are aware that this Court denied all *Dang* defendants' motion to dismiss prior to granting summary judgment. *See Nam Dang v. Sherriff of Seminole Cnty., Fla.*, 38 F.Supp.3d 1333 (M.D. Fla. 2014). However, the allegations there demonstrated a twenty-nine day period of decline, including a 101.5°F fever on the fifteenth day that was itself eight days after fever onset. *Id.* at 1338. In response to a medical emergency on the twenty-seventh and twenty-eighth days,

sign of anything going remotely wrong began at 5:13 p.m. on August 8, when it was documented that the Decedent had vomited twice. (*Id.* at ¶ 30.) And while Plaintiffs again complain that GONZALEZ "did not obtain vital signs" at that point, they do not suggest that GONZALEZ had actual knowledge of a <u>serious</u> medical condition. (*Id.* at ¶ 40.)

Similarly, the following morning Plaintiffs allege that CLAIRMONT, another Registered Nurse, documented that the Decedent's wound "was reddened with a large amount of bloody drainage." (*Id.* at ¶ 31.) CLAIRMONT attended to the wound, just as GONZALEZ had several times over the preceding days. (*Id.* at ¶¶ 25-31.) A few hours later, GONZALEZ noted that the Decedent "complained of weakness and dizziness." (*Id.* at ¶ 32.) She notified EVANS, an Advanced Registered Nurse, of this development – demonstrating <u>attentiveness</u> to worsening <u>symptoms</u>, quite the opposite of <u>indifference</u> to a known <u>condition</u>. (*Id.* at ¶¶ 32, 41.) In turn, on August 9, EVANS "ordered an increased fluid intake." (*Id.* at ¶ 32.) EVANS therefore also demonstrated at least some attentiveness by ordering particularized care, and certainly not care that "shocks the conscience." In fact, Plaintiffs can only allege that had EVANS reevaluated the Decedent at that time, she "more likely than not" would have identified the medical emergency and sent the Decedent back to the hospital. (*Id.* at ¶ 44.) But implicitly, this demonstrates that <u>no one knew there was a medical emergency</u>. There therefore was no serious medical need anyone could have possibly deliberately ignored.

The final critical events apparently began around 9:00 p.m. on August 9 and culminate at 5:15 a.m. the following day – or roughly eight hours later. (*Id.* at ¶¶ 33-36.) At 11:54 p.m., newly on the scene HARTER, a licensed Practical Nurse, merely allegedly documented that the

---

nurses responded to the plaintiff's "medical alert" by sending him back to general population. *Id.* at 1338-39. Those allegations survived dismissal but not summary judgment; our allegations, describing an emergency that materialized over the course of a single night, do not make it that far.

Decedent refused to "get up for his evening medications." (*Id.* at ¶ 33.) Given the benefits of hindsight, we now unfortunately can see that the Decedent was deteriorating, but there is no plausible basis to infer that HARTER subjectively recognized and ignored any emergency.

Plaintiffs' allegations relating to CLAIRMONT during the night of August 9-10 are less clear. (*Id.* at ¶¶ 34-36.) Plaintiffs seem to allege that CLAIRMONT backdated various entries as part of some conspiratorial "cover-up of the total lack of care" leading to the Decedent's death. (*Id.*) But the alleged backdating is to the effect that the Decedent was "refusing all treatment." (*Id.* at ¶ 35.) Any constitutional impact is foreclosed by *Dang*, where Nurse Roberts discovered the plaintiff "unconscious, drooling, non-verbal, and unable to sit up." 856 F.3d at 852. Nurse Roberts assessed the plaintiff and "incorrectly believed Dang's behavior was voluntary," but the Eleventh Circuit clarified that "mere negligent misdiagnosis is not a constitutional violation." *Id.* (citation omitted). In fact, Nurse Roberts encountered these symptoms during a Code Orange medical emergency regarding Dang *weeks* into a fever, *id.*; nothing of the sort was reported regarding the Decedent.

In any event, Plaintiffs appear to describe CLAIRMONT allegedly observing the Decedent "twisting himself and moaning loudly on the bed" at 9:00 p.m. August 9. (Doc. 1 at ¶ 34.) Then at some other point on August 9, CLAIRMONT allegedly wrote that the Decedent was "refusing to follow corrections officers' orders … [and that] [the Decedent] continued to lie on the floor on his back, 'refusing all treatment.'" (*Id.* at ¶ 35.) These are strikingly similar to *Dang*, but again *Dang* considered a pattern of behavior and alarmingly progressive symptoms over nearly a month, and we contemplate a single night.

Moreover, Plaintiffs' actual allegations of CLAIRMONT's wrongdoing merely speak to various steps she could-or-should-have taken; *i.e.*, obtain vital signs, "conduct a proper physical

9

assessment," and "notify a more senior and credentialed provider about [the Decedent]'s changing condition." (Doc. 1 ¶ 42.) At the risk of repetition, deliberate indifference is not some heightened form of negligence – the care must shock the conscious – and nothing suggests that CLAIRMONT actually knew that a serious medical situation was underway over the course of a single night. *Cf. also Goebert*, 510 F.3d at 1328 (where jail captain was aware the plaintiff had been leaking amniotic fluid for nine days, that her baby had not moved for several days, and that jail doctor had recommended that she see an obstetrician).

Simply put, Plaintiffs' allegations give rise to various charges of medical negligence at worst. And once the interwoven legal conclusions are peeled away, Plaintiffs have come well short of stating a viable § 1983 claim. The Decedent's death was not caused by tortious conduct of constitutional dimensions, and this case should be dismissed in its entirety and remanded to state court.

The following analysis is only necessary if the Court disagrees and determines that at least one individual could be guilty of a constitutional tort. *See Dang*, 856 F.3d at 853 ("In light of the Court's determination that there was no constitutional deprivation, there is no basis for supervisor liability."); *see also City of Los Angeles v. Heller*, 475 U.S. 796 (1986) (where no constitutional violation is found, "the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point").

**IV.    No § 1983 "supervisory liability" claim has been stated against DR. BUCK.**

"It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). "Instead, to hold a supervisor liable a plaintiff must show that the supervisor either directly participated in the

unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." *Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1047-48 (11th Cir. 2014).  "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Id.* (citation omitted).  Not surprisingly, this standard is "extremely rigorous." *Id.* (citing *Cottone*, 326 F.3d at 1360).

DR. BUCK actually did have direct contact with the Decedent but only at initial admission. (Doc. 1 ¶ 22.)  At the time, the Decedent had just been discharged from the hospital, and there is no conceivable reading of the allegations to infer that DR. BUCK had reason to know that a serious medical condition existed.  Plaintiffs expressly allege that DR. BUCK "never saw or inquired about [the Decedent] again."  (*Id.* at ¶ 23.)  DR. BUCK's liability, if any, can therefore only be grounded on his role as "head" of the OCC's Health Services Department.  (*Id.* at ¶ 7.)

Reading *Twombly/Iqbal* and the "extremely rigorous" *Cottone* standard together, it then becomes blindingly apparent that Plaintiffs have not stated a plausible cause of action against DR. BUCK.  Plaintiffs have alleged no <u>factual</u> widespread medical abuse of detainees of an "obvious, flagrant, rampant, … continued duration"; in fact, they have not even alleged a single "isolated occurrence[]."  *See Keith/Cottone*, *supra*.  They have instead merely provided "threadbare" allegations showing a "possibility of misconduct" that are rendered implausible when "judicial experience and common sense" is applied.  *See Iqbal*, *supra*.

The constitutional allegations against DR. BUCK come terrifically short of stating a cause of action.

### V.     No *Monell* § 1983 claim has been stated against the COUNTY.

Originating with *Monell v. Department of Social Services*, 436 U.S. 658 (1978), there has been no paucity of case law establishing the requirements of § 1983 civil rights claims against government agencies. "A municipality or other local government may be liable under this section if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citations omitted). "But, under § 1983, local governments are responsible only for their *own* illegal acts." *Id.* (emphasis added) (citation omitted). "They are not vicariously liable under § 1983 for their employees' actions." *Id.*

"[L]ocal government" in this sense, and the COUNTY in our case, means "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread to actually have the force of law." *Id.* This assures that governments are only held financially responsible for constitutional violations they directly cause. *See id.* This deeply entrenched doctrine prevents taxpayers from answering for the conduct of rogue government agents. Taxpayers instead only answer for the constitutional deprivations caused by their duly elected representatives.

Unquestionably aware of these well-established standards, Plaintiffs here have alleged the following general bases for COUNTY liability, without any reference to specific facts:

- The COUNTY had a "custom or practice … of deliberate indifference to the serious medical needs of disabled and injured inmates, notwithstanding written protocols to the contrary";

- The COUNTY "specifically acquiesced to its medical staff not properly doing rounds, [etc.], amounting to an official dereliction of policy";

- The COUNTY "failed to adequately and properly train … with respect to the proper evaluation of inmates suffering under disabilities," etc.;

- The COUNTY "failed to adequately monitor and evaluate [employees'] performance … with respect to the proper evaluation of inmates suffering under disabilities"; and

- The COUNTY "failed to properly fund and staff OCC … to ensure an appropriate amount of licensed, trained and qualified medical professionals are present," etc.

(Doc. 1 ¶¶ 57-59.) These allegations are much too vague and conclusory to establish a valid *Monell* claim in light of *Twombly/Iqbal*. Plaintiffs essentially assert that the COUNTY did not train or monitor its medical staff with respect to inmates with preexisting conditions. "Failure to train" § 1983 liability has only been recognized in limited circumstances since *City of Canton v. Harris*, 489 U.S. 378 (1989), and we are not in the ballpark.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 at 51. It is therefore "ordinarily necessary" that a plaintiff demonstrate a pattern of similar violations to break the deliberate indifference barrier. *Id.* at 62 (citation omitted). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

*Connick*'s facts are instructive for our purposes. *Connick* asked whether a single *Brady* violation could establish deliberate indifference on the part of the respective prosecutor's office.[3] *Id.* at 63; *see also generally Brady v. Maryland*, 373 U.S. 83 (1963). The Court held that it could not because it could not have been obvious, based on a single incident, that specially trained

---

[3] The named defendant was the actual district attorney, but the case only proceeded against him in his official capacity and against his office. 563 U.S. at 54. At least in the Eleventh Circuit (if not everywhere), suit against an individual in his or her official capacity is the equivalent of suit against the agency. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) ("[W]hen an officer is sued under Section 1983 in his or her official capacity, the suit is simply another way of pleading an action against the entity of which an officer is an agent.") (citation omitted). *Connick* therefore considers government agency liability in the failure to train context, not supervisory liability that is separately applicable to DR. BUSH.

13

employees (namely, attorneys) would require additional training to carry out their jobs. *Connick*, 563 at 63-68. The Court distinguished hypothetical facts involving wholly untrained officers which might suffice to state a failure to train § 1983 claim. *See id.* at 64 ("There is no reason to assume that police academy applicants are familiar with the constitutional constraints of deadly force. And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require."). In contrast, for attorneys, "recurring constitutional violations are not the obvious consequence of failing to provide prosecutors with formal in-house training about how to obey the law." *Id.* at 66 (citation omitted).

Our case involves the alleged failure to train licensed medical professionals on how to make rounds, administer medical orders, and otherwise handle "inmates suffering under disabilities or conditions which require medical stabilization." (Doc. 1 at pp. 16-17.) DR. BUCK is a medical doctor, and the four other individual Defendants are all licensed nurses. (Doc. 1 ¶¶ 13-14). The Complaint is silent as to any prior incidents involving other "disabled" or perhaps medically sensitive pretrial detainees who suffered during their incarceration at OCC. The vague allegations epitomize the sort of facts that "do not permit the court to infer more than the mere possibility of misconduct," alleging but not "show[ing] that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (2009).

In short, it is neither plausible nor sufficiently alleged that COUNTY *policymakers* were actually aware that medically-sensitive detainees, however that might be defined, were routinely suffering from substandard care. Nor is it plausible or sufficiently alleged that these unknown policymakers consciously ignored this amorphous suffering. Rather, Plaintiffs merely track caselaw buzzwords peppered with conclusions of deliberate indifference. It bears repeating that the allegation that a supervisory official is deliberately indifferent is afforded "no weight."

*Franklin*, 738 F.3d at 1251.  The Complaint fails to state a federal cause of action against the COUNTY, and Count I should be dismissed.

**VI.   The COUNTY should be afforded fourteen days from the date of the Order resolving this motion to file its answer and affirmative defenses, if necessary.**

Rule 6 provides district courts with broad discretion to extend deadlines.  *See also Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 896-97 (1990).  Given the uncertainty of federal subject matter jurisdiction in light of the pending motion to dismiss, the COUNTY respectfully requests that it be allowed to await the results before filing its answer and affirmative defenses.

## CONCLUSION

It is unfortunate that the Decedent's rapid deterioration was not detected and treated immediately.  At worst, the attendant providers were negligent.  But these allegations do not give rise to a plausible inference that any of them were deliberately indifferent to a serious medical need.  Respectfully, all federal causes of action should be dismissed with prejudice.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September **1**, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record to date.

> */s Derek J. Angell*
> DENNIS R. O'CONNOR, ESQ.
> Fla. Bar No.
> doconnor@oconlaw.com
> RONALD L. HARROP, ESQ.
> Fla. Bar No. 260584
> rharrop@oconlaw.com
> DEREK J. ANGELL, B.C.S.
> Fla. Bar No. 73449
> dangell@oconlaw.com
> O'CONNOR & O'CONNOR, LLC
> 840 S. Denning Dr., Ste. 200
> Winter Park, Florida 32789