lUNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**WILLINE BRYANT and MAX GRACIA, SR. ,**

    **Plaintiffs,**

**v.**  Case No: 6:17-cv-1423-Orl-31KRS

**ORANGE COUNTY, FLORIDA, ROBERT J. BUCK, III , MARYANNE EVANS, KAREN CLAIRMONT, ELSA GALLOZA-GONZALEZ and LYNN MARIE HARTER,**

    **Defendants.**

## ORDER

This matter comes before the Court on Defendant Clairmont's Motion to Dismiss (Doc. 31); Defendant Evans' Motion to Dismiss (Doc. 32); the Motion to Dismiss filed by Defendants Buck, Gonzalez, Harter, and Orange County ("Collective Motion") (Doc. 33); the Response in Opposition filed by the Plaintiffs (Doc. 40); and the Reply filed by Defendants Buck, Gonzalez, Harter, and Orange County (Doc. 41).

**I.  Background**

   **A. Facts as Alleged in the Complaint**

During his arrest on August 6, 2015, Max Gracia, Jr. ("the Decedent") suffered dog bite wounds to his hands and legs. Amend. Compl., Doc. 29, ¶ 21. Although the Decedent received multiple dog bites on both his hands and legs, at least some of which were severe, the Plaintiffs do

not seek any relief with respect to the initial dog bite injuries themselves.[1] The Decedent received some treatment for those wounds at Orange County Regional Medical Center, and later on the day of his arrest, the Decedent was admitted to the Health Services Department, also known as Corrections Health Services ("CHS") of Orange County Corrections ("OCC"). *Id.*

The Decedent's injuries resulted in an assignment to the Infirmary as his housing unit at OCC. *Id.* ¶ 22. Around the time of his admission to the Infirmary, Defendant Robert Buck III, M.D. ("Buck") evaluated the Decedent and noted that he "had multiple dog bites with severe flesh involvement." *Id.* In addition to diagnosing multiple dog bites, Buck put the Decedent back on his seizure medication, prescribed antibiotics and pain medications, including ibuprofen and Tylenol #3, and noted that, upon verification that the Decedent "had been compliant in the community," Atripla[2] should be ordered. *Id.* ¶ 22-23. Buck did not order Atripla for the Decedent, and according to the Plaintiffs, "Buck never saw or inquired about [the Decedent] again." *Id.* ¶ 23. A summary of what happened to the Decedent next, based on the facts alleged in the Amended Complaint, follows.

On August 7, 2015, the Decedent's "wounds were cleaned and dressed" by Defendant Elsa Galloza-Gonzalez ("Gonzalez").[3] *Id.* ¶ 25. At that time, at least one of his wounds was "reddened with scant serosanguineous drainage present." *Id.* At some point on the same day, Defendant

---

[1] The Plaintiffs filed suit as co-personal representatives of the estate of the Decedent.

[2] Although not detailed in the Complaint, Atripla is apparently an antiviral medication used to treat HIV infections. *What is Atripla?*, ATRIPLA, http://www.atripla.com/about/ (accessed December 28, 2017).

[3] This was recorded in a Nursing Treatment Note, completed at 5:20 PM on August 7, 2015.

Karen Clairmont ("Clairmont") allegedly saw the Decedent, but did not obtain his vital signs or perform any physical assessment.[4] *Id.* ¶ 26.

On August 8, 2015, the Decedent was educated about the risk of infection and was told to increase his fluid intake.[5] *Id.* ¶ 27. The Decedent's wound dressing was changed, and Gonzalez again noted that the wound on his left leg was "reddened with scant serosanguineous drainage."[6] *Id.* ¶ 28. The Decedent vomited twice, and no vital signs were taken, but the Decedent was later given odansetron.[7] Although the wound was reddened and the Decedent complained of vomiting, Gonzalez recorded that he showed "no signs or symptoms of infection." *Id.* ¶ 28, 29.

On August 9, 2015, at 6:35 AM, the dressing on the Decedent's left leg wound was changed. The wound was reddened and had "a large amount of bloody drainage."[8] *Id.* ¶ 30. The Decedent complained of dizziness and weakness, and at some point that morning, his vital signs were taken for the first time in fifty-five hours, revealing tachycardia[9] of 131 and a respiratory

---

[4] This was recorded in a Nursing Progress Note, completed at 7:07 AM on August 8, 2015.

[5] This was recorded by Gonzalez in a Nursing Progress Note, completed at 11:38 AM on August 8, 2015.

[6] This was recorded in a Nursing Treatment Note, completed at 4:59 PM on August 8, 2015.

[7] This was recorded by Gonzalez at 5:13 PM on August 8, 2015. Defendant Maryanne Evans ("Evans") co-signed the order for odansetron at 5:00 PM on August 9, 2015. It is unclear whether the Decedent was given odansetron before or after the order was co-signed.

[8] This was recorded by Clairmont in a Nursing Progress Note, completed at 6:38 AM on August 9, 2015. The Note had the exact same language as the one recorded by Clairmont on the previous day. *Id.* ¶ 31.

[9] "Tachycardia occurs when an abnormality in the heart produces rapid electrical signals that quicken the heart rate, which is normally about 60 to 100 beats a minute at rest." *Tachycardia*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/tachycardia/symptoms-causes/syc-20355127 (accessed January 5, 2018).

rate of 22. *Id.* ¶ 32. In response to his abnormal vital signs, Evans ordered an increased fluid intake.[10] *Id.* The Decedent's vital signs were never taken again. *Id.* At 9:00 PM, the Decedent twisted and moaned loudly in bed, said that he "can't do it," and fell to the ground.[11] *Id.* ¶ 37. At some point prior to 9:54 PM, the Decedent "refused to get up for his evening medications."[12] *Id.* ¶ 33.

At around 11:16 PM on August 9, 2015, an officer and two supervisors came to transfer the Decedent to a different housing unit. *Id.* ¶ 35. At the time, the Decedent was unresponsive, groaning lethargically, and laying on the floor. *Id.* Clairmont was present and told the officers that he was "'faking or exaggerating his medical condition and inability to get up.'" *Id.* The officer and two inmate workers physically moved the Decedent to a cell with a recording camera, in order to "'ascertain the validity of his proclaimed illnesses.'" *Id.* The Decedent was documented as compliant. *Id.* However, a disciplinary report was filed against the Decedent because he "refus[ed]" to follow orders in connection with the transfer; instead, the Decedent lay on his back on the floor and "refus[ed] all treatment."[13] *See id.* ¶ 38.

---

[10] This was recorded by Gonzalez in a Nursing Progress Note, completed at 10:29 AM on August 9, 2015. Thus, it appears that Evans ordered the increased fluid intake prior to co-signing the odansetron order. *See supra* n.7 and accompanying text.

[11] This was recorded by Clairmont at 3:13 AM on August 10, 2015.

[12] This was recorded by Lynn Marie Harter ("Harter") in a Nursing Note, completed at 9:54 PM on August 9, 2015.

[13] This was recorded by Clairmont in a Nursing Progress Note, completed at 3:35 AM on August 10, 2015.

On August 10, 2015, at 2:58 AM, a corrections investigator tried to "interrogate" the Decedent with respect to the disciplinary report. *Id.* ¶ 36. The Decedent was unable to reply to the corrections investigator. *Id.*

At approximately 5:15 AM, an officer informed Clairmont that the Decedent was not breathing.[14] *Id.* ¶ 39. Clairmont observed the Decedent on his back in bed, with no pulse or respirations; at that time, efforts to revive the Decedent began and continued until EMS arrived and transported the Decedent at 5:48 AM. *Id.* At 6:09 AM, the Decedent was pronounced deceased at Orlando Regional Medical Center. *Id.* ¶ 40. An Autopsy Report concluded that the manner of his death was homicide, due to his incarceration, and that the cause of death was "septic shock complicating infected dog bite wounds" with HIV as a contributory factor. *Id.* ¶ 41.

### B. Procedural History

On September 18, 2017, the Plaintiffs filed the Amended Complaint. Doc. 29. Count I alleges a § 1983 claim against Orange County, Count II alleges a § 1983 claim against Buck, Count III alleges a § 1983 claim against Evans, Count IV alleges a § 1983 claim against Clairmont, Count V alleges a § 1983 claim against Gonzalez, Count VI alleges a § 1983 claim against Harter, and Count VII alleges a medical malpractice claim against Orange County.[15]

Defendants Clairmont and Evans each filed individual motions to dismiss on October 2, 2017. Docs. 31, 32. That same day, Defendants Orange County, Buck, Gonzalez, and Harter filed a collective motion to dismiss ("Collective Motion"). Doc. 33. The Plaintiffs filed a Response on

---

[14] This was recorded by Clairmont in a Nursing Progress Note, completed at 8:02 AM on August 10, 2015.

[15] Orange County concedes that a state law cause of action has been stated against it for purposes of the Collective Motion. Doc. 33 at 2.

October 31, 2017, and Defendants Orange County, Buck, Gonzalez, and Harter filed a collective Reply on November 15, 2017. Docs. 40, 43.

**II.     Standard of Review**

In ruling on a motion to dismiss, the Court must view the complaint in the light most favorable to the Plaintiff, *see, e.g., Jackson v. Okaloosa County, Fla.*, 21 F.3d 1531, 1534 (11th Cir. 1994), and must limit its consideration to the pleadings and any exhibits attached thereto. *See* Fed. R. Civ. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993). The Court will liberally construe the complaint's allegations in the Plaintiff's favor. *See Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). However, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "courts must be mindful that the Federal Rules require only that the complaint contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " *U.S. v. Baxter Intern., Inc.*, 345 F.3d 866, 880 (11th Cir. 2003) (citing Fed. R. Civ. P. 8(a)). This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action. *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001). However, a plaintiff's obligation to provide the grounds for his or her entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554–555 (2007). The complaint's factual allegations "must be enough to raise a right to relief above the speculative level," *id.* at 555, and cross "the line from conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).

**III.   Analysis**

   **A.   Legal Standards**

"To survive a motion to dismiss based upon qualified immunity, the plaintiff must have alleged sufficient facts to support a finding of a constitutional violation of a clearly established law." *Chandler v. Sec'y of Florida Dep't of Transp.*, 695 F.3d 1194, 1198 (11th Cir. 2012). Otherwise, qualified immunity protects government officials who were acting within their discretionary authority. *Franklin v. Curry*, 738 F.3d 1246, 1249 (11th Cir. 2013). There is no dispute as to whether the Defendants were acting within the scope of their discretionary authority, nor is there a dispute as to whether, if the Defendants did in fact violate the Decedent's constitutional rights, those constitutional rights were clearly established at the time of the violations. Accordingly, the sole question before the Court on the matter of qualified immunity is whether the Plaintiffs have alleged the violation of a constitutional right.

A claim for relief under § 1983 requires that the Plaintiff allege a "deprivation of an actual constitutional right." *McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999). "It is well settled that the deliberate indifference to serious medical needs of prisoners" constitutes a violation of the Eighth Amendment. *Id.* (internal quotation marks omitted). Therefore, to establish a claim in this context under § 1983, the Plaintiff must allege (1) a serious medical need, (2) deliberate indifference to that need by the Defendants, and (3) a causal connection between Defendant's deliberate indifference and Plaintiff's injuries. *See Hatten v. Prison Health Services, Inc.*, 2006 WL 4792785 (M. D. Fla. Sept. 13, 2006). For purposes of the Motions to Dismiss, Clairmont, Buck, Harter, Gonzalez, and Orange County have conceded that the Plaintiffs have met the third component, and Evans does not dispute this. Accordingly, the Court addresses only the first two components.

Because, in this particular case, the analyses for whether the Defendants are entitled to qualified immunity and whether the Plaintiffs have failed to state a claim for relief under § 1983 both turn on whether the Plaintiffs have properly alleged the violation of a constitutional right, the Court combines its discussion of the two issues.

### B. Violation of a Constitutional Right

#### 1. Serious Medical Need

For purposes of their motions to dismiss, Clairmont, Orange County, Buck, Harter, and Gonzalez have conceded that the Plaintiffs have met this objective component. Doc. 31 at 5; Doc. 33 at 6.[16] Evans appears to argue that her treatment of the Decedent nineteen hours before his death somehow "establish[es] the objective component that Max Gracia, Jr. did not have a serious and obvious medical need." Doc. 32 at 6-7.

Here, there can be little doubt that the Decedent presented a serious medical need.

> In our circuit, a serious medical need is considered one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. In either of these situations, the medical need must be one that, if left unattended, poses a substantial risk of serious harm.

*Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (internal quotation marks and citations omitted); *see also Carswell v. Bay Cnty.*, 854 F.2d 454, 457 (11th Cir. 1988) (noting that where some medical care was provided but diagnosis was incorrect and worsening symptoms were ignored, serious medical need could have been found by jury).

---

[16] Oddly, those Defendants still take time to argue that HIV-positive status cannot constitute a serious medical need "without upsetting the entire body of relevant case [] law." Doc. 33 at 7. On the contrary, HIV has been recognized as a serious medical need by the Eleventh Circuit and the Middle District of Florida. *McMillan v. Hunter*, 2007 WL 570180, at *3 (M.D. Fla. Feb. 20, 2007) (citing *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004)).

### 2. Deliberate Indifference

In *Farmer v. Brennan*, the Supreme Court held:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

511 U.S. 825, 837 (1994) (explaining the meaning of "deliberate indifference" to a risk of harm to an inmate). The Eleventh Circuit has taken this to mean that deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence. *see Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010) ("claim of deliberate indifference requires proof of more than gross negligence"); *Farrow*, 320 F.3d at 1246–47 ("This substantial and inordinate delay in treatment raises a jury question as to [the defendant physician's] deliberate indifference towards [the plaintiff's] serious medical need." (internal quotations and citations omitted)). Importantly, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842.

Obviously, the success of the Plaintiffs' claims will ultimately depend on what the Defendants knew about the Decedent's medical condition and why they did little if anything to address it. But at this stage, the Plaintiffs do not need to persuade the Court that the Defendants acted in deliberate indifference to the Decedent's medical needs. As Clairmont points out, "[t]he question is . . . whether the facts could plausibly show that any of the individual Defendants were deliberately indifferent to the serious medical need." Doc. 31 at 5-6. It is possible that this tragedy was borne of innocent unawareness, negligent miscommunication, or well-intentioned

misdiagnosis. However, viewing the Amended Complaint in the light most favorable to the Plaintiffs, it is also plausible that the Defendants acted with deliberate indifference in delaying to or failing to attend to the Decedent's serious medical need.

### *Summary of the Individual Defendants*

While the Court examines the alleged actions of each individual Defendant for purposes of the deliberate indifference analysis, the collective knowledge possessed and actions taken by the individual Defendants together as a medical team merit some discussion. Viewing the Amended Complaint in the light most favorable to the Plaintiffs, all of the individual Defendants were aware of the Decedent's HIV positive status and his dog bite wounds, and thus were aware of the elevated risk for infection. The Decedent's deterioration cannot be described as asymptomatic. He experienced and reported nausea, vomiting, and weakness. In addition to those symptoms, there were visible signs of his worsening condition: the amount of drainage from the reddened wound increased, and that increase was noted and documented. When his vital signs were finally taken, he had an elevated heart rate of 131 and a respiratory rate of 22; where infection is probable, a heart rate higher than 90 and a respiratory rate higher than 20 are sufficient for a sepsis diagnosis.[17] The extent of the "treatment" provided to the Decedent following the reveal of his troubling vital signs was an order for an increased fluid intake. *See* Doc. 29 ¶ 32. No one ever took his vital signs again during the short remainder of his life. Even when the Decedent was unresponsive and groaning on the floor, the primary concern was apparently moving him to a cell with a camera so that evidence of any malingering could be captured in support of the disciplinary

---

[17] *Compare* Doc. 29 ¶ 32 *with Sepsis: Overview*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/sepsis/symptoms-causes/syc-20351214?p=1 (accessed January 2, 2018). The Center for Disease Control's website directs those looking for information on sepsis to the cited Mayo Clinic summary of sepsis. *See* https://www.cdc.gov/sepsis/basic/index.html (accessed January 2, 2018).

report filed against him. While no one re-checked the Decedent's vital signs, his "refusal" to get up and take his medication was repeatedly documented, and arrangements were made for an investigator to interrogate the Decedent in his cell. It is unclear whether the Decedent was dead or alive during the interrogation attempt, but even if he was still alive, he was certainly fewer than three hours away from drawing his last breath.

### *Defendant Clairmont*

Contending that the Plaintiffs' allegations focus on a failure to diagnose and respond to the Decedent's infection, Defendant Clairmont states that "no human can deliberately ignore an undiagnosed condition they are unaware of." Doc. 31 at 6. That undiagnosed condition, according to Defendant Clairmont, is "a quickly progressing, acute infection from the dog bite complicated by HIV." Doc. 31 at 6. While a formal diagnosis would show a medical need, a medical need can certainly exist in the absence of a formal diagnosis. To accept the argument advanced by Defendant Clairmont would be to perversely incentivize complete denial of medical care in certain situations.[18] A medical professional cannot bury her head in the sand, fail to obtain a diagnosis for an obvious medical need, and avoid liability. Indeed, under some circumstances, the fact that a condition is undiagnosed may *itself* be evidence that there was deliberate indifference. Deliberate indifference requires subjective knowledge of a risk; it does not require the Defendants to have been certain that the Decedent had a life-threatening infection.[19]

---

[18] For example, here, the logical extension of Defendant Clairmont's argument is that, if the defendants were cautious and attentive enough to diagnose the infection, they would have been *more* susceptible to liability for deliberate indifference than they are under the instant facts.

[19] Notably, however, it appears that such certainty may have been plausible even with only the information that Clairmont had, at least after the Decedent displayed abnormal vital signs. *See supra* n.17 and accompanying text.

On August 8, 2015, the Decedent vomited twice. Doc. 31 at 8. The morning after the Decedent experienced vomiting, Clairmont "attended to the wound," and allegedly documented that the "wound 'was reddened with a large amount of bloody drainage.'" Doc. 31 at 8. On August 9, the Plaintiff alleges that Clairmont told corrections officers that the Decedent, who was "lying on the floor groaning in a lethargic manner" was "faking or exaggerating." Doc. 29 ¶ 35. Clairmont's Motion compares her actions to those of a defendant nurse in *Dang v. Seminole County*, a recent Eleventh Circuit case. *See* 871 F.3d 1272 (11th Cir. 2017). In *Dang*, a nurse believed that an inmate was voluntarily appearing unconscious, drooling, and acting as though he was unable to speak or sit up. *Id.* at 1282. However, that nurse performed an assessment of the inmate; took his vital signs, which were normal; and admitted the inmate to the infirmary, where he would be seen by doctors. *Id.* Here, taking the facts in the Complaint as true, Clairmont did nothing of the sort, despite the Decedent's abnormal vital signs earlier that day and the large amount of bloody drainage that Clairmont herself documented.

While the Eleventh Circuit has held that mere negligent misdiagnosis is not a constitutional violation, misdiagnosis of an illness obviously does not immunize prison officials from § 1983 liability. Deliberate indifference toward a serious medical need can plausibly be present where there is a "misdiagnosis" such as the one here. Even to the extent that labeling an HIV positive prisoner who suffered from a severe dog bite as "faking" symptoms of sepsis could be considered a misdiagnosis and not something more nefarious, the Court has no reason to assume that Clairmont truly believed the Decedent was faking. It is the allegations in the Amended Complaint that the Court must take as true, not the self-serving arguments made by the Defendants. The Plaintiffs have properly stated a claim against Defendant Clairmont.

*Defendant Gonzalez*

Contending that Gonzalez responded to the Decedent's vomiting by notifying a provider and prescribing specific treatment, the Collective Motion asserts that the Plaintiffs "do not suggest that Gonzalez had actual knowledge of a <u>serious</u> medical condition and ignored it with impunity." Doc. 33 at 8 (emphasis in original). Gonzalez also notified Evans of Decedent's complaints of weakness and dizziness, and the Collective Motion points to that course of action as evidence of "attentiveness." However, the Plaintiffs specifically alleged that Gonzalez knew how dangerous the Decedent's condition was, but failed to continue to monitor him, even though she documented that she would do so. Doc. 29 ¶ 45. The Collective Motion argues that Gonzalez's failure to obtain vital signs "at worst would constitute a failure to adhere to an appropriate standard of care." Doc. 33 at 8. This argument is a truism: any deliberate indifference to an obvious medical need would constitute a failure to adhere to an appropriate standard of care. Certainly, it is plausible that the facts that show a failure to adhere to an appropriate standard of care could also show deliberate indifference. Here, the Plaintiffs have plausibly alleged that Gonzalez's actions constituted deliberate indifference.

**Defendant Harter**

Allegedly, Harter made notes that the Decedent "refused to 'get up for his evening medications.'" Doc. 33 at 9. The Collective Motion argues that Harter's actions do not provide a sufficient basis for pleading that she was deliberately indifferent to the Decedent's serious medical need. According to the Plaintiffs, the Decedent did not get up for his evening medications because he was so weak that he was physically incapable of getting out of bed. Doc. 40 at 11. The Plaintiffs claim that Harter knew that the Decedent "was immunocompromised and was at serious risk for infection due to his wounds," Doc. 29 ¶ 51, yet disregarded that risk in failing to provide

care for the Decedent. *Id.* ¶ 90-94. Viewing the Amended Complaint in the light most favorable to the Plaintiffs, Harter was aware that the Decedent was at a serious risk of infection, but Harter did nothing when the Decedent did not get up to take medication, notwithstanding the fact that the Decedent had abnormal vital signs earlier that day, and had complained of weakness, dizziness, and vomiting. The Plaintiffs' allegations raise the right to relief above the speculative level here; it is plausible that Harter acted with deliberate indifference to the Decedent's serious medical need.

### *Defendant Evans*

Evans argues that she was not deliberately indifferent because she responded to the Decedent's complaints and provided treatment that she believed was appropriate at the time. Doc. 32 at 10. Like Clairmont, Evans attempts to analogize to a nurse in the *Dang* case who failed to take the inmate's vitals. However, that nurse performed a physical assessment of the inmate, and there was no indication that obtaining the inmate's vital signs would have been helpful, as his vital signs were normal thirty-six hours later. *Dang*, 871 F.3d at 1281. Evans contends that the Amended Complaint "does not plead that Evans had a subjective knowledge of risk of serious harm to [the Decedent] or sufficient facts to make that claim plausible." Doc. 32 at 5. The Second Amended Complaint does indeed plead sufficient facts to make such a claim plausible; the Plaintiffs aver that Evans "knew [the Decedent] was immunocompromised and was at serious risk for infection due to his wounds." Doc. 29 ¶ 51. Despite this knowledge, the Plaintiffs allege, Evans failed to evaluate the Decedent and was responsible for his discharge from the infirmary. Doc. 29 ¶ 46. The Plaintiffs have plausibly alleged that Evans was deliberately indifferent to the Decedent's serious medical need.

*Defendant Buck*

While § 1983 does not permit *respondeat superior* liability, a supervisor can be held liable where a plaintiff shows "that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." *Keith v. DeKalb Cty.*, 749 F.3d 1034, 1047-48 (11th Cir. 2014). The Plaintiffs can show a causal connection by showing that "the supervisor's policy or custom resulted in deliberate indifference." *Franklin v. Curry*, 738 F.3d 1246, 1249 (11th Cir. 2013) (internal quotation marks omitted). The Collective Motion protests that Buck only had direct contact with the Decedent when the Decedent was first admitted, and that he therefore had no reason to know a serious medical condition existed. Doc. 33 at 12. The Plaintiffs allege that Buck was actually aware of the Decedent's severe wound and HIV positive status, yet he never followed up with the Decedent in any way. *See* Doc. 29 ¶ 21-23. Thus, the Plaintiffs' allegations are not limited to Buck as a supervisor, but include Buck's actions as an "individual provider." *See* Doc. 40 at 15. Buck need not have been continuously aware of updates to the Decedent's condition to have been deliberately indifferent to a serious risk of harm to the Decedent, because he already knew of the severe wound and the HIV positive status, which together constituted the serious risk of harm. *Cf. Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1324 (11th Cir. 2016) (explaining that the defendants' unawareness of additional factors that would have enhanced their knowledge of the risk of harm did not negate the fact that they already knew of a risk of serious harm apart from those factors). The fact that he failed to follow up is not proof positive of deliberate indifference, to be sure, but based on the Plaintiffs' allegations, it is plausible that Buck was deliberately indifferent to the Decedent's serious medical need.

*Defendant Orange County*

In *Monell v. Dept. of Soc. Servs. of New York*, the Supreme Court rejected the proposition that municipalities can be held liable under the doctrine of *respondeat superior*. 436 U.S. 658, 694 (1978). Instead, a plaintiff is required to show that the Constitutional injury alleged was the result of a custom or policy. *Id.* Where no stated policy exists, a plaintiff must show that there was a pattern of deliberate indifference that is "so widespread as to have the force of law." *Bd. of Cnty. Comm'rs of Bryan Cnty v. Brown*, 520 U.S. 397, 404 (1997); *see also Craig v. Floyd Cnty.*, 643 F.3d 1306, 1310–11 (11th Cir. 2011). Municipal liability may be based on a claim of inadequate training where "a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants such that the failure to train can be properly thought of as a city policy or custom that is actionable under § 1983.*" Albra v. City of Ft. Lauderdale*, 232 Fed. App'x 885, 890 (11th Cir. 2007) (citations omitted).

The Plaintiffs allege that the Decedent's death was the result of "an unwritten policy of allowing documentation to be minimized to twice a week unless there was a change in the patient's medical condition." Doc. 29 ¶ 63. Additionally, the Plaintiffs aver that the "facility was medically understaffed, presumably due to budgetary concerns." *See id.* However, because there is no stated policy, the Plaintiffs would need to plausibly allege that there was a widespread pattern of deliberate indifference. The Plaintiffs have not done so. Accordingly, the Collective Motion to Dismiss is **GRANTED** as to Count I.

**IV. Conclusion**

The Defendants describe this tragedy as a mere misdiagnosis. In a sense that may be correct. While the Decedent lay dying in his cell on August 10th, the camera rolled as the

Defendants pursued their diagnosis of malingering. Faced with objective evidence of a serious medical need, an unfounded diagnosis of malingering is the epitome of deliberate indifference.

For the foregoing reasons, it is hereby **ORDERED** that Defendant Clairmont's Motion to Dismiss (Doc. 31) and Defendant Evans's Motion to Dismiss (Doc. 32) are **DENIED**. The Collective Motion to Dismiss (Doc. 33) is **GRANTED** as to Count I and **DENIED** as to all other Counts. Count I is **DISMISSED** without prejudice. If Plaintiffs wish to amend their Complaint as to Count I, they must do so by January 22, 2018. Orange County's Motion for Extension of Time to Answer the State Law Claim (Doc. 33) is **GRANTED**, and Orange County is hereby afforded fourteen (14) days from the date of this Order to file its answer and affirmative defenses. The other Defendants shall also answer the Amended Complaint within fourteen (14) days.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on January 8, 2018.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party