**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

WILLINE BRYANT a/k/a WILLINE GRACIA
and MAX GRACIA SR.,  as
Co-Personal Representatives of
the Estate of MAX GRACIA JR., II,

Plaintiffs,                                  CASE NO:  6:17-CV-1423-ORL-31-KRS

v.

ORANGE COUNTY, FLORIDA,
ROBERT J. BUCK, III,
MARYANNE EVANS,
KAREN CLAIRMONT,
ELSA GALLOZA-GONZALEZ, and
LYNN MARIE HARTER,

Defendants.

                                                                              /

**PLAINTIFFS' SECOND AMENDED COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

COME NOW, WILLINE BRYANT a/k/a WILLINE GRACIA and MAX

GRACIA SR. ("Plaintiffs"), as Co-Personal Representatives of the Estate of MAX

GRACIA JR., II ("Gracia or Decedent"), by and through their undersigned counsel, and

hereby file, pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure,[1] this Second

Amended Complaint against ORANGE COUNTY, FLORIDA; ROBERT J. BUCK, III;

MARYANNE EVANS; KAREN CLAIRMONT; ELSA GALLOZA-GONZALEZ; and

LYNN MARIE HARTER (collectively "Defendants" or, with the exclusion of ORANGE

COUNTY, "Individual Defendants") and respectfully state as follows:

---

[1]   The amendment of Count I against ORANGE COUNTY is by leave of Court  (Doc. 44, p. 17)
and the amendment to include a demand for punitive damages is upon the written consent of all
Individual Defendants.

## INTRODUCTION

1.     Plaintiffs bring this civil rights action to redress the deprivation of rights, privileges and immunities secured to Decedent by the Due Process Clause of the Fourteenth Amendment of the United States Constitution and actionable through Title 42 U.S.C. Section 1983, along with the related action for wrongful death under applicable state law.

## PARTIES

2.     Plaintiffs, WILLINE BRYANT a/k/a WILLINE GRACIA (mother) and MAX GRACIA SR. (father) are the biological parents of Decedent, who was 22 years of age at the time of his death, and were duly appointed Co-Personal Representatives of the ESTATE OF MAX GRACIA JR., II, by the General Sessions Court, Probate Division of Orange County, Florida on August 17, 2016, File No. 2015-CP-2511.

3.     Defendant ORANGE COUNTY, FLORIDA ("ORANGE COUNTY") is a municipal corporation and government entity located in Central Florida, in the Middle District of Florida, operating by virtue of the laws of the State of Florida and was responsible for the care, custody, health and well-being of Gracia during his custody and confinement at Orange County Corrections.

4.     At all times material, ORANGE COUNTY maintained, operated and administered the jail facility known as Orange County Corrections ("OCC"). ORANGE COUNTY failed to institute and provide appropriate policies and training to regulate the conduct of its medical personnel at OCC with regard to inmates or pretrial detainees who were in obvious medical decline. Even in the wake of documented prior instances of death and exacerbated injury arising from a lack of adequate training with respect to detainees in obvious medical decline as more fully set forth in Count I, ORANGE COUNTY consciously failed to take remedial action until after the tragic and avoidable death of

2

Decedent. ORANGE COUNTY's conscious failure to provide better training to OCC's medical staff in dealing with detainees in medical decline therefore became the custom or practice of ORANGE COUNTY and contributed to the establishment of a "culture of neglect" amounting to deliberate indifference to the health and safety of detainees, including Gracia.

5.     As used in this Second Amended Complaint, "deliberate indifference to the health and safety of Decedent" means that each of the Individual Defendants named herein (a) had subjective knowledge of a risk of serious harm to Gracia that actually existed based upon his known medical condition; (b) acted or failed to act in disregard of said risk; (c) by conduct or omissions that amount to more than negligence or even gross negligence.  A substantial and inordinate delay in treatment can satisfy the third prong, even in the absence of any intent by the provider to cause the injury, and can be actionable under 42 U.S.C. 1983 where such delay in treating a known risk of serious harm proximately causes the injury. In this case, the deliberate indifference by the Individual Defendants, as more fully set forth elsewhere in this Second Amended Complaint, to the known risk of harm to Gracia proximately caused his death.

6.     At all times material, ORANGE COUNTY maintained, operated and administered OCC's Health Services Department known as Corrections Health Services (hereinafter "CHS") headed by ROBERT BUCK, III, M.D. ("BUCK"). ORANGE COUNTY failed to institute or provide appropriate training and procedures to regulate the conduct of medical personnel at OCC to ensure that detainees in obvious medical decline be given proper attention and medical care.

7.     ORANGE COUNTY was and is responsible for the operation of OCC/CHS including, but not limited to the following:

    i.       establishing policies and procedures to regulate the conduct of employees of OCC/CHS and enforcing same, including providing adequate training to its medical staff in dealing with detainees in obvious medical decline;

    ii.      establishing the appropriate budget for OCC/CHS;

    iii.     approving specific expenses for OCC/CHS, including personnel training, staffing and medical equipment and testing expenses; and

    iv.     ensuring that employees of OCC/CHS obeyed the laws of the United States and the State of Florida.

8.     ORANGE COUNTY, through OCC/CHS, had a duty to ensure that the conditions of confinement and the health and safety of persons incarcerated at OCC/CHS, including Gracia, are in compliance with the Fourteenth Amendment of the United States Constitution and the laws of the United States and the State of Florida.

9.     ORANGE COUNTY is the local governmental entity that was ultimately responsible for the care, custody, health and well-being of Gracia when he presented to the jail and was held in custody.

10.     Under 42 U.S.C. 1983, as more fully set forth in Count I below, ORANGE COUNTY is liable by virtue of its negligent and inadequate training of its medical staff where ORANGE COUNTY's deliberate and conscious failure to properly train its medical employees in dealing with inmates and detainees in obvious physical or mental decline evidenced a deliberate indifference to the rights of its inmates and detainees such that the conscious failure to adequately train can properly be thought of as an agency or municipal custom or policy that is actionable under section 1983. As further set forth under Count I, ORANGE COUNTY, based on prior similar incidents, knew of the need to train and or/supervise its medical staff in dealing with inmates and detainees in obvious physical or

mental decline yet made a conscious choice not to provide such necessary training or supervision, all of which proximately caused the tragic and avoidable death of Decedent.

11.     Under 42 U.S.C. 1983, as more fully set forth in Counts II through VI below, said Individual Defendants are individually liable to the extent their acts and omissions constituted a deliberate indifference to the health and safety of Decedent. Under applicable state law, as more fully set forth in Count VII below, ORANGE COUNTY is liable for the actions and omissions of its medical staff employees which constituted medical malpractice under the doctrine of *respondeat superior.*

12.     Defendant BUCK ("BUCK"), a licensed physician, at all times material served as the Medical Director of Corrections Health Services Department (CHS) which provide healthcare to inmates and detainees at OCC/CHS. At all times material hereto, BUCK acted under color of state law in the course and scope of his employment or agency with ORANGE COUNTY. Given his directorship of the Corrections Health Services Department, BUCK also acted as a policy maker for CHS and ORANGE COUNTY in supervising and training members of the medical staff.

13.     Defendant MARYANNE EVANS ("EVANS") was at all times material an agent or employee of ORANGE COUNTY who worked at OCC/CHS as an Advanced Registered Nurse Practitioner. At all times material hereto, EVANS was responsible for providing medical and nursing care to inmates and detainees at OCC/CHS and acted under color of state law in the course and scope of her employment with ORANGE COUNTY.

14.     Defendant KAREN CLAIRMONT ("CLAIRMONT") was at all times material an agent or employee of ORANGE COUNTY who worked at OCC/CHS as a licensed Registered Nurse. At all times material hereto, CLAIRMONT was responsible for

providing medical and nursing care to inmates and detainees at OCC/CHS and acted under color of law in the course and scope of her employment or agency with ORANGE COUNTY.

15.     Defendant ELSA GALLOZA-GONZALEZ ("GONZALEZ") was at all times material an agent or employee of ORANGE COUNTY who worked at OCC/CHS as a licensed Registered Nurse. At all times material hereto, GONZALEZ was responsible for providing medical and nursing care to inmates and detainees at OCC/CHS and acted under color of state law in the course and scope of her employment with ORANGE COUNTY.

16.     Defendant LYNN MARIE HARTER ("HARTER") was at all times material an agent or employee of ORANGE COUNTY who worked at OCC/CHS as a licensed Practical Nurse. At all times material hereto, HARTER was responsible for providing medical and nursing care to inmates and detainees at OCC/CHS and acted under color of state law in the course and scope of her employment with ORANGE COUNTY.

17.     At all times material, Gracia was a pretrial detainee in custody at OCC/CHS under the care and control of ORANGE COUNTY when he died in his jail cell on August 10, 2015 as a result of the Defendants' actions and omissions as more specifically set forth below. Gracia's primary healthcare provider was BUCK, the only doctor who attended him at OCC, who was assisted by numerous members of his medical staff including the remaining Individual Defendants.

18.     The potential beneficiaries of any recovery in this action and the relationship each to Decedent are: (1) WILINE BRYANT a/k/a WILINE GRACIA, Decedent's natural mother; (2) MAX GRACIA SR., Decedent's natural father; and (3) THE ESTATE OF MAX GRACIA JR.

## JURISDICTION AND VENUE

19.     Subject matter jurisdiction is proper under 28 U.S.C. 1331 in that the action herein arises under a federal statute, 42 U.S.C. 1983. Venue is proper in this district under 28 U.S.C. 1391 because Defendants are located or reside in the Middle District of Florida. Venue is also proper in this district where all of the events giving rise to the claim occurred.

20.     All conditions precedent to the filing of this action, including compliance with Fla. Stat. Sections 766.106, 766.203, and 768.28(6), have been performed or have been waived.

## FACTUAL BACKGROUND

21.     Gracia was admitted to the OCC/CHS on August 6, 2015 after being treated at the Orlando Regional Medical Center for dog bites to his legs and hands incurred during his arrest earlier that day.

22.     Gracia was initially assigned to the Infirmary as his housing unit due to his injuries. BUCK also evaluated Gracia around this same time for his admission to the Infirmary. BUCK noted that Gracia, who was known by the entire medical staff at OCC to have been HIV positive, had multiple dog bites with severe flesh involvement. The diagnoses included multiple dog bites. It is noted that Gracia was "put back on his Depakote for seizures." Other medications ordered include Augmentin, an antibiotic; ibuprofen, a pain medication; and Tylenol #3, a pain medication.

23.     BUCK documented that OCC/CHS nursing staff needed to verify Gracia's Atripla to see if he had been compliant in the community. If he was, the Atripla was to be ordered. There is no documentation in the health record that this verification occurred, and

the Atripla was never ordered for Gracia, although it was known he was HIV positive. BUCK never saw or inquired about Gracia again.

24. On August 7, 2015 at 1708 hours, EVANS, the most senior credentialed non-physician provider treating Gracia, completed a Clinical List Update and changed the documentation of Gracia's problem in the health record to include the location of the wounds--left posterior thigh and calf--and added a new order of wound care. There is no physical assessment noted and no indication that EVANS actually saw Gracia.

25. On August 7, 2015 at 1720 hours, GONZALEZ completed a Nursing Treatments note for wound care. No vital signs were obtained at that time. Gracia's wounds were cleaned and dressed. It is noted that the wound was reddened with scant serosanguineous drainage present.

26. On August 8, 2015 at 0707 hours, CLAIRMONT documented on a Nursing Progress Note that she saw Gracia on August 7, 2015 and he was tolerating the medication without complaint. There was no recordation on the Nursing Note to indicate the time of the nursing evaluation. Notably however, no vital signs were obtained and no physical assessment was done.

27. On August 8, 2015 at 1138 hours, GONZALEZ completed a Nursing Progress Note about Gracia that documented that he had removed his dressing to take a shower prior to the nurse coming to do his wound care. Again, no vital signs were taken and no physical assessment was done. Patient education included the risk of infection and to increase his fluid intake. Gracia had no complaints per the Nursing Note. GONZALEZ' nursing plan was to continue to monitor Gracia.

28.    On August 8, 2015 at 1659 hours, GONZALEZ completed a Nursing Treatment Note about Gracia's daily wound care. She noted that the wound on his left leg was reddened with scant serosanguineous drainage. The dressing was changed and GONZALEZ noted that there were no signs or symptoms of infection.

29.    On August 8, 2015 at 1713 hours, GONZALEZ documented that Gracia complained of vomiting twice. Again, no physical assessment was conducted and no vital signs were obtained. GONZALEZ notified a provider and odansetron was ordered and given. GONZALEZ documented that she would continue to monitor Gracia. Nurse Practitioner EVANS co-signed this order on August 9, 2015 at 1700 hours.

30.    On August 9, 2015 CLAIRMONT documented that Gracia's dressing of his left posterior thigh wound was changed at 0635 hours. She documented that the wound was reddened with a large amount of bloody drainage. The technique used was non-sterile, and the procedure was poorly tolerated by Gracia.

31.    On August 9, 2015 at 0638 hours, CLAIRMONT completed a Nursing Progress Note that indicated Gracia was doing well with a clean, dry and intact dressing. Once again, there were no vital signs obtained and no physical assessment was done. This note is verbatim the same note that CLAIRMONT wrote on August 7, 2015 at 0707 hours.

32.    That same day, August 9th, at 1029 hours, GONZALEZ completed a Nursing Progress Note in which she documented that Gracia complained of weakness and dizziness. Vital signs were obtained that included an accelerated heart rate of 131 (tachycardia), a blood pressure of 111/56, respirations of 22, oxygen saturation of 98%, and a temperature of 97.4 °F. This was the first time that vital signs were obtained in the previous 55 hours. It was also the last time vital signs were obtained before Gracia was

found dead in his cell in the early morning hours of August 10, 2015. Notwithstanding his abnormally high heartbeat, no physical assessment was done. GONZALEZ notified EVANS, who ordered an increased fluid intake. GONZALEZ stated that extra fluid was given and that she would "continue to monitor Gracia."

33.     Later that same day, August 9th, at 2154 hours, HARTER documented in a Nursing Note that Gracia refused to get up for his evening medications. She unilaterally documented that a "refusal" was done, without any signed refusal by the patient, as though Garcia was being intentionally non-compliant as opposed to simply being too weak to get off his bed and take his medications, as was in fact the case. No vital signs were obtained by HARTER, even though his vital signs obtained by another nurse eleven (11) hours earlier on August 9th were clearly problematic and indicative of tachycardia.

34.     Incredulously, nothing whatsoever was done by HARTER to further evaluate Gracia's medical status, provide care and treatment or elevate him to a higher level of care at an outside medical facility. It was clear, as was obvious to HARTER and the medical staff at OCC/CHS at the time of her observation, that Gracia was declining rapidly. This conduct or failure to act by HARTER both deviated from the appropriate standard of care and evinced a deliberate indifference to the safety and health of Decedent. Rather than act as his healthcare provider, HARTER, later joined by CLAIRMONT, chose to adopt the role of his adversary and refused or deliberately failed to provide any further medical attention until he was found eight (8) hours later in his cell with no detectable pulse or respiration by a corrections officer during breakfast service.

35.     Shortly before midnight on August 9, 2015, a correctional officer and two supervisors came to the cell which housed Gracia to effect his transfer from the infirmary

to a general population housing unit, 3B. According to reports by both Officer Vargas and his tour supervisor, Cpl. Garrett, Garcia was lying on the floor groaning in a lethargic manner and appeared unresponsive to their commands. CLAIRMONT was present for this interface. She rendered no medical assistance or evaluation whatsoever. Instead, she advised the officers that Gracia was "faking or exaggerating his medical condition and inability to get up." Eventually, with the help of two inmate workers, Officer Vargas was able to move Gracia to an adjacent cell (#19) in the Medical 1B unit "where a recording camera [had been] installed in order to better ascertain the validity of his proclaimed illnesses," according to the report filed by Vargas. This occurred at approximately 2316 hours on August 9th without any force or resistance from the lethargic Gracia who was noted as being "compliant" to whatever extent his physical abilities permitted.

36.     Even after the move, neither CLAIRMONT nor any other medical staff member made any attempt to assess or evaluate the medical condition of Gracia.  At that point a decision had been made to file disciplinary charges against Gracia and apparently terminate all medical assistance.  Approximately three hours later, on August 10th at 0258 hours, a corrections investigator attempted to interrogate Gracia in cell #19 regarding this matter but Gracia was unable to reply.  It is not known whether Gracia was dead or alive at that point and no one attempted to ascertain his condition.  It is not known whether this development was reported to medical staff members who presumably were monitoring his condition through the camera in his cell.  ORANGE COUNTY has not yet provided a copy of the video to undersigned counsel for their inspection.  Nonetheless, during the five hours Gracia was in cell #19 being monitored by camera, neither CLAIRMONT nor any other

medical staff member made any attempt to attend or assess their medical patient until it later was reported at 0511 hours on August 10th that Gracia was no longer breathing.

37.     On August 10, 2015 at 0313 hours, CLAIRMONT retrospectively documented that at 2100 hours on August 9, 2015, Gracia was observed twisting himself and moaning loudly on the bed. He stated that he "can't do it" and slid to the floor. Again, there is no explanation in the medical records as to why no care or treatment was rendered to Gracia in those fateful eight (8) hours.

38.     Less than 25 minutes later, at 0335 hours on August 10th, CLAIRMONT retrospectively created a second document, a Nursing Progress Note dated August 9, 2015 regarding Gracia's alleged behavior—refusing to follow corrections officers' orders regarding a pending move to 3B— which resulted in the filing of a "DR" (Disciplinary Report) against Gracia.  She claimed that Gracia continued to lie on the floor on his back, "refusing all treatment." Upon information and belief, these belatedly documented "observations" and false characterizations by the medical staff at OCC/CHS were part of a cover-up of the total lack of care rendered to Gracia during the critical hours preceding his otherwise avoidable demise. It is both notable and curious, to say the least, that while CLAIRMONT was generating these retrospective notes at 3 o'clock in the morning on August 10th, she could have been attending or looking in on her patient whose condition had obviously declined dramatically in the preceding several hours.

39.     Later that same day, August 10th, at 0802 hours, CLAIRMONT created yet another retrospective Nursing Progress Note to the effect that an officer had notified her earlier, at approximately 0515 hours that Gracia was not breathing. According to the Note, when she arrived, Gracia was lying supine in the bed without a pulse or respiration.

Cardiopulmonary resuscitation efforts were initiated and continued until EMS arrived and assumed care of Gracia. She documented that Gracia was transported by EMS at 0548 hours on August 10, 2015. Upon information and belief, Gracia was already dead in his prison cell before he was even transported by EMS.

40.     Gracia was brought to the Orlando Regional Medical Center where he was pronounced deceased on August 10, 2015 at 0609 hours. Although CLAIRMONT was involved in the unsuccessful CPR efforts, she did not prepare any contemporaneous reports or nursing notes until more than two hours had lapsed.

41.     On August 10, 2015 at approximately 1100 hours, an autopsy was performed by Dr. Gary Lee Utz, Chief Medical Examiner in the District Nine Office of the Medical Examiner. The autopsy report stated that the cause of death was septic shock complicating infected dog bite wounds of lower extremity with human immunodeficiency virus infection as a contributory factor. The manner of death was listed as a "homicide" due to his arrest and incarceration.

42.     The care and treatment or lack thereof provided by CLAIRMONT to Decedent from August 8, 2015 to August 10, 2015 while he was incarcerated at the jail deviated from the acceptable medical and nursing standard of care, and rose to the level of deliberate indifference given what CLAIRMONT knew of Gracia's declining medical condition from August 8th at approximately 5 PM when he started vomiting through the early morning hours of August 10th when he was found dead in his cell after being totally unattended by medical staff for nearly eight (8) hours during which time he was under the direct care of CLAIRMONT.

43.     When CLAIRMONT returned for her shift on the evening of August 9, 2015, Gracia's condition had worsened to the point that he was writhing on the bed and refusing all assistance and medication. Instead of contacting a more credentialed provider, she chose to ignore his obvious and serious health condition. CLAIRMONT did not attempt to reevaluate Gracia or even check on his condition at *any* time during her shift, even though she knew he was immunocompromised and at serious risk for infection. She should have contacted a more credentialed provider immediately about his deteriorating condition; she should have reviewed his health records and noted that the last vital signs obtained were patently abnormal with no contemporaneous follow-up and informed a more credentialed provider of those abnormal vital signs as well. Had CLAIRMONT taken any of those steps, Garcia would have been sent immediately to the hospital. Instead, he was found with no pulse or respiration eight (8) hours later in his cell. CLAIRMONT's inexplicable failure to act in the face of known risk rose to the level of deliberate indifference when she chose to ignore the clearly deteriorating condition of Gracia.

44.     GONZALEZ deviated from the appropriate standard of care by failing to properly monitor and/or identify the deterioration in Gracia's physical and mental status; by failing to contact a provider regarding her observations; and by failing to obtain vital signs on August 7, 2015 and August 8, 2015. In addition, on August 8th, Gracia complained of vomiting, and still GONZALEZ did not obtain vital signs. She also failed to properly assess Gracia for his complaint. GONZALEZ did not re-evaluate Gracia after she medicated him for vomiting.

45.     On the morning of August 9, 2015 at 1029 hours, GONZALEZ obtained abnormal vital signs for Gracia but failed to conduct a proper physical assessment at that

time. While she did contact a more senior and credentialed provider, she failed to follow-up with Gracia throughout the remainder of her shift to ascertain whether his condition changed. This failure rose to the level of deliberate indifference as GONZALEZ knew that Gracia was immunocompromised and was at significant risk for infection, and had a dangerously rapid heart rate that would have serious consequences if allowed to continue, and she did nothing. She should have had gone back to monitor Gracia's condition as she documented in her nursing plan that she would do and confirm Gracia's worsening condition, rather than simply ignoring him. Instead, Gracia was not seen until more than ten (10) hours later, at approximately 2100 hours that evening, at which time his condition had deteriorated such that he was twisting and moaning in bed and refusing all assistance.

46.    EVANS deviated from the standard of care for an Advanced Registered Nurse Practitioner when she failed to evaluate Gracia when notified that he was vomiting, and then again the next day when he had a heart rate of 131 and respirations of 22. She failed to document her plan of care for Gracia when she ordered anti-emetic medication on August 8, 2105. On August 9, 2015 at 0500 hours when she co-signed the medication order, EVANS failed to review Gracia's chart and failed to act upon information in the chart that noted his abnormal vital signs with no re-evaluation. She should have immediately evaluated Gracia and sent him to the hospital for further evaluation and care. Instead, EVANS failed to evaluate Gracia, and he was found approximately 12 hours later in his jail cell with no pulse and no respiration. Upon information and belief, EVANS was responsible for discharging Gracia from the infirmary at some unknown point in time without any medical evaluation and directing that he be sent to the general population where the level of care would be significantly compromised, which was one of the

specifications against her resulting in issuance of a written reprimand in the aftermath of Gracia's death.

47.     These acts and omissions by EVANS constituted a deliberate indifference to the health and safety of Gracia. EVANS was later terminated in June 2016 after being overheard by a corrections officer and another detainee in responding to one of her patients who had been asking about follow-up care regarding his injured foot as follows: "I'm so tired of that damn foot. Fuck you and that foot, you piece of shit. I hope you die in jail and never get out again."

48.     At all times during Gracia's incarceration, ORANGE COUNTY, acting through the Orange County Corrections Health Services (CHS), under the directorship of BUCK, was in charge of the healthcare program at OCC/CHS. As the Medical Director for CHS and ORANGE COUNTY, BUCK was both a supervisor and a policy maker responsible to ensure that the care provided to the individuals at OCC/CHS was appropriate and timely, and provided by staff who were properly trained. BUCK and CHS failed in these responsibilities when the care rendered to Decedent fell significantly below the standard of care and rose to the level of an agency-wide deliberate indifference to his serious medical condition. These failures are the legal responsibility of ORANGE COUNTY for the reasons set forth in paragraphs 49 through 53 below and in Count I.

49.     ORANGE COUNTY, through CHS and BUCK, failed to properly train its medical staff in the assessment, identification and treatment of inmates and pretrial detainees in decline with patently observable serious medical or psychological conditions. A complete assessment by nursing staff or by a more senior and credentialed provider was not conducted on Gracia when he was complaining of vomiting and dizziness, when his

vital signs deviated significantly from normal, indicative of both tachycardia and the onset of sepsis, and when he could not even lift himself off his bed or get off the floor, all of which clearly indicated that Gracia's condition was worsening.

50.     ORANGE COUNTY, through CHS and BUCK, failed to appropriately supervise medical staff to ensure that they were adhering to the applicable standard of care in the medical community. The tragic and avoidable death of Decedent was the proximate result of ORANGE COUNTY's conscious decision to withhold adequate training and supervision of members of its medical staff at OCC despite knowledge that such better training and supervision was necessary in view of several prior incidents which caused the deaths of other inmates or detainees over a course of many years at the jail facility as further developed in Count I.

51.     Defendants CLAIRMONT, GONZALEZ, EVANS and HARTER, along with others who were on duty during Gracia's incarceration, due in part to a lack of training and supervision by OCC/CHS, consistently failed to monitor his vital signs and periodically assess and evaluate him, even though they knew he was immunocompromised and was at serious risk for infection due to his wounds.

52.     ORANGE COUNTY, through CHS and BUCK, failed to monitor the medication practices at the OCC/CHS, and as a result, the medication Gracia needed for his life-threatening chronic disease, Atripla, was never verified and ordered. If CHS had been conducting appropriate monitoring of their staff through a CQI program and peer review, they would have been aware that their nurses were not conducting appropriate assessments and interventions for their patients. CHS would have been aware that nursing staff were not verifying medication appropriately. If CHS and BUCK had been monitoring

the care rendered by their providers, they would have discovered that EVANS was not evaluating patients whose clinical status was worsening, was ordering medications and other treatments without evaluating the patient, was discharging infirmary patients to the general population with no documented assessment and was not reviewing the patients' charts before signing off on verbal orders.

53.    CHS and BUCK should have addressed these and other deficiencies through more adequate education and training long before Gracia was a patient at OCC based on known prior similar incidents which had resulted in either death or exacerbation of injury of other inmates or detainees in the past as set forth in paragraph 61 below. Instead, ORANGE COUNTY, acting through CHS and BUCK, consciously chose to ignore these historically known educational and training deficiencies. Had adequate training been provided to the medical staff at OCC, Gracia would have received appropriate and thorough care, his obviously worsening condition would have been confronted sooner, and he would have been appropriately sent to a higher level of care facility before he was found dead in his jail cell.

### COUNT I
### 42 U.S.C. 1983 CLAIM AS AGAINST ORANGE COUNTY

54.    Plaintiffs hereby incorporate by reference paragraphs 1-53 of this Second Amended Complaint as though more fully set forth herein.

55.    At all times relevant herein, Defendant ORANGE COUNTY, acting institutionally and through the Individual Defendants, was performing a traditional and discretionary, as opposed to ministerial, local governmental function in operating a correctional facility and was a state actor. All the actions and omissions alleged herein were performed under color of state law.

56.     At all times relevant to the events giving rise to this cause of action, Gracia was a pretrial detainee at OCC/CHS.

57.     ORANGE COUNTY was responsible for Gracia's well-being while he was in custody at the OCC/CHS since he did not have the ability to obtain medical treatment on his own or provide for his own well-being.

58.     ORANGE COUNTY had a constitutional duty under the Fourteenth Amendment of United States Constitution to provide Gracia with the basic necessities of life, including, but not limited to, food, shelter, observation and proper medical care.

59.     ORANGE COUNTY is liable under 42 U.S.C. 1983, as the primary policy maker, for tolerating and not correcting, a custom or practice to exist of deliberate indifference to the serious medical needs of inmates or detainees in obvious physical or mental decline. This laxity created a "culture of neglect" as an implied custom or policy of the agency. ORANGE COUNTY's knowledge of prior similar incidents, as identified in paragraph 61 below, which resulted in the deaths of inmates or detainees at OCC under similar circumstances and ORANGE COUNTY's conscious failure to properly train its medical staff to avoid repeated, unnecessary deaths of inmates or detainees in medical or mental decline manifest a deliberate indifference on the part of ORANGE COUNTY to the health and safety of those under its care and custody, including Decedent.

60.     ORANGE COUNTY routinely acquiesced to its medical staff not properly doing rounds, not properly documenting a detainee's medical conditions, not properly supervising and administering medical orders; all of which amounted to a policy of deliberate indifference to the health and safety of detainees under its care, including Decedent. As set forth below, other similar instances of harm have previously occurred

that had put ORANGE COUNTY on notice of the need for more adequate training of its medical staff when dealing with inmates or detainees in medical or mental decline, which ORANGE COUNTY consciously failed to implement. Said failure by ORANGE COUNTY to properly train OCC/CHS' medical staff resulted in the deliberate indifference on the part of the Individual Defendants in failing to attend or treat Decedent, which proximately resulted in his death.

61. Further investigative efforts by undersigned counsel subsequent to the filing of the previous operative complaint revealed a significant prior history of deliberate indifference by the medical staff at OCC which resulted in the death or exacerbation of injury of several inmates or pretrial detainees at OCC over the past nearly 30 years who were in obvious physical or mental decline. Consider the following court filings:

(a) On December 28, 1997, Martin Romero Torres, a detainee at Orange County Corrections with known physical and mental impairments, was found dead in his cell after having been left unattended for a period of hours. According to the complaint filed in the United States District Court for the Middle District of Florida, Orlando Division, when Torres' body was discovered, it was in full rigor mortis. The complaint (Doc. 1, pp. 21-23) alleged a violation of 42 U.S.C. 1983 against numerous members of the medical staff at the jail facility as well as Orange County itself for employing a custom or policy of violating standard operational policies and procedures which resulted in deliberate indifference to decedent's serious medical and psychiatric needs. *See Torres v. Orange County, Florida, et al.* Case No. 6:99-cv-01662-ACC.

(b) On October 5, 2000, Michael Ray Williams, a detainee at Orange County Corrections, was found dead in his cell after being denied proper medical attention and

treatment for his known asthmatic condition about which he made requests for medical treatment to no avail. According to the complaint (Doc. 1) filed in the United States District Court for the Middle District of Florida, Orlando Division, cries for help from fellow detainees went unheeded as Williams, gasping for air, slipped into unconsciousness and ultimate death. *See Estate of Williams v. Orange County, Florida, et al.* Case No. 6:02-civ-00788-ACC.

(c)  From January 22 through January 31, 1998, Albert Ponds, an inmate at Orange County Corrections known to be HIV positive, complained about severe diarrhea, abdominal pain and bleeding hemorrhoids but was not seen by a doctor at the jail facility until January 26, 1998, at which time a cursory and inadequate assessment was performed. According to the complaint (Doc. 2), which was originally filed in state court and then removed to United States District Court for the Middle District of Florida, Orlando Division, Pond's situation progressed to the point where he required emergency transfer to Florida Hospital on January 31, 1998. Because of the delay in assessment and treatment at the jail facility, Pond's condition worsened to the point where he required extensive hospitalization and three surgical procedures resulting in permanent disfigurement and other injuries. (Doc. 2, pp. 6-13). *See Ponds v. Orange County, Florida, et al.* Case No. 6:00-cv-01202-PCF.

(d)  On December 30, 1989, Ricky Richardson, an HIV positive inmate at Orange County Corrections, was found unconscious in his cell, apparently as a result of heat exhaustion after having been tied up and strapped between two mattresses for  alleged security reasons. He was rushed to Orlando Regional Medical Center where he was pronounced dead within the hour. Richardson was running a potentially fatal 108° fever at

the time of his death and had been denied access to medical care until he became unconscious. *See Richardson v. Orange County, Florida, et al.* Case No. 6:90-cv-00160-PCF.

62.     A review of certain Rule 26 materials provided subsequent to the filing of the previous operative complaint in this case revealed a long overdue recognition by ORANGE COUNTY regarding the lack of adequate training of CHS's medical staff, for whom BUCK, as Medical Director of CHS, was a policy maker for ORANGE COUNTY with respect to the training of medical staff dealing with inmates or detainees in obvious physical or mental decline. The new training and protocol requirements, outlined below, were only put into effect on November 30, 2015, or more than 3 months after the tragic and avoidable death of Decedent, notwithstanding the known prior incidents outlined in subparagraphs 61(a) through (d) which go back many years without any corrective action having been taken by ORANGE COUNTY until after Gracia's needless death.

63.     On November 30, 2015, RN Jane Jenkins, acting at the behest of BUCK, made a series of rule changes which now require that any inmate or detainee must have his or her vital signs taken at the time of any non-emergent sick call encounter and, if abnormal, every day thereafter until stable or referred to another level of care. While under emergency care, even if the vital signs are normal, vital signs should still be retaken every hour thereafter while under emergency care; if abnormal, they should be retaken every 15 minutes until stable or referred to another level of care. While in infirmary care, as was the case with Gracia, vital signs should be taken every four hours for the first 24 hours after admission to the infirmary and every six hours thereafter even if the patient is stable while in the infirmary. If abnormal while in infirmary care, as was the case with Gracia as of the

morning of August 9, 2015, vital signs must be taken every 30 minutes while in the infirmary until evaluated by a provider.

64.     These guidelines are consistent with the applicable standard of care in the medical community. Were these guidelines and training in place in August 2015, as they should have been in light of the known prior incidents, Decedent would have had his vital signs taken during his first three days at the OCC infirmary (August 6 through August 9) at least 12 to 15 times. Instead, they were only taken twice: once upon admission on August 6 and then again on August 9 at 1029 hours, at which time Decedent's vital signs were considerably abnormal, including a rapid heartbeat of 131 bpm indicative of tachycardia, along with an elevated respiratory rate of 22, which is indicative of sepsis. At that point, under the new protocol which should have been in place given the known prior similar incidents as well as the applicable standard of care in the medical community, his vital signs would have been retaken that day every 30 minutes thereafter through 2316 hours when he was forcibly removed from cell #15 to cell #19 for camera monitoring to determine whether he was malingering or actually in decline. Were the new protocols and training in effect, Gracia would have had his vital signs taken every 30 minutes during those intervening 12 1/2 hours, meaning he would had his vitals taken an additional 25 times. [Of course, in all likelihood, Gracia would have been transferred to an outside hospital well within that 12 1/2 hour period]. Instead, his vital signs *were never taken even once* and he was left isolated to die, unattended in cell #19 for more than five hours when, instead, he should have been referred to a higher level of care including outside hospitalization. The medical monitoring, including the taking of vital signs at appropriate intervals, that should have occurred would more likely than not have saved Decedent's life.

65.     The new information and material set forth in paragraphs 61 through 64, *supra,* establish municipal liability under §1983 in two ways. First, that there was a unwritten custom or practice which was reflected in the known specific incidents leading to the deaths or exacerbated injuries identified in subparagraphs 61(a) through (d) which evinced "a widespread pattern of deliberate indifference" on the part of ORANGE COUNTY; and, second, and perhaps more importantly, that by virtue of the known prior incidents, "the municipality had notice of the need to train" its medical employees on how to treat inmates or detainees in obvious medical or mental decline and consciously failed to do so for a number of years until the tragic death of Decedent. Where the failure of a municipality to train its employees in a relevant respect evidences a deliberate indifference to the rights of its citizens, including inmates or detainees, (for example, as here, by consciously not heeding the lessons to be drawn from known prior incidents of medical neglect), such failure to train can fairly be said to represent a custom or policy of the municipality and, therefore, actionable under section 1983.

66.     In the alternative, the nature of the responsibilities assumed by the state in caring for detainees in clearly manifested medical decline is such that the need for adequate training of jail medical personnel is obvious and does not require notice of prior incidents of harm. This is all the more the case where inadequately trained medical personnel might well be unaware of the appropriate balance between providing quality care to inmates or detainees in obvious medical decline in a timely manner and security concerns that arise in a corrections environment. Under such circumstances, it can be reasonably said that the failure of the municipality to act *sua sponte* is the causative agent in the ensuing injury and thus actionable under section 1983. Agency liability under section 1983 is all the more

24

properly found where the agency has been put on notice by prior similar incidents evidencing the need for better training and supervision of its medical staff, which the agency deliberately or consciously failed to provide, as occurred in this case.

67. ORANGE COUNTY, in view of its past history of deliberately ignoring the obvious need to properly train and supervise its medical staff employees regarding treatment to be afforded inmates and detainees in apparent medical or mental decline, is directly liable for the violation of Decedent's civil rights due to the following practices or customs of ORANGE COUNTY which were in effect at the time of this incident and which proximately caused Decedent's death:

    i.    ORANGE COUNTY consciously failed to adequately and properly train and educate their employees and agents with respect to the proper evaluation and treatment of inmates suffering under disabilities or conditions which require medical stabilization before incarceration, monitoring persons with obvious medical needs in rapid decline, transporting persons with obvious medical needs, and handling persons with disabilities, with deliberate indifference to the welfare of inmates, including Gracia;

    ii.    ORANGE COUNTY consciously failed to adequately monitor and evaluate the performance of their agents and employees with respect to the proper evaluation of inmates suffering under disabilities or conditions which require medical stabilization before incarceration, monitoring persons with obvious medical needs in rapid decline, transporting persons with obvious medical needs, and handling persons with disabilities, with deliberate indifference to the welfare of inmates, including Gracia; and

    iii.    ORANGE COUNTY failed to properly fund and staff OCC and/or CHS of ORANGE COUNTY, to ensure an appropriate amount of licensed, trained and qualified medical professionals are present to provide proper medical treatment to high-risk patients, with deliberate indifference to the welfare of inmates, including Gracia.

68. ORANGE COUNTY purportedly reviewed the actions of its own employees from booking through the death of Decedent. In reviewing its own employees' actions,

ORANGE COUNTY found that its employees failed to actually physically observe Decedent, take his vital signs or make a proper assessments at appropriate intervals consistent with the applicable standard of care. ORANGE COUNTY documented potential issues with respect to policy and training regarding observation of inmates and pretrial detainees and proper recording of medical observations, an issue which ORANGE COUNTY consciously avoided in the past despite the prior known incidents identified and subparagraphs 61 (a) through (d), *supra*. During this investigation, the nurses maintained that the facility was medically understaffed, presumably due to budgetary concerns, and that BUCK had an unwritten policy of allowing documentation to be minimized to twice a week unless there was a change in the patient's medical condition. The lack of adequate funding may have been responsible for ORANGE COUNTY's failure to implement better training and supervision, including taking vital signs in much closer intervals than what occurred here, especially for those inmates or detainees, such as Gracia, who were in obvious medical decline. Lack of adequate financial resources, however, is not a recognized defense to any of the claims set forth in this Second Amended Complaint, including municipal section 1983 liability.

69.    Notwithstanding the findings of its investigation, ORANGE COUNTY refused to significantly or meaningfully discipline any of its employees, including Individual Defendants BUCK, EVANS, CLAIRMONT, GONZALEZ and HARTER. The most severe discipline imposed on any of the Individual Defendants were written letters of reprimand to EVANS and GONZALEZ, both of whom were placed on paid administrative leave pending the outcome of the investigation, without any resulting loss of pay or status. CLAIRMONT was also placed on administrative leave, which was later made to be without

pay upon her refusal to cooperate in the investigation conducted by the Sheriff's Department. In effect, these individuals, who were directly responsible for the death of Gracia, were given a paid vacation (other than as noted in the case of CLAIRMONT) and what amounted to no more than a slap on the wrist. CLAIRMONT voluntarily resigned from her employment on September 11, 2015, prior to the finalization of proceedings against her. BUCK was never the subject of any disciplinary action whatsoever. Accordingly, ORANGE COUNTY effectively ratified and condoned such conduct and, for that reason as well, is liable under 42 U.S.C. 1983 for the death of Gracia.

## COUNT II
## 42 U.S.C. 1983 CLAIM AS AGAINST BUCK

70.     Plaintiffs hereby incorporate by reference paragraphs 1-53 of this Second Amended Complaint as though more fully set forth herein.

71.     Defendant BUCK, a licensed medical doctor, at all times material served as the Medical Director of Corrections Health Services Department (CHS) which supervises inmate medical care at OCC/CHS. At all times material hereto, BUCK acted under color of state law in the course and scope of his employment or agency with ORANGE COUNTY and with deliberate indifference to the health and safety of Decedent.

72.     At all times Gracia had an objectively serious medical need which was known to and recognized by BUCK in his individual capacity and as the supervisor of the other Individual Defendants.

73.     Plaintiffs' claim is brought pursuant to 42 U.S.C. 1983 and arises out of BUCK's failure to provide proper supervision regarding adequate and proper medical evaluation, treatment and care to Gracia while a pretrial detainee at Orange County Corrections. Said failure to provide adequate and proper medical care was the result of a

deliberate indifference on the part of the Individual Defendants, including BUCK, who was the most senior and credentialed provider, with respect to the known medical condition and needs of Gracia, all of which resulted in his death on August 10, 2015.

74.     Specifically, BUCK failed to adequately supervise the monitoring, evaluation and treating of Gracia, including the need for his transfer to a higher level of care facility. At all times material, Gracia was suffering from a serious dog bite injury coupled with infection, and who displayed signs of an obvious and visible deteriorating physical condition. As was fully known by BUCK, who originally assessed and admitted Gracia to the infirmary on August 6th, Gracia had a preexisting medical condition and serious disability which, as BUCK well knew, caused Gracia to suffer a compromised immune system while in the care and custody of BUCK and his medical staff.  Upon information and belief, despite being in charge of Gracia's case, BUCK made no review of the nursing treatment or progress notes nor did he ever visit or observe Gracia after his initial admission by BUCK to the infirmary on August 6, 2015. This abdication of responsibility by BUCK evinced a deliberate indifference to the risk of harm to Decedent, who remained at all times BUCK's patient.

75.     Plaintiffs' claim under 42 U.S.C. 1983 arises out BUCK's deliberate indifference to Gracia's serious medical needs as set out in this Second Amended Complaint, which led to Decedent's death. Such deliberate indifference to the health and safety of Gracia deprived him of rights guaranteed under the Due Process Clause of the Fourteenth Amendment of the United States Constitution which proximately caused his death.

## COUNT III
## 42 U.S.C. 1983 CLAIM AS AGAINST EVANS

76.     Plaintiffs hereby incorporate by reference paragraphs 1-11, 13, 17-23, 24, 46-47, 50-52 and 69 of this Second Amended Complaint as though more fully set forth herein.

77.     EVANS was at all times material an agent or employee of ORANGE COUNTY who worked at OCC/CHS as an Advanced Registered Nurse Practitioner. At all times material hereto, EVANS was responsible for providing medical and nursing care to inmates and detainees at OCC/CHS and acted under color of state law in the course and scope of her employment with ORANGE COUNTY and with deliberate indifference to the health and safety of Decedent.

78.     At all times relevant hereto, Gracia had an objectively serious and known medical need.

79.     Plaintiffs' claim is brought pursuant to 42 U.S.C. 1983 and arises out of EVANS' failure to provide adequate and proper medical evaluation, treatment and care to Gracia while a pretrial detainee at Orange County Corrections. Said failure to provide adequate and proper medical care was the result of a deliberate indifference on the part of EVANS as to the known medical condition and needs of Gracia which resulted in his death on August 10, 2015.

80.     Specifically, EVANS failed to monitor, evaluate, treat and/or recommend transport of Gracia to a higher level of care facility. At all times material, Gracia was suffering from a serious dog bite injury coupled with infection, and who displayed signs of an obvious and visible deteriorating physical condition. As was fully known by EVANS at all times material, Gracia had a preexisting medical condition and serious disability which,

as EVANS knew, caused Gracia to suffer a compromised immune system while in the care and custody of EVANS.

81.     Plaintiffs' claim under 42 U.S.C. 1983 arises out EVANS' deliberate indifference to Gracia's serious medical needs as set out in this Second Amended Complaint, which led to his death. Such deliberate indifference to the health and safety of Gracia deprived him of rights guaranteed under the Due Process Clause of the Fourteenth Amendment of the United States Constitution which proximately caused his death.

### COUNT IV
### 42 U.S.C. 1983 CLAIM AS AGAINST CLAIRMONT

82.     Plaintiffs hereby incorporate by reference paragraphs 1-11, 14, 17-23, 26, 30-31, 34-40, 42-43, 50-51 and 69 of this Second Amended Complaint as though more fully set forth herein.

83.     Defendant CLAIRMONT was at all times material an agent or employee of ORANGE COUNTY who worked at OCC/CHS as a licensed Registered Nurse. At all times material hereto, CLAIRMONT was responsible for providing medical and nursing care to inmates and detainees at OCC/CHS and acted under color of law in the course and scope of her employment or agency with ORANGE COUNTY and with deliberate indifference to the health and safety of Decedent.

84.     At all times relevant hereto, Gracia had an objectively serious and known medical need.

85.     Plaintiffs' claim is brought pursuant to 42 U.S.C. 1983 and arises out of CLAIRMONT's failure to provide adequate and proper medical evaluation, treatment and care to Gracia while a pretrial detainee at Orange County Corrections. Said failure to provide adequate and proper medical care was the result of a deliberate indifference on the

part of CLAIRMONT as to the known medical condition and needs of Gracia which resulted in his death on August 10, 2015.

86.     Specifically, CLAIRMONT failed to monitor, evaluate, treat and/or recommend transport of Gracia to a higher level of care facility. At all times material, Gracia was suffering from a serious dog bite injury coupled with infection, and who displayed signs of an obvious and visible deteriorating physical condition. As was fully known by CLAIRMONT at all times material, Gracia had a preexisting medical condition and serious disability which, as CLAIRMONT well knew, caused Gracia to suffer a compromised immune system while in the care and custody of CLAIRMONT.

87.     Plaintiffs' claim under 42 U.S.C. 1983 arises out CLAIRMONT's deliberate indifference to Gracia's serious medical needs as set out in this Second Amended Complaint, which led to his death. Such deliberate indifference to the health and safety of Gracia deprived him of rights guaranteed under the Due Process Clause of the Fourteenth Amendment of the United States Constitution which proximately caused his death.

## COUNT VI
## 42 U.S.C. 1983 CLAIM AS AGAINST GONZALEZ

88.     Plaintiffs hereby incorporate by reference paragraphs 1-11, 15, 17-23, 25, 27-29, 32, 44-45, 50-51 and 69 of this Second Amended Complaint as though more fully set forth herein.

89.     Defendant GONZALEZ was at all times material an agent or employee of ORANGE COUNTY who worked at OCC/CHS as a licensed Registered Nurse.  At all times material hereto, GONZALEZ was responsible for providing medical and nursing care to inmates and detainees at OCC/CHS and acted under color of state law in the course

and scope of her employment with ORANGE COUNTY and with deliberate indifference to the health and safety of Decedent.

90.    At all times relevant hereto, Gracia had an objectively serious and known medical need.

91.    Plaintiffs' claim is brought pursuant to 42 U.S.C. 1983 and arises out of GONZALEZ' failure to provide adequate and proper medical evaluation, treatment and care to Gracia while a pretrial detainee at Orange County Corrections. Said failure to provide adequate and proper medical care was the result of a deliberate indifference on the part of GONZALEZ as to the known medical condition and needs of Gracia which resulted in his death on August 10, 2015.

92.    Specifically, GONZALEZ failed to monitor, evaluate, treat and/or recommend transport of Gracia to a higher level of care facility. At all times material, Gracia was suffering from a serious dog bite injury coupled with infection, and who displayed signs of an obvious and visible deteriorating physical condition. As was fully known by GONZALEZ at all times material, Gracia had a preexisting medical condition and serious disability which, as GONZALEZ well knew, caused Gracia to suffer a compromised immune system while in the care and custody of GONZALEZ.

93.    Plaintiffs' claim under 42 U.S.C. 1983 arises out GONZALEZ' deliberate indifference to Gracia's serious medical needs as set out in this Second Amended Complaint, which led to his death. Such deliberate indifference to the health and safety of Gracia deprived him of rights guaranteed under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and proximately caused his death.

## COUNT VI
## 42 U.S.C. 1983 CLAIM AS AGAINST HARTER

94.     Plaintiffs hereby incorporate by reference paragraphs 1–11, 16, 17–23, 33–34, 51 and 69 of the Second Amended Complaint as though more fully set forth herein.

95.     Defendant HARTER was at all times material an agent or employee of ORANGE COUNTY who worked at OCC/CHS as a licensed Practical Nurse. At all times material hereto, HARTER was responsible for providing medical and nursing care to inmates and detainees at OCC/CHS and acted under color of state law in the course and scope of her employment with ORANGE COUNTY and with deliberate indifference to the health and safety of Decedent.

96.     At all times relevant hereto, Gracia had an objectively serious and known medical need.

97.     Plaintiffs' claim is brought pursuant to 42 U.S.C. 1983 and arises out of HARTER's failure to provide adequate and proper medical evaluation, treatment and care to Gracia while a pretrial detainee at Orange County Corrections. Said failure to provide adequate and proper medical care was the result of a deliberate indifference on the part of HARTER as to the known medical condition and needs of Gracia which resulted in his death on August 10, 2015.

98.     Specifically, HARTER failed to monitor, evaluate, treat and/or recommend transport of Gracia to a higher level of care facility. At all times material, Gracia was suffering from a serious dog bite injury coupled with infection, and who displayed signs of an obvious and visible deteriorating physical condition. As was fully known by HARTER at all times material, Gracia had a preexisting medical condition and serious disability

which, as HARTER knew, caused Gracia to suffer a compromised immune system while in the care and custody of HARTER.

99.     Plaintiffs' claim under 42 U.S.C. 1983 arises out HARTER's deliberate indifference to Gracia's serious medical needs as set out in this Second Amended Complaint, which led to his death. Such deliberate indifference to the health and safety of Gracia deprived him of rights guaranteed under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and proximately caused his death.

**COUNT VII**
**MEDICAL MALPRACTICE AGAINST DEFENDANT ORANGE COUNTY**

100.    Plaintiffs hereby incorporate by reference paragraphs 1–53 of this Second Amended Complaint as though more fully set forth herein.

101.    While the Plaintiffs have alleged that the acts and omissions set forth herein constituted deliberate indifference in violation of Gracia's constitutional rights, Plaintiffs alternatively plead that the conduct alleged herein constitutes at least ordinary negligence and medical malpractice under the laws of the State of Florida.

102.    The conduct of the Individual Defendants EVANS, CLAIRMONT, GONZALEZ and HARTER breached the prevailing standard of care in the nursing community. Said Individual Defendants committed medical negligence by denying Decedent access to care and in failing to evaluate and treat him for sepsis, despite ample opportunity and evidence of this illness. A referral to a higher level of care should have occurred no later than the morning hours of August 9, 2015 when his vital signs deteriorated. A jail infirmary, even if well-staff and equipped, let alone a jail cell, is not the appropriate setting to treat an individual displaying symptoms of Gracia. This breach of

the standard of care was the proximate cause of Decedent's death. Had Decedent been afforded appropriate and reasonable medical care, he more likely than not would have survived.

103.   Given the professional negligence of the Individual Defendants EVANS, CLAIRMONT, GONZALEZ and HARTER, all of whom were employed by ORANGE COUNTY and acting within the scope of said employment, ORANGE COUNTY is liable for such negligence under the doctrine of *respondeat superior*.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in in their favor as against Defendants named in each count, as follows:

(A)   all actual, compensatory damages under Counts I through VII as authorized by Florida's Wrongful Death Act and 42 U.S.C. 1983;

(B)   punitive damages against each of the Individual Defendants;

(C)   pre-and post judgment interest as may be authorized by law;

(D)   reasonable attorney's fees and costs under Counts I through VI; and

(E)   any such further relief as may be just and fair.

## **DEMAND FOR A TRIAL BY JURY**

Pursuant to Fed. R. Civ. P. 37, Plaintiffs hereby demand a trial by jury on all such issues so triable.

  *s/ Jason J. Recksiedler, Esquire*
JASON J. RECKSIEDLER, ESQUIRE
Florida Bar No.:  092060
NEJAME LAW, P.A.
189 S. Orange Avenue, Suite 1800
Orlando, FL  32801
Telephone:  407-500-0000
Facsimile:  407-802-1445

Email for service:
Primary email:  Jason@nejamelaw.com;
Secondary email: Bianca@nejamelaw.com;
       Litigation@nejamelaw.com

***s/ Stephen J. Calvacca, Esquire***
STEPHEN J. CALVACCA, ESQUIRE
Florida Bar No.:  561495
NEJAME LAW, P.A.
189 S. Orange Avenue, Suite 1800
Orlando, FL  32801
Telephone:  407-500-0000
Facsimile:  407-245-2980
Email for service:
Primary email:  civilservice@nejamelaw.com
Secondary email: stephen@nejamelaw.com;
       darlene@nejamelaw.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court and a true and correct copy of the foregoing has been furnished through the CM/ECF portal of the Middle District of Florida on this 18th day of January, 2018.

**/s/ Stephen J. Calvacca, Esquire**
STEPHEN J. CALVACCA, ESQUIRE
Florida Bar No.:  561495
NEJAME LAW, P.A.
189 S. Orange Avenue, Suite 1800
Orlando, FL  32801
Telephone:  407-500-0000
Facsimile:  407-245-2980
Primary email:  civilservice@nejamelaw.com
Secondary email: stephen@nejamelaw.com
       darlene@nejamelaw.com