Pursuant to Fed. R. Civ. P. 26(a)2(B), Thomas D. Fowlkes, M.D. submits the following Expert Report on behalf of Plaintiff, the Estate of Max Gracia Jr., II

**(i)    A complete statement of all opinions the witness will express and the basis and reasons for them.**

**Scope of report:**

(I.) The appropriateness of the medical care provided Mr. Max Gracia Jr., II (Mr. Gracia) while he was incarcerated at the Orange County Corrections (OCC) in August 2015 (II.) Whether Mr. Gracia's past medical history, on-going medical conditions and autopsy findings influence those opinions (III.) Whether the Policies & Procedures in place regarding medical care at the OCC are reasonable and appropriate.

My opinions are limited to those that I can offer to a reasonable degree of medical probability or likelihood.

**Factual Summary:** 1. Mr. Gracia was a 22 year-old male with a past medical history including:

a.   Seizure Disorder, maintained on Depakote.

b.   Human Immunodeficiency Virus (HIV) positive, maintained on Atripla, a combination anti-retroviral drug

2.   Mr. Gracia was arrested in the early morning hours of August 6, 2015 by the Orlando Police Department (OPD). During the arrest, Mr. Gracia received dog bite

wounds from a police canine. He was transported via Emergency Medical Services (EMS) to Orlando Regional Medical Center (ORMC).

3. At ORMC Emergency Department (ED) Mr. Gracia's history of seizures and HIV was noted and he was evaluated and treated for multiple dog bites. He was discharged at approximately 07:00 on the morning of August 6, 2015 into the custody of OPD with discharge instructions and a prescription for Augmentin antibiotic.

4. Mr. Gracia was booked into OCC on the morning of Thursday, August 6, 2015. His Receiving Screening noted the multiple dog bites to his legs and cuts to his fingers as well as the history of seizures and HIV. He was seen shortly after booking by Dr. Robert Buck, Medical Director for OCC. Dr. Buck noted Mr. Gracia's medical problems and the multiple dog bites. Dr. Buck also noted that Mr. Gracia was "in a lot of pain in his left leg." He admitted Mr. Gracia to the Infirmary at OCC and ordered:

    a. Daily dressing changes

    b. Augmentin 872-125 antibiotic twice a day

    c. Ibuprofen 800 mg twice a day

    d. Tylenol #3 three times a day as needed for pain for three days

    e. To inquire about compliance with Atripla and possibly re-start it

    f. Draw lab studies including CBC, CMP, CD-4 count and viral load

N.B. There is no documentation in the records I reviewed that anyone inquired of Mr. Gracia about his Atripla compliance. Nor is there any evidence that his Atripla was given. There is a note that the lab specimens were obtained but I did not see that any lab results were received before Mr. Gracia's death and I have not reviewed any antemortem lab results. There is no evidence in the record that Dr. Buck ever followed up on these orders. There is likewise no evidence in the record that Dr. Buck ever checked on or saw Mr. Gracia again after this initial encounter.

5. On the evening of 8/6/2015 Mr. Gracia was seen by a nurse, his vital signs were taken and were within normal limits. He was noted to be unable to bear weight on his left leg and was given crutches and a urinal.

6. On Friday, August 7, 2015 at 3:03 a.m. Mr. Gracia's vital signs were taken and found to be normal. His thigh was covered with a clean bandage and he was given pain medication for leg pain.

7. For the remainder August 7, 2015 and on Saturday August 8, 2015 there were notes by Nurse Clairmont and Nurse Galloza-Gonzalez. There were no vital signs recorded. There was also a provider note written by Nurse Practitioner (NP) Maryanne Evans at 5:08 p.m. on 8/7/2015.

8. On 8/7/2015 at 5:20 p.m. Nurse Galloza-Gonzalez noted that Mr. Gracia's wound was reddened with scant, serosanguineous drainage present. On 8/8/2015 at 11:38 a.m. she noted that "Pt took off bandage of all wounds. Bandage was

changed the day before 8/7/2015. Bandage was clean and dry. Pt verbalised (sic) he was taking a shower. Pt oriented for second time to keep bandage on all time until medical staff removed. Pt used socks to cover his wound. Pt oriented about risk of infection..."

9. On Saturday, August 8, 2015 at 4:59 p.m. Nurse Galloza-Gonzalez changed Mr. Gracia's dressing and noted a reddened wound with scant serosanguineous drainage. She recorded: "No signs/symptoms of infection." At 5:13 p.m. that afternoon she noted: "Pt verbalizes vomiting X 2." She notified NP Evans who ordered Zofran 8mg three times a day as needed for nausea and vomiting. Nurse Galloza-Gonzalez gave a dose and noted: "Will continue to monitor."

10. Overnight, Nurse Clairmont changed Mr. Gracia's dressing. She noted that he tolerated this poorly. She also noted the wound was reddened with a large amount of bloody drainage present. There were no vital signs recorded at any time on 8/8/2015 or on the overnight shift into Sunday morning, August 9, 2015.

11. On Sunday, August 9, 2015 at 10:29 a.m. Nurse Galloza-Gonzalez noted "Pt alert, oriented X 3, complains of weakness and dizziness." She took Mr. Gracia's vital signs and recorded a temperature of 97.4, pulse of 131, blood pressure of 111/56, respiratory rate of 22 and oxygen saturation of 98%. According to her note: "Provider Evans notified, Order to increase fluid intake, extra fluid given. Will continue to monitor."

4

12. There is no follow-up of this note recorded and no further vital signs recorded by Nurse Galloza-Gonzalez or any other healthcare staff. There is no indication that Nurse Galloza-Gonzalez monitored Mr. Gracia's condition.

13. The record indicates that NP Evans was present in the infirmary unit that afternoon. She co-signed the order for Zofran from the day before and authorized the release of Mr. Gracia to general population. There is no record that she actually evaluated or saw Mr. Gracia.

14. On 8/9/2015 at 7:48 p.m. Nurse Clairmont made a Housing Recommendation of General Population. There is no indication that she took any vital signs or followed up on Mr. Gracia's complaints or abnormal vital signs from earlier in the day.

15. At 9:54 p.m. on 8/9/2015 Nurse Harter note "Pt refused to get up and take his PM medications as ordered, refusal done."

16. At 3:13 a.m. on 8/10/2015 Nurse Clairmont documented: "9:00 pm Patient observed twisting himself and moaning loudly on bed during med pass when asked by staff to sit up for his pm meds. Patient cried, 'I can't do it,' and proceed to slide his body onto the floor near the foot of his bed. Patient refused all assistance and refused all care from nursing staff. Patient's dressings on the LL (sic) calf and upper left thigh are noted to be heavily soiled with dried, bloody drainage upon

assessment. Will encourage patient to allow wound care. Will continue to monitor."

17. According to the Orange County Sheriff's Office Investigative report (page 11 of 35) a narrative report authored by Corrections Officer Vargas at 1:33 a.m. on 8/10/2015 said: "In summary, the report stated, at approximately 2145 hours on August 9, 2015, during medication rounds, Nurse Karen Clairmont interpreted Gracia's actions (i.e. lying on the floor, stating he could not get up) as an 'implicit refusal for medication.' Furthermore, the report stated, in Nurse Clairmont's opinion, Gracia was, 'faking or exaggerating his medical condition.'"

18. As a result of this the security staff issued Mr. Gracia a Disciplinary Report (DR) which "listed two disciplinary charges: (1) failure to follow written or verbal order, and (2) malingering or feigning an illness."

19. At 3:35 a.m. Nurse Clairmont documented: "Patient refusing to follow Correction's officers orders regarding pending move to 3B. Patient in now serving a DR and will remain in the infirmary to serve out this DR. Patient continues to lay on cell floor on his back, refusing all treatment."

20. At approximately 5:15 a.m. on Monday morning, August 10, 2015 Mr. Gracia was found in cardiac arrest in his cell in the infirmary area of OCC. EMS was called and he was transported to ORMC where he could not be resuscitated

and was pronounced deceased at 6:09 a.m. The ED doctor reported: "very malodorous wounds left thigh and medial calf."

21. An autopsy was performed. Findings included:

   a. Mr. Gracia's death was due to "septic shock as a result of infected dog bite wounds."

   b. The wound as well as lung cultures grew out E. coli bacteria. There was "also evidence of systematic (sic) shock (bilateral adrenal hemorrhage, acute esophageal necrosis and acute renal failure)."

   c. It is "likely that HIV infection contributed to the death."

   d. Left ventricular hypertrophy

   e. There were ibuprofen and codeine metabolites present in the blood which reflect medications given at OCC. In addition, there were clinically insignificant quantities of cocaine and cannabinoid metabolites present in the blood.

   f. Vitreous Urea Nitrogen was elevated at 58.4 mg/dL and Vitreous Creatinine was elevated at 2.61 mg/dL.

22. An investigation was conducted by the Orange County Sheriff's Office. Findings in addition to those recorded above include:

a. Inmate Dante Ball who assisted in moving Mr. Gracia from cell 15 to cell 19 on the evening of 8/9/2015 noted that Mr. Gracia was "in pain and "out of it." "He also noticed a distinct, foul odor emitting from Gracia." (pg. 13 of 35)

b. Correctional Officer Vargas "recalled a distinct smell emitting from Gracia. He described the odor as that of 'decomposed blood or flesh.'" (pg. 17 of 35)

c. Nurse Galloza-Gonzalez reported that on the afternoon of August 9, 2015, "the provider, Nurse Evans, was present and authorized Gracia to be moved to general population." Nurse Galloza-Gonzalez did not report taking Mr. Gracia's vital signs again after the abnormal pulse and respiratory rate earlier in the day. The investigators also reported that according to Nurse Galloza-Gonzalez: "At the end of her shift, Nurse Clairmont took verbal report from Nurse Galloza-Gonzalez. Nurse Galloza-Gonzalez apprised Nurse Clairmont on Gracia's claim of dizziness and the provider's subsequent order for fluid increase." (pg. 19 of 35)

d. NP Evans reported to investigators about the events of August 9, 2015: "Later in the day, Nurse Evans saw Gracia, in passing, in the dayroom. She did not make contact with him." The investigator also wrote: "Nurse Evans ultimately authorized Gracia to be moved." (pg. 20 of 35)

e. Nurse Harter was also interviewed by investigators. She reported Mr. Gracia "simply shook his head 'no' when she asked him to take his medication."

8

She "relayed Gracia's refusal to accept his medication to Nurse Clairmont." The investigators do not report that Nurse Harter rendered Mr. Gracia any additional aid that evening or attempted to get him additional treatment.

**Opinions:** The following are my opinions to a reasonable degree of medical probability on each of these areas based upon my training, experience, and a review of the records in this case:

I. The actions taken by the medical staff of OCC in their assessment and treatment of Mr. Gracia during August 2015 while he was incarcerated at the OCC were far below the acceptable standard of care for healthcare within a detention facility. Specifically:

1. Nurse Galloza-Gonzalez's care of Mr. Gracia fell far below the standard of care in a number of ways, including:

   a. She noted that Mr. Gracia was vomiting on 8/8/2015 and she received an order for a prescription anti-emetic medication from NP Evans. The pain and vomiting were likely signs and symptoms of worsening infection. Yet, Nurse Galloza Gonzalez did not document the response to the medication or make any additional inquiry into his nausea and vomiting or underlying infection.

   b. On 8/9/2015 she recorded a very abnormal heart rate and an elevated respiratory rate. These were signs of worsening infection and sepsis. She called the provider, NP Evans, but when she received orders only for increasing fluid she did

9

not question whether Mr. Gracia needed some additional testing or treatment; neither did she even record that Mr. Gracia was able to take any additional fluid, much less quantify it nor did she ever repeat the clearly abnormal vital signs.

   c. Instead, she had NP Evans authorize Mr. Gracia's transfer out of the infirmary to general population without any additional assessment or treatment.

2.   Nurse Harter was on duty the evening of August 9, 2015 when his clinical condition was clearly deteriorating and he was unable to even take his medication. Mr. Gracia's condition at the time Nurse Harter attempted med pass was such that he was too weak to get up from his bed and likely was too weak even to speak. Nurse Harter reported that he "simply shook his head 'no.'" She simply documented that he refused his medication and notified Nurse Clairmont. Her failure to make additional assessment of Mr. Gracia's condition or his need for immediate treatment was a breach of the standard of care for a Licensed Practical Nurse in a correctional setting.

3.   NP Evans was aware that Mr. Gracia had HIV and that he was being treated with antibiotics in the infirmary for multiple dog bites. She was also made aware that Mr. Gracia was vomiting and then on the day before his death she was notified that he was very tachycardic and was tachypneic. Yet she did not order him to be sent to the hospital or order any additional testing/treatment except giving him fluids to drink. Instead, when she saw him on the afternoon before his death she

ordered him transferred out of the infirmary without even assessing him. NP Evans actions and her lack of even the most basic concern for Mr. Gracia's worsening condition appears to go beyond negligence and rises to the level of indifference.

4. Nurse Clairmont's actions regarding Mr. Gracia are very disturbing to me. Nurse Clairmont was also aware of Mr. Gracia's immunocompromised state and that he had multiple infected dog bites. She was also informed of his worsening clinical condition when she began her shift on the evening of 8/9/2015. Nurse Clairmont attempted to transfer Mr. Gracia out of the infirmary when he was clearly clinically worse. When Mr. Gracia was too weak to be able to stand or take his medication, Nurse Clairmont told the security staff that she felt he was faking and had him written up for a disciplinary infraction. She made no nursing assessment of Mr. Gracia whatsoever, did not take his vital signs, did not send him to the hospital or even contact a provider about his clearly worsened condition. In my opinion her lack of care and concern for Mr. Gracia goes beyond negligence and rises to the level of indifference.

5. It is noteworthy that Mr. Gracia was known to be immunocompromised, had multiple serious dog bites and was housed in an infirmary, with round-the-clock nurses present, yet he did not have his vital signs taken except one time in the 72 hours before his death. Each of the healthcare staff on duty failed to ensure that Mr. Gracia was monitored for signs of sepsis. The one nurse who did check his

vital signs during those three days got very abnormal results yet failed to re-assess Mr. Gracia or get him treatment.

6. Dr. Buck was the Medical Director for OCC and he was responsible for all medical care given in that facility. His responsibilities included having adequate policies and procedures in place to ensure that the nursing staff and providers adequately monitor, assess and treat patients housed in the infirmary, that vital signs are checked regularly, that patients are not transferred out without adequate assessment and that the staff monitors for the development of worsening conditions that require hospital treatment. He was also responsible for the training and supervision of the healthcare staff to ensure that they follow the policies and procedures of OCC. That was not done in this case.

7. As a direct result of the multiple, significant breaches of the standard of care, Mr. Gracia died. His dog bites became progressively more infected. The infection spread to the rest of his body and caused multiple organ systems to fail, resulting in septic shock and death. Even though Mr. Gracia was likely somewhat immunocompromised as a result of his HIV, his infection was due to a common bacteria which could have been easily treated with adequate doses of appropriate antibiotics.

Mr. Gracia was otherwise in good health and his infection could have been treated successfully up until shortly before his death in the early morning hours of

August 10, 2015. Had NP Evans sent Mr. Gracia to the hospital when he had early signs of sepsis on the morning of 8/9/2015 or had she assessed him on the afternoon of 8/9/2015 she would have more likely than not found that he was septic and would have sent him to the hospital where he would have been successfully treated.

Mr. Gracia's condition was still treatable and he would more likely than not survived had Nurse Harter and Nurse Clairmont performed an adequate assessment on the evening of 8/9/2015 and determined that he needed to go to the hospital. Instead, it appears that Nurse Clairmont concluded that Mr. Gracia was faking without adequately assessing him and she chose not to give him any medical assistance.

Even the medically untrained inmate workers knew that Mr. Gracia appeared to be weak and ill. There were multiple reports in the record of persons who came in contact with Mr. Gracia reporting a foul odor from his wounds, yet Nurses Clairmont and Harter chose to ignore the clearly apparent signs of worsening infection and sepsis. Instead of getting medical treatment for Mr. Gracia, Nurse Clairmont's words and actions resulted in Mr. Gracia being written up for failing to obey an order and feigning an illness.

8. The healthcare staff were aware that Mr. Gracia had a serious medical condition and that his condition was deteriorating. Even an untrained layperson

would have been able to recognize that Mr. Gracia needed immediate medical attention, yet they chose not to assess or treat him. The lack of care and attention in this case rises to the level of indifference.

II.     Mr. Gracia's autopsy findings influence my opinions as follows:

1.      I agree that the cause of death is septic shock due to infected dog bite wounds. The pathological findings of adrenal hemorrhage, esophageal necrosis, passive congestion of the liver and renal failure indicate that the sepsis and his death did not occur suddenly but developed over a period of time (hours to a few days).

2.      Although Mr. Gracia may have been somewhat immunocompromised by HIV, the bacteria causing his sepsis and death was not unusual or difficult to detect or treat. Rather than a rare pathogen seen only in immunocompromised patients, it was instead one of the more common bacteria.

3.      There were no other pathologic findings that contributed to or caused his death. The trace amounts of metabolites of cannabinoid and cocaine did not play a causative role in his death.

III.    The Policies & Procedures in place regarding medical care at the OCC were either not adequate to ensure assessment and management of patients with serious medical conditions or they were not consistently followed in Mr. Gracia's case. Specifically:

1. I did not find any policy or procedure requiring the nurses to contact a provider with abnormal vital signs or to repeat abnormal vital signs to ensure normalization.

2. Even though the Nursing SOP 300.36 on Infirmary Housing required that patients housed in the Infirmary for medical reasons have vital signs documented once each shift, this policy was not followed by multiple personnel in this case.

3. I did not find a policy ensuring that patients who were recorded as refusing treatment have an adequate assessment to determine that they are not too ill to cooperate and are competent to refuse treatment.

These opinions are expressed as requested to a reasonable degree of medical probability or likelihood. I reserve the right to review additional materials as noted or as they become available and to amend or modify these opinions based on the review of additional materials.

    **(ii) The facts or data considered by the witness in forming these opinions.**

To assist me in forming these medical opinions I have reviewed records in this case, including:

1. Second Amended Complaint

2. OCC Medical Records

3. ORMC ED Records 08/06/2015

4. ORMC ED Records 08/10/2015

5. Orange County Sheriff's Office Investigative Report

6. Autopsy Report

7. Orlando Police Department Report of Arrest 08/06/2015

8. OCC Policies on:

    a. Medical Emergency Response by Correction Health Services and OCC

    b. Treatment Plan

    c. Infirmary Housing

    d. Health Services Objectives

9. Depositions of:

    a. Dr. Robert Buck

    b. Nurse Karen Clairmont

I have also requested the following documents which I have not yet received:

1. Any videotape from the OCC showing Mr. Gracia

2. All deposition transcripts

3. Any mortality review and incident reports done by Dr. Buck and healthcare staff at OCC

4. Lab results drawn while Mr. Gracia was at OCC

5. The personnel and training files of the healthcare defendants in this case

    **(iii) Any exhibits that will be used to summarize or support these opinions.**

None at this time other than the documents listed above.

  (iv) **The witness's qualifications, including a list of all publications authored in the previous 10 years.**

See Appendix A for my current CV.

  (v) **A list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition.**

See Appendix B for my case list from the last four years.

  (vi) **A statement of the compensation to be paid for the study and testimony in the case.**

See Appendix C for my fee schedule.

*/s/ Thomas D. Fowlkes, MD*

Thomas D. Fowlkes, M.D.

17