WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   UNITED STATES DISTRICT COURT
    FOR THE MIDDLE DISTRICT OF FLORIDA
2   ORLANDO DIVISION

3   CASE NO.:  6:17-CV-1423-ORL-31-KRS

4

5   WILLINE BRYANT and MAX GRACIA, SR.,
    as Co-Personal Representatives of the
6   Estate of MAX GRACIA, JR., II,

7       Plaintiff,

    v.
8
    ORANGE COUNTY, FLORIDA, ROBERT J.
9   BUCK, III, MARYANNE EVANS, KAREN
    CLAIRMONT, ELSA GALLOZA-GONZALEZ,
10  and LYNN MARIE HARTER,

11      Defendants.
    _____/
12

13

14  DEPOSITION OF:    Thomas D. Fowlkes, M.D.

15  DATE TAKEN:       November 12, 2018

16  TIME:        10:00 a.m. to 1:30 p.m.

17  PLACE:          1080 Woodcock Road
                    Suite 100
18                  Orlando, Florida  32803

19  TAKEN BEFORE:     Mary L. Dobson, Court Reporter
                      and Notary Public
20

21

22

23

24

25

```
 1   APPEARANCES:
                APPEARING ON BEHALF OF THE PLAINTIFF:
 2
                   JASON J. RECKSIEDLER, ESQUIRE
 3                 Nejame Law
                   189 South Orange Avenue
 4                 Suite 1800
                   Orlando, Florida  32801
 5                 407-500-0000
                   jason@nejamelaw.com
 6

 7                APPEARING ON BEHALF OF DEFENDANTS,
              ORANGE COUNTY, FLORIDA AND ROBERT
 8            J. BUCK, III:

 9                 DEREK J. ANGELL, ESQUIRE
                   O'Connor & O'Connor, LLC
10                 800 North Magnolia Avenue
                   Suite 1350
11                 Orlando, Florida  32803
                   407-843-2100
12                 DAngell@oconlaw.com

13
               APPEARING ON BEHALF OF DEFENDANT
14              MARYANNE EVANS:

15                 GAIL C. BRADFORD, ESQUIRE
                   Dean, Ringers, Morgan & Lawton, P.A.
16                 Suite 1200
                   201 East Pine Street
17                 Orlando, Florida  32801
                   407-422-4310
18                 GBradford@DRML-law.com

19
               APPEARING ON BEHALF OF DEFENDANTS
20              ELSA GALLOZA-GONZALEZ AND LYNN MARIE
              HARTER:
21
                   BRIAN F. MOES, ESQUIRE
22                 Grower Ketcham Eide Telan & Meltz
                   901 North Lake Destiny Road
23                 Suite 450
                   Maitland, Florida 32751
24                 407-423-9545
                   bfmoes@growerketcham.com
25
```

1              I N D E X

2              EXAMINATIONS

3        DIRECT CROSS REDIRECT RECROSS FURTHER
   Mr. Angell        4
4
   Mr. Moes                 89
5
   Ms. Bradford            114
6
   Mr. Recksiedler         135
7

8   Certificate of Reporter...........................137

9   Certificate of Oath..............................138

10  Errata Sheet......................................139

11  Notification letter..............................140

12              EXHIBITS

13                              Page
   Exhibit 1.........................................5
14
   (Curriculum vitae)
15
   Exhibit 2.........................................5
16
   (Deposition and trial testimony list)
17
   Exhibit 3........................................16
18
   (Dr. Fowlkes' report)
19
   Exhibit 4........................................68
20
   (Handwritten notes)
21
   Exhibit 5.......................................115
22
   (Handwritten notes)
23
   Exhibit 6.......................................115
24
   (Handwritten notes)
25

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1          P R O C E E D I N G S

2                  * * * *

3        THE REPORTER:  Do you solemnly swear the

4     testimony you are about to give in this deposition

5     will be the truth, the whole truth, and nothing but

6     the truth?

7        THE WITNESS:  Yes.

8             THOMAS FOWLKES, M.D.,

9    having been first duly sworn, testified under oath as

10   follows:

11             DIRECT EXAMINATION

12   BY MR. ANGELL:

13      Q    Good morning, Doctor.  We've met informally a

14   moment ago.  My name is Derek Angell.  I represent

15   Orange County along with some of the other individual

16   defendants in this case.  And I take it you've been

17   deposed before.

18      A    I have.

19      Q    You know the general drill.  Obviously, the

20   one thing we try to do is not talk over each other.  If

21   I go like this, just wait.  I'm almost done.

22           Now, do you have a copy of your current C.V.

23   with you?

24      A    I do.

25      Q    And I know you provided one to us so I want to

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 5

1    know if it's been updated since you gave us your copy.

2       A    It has been updated.  I think it would

3    probably be minor changes but I do have a current.

4          MR. ANGELL:  Is that all right if we attach

5    one to the deposition?  Thank you, sir.  This will

6    be Exhibit A.  Do Exhibit 1.  I'll do numbers.

7    One.

8          (Exhibit No. 1 was marked for

9    identification.)

10   BY MR. ANGELL:

11      Q    Similarly, sir, your deposition or trial

12   testimony list, again, we have one but if it's been

13   updated, I'd appreciate it.

14      A    I haven't updated.  I actually don't think

15   that it has been changed.

16      Q    Just to be safe, let's go ahead and grab your

17   copy.  I'll mark that as two.  Thank you.

18          (Exhibit No. 2 was marked for

19   identification.)

20      Q    Now, these cases you have listed as case

21   list/expert testimony, are these cases in which you

22   rendered a deposition or trial or what have you?

23      A    Deposition or trial.  So sworn testimony, last

24   four years.

25      Q    So I take it you've been retained in an expert

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 6

1    capacity in other cases that didn't get as far as

2    deposition and they wouldn't be on here?

3        A    That's correct.

4        Q    And is there any way I could know by looking

5    at this whether the case actually proceeded to trial as

6    opposed to just deposition?

7        A    No, not by looking at that.

8        Q    Could you tell us which ones went to trial?

9        A    Yes.

10       Q    Thanks.

11       A    There are two on the second, Lee versus

12   Jackson County, Mississippi.

13       Q    All right.

14       A    And farther down that page 2, Benoit v.

15   Lincoln County, et al.

16       Q    Thank you.  Now, in these cases were you

17   retained by the plaintiff's lawyers, defense lawyers?

18       A    In the top one, in the first one, Lee v.

19   Jackson County, I was retained by Jackson County's

20   attorney.  And in the other one, Benoit, I was retained

21   by the plaintiff's attorney.

22       Q    Can you estimate in the past four years on

23   this list how often you were retained by plaintiff

24   versus defendant?

25       A    I would estimate 60 to 70 percent of the time

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 7

1    retained by defense lawyers.

2       Q    What would you consider your primary area of

3    expertise is?

4       A    Well, I am board certified in emergency

5    medicine and in addiction medicine, and in addition to

6    that I have 20 years experience as a medical director of

7    a detention center.  And so I've been retained in a

8    number of cases as an expert in correctional health

9    care.

10      Q    So you say you've been 20 years as a director

11   of a detention center?

12      A    That's correct.

13      Q    What is that center?

14      A    It's called the Lafayette County Detention

15   Center.

16      Q    Is that, like, a local jail?

17      A    It is a local jail.  So it is a county jail.

18   As well, we're a federal holding facility for the

19   northern district of Mississippi.  So about half of my

20   detainees are federal pretrial detainees.

21      Q    Do you know what the population, inmate

22   population, is in that facility?

23      A    Approximately 160-bed jail.

24      Q    Do you have any personal experience with

25   larger or I should say any other detention facilities?

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018
Page 8

1    A    That's the only detention facility I've worked

2    in.

3    Q    Is that your full-time job?

4    A    No.  It is one of several jobs that I have.

5    Q    What else do you presently do?

6    A    I'm -- so I'm an addiction medicine doctor and

7    I have owned a drug and alcohol treatment center.  I

8    sold it to a publicly -- so it's about 124 beds now.

9    And in 2015 I sold it to a publicly traded company, and

10   up until August of this year I worked for that company

11   as well at -- in between contracts, I guess you would

12   say.  I'm no longer an employee but about to become an

13   independent contractor for them.

14          In addition to that, I am an addiction

15   medicine doctor for a community mental health center in

16   our area, and in addition to that co-owner of a

17   outpatient mental health facility.

18   Q    And that jail, just to be clear, you say it's

19   160-bed jail, that's total inmate, right or is that --

20   A    That's essentially capacity probably.  The

21   census today I don't know for certain.  I think it's in

22   the 140 range since it's right today.

23   Q    Does that jail have an infirmary?

24   A    It does not have infirmary beds.  It has

25   observation beds that we use for that purpose.  I mean,

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 9

1    it has a nurse and it has a medical clinic area but not

2    infirmary beds as such.

3        Q    So the medical staffing of that facility,

4    there's a nurse?

5        A    There's more than one nurse but --

6        Q    At any given time is there always one nurse in

7    the jail?

8        A    No, there is not 24-hour a day coverage.  So

9    we have one full-time nurse and then we have a part-time

10   evening nurse.  So in the overnight hours there's not a

11   nurse in the facility.

12       Q    What about on the weekends?

13       A    There's a nurse present each day but she

14   doesn't have a set shift.

15       Q    What's your physical attendance at the jail in

16   a typical week?

17       A    So we have a nurse practitioner who -- by the

18   way, I'm an employee of the County.  For about the first

19   17 years I did it as an independent contractor where I

20   employ directly the nurse practitioners, nurses,

21   supplied medications, et cetera.  But about three years

22   ago I became a County employee as the medical director.

23          So we have a nurse practitioner that holds the

24   primary sick call once a week.  So the nurses hold sick

25   call each day and they call me.  I'm on call 24 hours a

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                    Page 10

1   day, seven days a week.  Then we have a nurse

2   practitioner who holds sick call one day a week.  And I

3   hold a clinic each week called Medical Director's

4   Clinic, which is essentially problem cases that they

5   want me to review.  And I -- so since I'm on call 24

6   hours a day, I quite often go by the jail most many days

7   of the week.

8       Q    So would you say most days you visit the jail?

9       A    Presently I wouldn't say most days but

10   multiple times a week.

11      Q    Your typical visit, how long do you spend

12   there?

13      A    Depends on whether I'm holding clinic that

14   day, but if not holding clinic it's less than an hour,

15   an hour or so.

16      Q    You're in Oxford, correct?

17      A    That is correct.

18      Q    That's Ole Miss, correct?

19      A    That is correct.

20      Q    Do you have any affiliation with the school?

21      A    I am on the university's Institutional Review

22   Board, IRB, as the prisoner advocate.  So basically I'm

23   on there -- been on about ten years serving on that IRB

24   as a prisoner advocate so making determinations about

25   research that involves prisoners.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    Q    So you -- how long have you considered

2    yourself a prisoner advocate?

3    A    I didn't say I was a prisoner advocate.

4    Q    Okay.

5    A    The federal law requires that vulnerable

6    population such as prisoners have a person who is

7    familiar with incarcerated populations to serve on

8    IRB's.

9        MR. MOES:  What are you saying, IRB?

10        THE WITNESS:  Institutional Review Board.  It

11    approves research.  It approves research that the

12    university is involved in, people at the

13    university.  So a hospital -- every research

14    organization that receives federal money is

15    required to have an institutional review board.

16        And so the reason that I'm on there is that a

17    federal law requires if you're going to do research

18    that involves inmates, which, of course, not --

19    only a very small percentage of the University of

20    Mississippi's research involves inmates; one a year

21    or something like that.  But you have to have a

22    person who is familiar with and can advocate for,

23    you know, or look out for the interest of the

24    inmates in the Institutional Review Board and

25    that's my role in that, has been for ten years.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                      Page 12

1    BY MR. ANGELL:

2        Q    All right.  Is that something you volunteer to

3    do or do you get paid to do that?

4        A    No, it's a volunteer position.

5        Q    Do you consider yourself an inmate advocate in

6    general?

7        A    I advocate for my patients in general always.

8            MR. RECKSIEDLER:  Don't just abandon them?

9    BY MR. ANGELL:

10       Q    Is the -- is that jail the only jail in

11   Oxford?

12       A    Yes.

13       Q    Is it the only one in that county?

14       A    Yes.

15       Q    Lafayette County?

16       A    In Mississippi we say Lafayette.

17       Q    I was in Lafayette, Louisiana last month and

18   they say a lot of things totally different there.

19           In your expert capacity how much would you

20   consider it has to do with correctional facility

21   medicine?

22       A    Over the last 18 months almost exclusively.  I

23   occasionally have -- take cases related to treatment

24   centers.  I'll call it drug treatment centers, but the

25   vast majority are correctional medicine.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                    Page 13

1      Q    To your knowledge have you ever had any of

2   your opinions excluded by a court?

3      A    I've not ever had an opinion disqualified.  I

4   have, in one case, had my opinion limited but not as it

5   relates to correctional medicine.

6      Q    Do you know which case that was?  Is it on

7   that list?

8      A    It is.

9      Q    Do you know which one it is?

10     A    Yes.

11     Q    I accidentally wrote on the exhibit so we'll

12  white it out or something.

13     A    It is State of Mississippi versus Joshua

14  Blunt.

15     Q    Thank you.  In this case what are you charging

16  the plaintiff's law firm, your hourly rate?

17     A    $500 per hour.

18     Q    Does that include travel, review and

19  testimony, is it all the same or --

20     A    So it -- all hours are the same, research,

21  deposition, trial are all the same and I do not charge

22  travel time, only travel expenses.

23     Q    Do you know how much time you have spent on

24  this file so far?

25     A    To the best of my recollection I believe 16

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                    Page 14

1    hours.

2       Q   Have you been paid?

3       A   I have.

4       Q   Now, are you -- do you consider yourself an

5    infectious disease expert?

6       A   I'm not board certified in infectious disease.

7    Obviously emergency medicine involves infectious

8    diseases in large measure.

9       Q   Since I'm totally unfamiliar with the field,

10   what does it take to be board certified in infectious

11   diseases, if you know?

12      A   You complete a residency in internal medicine,

13   and then a fellowship in infectious diseases.  So you

14   have to be an internal medicine doctor first and then

15   complete a fellowship in infectious diseases.

16      Q   So is that true for any board certification?

17   Is that what you have to do, complete a fellowship?

18      A   Any of the subspecialties of internal

19   medicine, of which infectious disease is one.  So

20   emergency medicine is its own specialty.  There are

21   probably ten subspecialties of medicine, cardiology,

22   gastroenterology, infectious diseases.

23      Q   So you're board certified in both emergency

24   and addiction medicine.  Does that mean you went through

25   the whole fellowship process for those?

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    A    So emergency medicine is what is called a

2    primary specialty meaning they have a residency in that.

3    So I completed a residency in that, and then completed

4    my board certification and testing in that and that was

5    at the University of Pittsburgh.

6         Addiction medicine is a relatively new

7    specialty, and at the time that I became board certified

8    you could become what is called grandfathered.  So if

9    you had worked a certain length of time and then took

10   the test, you could become board certified without doing

11   the fellowship.

12   Q    Now, in your report -- do you have a copy?

13   I'll just mark it as an exhibit.

14   A    I do.  This is my only copy.  I'll need to

15   refer to it.

16   Q    Okay.  We'll pass it back and forth.  I'll ask

17   the other things.  Has this been revised at any point

18   since it was provided to the lawyers?

19   A    No, that's the copy as it was submitted.

20   Q    So I can refer to mine and we'll be on the

21   same page then?

22   A    Yes.

23   Q    You can hold onto this.  Mark this as No. 3

24   before I forget.

25        (Exhibit No. 3 was marked for

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    identification.)

2    BY MR. ANGELL:

3        Q    Have you done any substantive work or review

4    since you authored that?

5        A    I have reviewed the defense expert reports,

6    three defense expert reports.  I think two of them were

7    amended, so a total of five reports.

8        Q    Have you reviewed any further depositions?

9        A    I have not.

10       Q    So as of today in your report it says you

11   reviewed Dr. Buck and Nurse Clairmont's depo; that's it,

12   right?

13       A    That's correct.

14       Q    Do you intend to review any additional

15   depositions if this case were to proceed to trial?

16       A    If I'm provided them, I certainly intend to

17   review them.

18       Q    Have you asked the lawyers for any depositions

19   since you authored this report?

20       A    I've asked for depositions as they've became

21   relevant and available.

22       Q    And before I get into this, reviewing the

23   defense experts' reports, did those reports cause you to

24   change or amend your opinions in any way?

25       A    Well, I have opinions about those.  So if I

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   have additional opinions as a result of reading those

2   reports based upon what they said, and -- but as far as

3   my -- the opinions in my report, the only thing that

4   comes to my mind is that I said in here -- let me see

5   what page -- on page 14, No. 2.  My first line of that

6   is, although Mr. Gracia may have been somewhat

7   immunocompromised by HIV, and I said that based upon the

8   pathologist's finding that he was immunocompromised and

9   it was a contributing factor.

10         Dr. Zawitz says he doesn't believe that he was

11   immunocompromised and gave his rationale for that.  And

12   I would say that on that point he is probably -- he has

13   more information.  He's board certified in infectious

14   disease.  So I would not argue with him if he says he's

15   not immunocompromised.  I don't have a basis upon which

16   to dispute that.

17     Q   Okay, thank you, and I appreciate that.  Saves

18   quite a bit of time.  Just so I can put it in my own

19   words, make sure I understood you.  You base your

20   opinion here in, I guess, II(2), on the pathology report

21   done shortly after Mr. Gracia's death, correct?

22     A   Well, and on my experience as an emergency

23   physician.  So I believe that a reasonably prudent

24   health care provider would believe that Mr. Gracia might

25   be immunocompromised.  Whether, in fact, he was or not

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   is something that I would defer to a infectious disease

2   specialist.

3        And I said he may have been.  It was not my

4   opinion that I -- so I didn't opine to a reasonable

5   degree of medical certainty that he was anyway.  I only

6   said he may have been.  I'm just saying that I would not

7   argue with Dr. Zawitz' opinion that he was not

8   immunocompromised.

9   Q    Thank you.  I appreciate that.

10       Now, your understanding of the facts, as I

11  read through your report, is derived largely from the

12  written records, right?

13  A    That is correct.

14  Q    The jail records, correct?

15  A    Well, there are the jail medical records.  In

16  addition to that there were emergency department records

17  from Orlando Regional Medical Center on two different

18  occasions, and then there is the investigative summary

19  that was compiled as a result of the Orange County

20  Sheriff's Department's investigation.  So those things

21  were my primary documents.

22  Q    Now, I'll just walk through this report, if

23  you don't mind, so going back to the first page here.

24  The scope of the report, sub three, and we'll get there,

25  of course -- you say you were asked to opine as to

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                    Page 19

1   whether the policies and procedures in place regarding

2   the medical care at the OCC are reasonable and

3   appropriate.

4        Did you review the written policies and

5   procedures?

6    A    I reviewed the ones that were provided to me.

7    Q    All right.  Are they listed in this report?  I

8   can't remember.

9    A    They are.

10   Q    I see.  Paragraph 8, page 16.  I didn't see

11  that.  Do you have any other -- and I hate to go back,

12  just to make sure I understand this.

13       Do you have any other experience, training or

14  study of other jail facilities' medical policies in your

15  history?  Does that make sense?  Want me to ask again?

16   A    Yeah.  I think you better ask it again.

17   Q    Okay.  So you have two decades experience at

18  160-bed facility, right?  Is that correct?  Did I hear

19  that right?

20   A    That is correct.

21   Q    My question is do you have any other

22  experience, either directly or through studies or

23  whatnot, of large facilities.

24   A    Well, so I am certified -- I'm a certified

25  correctional health care professional physician.  So in

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                          Page 20

1    other words, that's not a board certification but it's a

2    special certification which was obtained after study and

3    then testing by the NCCHC, the National Commission on

4    Correctional Health Care, wherein you have to

5    demonstrate your knowledge and competence with policies

6    and procedures about delivering health care in a variety

7    of settings; so in smaller detention facilities, larger

8    detention facilities, prisons, and juvenile facilities.

9    So, yes.  The answer is yes, I do.

10       Q    Do you know how many beds there are at OCC?

11       A    I know it is a large facility.  It's on the

12   order of about 800 to -- at the very least it's 800 and

13   I think it was more like a thousand plus, maybe as much

14   as 1,500.

15       Q    Would it surprise you to know there are over

16   3,000 inmates at that facility at any given time?

17       A    At that one facility?

18       Q    At the compound at the Orange County Jail.

19   Would that surprise you?

20       A    It would surprise me to know there was that

21   many in that facility.  I think that they had a number

22   of facilities.  I think that one facility doesn't have

23   3,000.

24       Q    You mean within the compound different

25   buildings are considered different facilities, is that

1    what you're -- okay.  Let me start that over.

2            Your facility in Mississippi, 160 beds, is

3    that one building essentially?

4       A    It is.

5       Q    So that's one facility?

6       A    Right.

7       Q    And then Orange County do you understand to

8    have multiple buildings?

9       A    Multiple buildings with multiple different

10   purposes.  So, in other words, there are -- I believe

11   Orange County has a -- the Orange County Corrections has

12   more than just a detention facility.  I believe they

13   also have something equivalent of work camps, like, in

14   other words, where people are sentenced and serve time.

15   So those are likely different facilities with likely

16   different medical staff that participate in those

17   facilities.

18      Q    You've never been to the Orange County Jail, I

19   presume?

20      A    I have not.

21      Q    Did you have occasion to drive by look at it

22   at any visual --

23      A    I have not.

24      Q    Now, on page 2 of your report, paragraph 3,

25   you note that Mr. Gracia was prescribed Augmentin upon

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                    Page 22

1    his intake, right?

2        A    That is correct.

3        Q    Do you believe that was appropriate to do?

4        A    Yes.

5        Q    What does Augmentin do?  What is it?

6        A    Well, it is a fairly broad spectrum oral

7    antibiotic that was appropriately prescribed by the

8    emergency department physician and then it was

9    appropriately continued by Dr. Buck upon -- so it's one

10   of the better oral antibiotics for providing to dog bite

11   wounds.

12       Q    So you would agree that it is within the

13   standard of care to prescribe Augmentin following a

14   police dog bite?

15       A    Yes.

16       Q    Would you -- based on the notes you have in

17   paragraph 4, do you have any issue with Dr. Buck's

18   initial care based on subparagraphs A through F?

19       A    The actual care rendered by Dr. Buck to

20   Mr. Gracia, no, I don't have any -- I do not find any

21   breaches of the standard of care.

22       Q    Now, in your facility do you, as the doctor,

23   see every new inmate that comes in?

24       A    No.

25       Q    Do you see -- go ahead.  I'm sorry.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    A    Well, we have a screening process that's

2    similar to this where our difference is that the first

3    person that screens them is often, especially in the

4    evening time, a correctional officer.  So then they're

5    seen by the nurse.  And then -- so each inmate that

6    comes in there is seen by my nurse.  And then each

7    inmate that remains there has an initial health

8    assessment within the first 14 days.

9        So, in other words, this speed with which this

10   all is accomplished is sped up in the Orange County

11   Corrections because of the size of it.  In other words,

12   they have a provider there each day.  So the same thing

13   happens, but it happens over a longer period of time at

14   my facility.

15   Q    So if somebody comes in with a dog bite in

16   your facility, what happens?

17   A    Presuming that it's during the daytime and the

18   nurse is there, the nurse will see them, look at the

19   instructions from the emergency department, will note

20   the orders by the emergency department and then will

21   call a provider, me or the nurse practitioner.  We will

22   issue an order for medications, and in the case of a

23   case like this, I would quite likely see the patient

24   within that day or so.

25   Q    Would you agree that there's no requirement

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   for a medical doctor to see every inmate who comes in

2   with a dog bite?

3       A    Especially not on the first day.  Dr. Buck saw

4   him the same day that he arrived.  Certainly there's no

5   requirement for that.

6       Q    Do you know why, from your view, Dr. Buck was

7   the one who saw Mr. Gracia when he showed up at the

8   jail?

9       A    Yes.

10      Q    What's your understanding?

11      A    The provider that was normally there, Nurse

12  Practitioner Evans, was out sick that day.  He was

13  covering for her.

14      Q    Do you believe -- and you may have it in here

15  somewhere later -- do you believe that Dr. Buck, there

16  was any requirement for him to physically return to see

17  Mr. Gracia at any point before his death?

18      A    No.

19      Q    Do you believe that there is any evidence in

20  which you could reach a conclusion that Dr. Buck was

21  deliberately indifferent to Mr. Gracia's illness?

22      A    No.

23      Q    Do you have any negative opinions about

24  Dr. Buck's work in this case?

25      A    Yes.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 25

1    Q   I'm sure it's in here, but why don't you just

2   tell me why I'm thinking it.

3    A   He was the medical director, and as such is

4   essentially responsible -- is responsible for all health

5   care that's delivered there.  He is responsible for

6   seeing that his other providers, so Nurse Practitioner

7   Evans, and the nurses carry out the policies and

8   procedures that are there, and is responsible for seeing

9   that those policies and procedures are followed and that

10   the care that's delivered is appropriate.

11    Q   So let me make sure I understand that.  Is

12   your basis for -- or I should say is your negative

13   opinion with Dr. Buck related to his vicarious

14   responsibility for the acts of the people within his

15   charge?

16    A   No.  He was the medical director, so I think

17   that's different than vicarious -- I mean, I don't have

18   criticisms of his individual care and treatment of this

19   individual patient, but I believe that his

20   responsibilities as a medical director are something

21   more than vicarious responsibility for employees, if

22   that makes --

23    Q   It does.  I want to know what you think he

24   could have done differently or should have done

25   differently.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 26

1    A    Well, he could or should have seen that his

2  employee -- that the employees there were following the

3  infirmary protocols, the policies and procedures that he

4  and the health care administrator had put into place.

5    Q    Do you believe he should be reviewing every

6  nurse's work every day?

7    A    I believe that he should be aware if he has

8  nurses who are not taking vital signs on multiple

9  shifts, multiple personnel not taking vital signs on

10  multiple shifts, he should have been aware of that and

11  he should have been aware of his providers not

12  appropriately documenting and rounding on these

13  patients.  He said as much as -- I'm sorry.  He didn't

14  say he should be aware.  He said that they did not do

15  the -- follow the policies as they should have.

16    Q    So you just said that and I believe it's your

17  understanding that vital signs were not taken of

18  Mr. Gracia as much as should have been?

19    A    That's certainly correct, yes.

20    Q    That's based on what?

21    A    It is based upon -- it's based upon the OCC

22  policy in infirmary housing.

23    Q    Now, are you aware that the nurses testified

24  that they, in fact, did take his vital signs at least

25  once a shift, that they just didn't record it?

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 27

1          MR. RECKSIEDLER:  Object to the form.

2     A    I'm not aware that they said they took it each

3    shift and they didn't record it, no, I'm not aware of

4    that.

5    BY MR. ANGELL:

6     Q    I will have you assume that the nurses did, in

7    fact, take Mr. Gracia's vital signs every shift.

8          MR. RECKSIEDLER:  Object to the form.

9          MR. ANGELL:  That's fine.

10    Q    With that assumption, which we know the lawyer

11   objects to, would that change any of your opinions in

12   this case?

13    A    No, because they did not document them and so

14   if they were taken but not yet documented, it becomes

15   impossible for someone like me in hindsight reviewing

16   the case to be able to know what they did.

17          Certainly if you could provide me a list of

18   vital signs where I could see whether they were normal

19   or abnormal, it could or not -- I'd be happy to look at

20   a list vital signs but --

21    Q    Thank you.  Now, I tend to jump around in

22   these things so I apologize in advance.  On page 3 of

23   your report -- sorry -- the top of the page you say,

24   there is no documentation in the records I reviewed that

25   anyone inquired of Mr. Gracia about his Atripla

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    compliance.

2         Tell me why is that an important fact for you

3    to put in your report.

4         A    If you don't mind me just saying that this

5    section is intended to be a timeline summary.  So, in

6    other words, it is not intended to offer my opinions.

7    This is simply a timeline summary.

8         Q    Okay.

9         A    And I -- but you are correct that I did put it

10   in there as a significant finding.  Dr. Buck had asked

11   that someone -- that the nurses inquire of his

12   compliance and also Dr. Buck ordered that labs be drawn.

13        Q    Now, Atripla -- and I appreciate you're not an

14   immuno or I guess infectious disease expert as we

15   discussed -- do you know what Atripla is typically used

16   for?

17        A    Yes.  It's an antiviral medication that's

18   often used in HIV infection.

19        Q    That's something I presume you have experience

20   with working in a jail facility?

21        A    Yes.

22        Q    Now, do you have any opinions of whether --

23   let me ask you this.

24         Do you have any knowledge of Mr. Gracia's

25   Atripla compliance from any sources?

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    A    I have peripheral knowledge from Dr. Zawitz'

2   report.  I did not review prior OCC medical records.

3   Dr. Zawitz said that there was a viral load from a few

4   months before which was essentially undetectable.  And

5   he also said that he reviewed the lab work from this

6   admission, which I did not.  I have not seen that lab

7   work.  But it did not come in advance of Mr. Gracia's

8   death.

9         So I have some peripheral understanding but he

10   was supposed to be on Atripla.  We don't know for

11   certain whether he was or not, and they were to inquire

12   about that and were to draw labs, and based upon that

13   were then to potentially restart it and that didn't

14   occur before he died, passed away.

15    Q    I'm sure it's been your experience that

16   patients in confinement facilities whose have HIV or HIV

17   positive sometimes don't take their medications?

18    A    Patients with many different diseases often

19   don't take their medications in and out of jail.

20    Q    Thank you.  Now, just up through paragraph 6,

21   so far do you see anything that you take issue with the

22   care that was administered to Mr. Gracia?

23         MR. RECKSIEDLER:  Object to the form.

24         MS. BRADFORD:  On page 3?

25         MR. ANGELL:  Yes.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1      MS. BRADFORD:  Thank you.

2    A    You said through which number?

3  BY MR. ANGELL:

4    Q    Through paragraph 6.

5    A    I see no breaches of the standard of care to

6  that point.

7    Q    No. 7, we see no vital signs.  I presume you

8  have an issue with that?

9    A    I do.

10    Q    How frequently should an inmate -- let's just

11  take your standard healthy inmate.  How often should

12  they be seen by medical staff in confinement?

13      MR. RECKSIEDLER:  Object to the form.

14    A    Well, I don't think that you can -- I think

15  you have to have more information than to say a standard

16  healthy inmate.  This inmate, in particular, was in an

17  infirmary setting and there are particular policies and

18  procedures that specified how often his vital signs

19  should be taken.  So I don't think you can generalize

20  that to healthy inmates not in the general population.

21  BY MR. ANGELL:

22    Q    All right.  So you acknowledge there were

23  policies and procedures for how often his vitals should

24  be taken?

25    A    Every shift, which is my understanding the

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   shifts at the Orange County Corrections were 12 hours in

2   length.  So at least two times a day.

3       Q    Is that within the normal standard of care?

4       A    Yes, for an inmate in an infirmary setting,

5   yes.

6       Q    Then on paragraph 8 where Nurse Galloza noted

7   that Mr. Gracia's wound was reddened with scant,

8   serosanguineous drainage present.  Tell me what does

9   that mean?  What does that serosanguineous word mean?

10      A    Okay.  Well, the first part is that it was

11  reddened.  So now the wounds are reddened and that was

12  the first time, I believe, that we've seen that

13  description.  Serosanguineous means -- sanguineous is

14  blood.  And sero is serous or the yellow drainage that

15  often comes from wounds.  So serosanguineous is a

16  mixture of yellow drainage and blood.  So what you might

17  would call bloody drainage from a wound.

18      Q    And "scant" that means just a little bit,

19  right?

20      A    That's correct.

21      Q    Do you think that what she did here that you

22  described, do you think that's okay within the standard

23  of care?

24          MR. RECKSIEDLER:  Object to the form.

25      A    I do.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                    Page 32

1   BY MR. ANGELL:

2       Q    At this point do you think that there's any

3   reason to suspect a more serious infection?

4       A    Not at this point.  I'm sorry.  I do need to

5   say that by -- so that time is on Friday, the 7th, at

6   5 p.m.  I'm sorry.  This is at 11:38 the next morning

7   when -- those times are both described, but I will say

8   that vital signs haven't been taken now for over 12

9   hours.  So one would not know whether there was a

10  developing problem since the temperature was not

11  recorded for the past at least 12 hours at this point.

12      Q    At least we don't -- we know that they haven't

13  been recorded.  We don't know if they were actually

14  taken, correct?

15      A    We know that they are not recorded in the

16  records that I have.

17      Q    And then we get into Saturday which is

18  paragraph 9, Saturday the 8th, 4:59 p.m.  Based on these

19  reports -- let's start, just the first sentence there

20  with Nurse Galloza.

21          Do you have any problem with what she did

22  there?

23      A    Changing his dressing and noticing what she

24  did?  No, I do not.

25      Q    At 5:13 she notes, patient verbalizes vomiting

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                    Page 33

1   times two?

2      A   Yes.  You skipped over the second which is

3   that she recorded no signs or symptoms of infection.  I

4   don't know that I agree with that.  I mean, the wound is

5   reddened and so, I mean, there's potentially some early

6   infection there but, again, that's just a description.

7   So reddening is a sign and symptom of infection

8   potentially.

9      Q   So what should she have done there then,

10  anything else?

11     A   I believe she should have taken a set of vital

12  signs when he was vomiting.

13     Q   We're moving now to 5:13, right?

14     A   Right.

15     Q   So prior to the 5:13 we have the reddened

16  wound, right?

17     A   Right.

18     Q   Should she have done anything else at that

19  point?

20     A   No, I don't believe so.  She changed the wound

21  and her report to the -- her sworn report, her sworn

22  statement, indicated that she spoke with Nurse

23  Practitioner Evans about Mr. Gracia not keeping his

24  dressing on, and that Nurse Practitioner Evans, in fact,

25  talked to Mr. Gracia on that day.  So she did do

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   something more, she told Nurse Practitioner Evans about

2   it who talked to him.

3       Q    So now moving to the 5:13 entry, the

4   verbalizing vomiting, it says, she notified Nurse

5   Practitioner Evans who ordered Zofran 8 milligrams three

6   times a day as needed for nausea and vomiting.  Do you

7   have a problem with how she responded to verbalized

8   vomiting?

9       A    Yes.  She should have taken a set of vital

10  signs and determined whether this was, in fact, early

11  signs of worsening infection or not.  We don't have

12  enough infection to know.  In hindsight -- I agree with

13  Dr. Zawitz that in hindsight this appears to be the

14  first sign of potentially worsening infection.  We can't

15  say for certain since we don't have more information or

16  more assessment.

17      Q    Would you agree that vomiting can be a symptom

18  of all sorts of things?

19      A    Vomiting is a relatively non-specific symptom,

20  yes, I would agree.

21      Q    Much more articulate than I was.  What is

22  Zofran?

23      A    Zofran is antiemetic, so an anti-nausea

24  medicine.

25      Q    Is that an appropriate thing to give to

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    somebody who reported vomiting?

2       A    It is.

3       Q    Any problem with the dosage, 8 milligrams

4    three times a day?

5       A    No.

6       Q    Now we have paragraph 10, a statement about

7    Nurse Clairmont noting that he tolerated this poorly.

8    What would that mean to you as a physician?

9       A    I'm sorry.  Well --

10      Q    Go ahead.

11      A    So you said the last -- you left off the last

12   sentence which was that Nurse Gonzalez gave a dose and

13   stated, will continue to monitor, but she never recorded

14   any other reference to vomiting or there's no evidence

15   that she did continue to monitor his vital signs or

16   effectiveness of that.

17      Q    Do you know the times the nurses had their

18   shift change?

19      A    I believe it was around 6:00 because you can

20   tell from the report times.  I didn't see a time sheet

21   or something like that, but it was on the order of six

22   o'clock.  It could have been 5:30 or it could have been

23   6:30 but it was around 6 p.m.

24      Q    So you wouldn't have expected her to monitor

25   him later that night, though, if she -- her note is at

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   5:30 and she's about to leave?

2      A   Well, I would have expected her to pass that

3   along to the oncoming shift and for the oncoming shift

4   to have made some kind of continuing monitoring.  And I

5   would have expected her to remember that the next

6   morning but --

7      Q   So let's -- I appreciate that.  Let's go to

8   paragraph 10.  Back to my question.

9         When you would, a physician, would see

10  Mr. Gracia tolerated changing dressing poorly, what

11  would you expect that to mean?  What does that phrase

12  "tolerated poorly" mean?

13     A   It means -- to my interpretation it means that

14  he didn't like it that she was changes his dressing.  He

15  might have complained of pain or he pulled away or other

16  kinds of -- he didn't -- he didn't like that his

17  dressing was being changed in the middle of the night.

18  I mean, more than didn't like it.  His body reacted

19  poorly to that.

20     Q   Hypothetically if there was a inmate who just

21  didn't want to deal with a nurse, had no physical

22  problem, you know, no medical problem, and he was

23  resisting the treatment or whatever, would that be

24  considered tolerated poorly?

25        MR. RECKSIEDLER:  Object to the form.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    A    I don't believe that a nurse would use that

2  phrase, no.  It doesn't sound like phrasing you would

3  use if they just didn't want it done.

4  BY MR. ANGELL:

5    Q    The next line, she also noted the wound was

6  redden with a large amount bleed drainage present.

7  There were no vital signs reported at any time on

8  8/8/215 -- 2015 or on the overnight shift into Sunday

9  morning, August 9.

10         Tell me, first of all, what do you think might

11  be indicated from the reddened wound with a large amount

12  of bloody drainage.

13    A    Well, it may well indicate that the infection

14  is getting worse.  Again, we don't know the status of

15  sepsis or not because we don't have vital signs upon

16  which to go or any other kind of assessment.  We don't

17  have an assessment of his mental status.  We don't have

18  an assessment of his heart or his lungs, his temperature

19  or any of his other vital signs.  So we just can't say

20  at this point.

21         In hindsight, one can say that he is probably

22  getting worse based upon what happens, but we don't have

23  information to be able to pinpoint that for certain

24  because of the lack of vital signs and assessment.

25    Q    So we know you're critical of the lack of

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    recording vital signs.  Are you critical of anything

2    else with Nurse Clairmont as referenced in paragraph 10?

3        A    Well, she describes it being reddened.  So not

4    slightly reddened now but reddened with a large amount

5    of bloody drainage present but no further -- no further

6    description or assessment.  So I would expect some

7    further assessment of that.  Looks the same as when I

8    saw it yesterday; looks worse than when -- so she had

9    been there the evening before so...

10       Q    Paragraph 11, we have at 10:29 a.m., so August

11   9th, Nurse Galloza-Gonzalez noted patient alert,

12   oriented times three, complains of weakness and

13   dizziness.  We have the vitals, which I won't read it

14   all into the record.

15           Tell me what you think she -- well, first

16   question.  Do you think she was appropriate by what she

17   wrote down that she did that she notified Provider

18   Evans?  Do you think that was appropriate?

19       A    That step was appropriate, yes.

20       Q    Do you think there was anything else she

21   should have done?

22       A    I think she should have recorded a more

23   thorough assessment of him at that time, his wounds, his

24   mental status, et cetera, but what is recorded there did

25   indicate that she should contact a provider and she did.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    Q    Now, when it says oriented times three, is

2    that -- that's a mental assessment to a certain degree,

3    correct?

4    A    That is.

5    Q    Is oriented times three the highest or is it

6    times four?  I can't remember.

7    A    There is a times four but most nurses would

8    only use times three as -- so that would not indicate an

9    abnormal confusion.  That would indicate being oriented

10   normally.

11   Q    Now, these vitals, do you find them to be --

12   let's say on a scale of one to ten where one is totally

13   normal and ten is, you know, critical mass territory.

14   Where would you consider this, these vitals to be on

15   alarm scale, if you will?

16   A    Well, I don't want to put a number on a one to

17   ten scale but the temperature is normal.  The pulse rate

18   of 131 is dramatically abnormal.  So in other words,

19   that specifically requires some further intervention and

20   monitoring assessment.  The blood pressure is normal

21   especially given we don't have many prior records.  I

22   mean, it's maybe a little less than his baseline but

23   it's within the normal range.  The respiratory rate

24   being 22 is abnormal.  So top normal is 20.  So that's

25   breathing faster than normal, and the oxygen saturation

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1  is normal.  So a markedly abnormal pulse and an elevated

2  respiratory rate.

3      Q    And I know you don't want to put numbers on

4  it, but I just want to know how concerning is that pulse

5  rate?  How concerning is that respiratory rate in

6  general terms?

7          MR. RECKSIEDLER:  Object to the form.

8      A    Well, given that he had had normal vital signs

9  before, meaning heart rate less than 100, something is

10 dramatically different now; that is, a markedly abnormal

11 pulse rate and something is dramatically different than

12 when he's prior been measured.  What that is caused by,

13 one can't say for certain without further assessment but

14 it requires -- that's what required further action,

15 further assessment, calling the provider.

16 BY MR. ANGELL:

17     Q    And then at that point what else -- what other

18 sort of assessment could nurse -- I guess it was

19 Galloza-Gonzalez -- what else could she have done as far

20 as assessment goes at this point?

21     A    Well, so you have to note also that the pulse

22 is 131 in combination with weakness and dizziness.  In

23 other words, it's not just a pulse of 131 that is

24 asymptomatic but it's a symptomatic pulse of 131.  She

25 could have made an assessment of his hydration status so

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    taken vital signs both lying and standing to see if his

2    blood pressure -- because if this was a blood pressure

3    that was taken lying down and he had a heart rate of 131

4    and was dizzy, then when he stood up, one would expect

5    his blood pressure to drop, she could have made a

6    further assessment of, as I said, the wound or signs of

7    infection.  So she should have made a more thorough

8    assessment.

9          Likewise, Nurse Practitioner Evans should have

10   inquired of her, if called about these things, about

11   those things as well.

12       Q    And then you would agree that a registered

13   nurse or an RN reports to a nurse practitioner, right?

14       A    Well, in this case she certainly called -- the

15   provider has the capability of placing orders.  The

16   registered nurse or LPN makes assessments and provides

17   information to either a nurse practitioner or a doctor.

18   But in this case it was Nurse Practitioner Evans that

19   was on call, the provider on call.

20       Q    Just to make sure I'm covering my bases.  Is

21   it true nationally that basically an LPN assists an RN

22   who then reports to a practitioner or doctor?  Is that

23   the same everywhere or is that a Florida thing?  That's

24   what I'm trying to figure out.

25       A    That hierarchy is the same everywhere.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    However -- so, for instance, an LPN could report their

2    assessment directly to a doctor or to -- it doesn't have

3    to be an RN in the chain of command.  In other words, I

4    would expect an LPN working at my facility and I was the

5    provider over the weekend to call me directly, not some

6    intervening RN.  In general that is the hierarchy.

7         Q    Thanks.  Now, where it says Provider Evans

8    notified, order to increase fluid intake, extra fluid

9    given.  Will continue to monitor.

10         Do have a problem with either Nurse

11    Galloza-Gonzalez or Provider Evans?

12        A    Both of them.

13        Q    Tell me -- let's start with Nurse

14    Galloza-Gonzalez.  What's your issue there?

15        A    I think I've already addressed them.  They

16    don't have adequate assessment and then don't question

17    when Nurse Practitioner Evans says, give him some extra

18    fluid to drink, not questioning anymore, is that

19    adequate or are you certain that's all that you want to

20    do.  And then, most significantly, no follow up, no

21    assessment of was the fluid consumed.

22         I saw where one of the expert reports, I

23    believe it was the first one, I'm not sure what that

24    nurse's name was, said that extra fluid was given which

25    he consumed.  I didn't see evidence in the record that

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    he consumed it.  I see it says, extra fluid given.  So

2    there's no indication was he able to tolerate it.

3    Certainly no indication that the amounts of fluids given

4    or output, in other words did he urinate as a result of

5    that, did his symptoms of weakness and dizziness get

6    better, did his pulse rate come down.

7         So at the very least, you needed some kind of

8    reassessment to determine whether the extra fluid was,

9    in fact, beneficial or all that was needed.

10    Q    Do you -- so what about -- and I think you

11    were responding to Nurse Galloza-Gonzalez.  What about

12    Provider Evans?  Do you think her response to this

13    report was appropriate?

14    A    Under certain circumstances it could be.  So

15    as a for instance, if she knew that she was later going

16    to be there in a couple of hours, which she was, yes,

17    then it could have been an appropriate response to say

18    give fluids and I will assess him when I arrive there.

19    So I don't think that -- there's other responses other

20    than just have to send him to the hospital.  Do you

21    understand what I'm saying?  I'm not saying this

22    requires sending him to the hospital.  It requires some

23    further assessment and determination.

24         So she could have said, I'll see him when I

25    get there.  I'll make an assessment.  So, no, I don't

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                      Page 44

1    think that her response --

2        Q    Is necessarily improper?

3        A    Or is necessarily proper, either one.  By

4    itself it's not proper.

5        Q    I understand exactly.  Thank you.  Now, on the

6    next page, paragraph 13 --

7            MR. RECKSIEDLER:  Did you intend on skipping

8        12?

9            MR. ANGELL:  Yes, I did.  Thanks.

10           MR. RECKSIEDLER:  Okay.

11           MR. ANGELL:  We've already discussed it, I

12       think.

13   BY MR. ANGELL:

14       Q    Paragraph 13, Nurse Practitioner Evans was

15   present in the infirmary unit that afternoon.  She

16   co-signed the order for Zofran from the day before and

17   authorized release of Mr. Gracia to general population.

18   There is no record that she actually evaluated or saw

19   Mr. Gracia.

20           Let's take that step by step.  Do you have any

21   critiques of co-signing the order for Zofran?

22       A    No.  Let me clarify that when we were talking

23   about over here, we were talking about Saturday, the --

24   I'm sorry, no.  The weakness and dizziness was on

25   Sunday, I'm sorry.  She comes in -- the nausea was on

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    Saturday.  I'm sorry.  I got my days mixes up.  So the

2    weakness and dizziness was on Sunday morning, the 9th.

3        Q    Hold on here.  Now I'm confused.  So on

4    Sunday, the 9th, is when we have the weakness and

5    dizziness and the vitals taken, right?

6        A    That's right.

7        Q    Sunday morning?

8        A    That's right.

9        Q    Now, we go to paragraph 13, Nurse Evans was --

10   pardon me, Provider Evans was present in the infirmary

11   that afternoon.  Was that the Sunday or the Saturday?

12       A    This refers to the Sunday.  I got mixed up for

13   a moment.  We saw later that she did come in on Saturday

14   and talk to him but this refers to the Sunday afternoon.

15       Q    In other words, Nurse Practitioner Evans saw

16   Mr. Gracia on the Saturday?

17       A    She talked to him about leaving his dressing

18   on is what I believe she and/or Nurse Gonzalez say in

19   the investigative report on Saturday.

20       Q    Then Sunday, Nurse Practitioner Evans was

21   there again, correct?

22       A    Right.

23       Q    Now, anything -- any issue with the Zofran?

24       A    Co-signing the order from the day before, no.

25       Q    What about authorizing the release to general

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   population?

2       A   Yes.  She -- I have a major problem with that.

3   She failed to assess -- just a few hours before he'd had

4   a markedly abnormal pulse rate and weakness and

5   dizziness and she made no assessment of him.  She didn't

6   assess him at all.

7       Q   Is that the extent of your critique, that she

8   did not do an assessment?  Anything else with -- any

9   other problem with releasing him to the general

10  population?

11      A   Well, I believe at that point a reasonably

12  prudent provider who had assessed him would have

13  determined that he was having sepsis and would have sent

14  him to the hospital.

15      Q   So you believe that in the Sunday afternoon it

16  would have been clear that he was suffering from sepsis?

17      A   Yes.

18      Q   To the exclusion of other potential diagnoses?

19      A   No, but to the extent that he would have

20  required further assessment that they weren't capable of

21  and would have sent him to the hospital at that point.

22      Q   Now, at this point we have weakness and

23  dizziness.  We have elevated pulse rate and elevated

24  respirations, normal temperature and normal blood

25  pressure, correct?

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    A    Vomiting.

2    Q    And vomiting.  That category of symptoms, what

3    are the potential diagnoses that you could draw from

4    that?

5    A    Well, there are a whole list of potentials but

6    you also left out one important fact.  I mean, which is

7    that he had multiple dog bite wounds which are now red

8    and draining.  So sort of like Dr. Zawitz said something

9    about even if you suspected sepsis, a doctor would not

10   necessarily identify it because sepsis is more commonly

11   due to your lungs or your gastrointestinal tract or your

12   urinary tract.  Those things are true in the absence of

13   a red draining dog bite wound.  That then rises to the

14   high on the list of things.

15        So in other words, although there are other --

16   certainly other possibilities about what could be wrong

17   with him, when you have a person with those symptoms in

18   the face of dog bite wounds which are reddened and which

19   are draining, that rises to the top as the cause.

20   Q    And I understand that likelihood.  I'm just

21   curious what other sort of things might there be that

22   could explain these symptoms?

23   A    He could have gotten -- been vomiting so much

24   that he became dehydrated, so he has dehydration.  He

25   could have had some -- the infection could have spread

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1  to other parts of his body.  So in other words, he could

2  have another kind of infection or an infection related

3  to HIV.  So this is not a normal person to the

4  reasonably prudent provider.  In other words, you're

5  expecting that they're immunocompromised and that adds a

6  whole another list of potential problems.

7      Q    I appreciate that.  Anything else that these

8  symptoms could be indicative of?

9      A    I mean, they're -- I could probably stay here

10  all day and think of things they possibly could be due

11  to.  I saw one the experts commented upon vomiting can

12  be related to the medicines.  Certainly Augmentin can

13  cause nausea.  Augmentin does not cause you to have a

14  heart rate of 131.

15      Q    Paragraph 14, we have 7:48 p.m., August 9th,

16  which is a Sunday.  Nurse Clairmont made a housing

17  recommendation to the general population.  Now, I can't

18  remember myself from the records, is it true then that

19  both Nurse Practitioner Evans and Nurse Clairmont

20  independently notated that he should be in general

21  population?

22          MR. RECKSIEDLER:  Object to the form.

23      A    I don't believe they independently did it.

24  What I am referring to here is a note made by Nurse

25  Clairmont.  It's essentially caused that housing

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    recommendation.  It's essentially a note that she

2    entered, if you follow what I'm saying.  It could well

3    be in response to what Nurse Practitioner Evans had

4    previously said should occur.  So I don't know that she

5    independently did that.

6    BY MR. ANGELL:

7        Q    And, again, no recording of vital signs; I'm

8    certain you're critical of that?

9        A    Yes.

10       Q    Then at 9:54 p.m. Nurse Harter -- do you

11   understand that she's an LPN?

12       A    I do.

13       Q    Noted that patient refused to get up and take

14   his p.m. medications as ordered, refusal done.

15           Do you have an issue with Nurse Harter's

16   conduct in this case?

17       A    I do.

18       Q    Tell me what that is, please, at least at this

19   point.

20       A    I believe that from the description made by

21   two non-medical people who were there, so Officer Vargas

22   and Inmate Ball, Inmate Ball specifically says that he

23   appeared to be out of it and too weak to stand up and

24   described a distinctive foul odor.  Likewise, CO Vargas

25   describes him as being very weak at this point.  So you

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   have two non-medical personnel who describe a person

2   who's in obvious medical distress.  So if it was obvious

3   to non-medically trained personnel, I think it should

4   have been obvious to Nurse Harter and she should have

5   seen that she got him some more help.

6      Q    So you think it was incumbent upon Nurse

7   Harter to go above her RN that was with her?

8      A    I think that what she did was she reported the

9   refusal, as I read it.  So, in other words, she didn't

10  necessarily do anything -- she didn't do anything else

11  to get him assistance.  She reported that he refused

12  medication, that's all that she reported.

13        I don't know what she did or didn't tell Nurse

14  Clairmont, but I think it should have been obvious to

15  her that he had a severe medical condition at that time.

16     Q    And you understand his appearance of severe

17  medical condition based on reports of CO Vargas and the

18  inmate, right?  Is there anything else you're drawing on

19  in their reports?

20       MR. RECKSIEDLER:  Object to the form of the

21    question.

22       MR. ANGELL:  Answer, if you can.

23     A    Well, the entire investigative report they

24  talked to multiple people.

25

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    BY MR. ANGELL:

2       Q    Then we have Nurse Clairmont's 3:13 a.m. note

3    on -- this would technically be the Monday, August 1oth.

4    I won't read the whole thing.

5          Are you critical of how she responded to this

6    report?

7       A    Yes.  So from reading the investigative

8    report, it appears that Nurse Clairmont never even went

9    in his room.  She asked him to open the meal slot and

10   ordered him to come to the door for his medications.  So

11   not only did she not perform any kind of assessment or

12   check any vital signs or talk to a provider or send him

13   to the hospital, she didn't even go into his cell.  She

14   simply had the officers the meal tray, gave him a couple

15   of opportunities to walk up there, said that the

16   dayshift nurse said you can walk so you need to come up

17   here.  When he didn't, then she had the CO's write him a

18   disciplinary report for refusing an order and feigning

19   an illness.

20      Q    In your experience in correctional medicine is

21   it common for patients to feign illnesses?

22         MR. RECKSIEDLER:  Object to the form of the

23         question.

24      A    I would not say it's common and it occurs in

25   jail settings; it occurs in other settings as well.  I

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1  think this particular scenario doesn't strike me as

2  anything feigning about it.  It doesn't strike me as

3  typical kind of scenario for that, and I don't believe

4  it's typical that people, even inmates, feign illnesses

5  in this kind of scenario.

6  BY MR. ANGELL:

7      Q    It is certainly possible though that Nurse

8  Clairmont misinterpreted his -- I guess we can call them

9  symptoms or his actions here as feigning an illness.

10  Would you agree that's a possibility?

11     A    It is.  And the reason -- and because it is a

12  possibility and is what occurred here, it's why so much

13  time is spent on training correctional nurses that,

14  No. 1, nurses are not to make diagnoses.  So malingering

15  is a medical diagnosis not a nursing assessment, and

16  it's a very dangerous assessment to make.  And if you're

17  going to make that assessment, you should be very

18  cautious about it because if there's a bad outcome in

19  proximity to having made that assessment, it will not

20  end well.

21     Q    Interesting.  You said malingering is a

22  medical diagnosis?

23     A    It is.

24     Q    So is that -- I wasn't aware of that.

25         So is that something that must be done, in

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   your opinion, by a nurse practitioner or a medical

2   doctor?

3       A   If you were going to make that diagnosis, yes,

4   and should be done very cautiously by them.

5       Q   Sure.  You also mentioned I think it was the

6   CO Vargas noted there was a foul odor, it might have

7   been the inmate.  What would that possibly be indicative

8   of?

9       A   Both of them indicated that.  And it would

10  indicate a deep tissue infection, specifically caused --

11  E. coli is one of the ones that causes an odor.  There

12  are a couple more that -- basically a deep tissue

13  infection.

14      Q   Now, paragraph 17 on the next page, you're

15  going from the narrative from Officer Vargas.  Do you

16  have any criticisms of Officer Vargas?

17      A   Yes.

18      Q   Please tell me what those criticisms are.

19      A   I believe even the correctional officer should

20  have been able to identify that he was in a medical

21  crisis and should not have -- and should have taken some

22  action to get him help.  In most scenarios, officers

23  have the ability to call 911 themselves.  This is a

24  little bit different in that it's an infirmary.  But I

25  believe they should not have gone along with the

1    feigning illness and should have seen how weak he was.

2       Q    So, in other words, you're critical of Officer

3    Vargas for relying on the medical personnel?

4       A    What I'm saying is that even non-medically

5    trained persons, a lay person which Officer Vargas was,

6    should have been able to identify that this man was very

7    severely ill at that point and should have taken some

8    action to get him help.

9       Q    Now, you have paragraphs 18 and 19.  Does this

10   change anything we've already talked about?  Is that in

11   your opinions or is this just more documentation of the

12   timing?

13      A    I think it's more documentation of the timing.

14   I will comment to say that I believe nurse -- I saw some

15   varying comments by the experts that Nurse Clairmont

16   didn't have anything to do with his transfer to Cell 19.

17   I don't believe that's correct.  I believe she

18   authorized him to go there.  That was an observation

19   bed.  Nurses weren't allowed to authorize a person to be

20   in an observation bed.  I believe she later said in her

21   deposition that she did, in fact, authorize the

22   transfer.

23      Q    Thanks.  And then we know that he expired.

24   The next page here, the autopsy report.  Aside from what

25   we've already talked about with the HIV issue, are you

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 55

1    accepting the findings of the medical examiner's office

2    as true?

3        A    I believe that they are.

4        Q    And is this sort of analysis, this postmortem

5    analysis, is that something that has been your scope of

6    expertise or not?

7        A    I believe that it is.

8        Q    And, again, aside from the HIV issue, any

9    concerns, disagreements, with the results from the

10   medical examiner?

11       A    I essentially agreed with their findings.

12       Q    Have you personally dealt with death from

13   sepsis in confinement settings in your experience?

14       A    I have not ever had a death from sepsis in my

15   jail.

16       Q    Have you had septic infections in your jail?

17       A    I've had patients who I've concern may be

18   becoming septic and sent them to the hospital, yes.  I'm

19   not aware any of them died after.

20       Q    How many times has that happened in your 20

21   years with your facility?

22       A    Almost impossible to answer if you use sepsis.

23   I've sent dozens and dozens of people with infections to

24   the hospital now.  How many of them actually had sepsis

25   I couldn't speculate.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    Q    What is left ventricular hypertrophy?

2    A    Hypertrophy.  It is enlargement of the heart.

3    Q    Is that something that accompanies shock?

4    A    No.  It occurs over a long period of time.

5    Q    So that was something that would have

6    developed -- by a long period of time do you mean days

7    or years?

8    A    Years.

9    Q    What could that have been indicative of in

10    Mr. Gracia's case?

11    A    Possibly high blood pressure; that would be

12    the most common cause.

13    Q    I'm going back but systematic shock, that

14    would be -- is that what you consider to be the actual

15    cause of death?

16    A    Septic shock, yes.  The medical examiner, I

17    think, mixed systemic or maybe the transcriptionist got

18    it incorrect.  But anyway, the systemic shock meaning

19    septic shock.  The reason that that's important is --

20    especially is there is acute esophageal necrosis.  So in

21    other words, the esophagus had started to die, the

22    tissue had started to die, and that doesn't happen in a

23    matter of minutes or even a couple of hours; that means

24    it's been going on for a while.  And acute renal failure

25    down below, we see that the vitreous degree of nitrogen

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    and vitreous creatinine are both elevated.  So he had

2    kidney failure at the time he died which, again, doesn't

3    occur within minutes.  That's a multiple-hour process.

4        Q    Okay.  So let me make sure I understand that.

5    The acute esophageal necrosis, is that hours or days or

6    weeks?

7        A    I don't know that I can pin it down.  I can

8    say it doesn't have to be weeks.  It could develop in

9    hours or days.

10       Q    Does that mean the whole esophagus is dying or

11   what does that mean?

12       A    Essentially, yes.  The blood flow was cut off

13   to the esophagus.  The tissue became what's called

14   friable or bleeding and friable.  There was lots of

15   coffee ground materials noted on towels and sheets when

16   he was found around where he was found.  It's often

17   described as coffee ground looking stuff.  You might

18   have heard of coffee ground emesis or when people vomit

19   black specs, it's essentially blood.  So that's what was

20   happening to his esophagus in the hours before he died.

21       Q    And the bilateral adrenal hemorrhage, is

22   that -- tell me about that.

23       A    So your adrenal glands are on top of your

24   kidneys and basically if they go without blood flow for

25   a prolonged period of time they can hemorrhage.  So it's

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    a shock finding in other words.  As a result of hours

2    worth of shock, the adrenal glands are hemorrhaged.  So,

3    again, that's a finding that doesn't occur in minutes

4    but over a period of hours or days.

5        Q    I see.  Clinically -- in subparagraph E you

6    have, clinically insignificant quantities of cocaine and

7    cannabinoid.  What is clinically significant?  What does

8    clinically insignificant quantity, how close was he to

9    that point of cocaine?

10       A    Very far away.  So these were essentially

11   trace amounts.

12       Q    How long can cocaine show up with clinically

13   insignificant quantities?

14       A    Well, obviously it can show up four -- I mean,

15   four days.  He apparently had not had cocaine within the

16   jail.  So he consumed at it at the very least prior to

17   his incarceration meaning at least four days prior.

18       Q    My question is how much -- what's that range?

19   How long does it take for cocaine to fully metabolize

20   out of the body?

21       A    Well, there's blood and there's urine.  It

22   actually metabolizes out of the blood sooner.  This is

23   actually blood.  So it takes in the range of all

24   metabolites up to a week.  So four to seven days it

25   would be completely out of the blood.  I would have

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   expected -- I would have expected it to be out of the

2   blood pretty quickly here and there is only trace

3   amounts.  In other words, there's no evidence that he

4   consumed cocaine within the jail setting or these are

5   very trace amount.

6       Q    But -- so it sounds like it wouldn't be, like,

7   a month though.  It would have been -- sounds like you

8   would expect he would have consumed cocaine within three

9   days or so before he was arrested, within that period?

10      A    Within the prior week.  That is not true of

11  cannabinoid.

12      Q    That was my next question.  What's the time

13  line on cannabinoid?  I thought it was cannabinoid.  Oh

14  well.

15      A    Either one.  That can be upwards of four to

16  six, even eight weeks.

17      Q    We have already talked about F.  I will be

18  flipping through -- looks like we've covered a lot of

19  this ground already.  We can flip all the way to nine.

20  We've talked about everything else along the way.

21      MS. BRADFORD:  Page 9?

22      MR. ANGELL:  Yes, I'm sorry.  Thanks.

23  BY MR. ANGELL:

24      Q    We are now into your opinions.  We have Roman

25  Numeral I and sub one.  These are your criticisms of

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   Nurse Galloza-Gonzalez.  One thing I saw you did not

2   say, which you did for other folks, I'm trying to find

3   your own language.  Yeah.

4        So in subparagraph three -- I'm jumping

5   around, sorry about that everybody -- but in

6   subparagraph three we talk about Nurse Practitioner

7   Evans.  At the end of that paragraph you say, Nurse

8   Practitioner Evans' actions and her lack of even the

9   most basic concern for Mr. Gracia's worsening condition

10  appears to go beyond negligence and rises to the level

11  of indifference.

12       My question is whether you excluded that

13  opinion intentionally from your opinions about Nurse

14  Galloza-Gonzalez.

15     A   I did.

16     Q   So you do not believe that we could reasonably

17  interpret indifference on the part of Nurse

18  Galloza-Gonzalez; is that correct?

19     A   I agree.

20     Q   Thank you very much.

21       Now, the same question for Nurse Harter.  Did

22  you exclude the possibility that indifference is a

23  conclusion?

24     A   I reached the conclusion that what she did was

25  a breach of the standard of care.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                    Page 61

1      Q    Which would not be indifference; that would be

2   negligence, right?

3      A    Well, so it's my understanding that really the

4   determination of indifference is more a legal conclusion

5   rather than a medical opinion, and so I don't take

6   lightly saying that someone was indifferent.  I usually

7   describe it in terms of their -- the degree to which

8   they breached the standard of care.  So far below the

9   standard of care could be interpreted as being

10  indifferent.

11          In this case, in Nurse Harter's particular

12  case, I think it was just a breach of the standard of

13  care.  So I would not expect that she would have been

14  deliberately indifferent.

15     Q    Thank you.  So from your work as an expert in

16  other cases have you been familiar with the term

17  "deliberate indifference" before this case?

18     A    I have.

19     Q    Is that a term that's used in this field?

20     A    It is.

21     Q    So you now -- if you were talking about

22  degrees of falling below the standard of care, do you

23  have degrees of Nurse Galloza-Gonzalez and Nurse

24  Harter's failures in your opinion?

25     A    I believe that they did not rise to the level

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                    Page 62

1    of what I would believe someone would reasonably call

2    indifference.

3        Q    But what -- in your own personal terminology

4    what are the degrees of below the standard of care that

5    you use in your practice?

6            Because I think -- let me make sure I

7    understand it.  I think what you told me was that you

8    determine, in your opinion, whether somebody fell below

9    the standard of care, fell far below the standard of

10   care, or is there another lower category of being

11   indifferent?

12       A    Yes.  So we're either ignored or deliberately

13   ignored or I prefer terminology like that.  But failed

14   to attempt to get them care, did not just make a mistake

15   in judgment but were, in fact, indifferent to their --

16   to what should have been perceived as a serious medical

17   condition.

18           I also think that goes quite -- goes well with

19   what even a layperson, a non-medically trained person

20   can identify as a serious medical condition.  If you

21   don't provide them some treatment, then I think that is

22   so far below the standard of care as to raise the

23   question to a court of whether it represents to them

24   indifference.

25       Q    Thank you.  I'm not trying to ask the same

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    question a thousand times.  But I think your opinions

2    are that Nurse Galloza-Gonzalez and Nurse Harter were

3    ordinarily negligent; does that make sense?

4        A    Were below the standard of care but not rising

5    to the level I would consider to have been indifference.

6        Q    Thank you very much.

7            Your paragraph sub three when you talk about

8    Nurse Practitioner Evans, you believe she did fall to

9    that level of indifference; is that correct?

10       A    Yes.

11       Q    Do you have any other basis aside from

12   everything we've talked about and what's in this

13   paragraph 3 for that opinion?

14       A    One thing that has come to light since -- I

15   think since I wrote this report was that essentially

16   Nurse Practitioner Evans did not really even document an

17   assessment on Friday when she -- Dr. Buck said that the

18   provider, which was Nurse Practitioner Evans, was to

19   round on every patient in the infirmary each day of the

20   week Monday through Friday and to write a note about

21   that.

22           She has a note in the chart but it is

23   essentially -- it's essentially a review of diagnoses.

24   It doesn't -- one cannot even infer that she actually

25   saw him on that day.  It's a -- essentially a review of

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    diagnoses.  So I don't see evidence that she even

2    assessed him on Friday.

3         We do know, according to her own testimony,

4    that she talked to him both on Saturday and she at least

5    had contact with him on Sunday, but didn't do an

6    assessment or made no effort at an assessment either

7    day.

8        Q    Now, for paragraph 4 we have Nurse Clairmont

9    and you also opined that her lack of care and concern

10   rises to the level of indifference; that is your

11   opinion, correct?

12       A    That is correct.

13       Q    And other than the things we've already talked

14   about in the timeline and what you have here in this

15   paragraph, are there any other factors or opinions that

16   you hold concerning Nurse Clairmont that impact that

17   conclusion?

18       A    To the best of my recollection we've discussed

19   the major ones.

20       Q    Then if you flip the page, subparagraph six,

21   we talk about Dr. Buck.  If you'd read that paragraph.

22        Is this what we've talked about earlier when I

23   was asking questions about Dr. Buck?  Is there anything

24   else I missed?

25       A    I think that fairly summarizes it.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1      Q    Now, paragraph seven, the penultimate sentence

2   there, you say Mr. Gracia was otherwise in good health

3   and his infection could have been treated successfully

4   up until shortly before his death in the early morning

5   hours of August 10, 2015.

6           First of all, otherwise in good health, tell

7   me about that.

8      A    So he was not known to have -- they did not

9   identify at the hospital any other ongoing intercurrent

10  illnesses.  He had HIV positivity but that no longer

11  qualifies as not being in good health or it can, I mean.

12  So a prudent provider should identify that you could

13  possibly be immunocompromised but many people who have

14  HIV are no longer immunocompromised.  In fact, might not

15  even have the virus detected.  I saw no evidence that he

16  had problems; in other words, health problems going on.

17     Q    So is this status of HIV -- Let me start this

18  question over.

19          If somebody is HIV positive, that alone, in

20  your opinion, constitute a serious medical need?

21     A    Serious medical needs have all kinds of degree

22  of -- I'm not trying to hedge but it is a serious

23  medical condition if you take serious medical condition

24  as sort of definition being that it requires care by a

25  doctor.  In other words, it would be not taking care of

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   a serious medical need if you had someone who was HIV

2   positive and you failed to him them their HIV medicines

3   for two years while they were incarcerated.  That would

4   be a serious medical need which you did not address.

5        So, yes, it could certainly be.  The very fact

6   that he had HIV did not mandate that he go to the

7   hospital or anything.  It would raise the level of

8   concern that he might be immunocompromised.  And so a

9   reasonably prudent provider would take that into account

10  that this is a special person that might be

11  immunocompromised and needs even closer attention to

12  infections.

13      Q   So it's fair to say then that somebody who is

14  immunocompromised HIV positive, that's not necessarily

15  an acute condition; is that fair?

16      A   That's correct.

17      Q   Now, you also opine that his infection could

18  have been treated successfully up until shortly before

19  his death.

20        Do you have an opinion as to when perhaps the

21  critical, like, the point of no return had been reached?

22  What sort of window could he still have been saved for

23  lack of a better term?

24      A   My opinion would be sometime very few hours

25  before his death.  So around or after the transfer of

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    his -- after the transfer to Cell 19.  In other words,

2    if he had been sent to the hospital around the time of

3    the events of the evening of the 9th, there's no

4    evidence that he was -- it's not certain whether he was

5    in septic shock or not, but Dr. Zawitz provided

6    mortality estimates for people with sepsis and with

7    septic shock.  And we never have documented for certain

8    that he was in septic shock.  So we only have sepsis

9    going on, which is a very treatable, very much

10   survivable condition.

11       Q    So you referenced Dr. Zawitz there.  Do you

12   defer to him on his opinions concerning those mortality

13   probabilities and whatnot?

14       A    I do not defer to him.  I agree with him about

15   the approximate mortalities of sepsis and septic shock.

16       Q    So do you have his report with you?

17       A    I do.

18       MR. RECKSIEDLER:  30 percent, if that's what

19   you're looking for.

20       THE WITNESS:  That's right.

21       MR. ANGELL:  I want to take a look at a few

22   other things.

23       THE WITNESS:  I did pull the first few pages

24   of his report out.  That's the other -- it's on

25   page 10, I believe, to what I refer.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 68

1    BY MR. ANGELL:

2        Q    My question was going to be what is it about

3    his opinions that you disagree with.

4            MR. RECKSIEDLER:  Object to the form.

5        A    I have a bullet point list of items which I

6    disagree with his opinions.

7    BY MR. ANGELL:

8        Q    Is that the handwritten document you just

9    pulled out there?

10       A    Yes.

11       Q    Is that your only copy of that or is that a

12   copy --

13       A    No, this is my only copy.

14       Q    Would it be a problem if you made an exhibit

15   to this deposition?

16       A    Not at all.

17       Q    Make a copy of it?

18       A    I would like a copy back but, no, I don't mind

19   you making one.

20           MR. ANGELL:  Okay, thanks.  I'll mark this as

21   No. 4.  You can keep Dr. Zawitz' report in there.

22   Keep your papers in line.

23           (Exhibit No. 4 was marked for

24   identification.)

25

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    BY MR. ANGELL:

2        Q    Your handwriting is definitely better than

3    mine, and based on the jokes about doctors I'm guessing

4    better than your colleagues.  That being said, why don't

5    you walk through that for us.

6            What are the bullet point critiques of

7    Dr. Zawitz' opinions?

8        A    One of the first critiques I have is that in

9    his timeline section he also issues several opinions,

10   but two different times he basically says that it would

11   be -- I'm going to paraphrase now rather than saying

12   what he said.

13       Q    Sure.

14       A    It would be speculation as to how much more

15   likely it would be that Mr. Gracia survived.  At most,

16   it would be an incalculable increase in the chance of or

17   the possibility of survival.  He says that two times in

18   his report, yet on page 10 he says that sepsis and

19   septic shock are a serious -- are serious conditions and

20   sepsis has a mortality of 25 to 30 percent; septic shock

21   has a mortality of up to 70 percent.  But all of the

22   descriptions are of Mr. Gracia having sepsis up

23   through -- I told you that at some point in the hours

24   before he died he developed septic shock, but up until

25   that time he had only sepsis.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1        So although you might not know the certainty

2  what the survival is, more likely than not he would have

3  survived because only 30 percent or so of people with

4  sepsis die.  So more likely than not he would have

5  survived had he been sent to the hospital anytime up

6  through some point that we just talked about when that

7  point was.  But it was, I believe, some point after when

8  he -- I believe had he been sent to the hospital at the

9  time of his transfer to Cell 19, he would have survived

10  more likely than not.

11      Q    And that opinion, where do you draw that

12  opinion from, more likely than not opinion, that comes

13  to the timing of the development of septic shock?

14      A    Well, it's made more difficult by the fact

15  that we don't have any vital signs through any of this,

16  so we don't know for certain.  But my opinion is that a

17  young, healthy person, and I understand that he has HIV,

18  but a young person with sepsis who was sent to a

19  hospital would be quickly diagnosed which is another

20  thing that I disagree with Dr. Zawitz.  He said it could

21  have taken a pretty long time to get him to the

22  hospital.  It could have taken a long time to come to

23  the correct conclusion because there are many -- the

24  abscesses were not visible and so, therefore, it was

25  occult.  He described sepsis as being occult.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1          I would describe it not as occult but just

2     undiagnosed.  So in other words, had he been sent to the

3     hospital, a person who's septic in the setting of

4     multiple dog bite wounds which are draining and which

5     are red, that would be the conclusion about what the

6     cause of his sepsis was.

7          Q     What does the word "occult" mean in this

8     context?

9          A     It means with hidden or without obvious signs,

10    and I believe that's incorrect of him to use that.  It

11    wasn't without obvious signs.  It was undiagnosed.  So

12    without recognized signs.  They didn't recognize that it

13    was sepsis but it was not occult sepsis.  It was regular

14    sepsis that was not diagnosed.

15         Q     So I understand this sepsis itself has a 70

16    percent survival rate in general; is that right?

17         A     Right.  Dr. Zawitz reported a 25 to 30 percent

18    mortality but I am using the inverse of that.

19         Q     So what exactly is sepsis as opposed to septic

20    shock?

21         A     Okay.  Sepsis is a systemic or the body's

22    response to an inspection.  And it is when the body

23    begins -- so when there is dysfunction or lack --

24    failure to function of body parts due to -- that are

25    remote from the septic site.  So, in other words, a dog

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    bite wound on the first date is not infected.  It's just

2    a dog bite wound.  When it becomes reddened and drains,

3    that is an infected dog bite wound but, again, a local

4    infection.  So you have pimple on your leg, that's an

5    infection but it is not a systemic infection.

6             The first reaction that our bodies have to

7    infection somewhere is a fever.  So when you have --

8    that is a remote effect of your body from an infection.

9    So when you have strep throat and you have a fever,

10   you're not necessarily septic but it is a reaction of

11   your body to an infection.  When body organ systems

12   start to fail as a result of an infection, so kidney

13   function goes bad, your adrenals, things start

14   happening, you start getting liver damage, those things

15   are effects of -- systemic effects of an infection and

16   that's what we call sepsis.

17            Septic shock is when it has gotten so bad that

18   there is lack of profusion.  So, in other words, your

19   brain doesn't work right.  Your blood pressure is very

20   low.  Your heart is no longer pumping effectively.  So

21   it is the same end effect as if you had been shot and

22   lost most of your blood.  It's a shock situation.  Your

23   body's not reducing -- and if that's not corrected

24   pretty quickly, you're going to die.

25            But it can be, in a young, healthy person,

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   even septic shock can be reversed pretty quickly.  Three

2   liters of IV fluids, correct antibiotics, what are

3   called pressers or medicines to get your blood pressure

4   up so...

5       Q    You would agree though that somebody even in

6   the care in a hospital who's suffering from actual

7   septic shock could be beyond the point of no return;

8   it's certainly a possibility?

9       A   I agree that there are -- I don't disagree

10  with Dr. Zawitz's presumption that that is a 70 percent

11  mortality.  However, I will say that that's across all

12  people who are septic, and a 22 year old otherwise

13  healthy guy is much more likely to survive than a 90

14  year old from the nursing home with septic shock.  It's

15  a wide variety of people.

16          But I believe that in this particular case

17  Mr. Gracia's condition was reversible and treatable and,

18  he more likely than not would have survived with

19  adequate treatment up until very shortly before his

20  death, so within the single digit hours.

21      Q    And the septic shock is -- how long does one

22  have sepsis before you develop some shock?  Is it

23  different all over the place?  Is there some sort of

24  regularity to how this works?

25      A    I would say that sepsis -- that infection can

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                              Page 74

1    progress to sepsis can progress to septic shock in a

2    variety of timeframes.  You've probably heard of these

3    flesh eating bacteria that you go from having a pimple

4    on your leg to being in the ICU in three hours.  Then

5    you have people in a nursing home that get an untreated

6    urinary infection that go for weeks before they get that

7    way.  So it's a varied variable.

8           THE WITNESS:  Would you all mind if we took a

9       break?

10          MR. ANGELL:  Sure.

11          (Off the record.)

12   BY MR. ANGELL:

13      Q    We're back on after a short break.  I've had a

14   chance to read through your handwritten notes and have a

15   couple questions.  I think we've talked about just about

16   everything on here already but let's see.

17          On where you have on the left side page 11

18   top, my opinion this progression occurred over only a

19   few hours.  I disagree because the AKI in the esophageal

20   necrosis.  What's AKI?

21      A    Acute kidney injury.  Acute renal failure it

22   could also be.

23          MR. RECKSIEDLER:  Just to clarify, you're

24      looking at Exhibit 4?

25          MR. ANGELL:  Yes.  Thank you, Jason.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                           Page 75

1    BY MR. ANGELL:

2        Q    Where you have at bottom, it says, I disagree

3    that, quote, it is well known that the most common

4    sources of sepsis are pulmonary commen -- is that CI?

5        A    GI, gastrointestinal.

6        Q    UTI?

7        A    Urinary tract.

8        Q    Is your dash here that's your disagreement

9    with that?

10       A    Yes.  I don't disagree with the general

11   statement but the most common sources of sepsis are

12   pulmonary GI and UTI.  I disagree that in a person with

13   multiple dog bite wounds that are red and draining that

14   the most common sources would be anything than the

15   obvious source.  When you have an obvious source of

16   infection, it's not those things but the obvious source

17   of infection.

18       Q    The next line you have dog bite wounds and you

19   have a little "P" with a line over it.  What's that?

20       A    After -- so not in someone who is suffering

21   from multiple serious dog bite wounds after being in

22   lake.

23       Q    ESP, is that especially?

24       A    Uh-huh.  Especially ones which are painful,

25   red and draining.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                    Page 76

1    Q    Page 12, you say I disagree and what's that

2    little symbol?

3    A    The first -- with the first paragraph.

4    Q    Can we take a look at what the first paragraph

5    is and talk about that?

6    A    Yes.

7    Q    The first paragraph of his report, page 12?

8    A    Yes.

9    Q    Tell me what -- first of all, can you kind of

10   paraphrase what it says there?

11       MR. MOES:  For clarification, what page are

12    you on?

13       MR. ANGELL:  He's on page 12 of Dr. Zawitz'

14    report.

15   BY MR. ANGELL:

16   Q    Is that correct?

17   A    Yes.

18   Q    Can you go ahead and read and paraphrase it?

19   A    Let me just read it.

20   Q    Okay.

21   A    So basically he says that if he had been sent

22   to the hospital, they might not have identified that

23   these abscesses were deep and might not have given him

24   antibiotics.  And if they had, it probably wouldn't have

25   gotten to it.  And so he says at least, at best, had

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   source control been obtained quickly, one could only

2   speculate an immeasurable possibility of improved chance

3   of survival.  I disagree.  I think more likely than not

4   he would have survived.

5        Q    For all the reasons we talked about earlier,

6   right?

7        A    Yes.

8        Q    And on your handwritten notes, it says, page

9   13, second paragraph, unlikely HIV was contributing

10  factor.

11            Am I correct you're just observing that you

12  don't disagree with that?

13       A    That's right.  I would go more to say that he

14  is an infectious disease specialist and if he says it

15  was not a contributing factor, I don't have any basis to

16  upon which to disagree.

17       Q    Thank you.  And page -- your last line of your

18  notes, page 15, I disagree with entire last paragraph.

19  Just tell us what his last paragraph is, and then tell

20  us what -- why you disagree with it.

21       A    I think it's easiest if I read it.  It's very

22  short.  It is my opinion that even in hindsight had

23  any/all of the OCJ medical staff sent Mr. Gracia to the

24  hospital at the earliest recognizable -- I'm sorry,

25  earliest reasonable signs which one could suspect

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1  sepsis, the outcome would still have been uncertain.  At

2  best, one could speculate that Mr. Gracia may have had

3  an incalculably better possible chance of survival.

4      Q    Tell us why you disagree with that.

5      A    I disagree because he had said that the

6  earliest reasonable sign was at the time of the

7  vomiting.  But in any event, anytime he was sent to the

8  hospital prior to that evening the outcome, although

9  uncertain, obviously there's no certainties, but to a

10  reasonable degree of medical probability he would have

11  survived.  And so I don't think it was incalculably

12  better possible chance, but more likely than not he

13  would have survived.

14      Q    Thank you very much.  Now, going back to your

15  report.  We were on page 13 and down at eight.  You say,

16  the health care staff were aware that Mr. Gracia had a

17  serious medical condition and that his condition was

18  deteriorating.

19          What point do you think it would be fair to

20  say that he had a serious medical condition, was

21  diagnosable?  Or I guess observable is probably a better

22  question to ask.

23      A    Well, perhaps I don't understand the question

24  because he had a serious medical condition from when he

25  first came there.  He had HIV and multiple dog bites.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    Q    Okay.  So let's -- maybe that is the answer,

2    which is the staff was aware that he had a serious

3    medical condition which was the dog bites and the

4    treatment for the dog bites; is that correct?

5    A    And he was HIV positive, and that there are

6    signs that they're now becoming infected.  So there's a

7    bit more to it than that, but I mean --

8    Q    Do you have an opinion of when he could have

9    been -- well, when should he have been assessed for

10   potential sepsis?  Does that even make sense?

11   A    It does.

12   Q    When do you think that happened?

13   A    So the nurses should have been assessing him

14   for potential sepsis all along; i.e., they should have

15   been taking his vital signs and recording an adequate

16   assessment each shift.  And at some points along the

17   way, either at the time he was vomiting or some point

18   thereafter, it should have raised to the level of

19   concern that they had a provider do an assessment that a

20   reasonably trained provider would have likely identified

21   that he had a worsening infection and would likely have

22   sent him to the hospital, and that never occurred.

23   Q    And then on the next page, the last sentence

24   of that section, you say the lack of care and attention

25   in this case rises to the level of indifference.  That

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1  would be -- that opinion is qualified based on what

2  you've already told us earlier today, right?

3     A    That is correct.

4     Q    Thanks.  Now we're under II, sub two, the

5  bacteria causing his sepsis and death was not unusual or

6  difficult to detect and treat.

7        First of all, what bacteria was it?

8     A    It's called E. coli, Escherichia coli.  Don't

9  ask me to spell it.

10    Q    So when you say it was not unusual, is that

11  because E. coli is everywhere?

12    A    Yes.  More to the point though, you are

13  concerned about certain what they call opportunistic

14  infections in people with HIV, so fungal infections,

15  rare bacteria; this is not that.  This is a common

16  everyday bacteria that everyone has in their body.

17    Q    I see.  I understand the point now.  When you

18  say not unusual or difficult to detect, how do you

19  detect it?

20    A    Well, you detect the exact organism by

21  culturing the wound and/or the blood.

22    Q    So does that mean do you think they should

23  have cultured it upon his intake?

24    A    No.  I don't believe it was infected upon his

25  intake.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    Q    I see.  So it's not difficult to detect but

2    that's -- when would they have been able to detect it?

3    A    Well, had they sent him to the hospital, the

4    emergency department would not necessarily identify E.

5    coli right away but would have identified an infected

6    dog bite wound with sepsis, would have given him broad

7    spectrum antibiotics which would treat a wide variety of

8    bacteria.  They would also then culture the wound or the

9    blood and when the actual known bacteria was identified,

10   they would then narrow the scope of the antibiotic.

11   Q    When you say not unusual or difficult to

12   detect, you don't mean by the nurses at the infirmary?

13   A    That bacteria is not one that -- TB, as an

14   example, of a bacteria that can be difficult to detect.

15   This is a garden variety bacteria that's not hard to

16   identify.  It's not hard to culture.  It's not hard to

17   see on Gram stain.

18   Q    That identification is something you would

19   expect to occur at a hospital?

20   A    That's correct.

21   Q    Okay.  So III, you say, the policies and

22   procedures in place regarding medical care at the OCC

23   were either not adequate to ensure assessment and

24   management of patients with serious medical conditions

25   or they were not consistently followed in Mr. Gracia's

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   case.  I want to break those two prongs apart.

2        Do you have any criticisms of the written

3   policies that you reviewed?

4      A   Yes, that and in conjunction with Dr. Buck's

5   statement saying that they changed them later which was

6   that there was no policy or procedure that required the

7   nurses to contact a provider with abnormal vital signs

8   or to repeat those vital signs.  In other words, that

9   was not a policy that existed at the time to the best of

10  my understanding.

11     Q   So that policy -- do you agree with the new

12  policy?

13     A   I didn't review it but I do --

14     Q   What you just said, I mean.

15     A   Yes, I do agree with that.

16     Q   Okay.  Is that a policy that is in place in

17  prisons throughout -- correctional institutions

18  throughout the country to your knowledge?

19     A   I'm certain that some have it and some don't,

20  would imagine.

21     Q   Do you think that it is -- for a correctional

22  facility to meet the level of the standard of care they

23  must have that in place?

24     A   No.  I believe the standard of care can be met

25  without that policy in place.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    Q    Were there any other critiques you had of the

2  written policies and procedures?

3    A    Well, that they were not consistently followed

4  or --

5    Q    I appreciate that and I understand that, but

6  that's not my question.

7         My question is do you have any other critiques

8  of the written procedures themselves.

9    A    No.

10   Q    So on the next page this top paragraph, sub

11  one.  This is page 15 of your report.  You say, I did

12  not find any policy or procedure requiring the nurses to

13  contact a provider with abnormal vital signs or to

14  repeat abnormal vital signs to ensure normalization.

15        Is that what we just talked about?

16   A    Yes.

17   Q    So just to make sure I'm clear, even though

18  you put that here that by itself would not fall below a

19  standard of care; is that correct?

20   A    Your policies and procedures could meet the

21  standard of care without that specific policy in there.

22   Q    Thank you.  So then No. 2, you have no problem

23  with the SOP.  It's just your understanding of the

24  record is that his vitals were not taken, correct?

25   A    That's correct.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1     Q    Then what about this third paragraph?  I'll

2   read it.  I did not find a policy ensuring that patients

3   who were recorded as refusing treatment have an adequate

4   assessment to determine that they are not too ill to

5   cooperate and are competent to refuse treatment.

6           Tell me, first of all, what is the standard of

7   care in your opinion and does this lack of policy, by

8   itself, constitute a departure from the standard of

9   care?

10    A    So persons who are refusing treatment of

11  whatever variety, refusing medications, refusing

12  dressing changes, they are only competent -- they are

13  only able to refuse if they are competent.  In other

14  words, not if they're too ill.  So being too ill to get

15  up from the bed and come get your medications is not

16  necessarily a refusal, but too ill to comply.  And there

17  has to be some way to address that so that you don't do

18  what happened in this case, which was label an inability

19  to comply with treatment as a refusal.

20          You do need some type of mechanism to do that,

21  either with written policy or with some other type of

22  protocol that addresses that, and I didn't see it in

23  this case.

24    Q    So just to be clear, you don't necessarily

25  have to have a written protocol.  You just must have

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   something in place, some practice in place, to meet the

2   standard of care?

3       A    That's correct.

4       Q    Is it your opinion that a correctional

5   facility that has no policy one way or the other with

6   how to deal with a potentially malingering inmate, is

7   that facility necessarily falling below the standard of

8   care?

9       A    Well, it wasn't malingering we were discussing

10  but refusing care, which are two different entities.

11  But if you didn't have any policy/practice in place to

12  assess competency to refuse care then, yes, you would be

13  below the standard of care.

14      Q    Thank you for that clarification.  Am I

15  correct that that encompasses the -- what we've talked

16  about today, the wording at the end of your report, that

17  is the universal opinions that you harbor in this case?

18      A    That I have developed up to this point, yes.

19      Q    Do you have any other opinions about this

20  case?

21      A    I do not at this time, but I may form more if

22  more documents or information is provided to me.

23      Q    As you sit here right now, do you intend to do

24  any further work prior to potential trial of this

25  matter?

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    A    I intend to review any further documents or

2   deposition transcripts that are provided to me.

3    Q    All right.  I want to talk a little bit

4   about -- just about done with me anyway -- I want to

5   talk about this occult infection issue.  That just means

6   something that you could not detect?  Again, the term

7   "occult" is hidden, right?

8    A    That's a synonym of hidden, yes.

9    Q    And how would they detect the infection in his

10  leg?  How would you go about doing that?

11    A    So anyone would look at the local condition of

12  the wound; so, in other words, redness, drainage.  In

13  addition to that, more importantly probably, you would

14  determine whether there was any signs that it was more

15  than a local infection.  So, in other words, was there

16  signs of sepsis, fever, elevated heart rate, abnormal

17  blood counts.

18         So, in other words, at some point were you to

19  identify an infected dog bite wound that was causing an

20  elevated heart rate, you wouldn't diagnose the exact

21  infection or exact bacteria but rather send the person

22  to the hospital.  At the hospital they would identify

23  easily the dog bites as the cause of the infection.

24  They wouldn't go looking for other causes of infection

25  because they have obvious cause of infection.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1        The question would be what then is the

2    appropriate treatment.  In other words, could they

3    change an oral antibiotic or, in fact, was this so

4    severe that he needed admission into the hospital.  That

5    would quite likely be the outcome would be needed

6    admission to the hospital and IV antibiotics.

7        Q    I thank you for that.  Can you tell me what an

8    abscess is?

9        A    Yes.

10       Q    What is that?

11       A    It is a collection of puss.  Puss is a

12    collection of debris essentially on the inside of the

13    wound that is -- so it's a collection within the body.

14       Q    And so is that something that you would see in

15    an infection, abscess?

16       A    Yes.  So a dog bite can get an abscess below

17    the -- by its definition it's covered.  So if it's just

18    draining, it's not an abscess because an abscess

19    represents a collection.  In this case, what you saw was

20    only on autopsy they saw essentially puss when they cut

21    open the dog bite wound.  In other words, the skin had

22    closed over.  But when they presumably cut the wound

23    open, there was puss inside there and that's the

24    definition of an abscess.

25       Q    Okay.  So if somebody has an abscess -- I'm

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    learning as we go here so forgive my ignorance.  If

2    someone has an abscess of a wound, does that mean that

3    doctors looking at the wound can't see the abscess?

4        A    Normally you can see some signs of an abscess

5    so it's swollen on -- it's enlarged on top.  There's a

6    lump that's what we call fluctuant or you can press on

7    it and feel that there's some abnormal fluid underneath

8    there that needs to be cut open.  We don't have a

9    description of was that visible on the outside or not.

10            The description on the autopsy was that when

11    they incise the wounds, there was -- deep down inside

12    there was puss.  So it doesn't say for certain whether

13    there were signs on the outside or not.

14        Q    How quick can abscesses form after a dog bite

15    like this?  How long do they take to --

16        A    I hate to be smart-alecky but within about

17    four days.  Obviously it did develop in this case and he

18    got bit four days before.  So one would expect over a

19    period of days.  It's not something that -- in other

20    words, he didn't have an infected dog bite wound on

21    Thursday.  He did have by Saturday or Sunday.  So three,

22    four days.

23        Q    Somewhere in that timeframe?

24        A    And that's very typical for an infection, yes.

25        Q    Do you know what the term "doubling time"

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                      Page 89

1    means for bacteria?

2        A    Well, yes.  That's a lab term essentially.  So

3    if you have bacteria grow exponentially or

4    logarithmically.  So one goes -- one goes to two that

5    goes to four very quickly, so they continue to grow.

6        Q    Do you know what the doubling time is for

7    E. coli?

8        A    I do not.

9        MR. ANGELL:  Pretty much, Doctor, I think

10       that's all I have.  That does not mean we're done.

11       There are other lawyers and lawyers like to talk.

12       So I will go ahead and pass the witness.  Thank

13       you.

14              CROSS EXAMINATION

15   BY MR. MOES:

16       Q    Good afternoon.  My name is Brian Moes.  I

17   represent Nurse Clairmont.  How are you today?

18       A    I'm well.  Thank you.

19       Q    So why didn't Augmentin work on killing this

20   infection?

21       A    I don't know the answer to that.  As Dr. Moss

22   (phonetic) pointed out, it could have been a bacteria

23   that was resistant to Augmentin.  Most E. coli are not

24   so more likely than not that was not the reason, but I

25   don't know the reason.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1          Wounds get infected often even in the face of

2    being given an antibiotic.  This Augmentin was giving

3    what's called prophylactically, so without evidence of

4    infection at the time.  And you often still get

5    infections even with that.

6        Q    So you would agree with me that Mr. Gracia was

7    being treated prophylactically for an infection during

8    his incarceration?

9        A    Yes.

10       Q    You would agree with me that the nurses were

11   aware that Mr. Gracia was being treated prophylactically

12   for an infection?

13       A    Yes.

14       Q    Have you worked within the emergency

15   department setting within the last 15 years?

16       A    Yes.

17       Q    Can you describe the scope of your work within

18   the ER setting?

19       A    So more recently, within the last seven or

20   eight years, I've worked in urgent care setting.  It has

21   been probably 2005 since I worked in the emergency

22   department and, I mean, that was a standard emergency

23   department.

24       Q    What's the difference between an urgent care

25   center and an emergency department as you use those

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    terms or as you draw that distinction?

2        A    Well, the most simple is that an urgent care

3    center is often not associated with, not connected to a

4    hospital.  So, in other words, if a person needed

5    hospitalization, we would send them to a hospital as

6    opposed to --

7        Q    Have you worked with any emergency department

8    associated with a hospital within the last 15 years?

9        A    So I gave you the -- trying to calculate back

10   from 2004, 2005.  That's however many years ago that

11   was, that's the last time.

12       Q    Do you have admitting privileges at any

13   hospital?

14       A    No emergency -- I do not nor does any other

15   emergency physician.  Emergency physicians don't have

16   admitting privileges.

17       Q    Even those associated with the emergency

18   department of the hospital?

19       A    That's right.

20       Q    So you've never had -- just for

21   clarification -- you do not have admitting privileges to

22   any hospital?

23       A    Neither does any --

24       Q    Okay.

25       A    No, I do not.  No.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                    Page 92

1      Q    I'll follow with my question.  I just want to

2    establish.  None of your certifications qualify you for

3    admitting privileges?

4      A    That's not true.  So people with an addiction

5    medicine could have admitting privileges to a hospital.

6      Q    Do you have any?

7      A    Not to a hospital.  And emergency physicians

8    never have admitting privileges.

9      Q    But addiction physicians do?

10      A    Sometimes.  The facility -- sometimes.  The

11    facility I worked at was not licensed as a hospital but

12    as a residential treatment facility, so it doesn't have

13    admitting privileges.

14      Q    You don't have staff privileges at any

15    hospital?

16      A    Emergency physicians, in general, don't have

17    staff privileges but, no, I do not.

18      Q    Have you ever been a member of a faculty at

19    any medical college?

20      A    No.

21      Q    Have you ever authored any medical treaties

22    concerning nursing practices?

23      A    No.

24      Q    Have you ever been a member of a faculty at

25    any nursing college or university?

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   A   No.

2   Q   Have you ever been hired as an expert to give

3   opinions as to nursing standards of care?

4   A   Almost every case that I take.

5   Q   What is your working definition of deliberate

6   indifference?

7   A   It is care which goes beyond mere malpractice

8   to ignoring or failing to treat a known serious medical

9   condition, especially one that even a non-trained

10   medical person could identify.

11   Q   Have any of your opinions concerning nursing

12   practices or nursing standards of care ever been

13   disqualified?

14   A   No.

15   Q   Now, I'm going to ask you some questions.  I'm

16   likely going to be bouncing around a little bit, so if I

17   lose you at any time, would you let me know?

18   A   I will.

19   Q   Again, I represent Nurse Clairmont.  Do you

20   hold any opinion that she ignored Mr. Gracia?

21   MR. RECKSIEDLER:  Object to the form.

22   A   I believe that she did, yes.

23   BY MR. MOES:

24   Q   At what point?

25   A   At the point when she was at his door on the

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    right of the 9th and he said he was unable to come to

2    the door.  And rather than assess him, she just went on

3    and delivered medicines to the other inmates.

4       Q    You regard that to be ignoring?

5       A    I do.

6       Q    Give no account for her visual assessment of

7    him through the door?

8       A    It's my understanding it was through a meal

9    slot which is not through the door necessarily.  That's

10   a small opening in the door, in the lower portion of the

11   door.  I believe that she saw him on the bed is what the

12   officer's testified that she saw him on the bed and

13   didn't see him get up.

14      Q    Do you know what protocols existed that would

15   control whether a nursing or correctional health staff

16   member would enter into a jail -- do you know what

17   protocols exist?

18         MR. RECKSIEDLER:  Object to the form.

19      A    Into the cell, you said?

20   BY MR. MOES:

21      Q    Yes.

22      A    So there's two different portions to that.

23   There is nursing assessments which were to be done in

24   shifts and which were to include vital signs which would

25   necessitate direct physical contact with the inmate, and

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1  that never occurred on this night shift either at pass

2  time or any other time.

3       It was my understanding that Nurse Clairmont

4  was not the primary med pass nurse but it was Nurse

5  Harter.  And so Nurse Clairmont only got involved when

6  Nurse Harter reported that Mr. Gracia was refusing his

7  medications.

8       Q    You were questioned about malingering or

9  feigning.

10      A    Yes.

11      Q    Is malingering a medical diagnosis which

12  nurses are qualified to make?

13      A    Well, in general nurses are not to make

14  diagnoses but rather to make assessments and it's

15  providers who make medical diagnoses.

16      Q    If Nurse Clairmont had considered that

17  Mr. Gracia may be malingering or feigning his condition,

18  would that have been a mistake in judgment?

19      A    It would have been a serious one.  And I

20  believe it represents more than just a mistake in

21  judgment but an indifference to Mr. Gracia's condition.

22      Q    What do you mean by that?

23      A    Well, it was a very dangerous misjudgment.  In

24  other words, it was not an innocent misdiagnosis but

25  a -- an ignoring of what was potentially and what should

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   have been obviously a serious medical condition.  So it

2   was something more than a mistake in judgment but a very

3   bad determination that shouldn't have been made and

4   wouldn't have been made with any assessment of

5   Mr. Gracia, I believe.

6       Q    Can you entertain any scenario where that

7   judgment may have been reasonable although mistaken?

8           MR. RECKSIEDLER:  Object to the form.

9       A   Well, I believe that's a hypothetical.  If you

10   want to give me more specifics about the hypothetical,

11   I'll be glad to entertain that.  But in this particular

12   case I believe it wasn't.  It was in no eyes reasonable.

13   BY MR. MOES:

14      Q    Again, provide me the basis for your belief

15   that this was an unreasonable mistaken belief.

16          MR. RECKSIEDLER:  Object to the form.

17      A    Because it was made without any assessment of

18   the patient, without taking vital signs, without any

19   history or -- so there was no history of a diagnosis of

20   malingering.  There was simply a patient who had dog

21   bite wounds who had gotten progressively weaker and who

22   was now unable to get off the bed, and who said that he

23   couldn't get off of the bed and that was interpreted by

24   the nurse as malingering rather than what turned out to

25   be the case, which was worsening sepsis.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   BY MR. MOES:

2       Q    You are not offering any opinions in this case

3   as to mortality?

4           MR. RECKSIEDLER:  Object to the form.

5       Q    You are not -- let me rephrase that.

6           You're not offering any opinions in this case

7   as to Mr. Gracia's survivability?

8           MR. RECKSIEDLER:  Object to the form of the

9       question.

10      A    I don't believe that's correct.

11  BY MR. MOES:

12      Q    Your opinion is that more likely than not he

13  would have survived had treatment been provided to him

14  at which point?

15      A    That's a question at which point you're

16  asking?

17      Q    Yes, sir.

18      A    So, yes, it is my opinion that he would have

19  more likely than not survived had he been taken to the

20  hospital and given treatment at any time up to the few

21  hours prior to his actual -- until his death.  We don't

22  know the exact time of his death either, but up until

23  the -- all through the day of the 9th at least.

24      Q    If you had been the physician who had received

25  the call in Mr. Gracia's care on the evening of the 9th,

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    at that point where you feel he should have been

2    admitted or transferred, I should say, to the hospital?

3    Who orders would you have given?

4         MR. RECKSIEDLER:  Object to the form.

5      A    Well, that requires me to make a few leaps.

6    But in this particular case, the provider on call, I

7    believe, was Nurse Practitioner Evans who had already

8    been provided the information the day before that he was

9    vomiting, the information earlier that day that he had a

10   heart rate of 131, that she'd asked for him to take more

11   fluids but had no information or reassessment of either

12   his vital signs or his ability to take fluids.

13        So I think given those things had I received a

14   call with those hindsights in place, I would have quite

15   quickly said take him to the hospital.  But so those are

16   presuming that set of circumstances.  But in any event

17   my nurses, the nurses that I instruct and work with,

18   understand that a diagnosis of feigning an illness or

19   malingering is not one to be taken lightly or without my

20   direct observation of the person.

21   BY MR. MOES:

22     Q    For an emergency room physician receiving a

23   patient like Mr. Gracia at the time that you believe he

24   should have been transferred to the hospital, what would

25   the admitting orders have been?

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1     MR. RECKSIEDLER:  Object to the form of the

2     question.

3     Q    What would the standard of care dictate the

4     admitting orders be?

5     A    Well, the admitting orders, you're talking

6     about a period of time after he's been worked up.  What

7     would it be would be an adequate workup and assessment

8     in the emergency department.  So you would need first to

9     assess life threatening things; such as, low blood

10    pressure, sepsis, what is apparent sepsis.  You would

11    give broad spectrum antibiotics, culture the wounds,

12    culture his blood, give him IV fluid resuscitation and

13    broad spectrum antibiotics.  Then undertake further

14    diagnostic assessment; such as, potentially CT to see

15    whether there was a deep wound or not or potentially

16    putting in the hospital under the care of an infectious

17    disease specialist or a surgeon with broad spectrum

18    antibiotics.  Then as you got the results of the Gram

19    stain and the culture, you would then narrow your

20    antibiotic scope.

21    Q    Typically how long would it take to know the

22    results of a culture?

23    A    Well, the Gram stain, which would likely show

24    you the E. coli or at least Gram-negative rods, would be

25    back within an hour or so.  Normally in the case like

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 100

1    this, the next day at least the blood cultures are

2    showing growth and usually have an identification within

3    about two days.

4        Q    Now, I think you already testified that

5    Augmentin was an antibiotic prescribed to kill the

6    E. coli bug so to speak?

7        A    Well, my testimony, as I recall it, was that

8    Augmentin is an appropriate antibiotic to be given in

9    the setting of a dog bite.  There are a number of

10   bacteria that are common in dog bite wounds.  E. coli is

11   one of them but there are multiple others that are

12   common.

13       Q    Well, does Augmentin treat E. coli?

14       A    It normally does, yes.  By the way, I'm not a

15   specialist in infectious disease or do I know the

16   percentage of E. coli that are now -- some of them can

17   be resistant to Augmentin.  But in general, it's

18   designed to be able to treat it.

19       Q    What type of precautions would an emergency

20   physician take before putting a person on a broad

21   spectrum antibiotic not knowing their history?

22           MR. RECKSIEDLER:  Object to the form.

23       A    You're referring to the emergency department

24   doctor at the time of the initial emergency department

25   visit, is that what you're referring to?

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                    Page 101

1    BY MR. MOES:

2       Q    Yeah.  Obviously we don't have the testimony

3    of the ER doc in this particular case.  You are a board

4    certified ER physician.  I'm asking you had you -- in

5    the scenario like Mr. Gracia, had you received

6    Mr. Gracia in the emergency department connected with a

7    hospital, what orders would you have given?

8            MR. RECKSIEDLER:  Can you just clarify?  Are

9        you talking before he was transferred to the jail?

10       Are you talking about your hypothetical after he is

11       leaving -- I've lost you.  Sorry, I really have.

12           MR. MOES:  Sure.  Sure.

13   BY MR. MOES:

14      Q    If you had been -- the timeframe that I'm

15   referring to is the point where you believe Mr. Gracia

16   should have been transferred from Orange County Jail to

17   a local ER.

18      A    Okay.

19      Q    If you were that receiving emergency room

20   physician, you testified that you would have cultured

21   the infection site or blood, it's not clear which.  You

22   would have prescribed a broad spectrum antibiotic.

23   Pending the results of the culture you would have

24   ordered a CT scan of the body and what else?

25      A    Well, the first thing -- you left off the

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   first few things.

2       Q    Which is?

3       A    Which was fluid resuscitation.  In other

4   words, to address his shock status, if it existed.  We

5   don't know.  We don't have a blood pressure.  We don't

6   have a pulse.  But you would fluid resuscitate them

7   first.  So then you would -- the next thing you would do

8   is obtain cultures of both the blood and any wound.

9           Then you would initiate broad spectrum

10  antibiotics and you would give them via the intravenous

11  route.  So you would know that the person had been on

12  oral Augmentin, and that that is not controlling the

13  infection.  So it would be an intravenous antibiotic or

14  probably several.  In other words, a broad spectrum

15  because you don't know it's E. coli at that point.

16  You're giving a broad spectrum of antibiotics.

17          You'd potentially be concerned about this is a

18  HIV positive patient so you might also be concerned

19  about opportunistic infections having gotten -- in other

20  words, fungus infections having gotten in his wounds and

21  you might well treat with an antifungal immediately as

22  well.

23          You would quite likely though -- you said I

24  would order a CT.  I would not necessarily do that.  I

25  would quite likely have engaged the services of a

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 103

1   surgeon to make a determination about whether imaging

2   was needed of particular areas or not.  I don't know

3   that a CT scan was needed.  I was just saying that you

4   need to address the local wounds.  Do they need I & D.

5   Do they need -- and if they need I & D, you probably

6   have time to have consult from a surgeon.

7       Q    Now, as far as the timeline and knowing the

8   results of the cultures, there is a Gram stain culture

9   that's been -- the results are known within what period

10  of time?

11      A    A couple of hours.  It's not a culture.  A

12  Gram stain is when they take the swab from the wound and

13  they look at it underneath a microscope to see if they

14  see bacteria.  So they would see bacteria and know there

15  is both Gram-positive and Gram-negative organisms there

16  of shapes of round or rods.  E. coli, I believe, is a

17  Gram-negative rod.  So they would know it's a

18  Gram-negative rod and they would be able to tailor the

19  antibiotic a bit more closely knowing that, within a

20  short period of time.

21          But don't misunderstand me.  An ER doctor

22  would not know the source of the infection and would

23  treat with broad spectrum antibiotics by intravenously,

24  not orally and would not treat E. coli specifically but

25  would treat E. coli, would cover E. coli with their

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    antibiotics.

2        Q    Is there a particular antibiotic that would

3    have been prescribed?

4        A    No.  There's a variety that would be used.

5        Q    Do you know the variety that would have been

6    used in broad spectrum?

7        A    Well, so there are protocols at different

8    hospitals have with different antibiotics.  There is

9    antibiotics very similar to Augmentin that could be used

10   intravenously but they would be intravenous and you

11   would use a combination of them that would cover almost

12   any bacteria that existed until you knew the results of

13   your culture.

14       Q    And then how would the results of the Gram

15   stain guide care at that point?

16       A    Quite likely you would not narrow based on

17   that but you'd wait until -- what you would know is that

18   it was a Gram-negative rod, which would tell you that it

19   wasn't fungus.  There's a lot of different things that

20   you would now know.  This is a bacterial infection.

21   This is not a parasite infection.

22           They're all kinds of opportunistic infections

23   that can occur in HIV positive patients, but you would

24   know that's not this.  This is a bacterial infection.

25   We need to be on the antibiotics that kill bacteria and

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 105

1    not other strange organisms, not fungus.

2        Q    Turning to page 4 of your report, paragraph

3    11.  You note that the temperature was 97.4 degrees

4    which you've testified that's within normal range,

5    correct?

6        A    Correct.

7        Q    The pulse 131 was a dramatically abnormal --

8        A    Correct.

9        Q    -- finding?

10       A    Correct.

11       Q    You also testified that infection is known,

12   commonly known to increase one's body temperature?

13       A    It can.  You would not expect it in septic

14   shock.  I'm not saying he had septic shock at this time

15   but body temperature can also be low with septic shock.

16       Q    But isn't an elevated temperature one of the

17   most common signs of an infection?

18       A    That is correct.

19       Q    So the nurses would be looking for an elevated

20   temperature as an indicator of a possible infection?

21       A    At this one particular instant during the 72

22   hours prior to his death they checked it once, yes.

23       Q    Have you ever noted upon your review of the

24   record an elevated body temperature for Mr. Gracia?

25       A    I noted no other recording of his temperature

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018
Page 106

1   in the 72 hours prior to his death other than this one.

2       Q    What about upon his admission to the emergency

3   department?

4       A    He was dead at that point and his -- so he was

5   dead.

6       Q    Okay.

7       A    One wouldn't expect an elevated temperature

8   once a person's dead.

9       Q    Agreed.

10          MR. RECKSIEDLER:  That would be an interesting

11       finding, wouldn't it?

12   BY MR. MOES:

13      Q    You found or at least you opine that the blood

14   pressure was an abnormal reading, 111/56.  Did you give

15   us a normal range for that?

16      A    I don't believe I opined that that was

17   abnormal.

18      Q    Oh, you did not?  Okay.  So as of Sunday,

19   August 9, 2015 at 10:30 a.m. roughly you found the only

20   abnormal vital signs to be the pulse of 131 and was it

21   respiratory rate 22 was elevated?

22      A    That's correct.  That's correct.

23      Q    What is the normal range for the respiratory

24   rate?

25      A    In general, 12 to 16 is a normal range.  I

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                                  Page 107

1  would not get concerned until it was above 20.  But in

2  general, 12 to 16.  Obviously that is very dependent on

3  -- respiratory rate is very dependent on level of

4  exertion, et cetera.  So if a person's been running,

5  they have a different respiratory rate than at rest.

6       Q    You were critical of the absence of any

7  recording of fluid output?

8       A    Intake or output; I didn't see either

9  recorded.

10      Q    And you report output by quantifying urine,

11  correct?

12      A    Yes.

13      Q    Is it your opinion that standard of care

14  required that a measure be made of Mr. Gracia's urine?

15      A    That is not my opinion.

16      Q    How would one know --

17      A    What I said -- what it is -- my opinion is

18  that there should have been some measurement that he was

19  even able to consume, tolerate any of the fluids that

20  were given to him, and one would expect a general

21  statement about his output.  In other words, as drunk

22  two gallons of Gatorade.  Apparently Nurse Practitioner

23  Evans told the nurse to give him Gatorade.  So one would

24  expect has tolerated one gallon of Gatorade, has

25  urinated twice, something like that.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1          I understand this is not a medical setting

2    where you would expect a specific quantification of the

3    output but some measure that he was at least able to

4    tolerate the fluids and at least some measurement of his

5    intake and output.

6        Q    Where was the infection in Mr. Gracia's body?

7        A    It was all over his body.

8        Q    Where was the abscess?

9        A    So there were two wounds on his -- there were

10   two wounds on his legs which had necrotic tissue.  So I

11   don't know that it was actually an abscess.  What there

12   was was deep -- there were wounds.  There was flesh

13   missing which had healed over.  There was necrotic

14   tissue deep to that on the medical examiner's finding.

15   Then in the deep areas underneath the skin -- so, in

16   other words, between the skin and the muscle, there were

17   areas of puss collection.  I don't know that that

18   qualifies as an abscess.

19          The medical examiner did not use the term

20   "abscess" but used the term "puss" and "necrotic

21   tissue".  So, in other words, I'm not certain that there

22   was an abscess that would have required surgery.  I know

23   that deep to those dog bite wounds there was necrotic

24   tissue and evidence of infection, and that's where the

25   bacteria were located.  So that's where they came from,

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1  but then they spread throughout his body.  The bacteria

2  got into his blood, caused -- bacteria in his blood

3  caused the sepsis which then caused the distant organ

4  failure.

5      Q    There's a difference between puss and

6  serosanguineous fluid?

7      A    Yes.  In fact, they're sort of mutually

8  exclusive, I guess you would say.

9      Q    Puss is a clear indication of the body's

10  effort to fight infection?

11      A    That's correct.  And that drainage would be

12  called purulent so...

13      Q    And it would be cloudy or it would have a

14  color tinge to it?

15      A    Usually, yes.

16      Q    Serosanguineous fluid, on the other hand, is

17  part of the healing process, is it not?

18      A    That is correct.  It can be.  Certainly serous

19  drainage is.  Sanguineous, it depends on how much serous

20  and how much sanguineous.  It's not normal to bleed for

21  a prolonged period of time, that's not normal.  Some

22  amount of serous drainage would be normal for a wound

23  like this.

24      Q    Correct.  And that's why you would have

25  periodic dressing changes, correct?

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 110

1    A    Correct.

2    Q    Because the body would be expected to emit or

3    exude this blood and serosanguineous fluid?

4    A    That's correct.

5    Q    There was no reported -- you would expect a

6    nurse to know the difference between puss and

7    serosanguineous fluid, correct?

8    A    You would.

9    Q    There was no noted puss in any of the records

10   of his detention, was there?

11    A    Well, on the -- so the last time I saw any

12   address of his wounds at all were on the date of the

13   8th.  I didn't see addressed -- that his wounds were

14   addressed at all on the day of the 9th.  Maybe there was

15   a description about large amount of bloody drainage but

16   there was not -- I'm not certain that the wounds were

17   assessed or addressed either on the day shift of the 9th

18   or the evening shift of the 9th.

19   Q    Are you equating bloody drainage with puss?

20   A    No.  You asked me if -- I thought the question

21   was did the nurses note puss at any time and my --

22   Q    That's correct.

23   A    My answer was I don't think they looked at all

24   on the 9th.

25   Q    I'm just asking, did you see in your review of

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   the record any puss observed by any nurse who was

2   involved with Mr. Gracia's care?

3       A    Not -- no, I did not.  And not only that, I

4   didn't see that they addressed the wound at all or

5   looked at the wound, addressed the wound at all on

6   Sunday.  I didn't look for it.

7       Q    But you would also agree that you would expect

8   a qualified nurse to know the difference between a

9   bloody drainage or between bloody drainage and puss?

10          MR. RECKSIEDLER:  Object to the form.

11      A    No.  I would expect that you would have to

12  take the bloody dressings off to see whether there was

13  puss coming out of a wound or not.

14  BY MR. MOES:

15      Q    Simple question.  Should a reasonably

16  qualified nurse know the difference between bloody

17  drainage and puss?

18      A    If she took the dressing off and looked at the

19  wound directly, she should know the difference, yes.

20      Q    In other words, it's pretty obvious to a

21  qualified health care provider?

22      A    If they assess the wound it is.

23      Q    Similarly, puss has an odor?

24      A    No.  Well, puss can have an odor.  I would

25  expect the odor to come from necrotic tissue not from

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1   the puss, but it could be a combination of.  I would

2   agree with that.

3        Q    And you would expect a reasonably qualified

4   health care practitioner to know the difference between

5   a foul odor and the odor coming from necrotic tissue?

6        A    No.  Maybe I didn't understand the --

7        Q    Maybe it was an inartful question.  But you

8   testified that, I believe, it was Correctional Officer

9   Vargas you were critical of because he should have had

10  some sense when the odor that was being reported?

11       MR. RECKSIEDLER:  Object to the form.

12       A    My criticism of Correctional Officer Vargas

13  was that in the overall condition, including an odor,

14  should have -- he should have identified, even as a

15  medically untrained person, that there was a serious

16  condition going on.  The odor, I believe, was detected

17  by both CO Vargas and by Inmate ball.  And so the odor

18  was present and then was not recorded by either Nurse

19  Harter or by Nurse Clairmont.  I would expect that they

20  did smell the odor and didn't record it unless they were

21  suffering from anosmia or some other condition that

22  would prevent them from detecting the odor.

23  BY MR. MOES:

24       Q    What is that condition?  I'm not familiar with

25  that.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                          Page 113

1       A    Loss of smell.

2          MR. RECKSIEDLER:  Brain damaged people get it.

3    BY MR. MOES:

4       Q    You would expect a qualified nurse to know the

5    difference between the odor that is medically related to

6    a wound from a different odor?

7       A    Absolutely.

8       Q    Such as an odor from human waste or anything

9    like that, correct?

10       A    Well, I will clearly say that I'm sure there

11    are very -- there's subtleties but, in general, yes, one

12    can detect an odor from what they described as rotting

13    flesh, and you can, in general, detect that.

14          What is clear is that even non-medically

15    trained persons detected a foul odor.  And the nurses,

16    I'm quite sure, smelled it as well but yet ignored it

17    and didn't document it and didn't assess anything.

18       Q    But your assumption is that odor was emanating

19    from the wound as opposed to any other foul source?

20       A    No.  That is not an assumption.  So it's

21    contained within the records that the emergency

22    department physician the next morning when he was

23    brought to the hospital deceased, noted a mild odorous

24    wound, a mild odorous drainage from a leg wound.  So the

25    emergency physician department noted it as well.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1      And I believe that the coroner noted it,

2   although I looked last night for the coroner's report

3   and I don't see a coroner's report.  I think I had one

4   in there somewhere.  I believe the coroner noted a

5   odorous wound, leg wound as well.  So I'm not talking

6   about the medical examiner but the actual coroner.

7      MR. MOES:  I have nothing further.

8      MR. RECKSIEDLER:  Do you want to take another

9    quick break?

10      THE WITNESS:  I actually wouldn't mind going

11    for literally for a two-minute break.

12      (Off the record.)

13         CROSS EXAMINATION

14   BY MS. BRADFORD:

15      Q    Dr. Fowlkes, my name is Gail Bradford.  I

16   represent ARNP Evans.  I'm going to be asking you a

17   series of questions.  I don't expect that it will take

18   long, and I can guaranty that I will be bouncing around

19   and I will not do it nearly as artfully as Mr. Moes did.

20   So please stop me if I ask a question and I'm going

21   someplace you have no idea where I'm going.  Okay?

22      A    Okay.

23      Q    As an administrative matter, this Exhibit 4

24   that you and Mr. Angell talked about, your handwritten

25   notes regarding Dr. Zawitz' report.  Do you have any

1   notes regarding any of the other defendant experts?

2   A   I do.

3   Q   Can I see those?

4   A   You may.

5   Q   Properly I should say may I see those.

6   A   Here's my notes about Nurse Pearson's amended

7   report.

8       MS. BRADFORD:  May I have an exhibit sticker?

9   I don't know if we're up to five.

10      MR. ANGELL:  Five.

11       (Exhibit No. 5 was marked for

12   identification.)

13      MS. BRADFORD:  I'm going to put exhibit

14   sticker No. 5 on this and try not to cover up any

15   of the --

16  BY MS. BRADFORD:

17  Q   Dr. Fowlkes, any other notes?

18  A   This is Nurse McMunn's.

19      THE REPORTER:  Can you repeat that, please?

20      THE WITNESS:  Nurse McMunn.

21      MS. BRADFORD:  M-C capital M-U-N-N.  I'm going

22   to mark this, if you don't mind, Exhibit 6.

23       (Exhibit No. 6 was marked for

24   identification.)

25      MS. BRADFORD:  And I guess we will get copies

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                    Page 116

1      of those at some point.  Before I hand them back to

2      you I want to take a --

3   BY MS. BRADFORD:

4      Q    Any other handwritten notes about any of the

5   other defense experts?

6      A    No.

7      Q    So we've got everything you have with regard

8   to the defendant's experts in terms of your handwritten

9   notes?

10      A    That is correct.

11      Q    Any other notes on a computer or dictation

12   anywhere with regard to any of the defendant's experts?

13      A    No.

14      Q    In your capacity as director at the detention

15   center in -- I'll mispronounce this -- Lafayette County?

16      A    That's correct.

17      Q    What do you do?

18      A    So I'm the medical director there.  And in

19   short, it is my job to ensure that all health care

20   that's delivered to our inmates is done in accordance

21   with the guidelines, policies and procedures.

22      Q    Do you actually go hands-on and treat

23   patients?

24      A    I do.

25      Q    And I think you said that you had clinic once

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1    a week?

2        A    That's correct.  That -- I don't hold a

3    primary sick call.  I have a nurse practitioner that

4    works under me that works that holds the primary sick

5    call.  I have something medical director clinic.

6    Basically I handle problems or if somebody wants to talk

7    to somebody else.

8        Q    When you say handle problems, that doesn't

9    mean administratively; that means actually addressing

10   health care concerns?

11       A    That's right.

12       Q    And going hand-on, as it were?

13       A    That's right.

14       Q    And that is approximately once a week for an

15   hour, I think you testified?

16       A    That is clinic, but I -- but, as a for

17   instance, because I'm an addiction medicine doctor I

18   give orders and then evaluate everyone who I am detoxing

19   on a more frequent basis than that.  So, in other words,

20   people that are being prescribed controlled substances

21   being detoxed, I see them on an as-needed basis.  So I

22   don't wait until my weekly day to do that.

23       Q    If the detox folks need you, then you're

24   there?

25       A    Or any other emergency.  I'm on call 24 hours

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                    Page 118

1    a day for an emergency, either respond in person or

2    handle it over the phone.

3        Q    When you're on call 24 hours a day, seven days

4    a week and a nurse calls you up to say, hey, I've got an

5    issue with this patient, do you have a standard litany

6    of questions that you ask that nurse?

7        A   I do not have a written protocol.

8        Q    Do you have a -- even if it's not a written

9    protocol, a standard that you follow in your mind in

10   terms of I need to get information regarding A, B, C, D,

11   E, F and G?

12       A    Obviously there are lots of variables but in

13   general, in general I want to know what medications the

14   person is on.  I want to know what their vital signs

15   are, what confounding past medical history they may

16   have, and what the nurse is calling me about.  There --

17   her assessment.

18       Q    Do you rely on your nurses to give you

19   information that they think that you'll need in terms

20   of -- in order to make an assessment when you're on the

21   phone?

22       A    I do.  But I also recognize that it is my

23   responsibility to ask the correct questions if they

24   don't provide me information, so it works both ways.

25       Q    And the correct questions would depend, of

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 119

1   course, on what the nurse is calling about and a variety

2   of factors at the time?

3       A    That's correct.  Since I'm ultimately

4   responsible to be the decision maker, I need to make

5   sure that if the nurse calls me, they obviously have a

6   level of concern to call me so I have to ask enough

7   information if they don't provide it to me outright.

8       Q    Your opinion references ARNP Evans and the

9   fact that she was on site in the facility on the

10  Saturday and Sunday.

11      A    Yes.

12      Q    How do you know that Nurse Evans was on site

13  in the facility on Saturday or Sunday?

14      A    Because I believe that this is in the

15  investigative report and -- possibly it's in the

16  investigative reports.  I believe that Nurse Gonzalez

17  says that on Saturday she spoke with Nurse Practitioner

18  Evans about the Zofran.  Later on when Nurse Evans was

19  there, she spoke with Mr. Gracia directly about his not

20  leaving his bandages on.  So on Saturday she spoke to

21  him.

22          The description that I recall, and I don't

23  have the document in front of me, was that he was --

24  something like he was polite and cooperative and said

25  something.  She talked to him on Saturday about leaving

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 120

1    his dressings on.  Then on Sunday she said in her

2    investigative issue summary that she was there at 4:30

3    or 5:00 and that she made contact with him in the

4    dayroom but did not see --

5       Q    Would you opinions with regard to Nurse Evans

6    or any defendant in this case change if Nurse Evans was

7    actually not on -- physically on site on Saturday or

8    Sunday?

9       A    Of course.  It is entirely possible if you

10   showed me some set of circumstances, it could change my

11   opinions but, in general, no.  And Dr. Buck said in his

12   deposition that the provider, who was Nurse Evans, was

13   to round on all the patients on Monday through Friday

14   and was to write a note, which wasn't -- which

15   apparently wasn't done on Friday.  There was no note, no

16   assessment written, and that she was then to see

17   patients as needed.

18         So, in other words, she wasn't required to

19   necessarily round on every patient on Saturday and

20   Sunday but rather to address problems, people either new

21   admissions to the infirmary or whatever.  She did happen

22   to see him both days.

23      Q    And you're sure that Nurse Evans laid eyes on

24   Max Gracia, Jr. on Saturday -- I don't know what date --

25   April the 8th?  April the 9th?  August the 9th?

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 121

1   A   I'm sure that the record says that, yes.

2   Q   And where in the record does it say that?

3   A   If you would bear with me just for a moment.

4   Q   Sure.  Take your time, sir.

5   A   Hand me those pieces of paper back, if you

6 don't mind.

7   Q   Sure.

8   A   So this is on page 20 of 35 of the Orange

9 County Sheriff's Office investigative report.  I don't

10 have another Bates stamp number.

11   Q   That's quite all right.

12   A   Mine says 20 of 35.  This says Nurse Mary Anne

13 Evans' sworn statement, and I'll read the bullet point

14 above that so that it gives you context.

15       On August 9th, 2015 at an unknown time during

16 her shift Nurse Galloza-Gonzalez notified Nurse Evans

17 that Gracia was complaining of dizziness.  His blood

18 pressure reading was within normal range, so Nurse Evans

19 ordered additional fluid be administered to him.  She

20 added that inmates do not routinely get enough water so

21 she made a special request for Gatorade.

22       Then in the next bullet it says, later in the

23 day Nurse Evans saw Gracia in passing in the dayroom.

24 She did not make contact with him.  Nurse Evans had no

25 further contact with Gracia that day.  This is the last

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                    Page 122

1    time she saw Gracia.

2       Q    And that document is what you base the

3    information that Nurse Evans was on site and was able to

4    go eyes on Mr. Gracia at least that Saturday?

5       A    This is on Sunday.

6       Q    Sunday, okay.  Any other information that

7    leads you to believe that Nurse Evans was on site on

8    either Saturday or Sunday aside from that document you

9    just talked about?

10      A    So that is Sunday.  And then on Saturday there

11   is testimony by someone.  I thought it was Nurse

12   Gonzalez, and perhaps it is not, but someone says

13   that -- it must be Nurse Gonzalez somewhere -- says that

14   she spoke with Provider Evans when she was there by him

15   taking his dressing off and not -- it's Nurse Evans, I

16   think, again in her own statement.  Yes, that's right.

17          Two -- on that same page 2 bullet points up

18   from that it says, at approximately 1500 or 1600

19   hours -- and it's talking about on Saturday here --

20   Nurse Evans was contacted by Nurse Galloza-Gonzalez and

21   informed that Gracia had removed his dressing and taken

22   a shower.  Nurse Evans met with Gracia, spoke with him

23   and emphasized the importance of keeping his dressing on

24   citing the risk of infection.  According to Nurse Evans,

25   Gracia seemed receptive and was polite during this

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                    Page 123

1    encounter.  Nurse Evans had no further contact with

2    Gracia that day.

3         So she said in her own sworn statement, which

4    was taken August 31st, 2015, that she made contact with

5    him both days.

6    Q    Those two instances that we talked about,

7    that's where you're getting that information?

8    A    Yes.

9         MR. RECKSIEDLER:  Do you want to make copies

10    of those?

11        MS. BRADFORD:  It would be lovely if we could

12    do that now.

13        THE WITNESS:  I probably need to look at them

14    if you're going to ask me questions about them.

15        MS. BRADFORD:  Let's make copies.

16        (Off the record.)

17   BY MS. BRADFORD:

18   Q    What would the hospital -- assume that Max

19   Gracia, Jr. was transferred to a hospital sometime

20   shortly after vomiting was reported on August the 8th

21   pursuant to the 5:13 p.m. note, what would the hospital

22   have done?

23        MR. RECKSIEDLER:  Object to the form.

24   A    The hospital would have assessed for the

25   progression of and severity of the infection and/or the

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                    Page 124

1    existence or lack of existence of sepsis.  So, in other

2    words, would have measured vital signs, would have done

3    lab work, would have looked at his clinical condition,

4    done a physical exam, and may have determined that he

5    had sepsis at that point in which case they would have

6    admitted him to the hospital and treated for sepsis, may

7    have determined -- we could speculate that they

8    determined that he didn't have sepsis at that point and

9    changed his antibiotic and sent him back.

10          It would be incumbent on the hospital to do an

11   evaluation and make a prudent determination depending on

12   their findings, which I would only be speculating to say

13   what the findings were.

14   BY MS. BRADFORD:

15       Q    Same question if we move the timeline a little

16   bit forward.  What would the hospital have done when Max

17   Gracia was reported to be weak and dizzy on August the

18   9th pursuant to a 10:29 a.m. note?

19          MR. RECKSIEDLER:  Object to the form.  You can

20       answer.

21       A    Now, at this point I think you have more clear

22   signs of sepsis and sepsis is not treated in an

23   outpatient setting.  So he would have had to have been

24   admitted to the hospital and given at least IV

25   antibiotics and fluids.  So I think that you're past the

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 125

1 point where you wonder whether he had sepsis at that

2 point.

3 BY MS. BRADFORD:

4    Q   As part of your work as medical director at

5 the Lafayette County Jail, do you make any decisions

6 regarding moving patients from I think you referred to

7 them as observation beds to general population?

8    A   Yes.

9    Q   What is your process to make those

10 recommendations?

11    A   Well, we're in a little bit different

12 situation, as I told you, that we don't have 24-hour a

13 day designated infirmary beds. Our beds are more

14 observation beds to have officers there at nighttime.

15 But quite often it is the provider that makes the

16 determination about -- for instance, taking someone off

17 suicide watch. That's often what we have people in

18 observation beds for. So it's the provider that takes

19 the person off.

20      Much like in this case they -- the policy and

21 procedures that a provider would make the order to have

22 a person moved. So the nurses don't move the people

23 from the infirmary; the provider has to make that order,

24 that's according to their policies and procedures.

25    Q   Is that the policy and procedure at your

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                              Page 126

1    facility?

2        A    Yes.  I would say -- I don't know that it's

3    written that way.  In almost all cases a nurse will call

4    me and tell me the circumstances and I will approve

5    their removal from -- they're, I'm sure, certain

6    circumstances -- as a for instance, somewhere is there

7    overnight observation for they had a tooth pulled or

8    something and the nurse might let them go back the next

9    day.  So I'm not going to say in every single case I

10   approve the person being released.

11           In general, for something like what you would

12   consider an infirmary kind of situation I would make a

13   determination that they can go back to the general

14   population.

15       Q    I'm assuming for your facility, given the size

16   difference -- Well, let me not make an assumption.

17           Are your observation beds collected together

18   in your facility?

19       A    They are.

20       Q    So you don't have an observation bed on one

21   side of the room and another side of the room and

22   another room scattered throughout the facility?

23       A    That's right.

24       Q    And you do have in your facility GP or general

25   population?

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                    Page 127

1        A     Absolutely.

2        Q     I assume that you have treated folks at the

3    Lafayette County Facility for bacterial infections?

4        A     I have.

5        Q     When you suspect a bacterial infection, do you

6    automatically assume that the bacteria is going to be

7    highly resistent?

8        A     No.

9        Q     Why not?

10       A     Because most -- actually, I might have to

11   change my answer.  Skin infections we nowadays presume

12   they are MRSA which is highly resistent.  Actually, we

13   treat mainly for MRSA with skin infections.  I guess the

14   answer to that is when I see a skin infection, I assume

15   it's highly resistent.

16           Other kinds of infections that are acquired in

17   the community, so as a for instance, a urinary tract

18   infection, I would presume it was caused by resistent

19   bacteria because we're not in a health care setting in

20   general.  We're not -- it's not a hospital.  They're not

21   hospital-acquired infections; they're community-acquired

22   infections.

23       Q     When you're distinguishing between infections

24   and then hospital-acquired infections, what's the --

25       A     Well, in a -- so if a person develops

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1  pneumonia in the hospital, while they're in the

2  hospital, you presume that that is called a

3  hospital-acquired pneumonia and it has a different set

4  of bacteria than if they developed it community-acquired

5  at home.  So if a person has pneumonia at home, there's

6  one set of bacteria that's likely to cause it.  If they

7  develop it in a health care setting, then it's a

8  different set of bacteria.

9      Q    Is it a fair statement unless you have

10  inflammation that an inmate at Lafayette County

11  Correctional Facility was recently in a hospital or in a

12  health care setting, you would assume that it is not a

13  hospital-acquired infection?

14      A    That's right.  And in this case the Augmentin

15  was giving as a prophylactic not even to treat

16  infection.  So it was not in even in response to the

17  infection.

18      Q    As a preventative measure?

19      A    That's correct.

20      Q    You indicate in your report on page 16 that

21  you've requested the following documents which you have

22  not yet received.  Can you see where I'm reading?

23      A    I do.

24      Q    You've identified five items?

25      A    I do.

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1     Q     Have you received any of those items since

2   drafting this report?

3     A    I have not.

4     Q     Would the lab results drawn while Mr. Gracia

5   was at OCC make a difference in your opinions or you

6   have no way of knowing one way or the other?

7     A    I do -- I saw -- I saw reports of the results

8   from -- in Dr. Zawitz'.  The medical examiner makes a

9   comment about the CD4 count, the medical examiner

10  somehow may have gotten the CD4 count.  Then Dr. Zawitz

11  makes a comment on the results.  I feel I have seen them

12  second hand but I did not see the actual lab results,

13  which I understand were resulted after Mr. Gracia had

14  died.

15    Q     Did viewing those lab results that you just

16  talked about make any difference in any of your

17  opinions?

18    A    They're incorporated within these opinions.

19    Q     Do you know why you haven't received any of

20  these items?

21    A    I do not.

22    Q     You testified earlier when Max Gracia, Jr.

23  reported weakness and dizziness that Nurse

24  Galloza-Gonzalez should have addressed his hydration

25  status.  Do you recall that testimony?

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                    Page 130

1      A    Yes.

2      Q    That's my paraphrasing.  I'm certainly not

3  direct quoting you.  What do you mean by hydration

4  status?

5      A    So whether he was dehydrated.  In other words,

6  he had a rapid heart rate.  One of the things you would

7  be concerned about is that he's dehydrated and has too

8  little fluid in his body.  He's either not been taking

9  in enough, has been vomiting, has had too much output

10  via vomiting or some other output, and that that is why

11  his heart rate is elevated.

12      Q    And so heart rate is a potential sign of being

13  dehydrated?

14      A    That's correct.

15      Q    And weakness is a potential sign of being

16  dehydrated?

17      A    That's correct.

18      Q    And dizziness is a potential sign of being

19  dehydrated?

20      A    Absolutely.

21      Q    Throughout your testimony and, again, my

22  words, not yours, you used the term immunocompromised.

23  And you've also, as have we all, used the term HIV or

24  HIV positive.  When you testified today, are you using

25  HIV positive interchangeably with the term

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                   Page 131

1    immunocompromised?

2       A    No.

3       Q    So somebody who is HIV positive is not

4    necessarily immunocompromised?

5       A    That is correct.

6       Q    Likewise, someone who is immunocompromised is

7    not necessarily HIV positive?

8       A    That's correct.

9       Q    How do you know Max Gracia, Jr. was

10   immunocompromised or do you know that?

11      A    I do not know that.  So my report -- I think

12   I've already said this but I will say it again.  My

13   report said he was -- he may have been or some words

14   like that.  It was not to a reasonable degree of medical

15   certainty that he was.  He may have been

16   immunocompromised.  I base that on the medical

17   examiner's finding of the low CD4.

18          However, when Dr. Zawitz commented that he

19   didn't believe that he was immunocompromised and he went

20   into his rationale why he was not, I -- it sounded

21   reasonable to me and I don't have a reason to argue with

22   that.  So I would defer to Dr. Zawitz on that point.

23      Q    You also testified -- and I am jumping around

24   a lot so thank you very much for following me -- about

25   E. coli when you were speaking to Mr. Angell.  You were

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                   Page 132

1    talking about the fact that E. coli was detectable.  Do

2    you recall that testimony?

3        A    Not specifically detectable.

4        Q    Is E. coli detectable?

5        A    Any bacteria is detectable.  I think what I

6    may have been referring to, or what you may be referring

7    to, is that Dr. Zawitz, in his report, made several

8    references to occult infection or something that was

9    hidden.  And my testimony was and my opinion is that

10   there wasn't anything particularly hidden about his

11   infection.  It was simply not diagnosed, not found.

12           So hidden connotates or occult connotates that

13   you looked for it and were not easily able to detect it.

14   But E. coli is a common bacteria and easily drew out in

15   his blood and in the Gram stain so I don't believe it

16   was occult.

17       Q    Do you believe that Nurse Evans was

18   deliberately indifferent to Max Gracia's, Jr. health

19   condition?

20       A    I believe that it is not -- I believe it is

21   not a determination that -- it's not up to me to

22   determine whether an individual provider is deliberately

23   indifferent or not.  It's my understanding that that is

24   a legal conclusion to be determined by the trier of fact

25   but I believe that the care that she rendered in this

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                    Page 133

1    case went beyond mere negligence and is concerning that

2    she was indifferent to his what should have been an

3    obviously or serious -- an obviously serious medical

4    condition.

5        Q    And so I don't put words in your mouth, and I

6    apologize to you, on page 10 and 11 in paragraph 3 you

7    opine regarding Nurse Evans.  And you do say, Ms. Evans'

8    action, quote, appears to be go beyond negligence and

9    rise to the level of indifference.

10       A    I didn't say deliberate.

11       Q    Yes.  Thank you for clarifying that.

12       A    I mean -- which, I mean, I guess the short

13   answer is that, yes, I believe that she was deliberately

14   indifferent.  However, I recognize that that is not a

15   determination that an expert is -- my job, as I see it,

16   is to opine upon her actions as it relate to the

17   standard of care and to her level of deviation from the

18   standard of care, and for her paying attention to or

19   not -- or ignoring what should have been obvious to even

20   a non-medically trained person.  I think it does rise to

21   that level.  Now, whether a court will find that

22   deliberately indifferent is up to the trier of fact, not

23   me.

24       Q    What did Nurse Evans ignore?

25       A    Well, specifically she ignored the fact that

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 134

1   the day before Nurse Gonzalez had said that he was

2   vomiting, yet she never inquired to see whether he was

3   still vomiting or whether he had taken any medicines,

4   how many times the medicines had been taken.  Then on

5   Sunday morning he was weak, dizzy, had a markedly

6   abnormal heart rate.  She didn't make any other -- she

7   didn't send him to the hospital obviously.  But in

8   addition to that, didn't make any inquiry to see that

9   the treatments she suggested, which was giving Gatorade,

10  was even tolerated or was effective.

11        So she was there at five o'clock that

12  afternoon.  Even had she not been there, it was

13  incumbent upon her to follow up to see that those things

14  were effective because if not, then it was clear that he

15  needed to go to the hospital, and she just didn't assess

16  any of the --

17     Q    Is there anything else that Nurse Evans

18  ignored?

19     A    Well, I don't believe that she saw him or

20  assessed him on any of the days she was there, Friday,

21  Saturday or Sunday.

22     Q    Anything else?

23     A    Not that I can think of at this moment.

24     Q    Fair enough.

25        MR. RECKSIEDLER:  Off the record.

```
 1        (Off the record.)

 2        MS. BRADFORD:  Give me one minute.  I think we

 3   may be at the end.  I don't have any other

 4   questions, Dr. Fowlkes.  Thank you.

 5        THE WITNESS:  Thank you.

 6        MR. ANGELL:  I have no follow up.

 7        MR. MOES:  None here.

 8             CROSS EXAMINATION

 9   BY MR. RECKSIEDLER:

10     Q    Have all the opinions that you rendered here

11   today been within a reasonable degree of medical

12   probability and/or certainty?

13     A    They have.

14     Q    And the opinions in your report, have they

15   been issued in a reasonable degree of medical

16   probability and/or certainty?

17     A    They were.

18        MR. RECKSIEDLER:  That's all I have.

19        MR. ANGELL:  Read or waive?

20        MR. RECKSIEDLER:  Doc, that's your call.

21        THE WITNESS:  Read, please.

22        MR. RECKSIEDLER:  You can come through me for

23   the reading.  I assume you all are ordering?

24        MR. ANGELL:  No.  We haven't mediated this

25   case yet so we'll wait to order.
```

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 136

1    MR. RECKSIEDLER:  All right.

2    (Time ended 1:30 p.m.)

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

1              CERTIFICATE OF REPORTER

2

STATE OF FLORIDA
3 COUNTY OF ORANGE

4

      I, Mary L. Dobson, do hereby certify that I was
5
authorized to and did stenographically report the
6
foregoing deposition of THOMAS D. FOWLKES, M.D.; that a
7
review of the transcript was requested; and that
8
the foregoing transcript, pages 1 through 136, is a true
9
record of my stenographic notes.
10
      I FURTHER CERTIFY that I am not a relative,
11
employee, attorney or counsel of any of the parties'
12
attorney or counsel connected with the action, nor am I
13
financially interested in the action.
14
      Dated this 22nd day of February, 2019 at Orlando,
15
Orange County, Florida.
16

17

18

19

20

21      _____
              MARY L. DOBSON, COURT REPORTER
22

23

24

25

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 138

1          CERTIFICATE OF OATH

2   STATE OF FLORIDA)
    COUNTY OF ORANGE)
3

4        I, MARY L. DOBSON, COURT REPORTER, Notary

5   Public, State of Florida, certify that the witness,

6   THOMAS D. FOWLKES, M.D., personally appeared before me

7   on the 12th day of November, 2018 and was duly sworn.

8
         WITNESS my hand and official seal this 22nd
9
    day of February, 2019.
10

11

12

13

14        _____

15        Mary L. Dobson
          Notary Public
          State of Florida
16        Commission #GG231639

17        My commission expires August 19, 2022

18

19

20

21

22

23

24

25

1      E R R A T A   S H E E T

2    IN RE:  BRYANT V. ORANGE COUNTY, ET AL.

3    DEPOSITION OF:  THOMAS D. FOWLKES, M.D.
     TAKEN:  11/12/2018
4
     DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE
5
     Please sign, date, and return this sheet to our office.
6    If additional lines are required for corrections, attach
     additional sheets.
7
     At the time of the reading and signing of the
8    deposition, the following changes were noted:

9    PAGE   LINE    CHANGE            REASON

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   Under penalty of perjury, I declare that I have read my
     deposition and that it is true and correct subject to
21   any changes in form or substance entered here.

22   SIGNATURE OF DEPONENT:  _____

23   DATE:  _____

24

25

Case 6:17-cv-01423-GAP-LRH   Document 95-1   Filed 02/25/19   Page 140 of 201 PageID 1029

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Page 140



1   February 22, 2019

2   Jason J. Recksiedler, Esquire
    Nejame Law
3   189 South Orange Avenue, Suite 1800
    Orlando, Florida  32801

4

5   IN RE:  Bryant v. Orange County, et al.

6
    Dear Mr. Recksiedler:
7
    Enclosed please find the original errata page with your
8   copy of the transcript so Dr. Fowlkes may read and sign.
    Please have him make whatever changes are necessary on
9   the errata page and sign it.  Please make a copy of the
    errata page and place it in your copy of the transcript.
10  Please then forward the original errata page back to our
    office at 1080 Woodcock Road, Suite 100, Orlando,
11  Florida, 32803.

12  If the errata page is not signed by the witness within
    30 days after this letter has been furnished, we will
13  then process the transcript without a signed errata
    page.  If your client wishes to waive his right to read
14  and sign, please have him sign his name at the bottom of
    this letter and send it back to our office.
15
    Your prompt attention to this matter is appreciated.
16

17  Sincerely,

18  _____

19  Mary Dobson, Court Reporter
    First Choice Reporting & Video Services, Inc.
20

21
    I do hereby waive my right to read and sign.
22
23  _____

24  cc:  Derek J. Angell, Esquire

25

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Index: $500..9:54

**Exhibits**

**Exhibit 01**  3:13 5:6,8

**Exhibit 02**  3:15 5:18

**Exhibit 03**  3:17 15:25

**Exhibit 04**  3:19 68:23 74:24
  114:23

**Exhibit 05**  3:21 115:11

**Exhibit 06**  3:23 115:22,23

**$**

**$500**  13:17

**1**

**1**  5:6,8 52:14

**1,500**  20:14

**10**  35:6 36:8 38:2 65:5 67:25
  69:18 133:6

**100**  40:9

**10:29**  38:10 124:18

**10:30**  106:19

**11**  38:10 74:17 105:3 133:6

**111/56**  106:14

**11:38**  32:6

**12**  31:1 32:8,11 44:8 76:1,7,13
  106:25 107:2

**124**  8:8

**13**  44:6,14 45:9 77:9 78:15

**131**  39:18 40:22,23,24 41:3
  48:14 98:10 105:7 106:20

**14**  17:5 23:8 48:15

**140**  8:22

**15**  77:18 83:11 90:15 91:8

**1500**  122:18

**16**  13:25 19:10 106:25 107:2
  128:20

**160**  21:2

**160-bed**  7:23 8:19 19:18

**1600**  122:18

**17**  9:19 53:14

**18**  12:22 54:9

**19**  54:9,16 67:1 70:9

**1:30**  136:2

**1oth**  51:3

**2**

**2**  5:18 6:14 17:5 21:24 83:22
  122:17

**20**  7:6,10 39:24 55:20 107:1
  121:8,12

**2004**  91:10

**2005**  90:21 91:10

**2015**  8:9 37:8 65:5 106:19
  121:15 123:4

**22**  39:24 73:12 106:21

**24**  9:25 10:5 117:25 118:3

**24-hour**  9:8 125:12

**25**  69:20 71:17

**3**

**3**  15:23,25 21:24 27:22 29:24
  63:13 133:6

**3,000**  20:16,23

**30**  67:18 69:20 70:3 71:17

**31st**  123:4

**35**  121:8,12

**3:13**  51:2

**4**

**4**  22:17 64:8 68:21,23 74:24
  105:2 114:23

**4:30**  120:2

**4:59**  32:18

**5**

**5**  32:6 115:11,14

**5:00**  120:3

**5:13**  32:25 33:13,15 34:3
  123:21

**5:30**  35:22 36:1

**6**

**6**  29:20 30:4 35:23 115:22,23

**60**  6:25

**6:00**  35:19

**6:30**  35:23

**7**

**7**  30:7

**70**  6:25 69:21 71:15 73:10

**72**  105:21 106:1

**7:48**  48:15

**7th**  32:5

**8**

**8**  19:10 31:6 34:5 35:3

**8/8/215**  37:8

**800**  20:12

**8th**  32:18 110:13 120:25
  123:20

**9**

**9**  32:18 37:9 59:21 106:19

**90**  73:13

**911**  53:23

**97.4**  105:3

**9:54**  49:10

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                          Index: 9th..appeared

**9th** 38:11 45:2,4 48:15 67:3 94:1 97:23,25 110:14,17,18, 24 120:25 121:15 124:18

---

**A**

---

**a.m.** 38:10 51:2 106:19 124:18

**abandon** 12:8

**ability** 53:23 98:12

**abnormal** 27:19 39:9,18,24 40:1,10 46:4 82:7 83:13,14 86:16 88:7 105:7 106:14,17, 20 134:6

**abscess** 87:8,15,16,18,24,25 88:2,3,4 108:8,11,18,20,22

**abscesses** 70:24 76:23 88:14

**absence** 47:12 107:6

**Absolutely** 113:7 127:1 130:20

**accepting** 55:1

**accidentally** 13:11

**accompanies** 56:3

**accomplished** 23:10

**accordance** 116:20

**account** 66:9 94:6

**acknowledge** 30:22

**acquired** 127:16

**action** 40:14 53:22 54:8 133:8

**actions** 52:9 60:8 133:16

**acts** 25:14

**actual** 22:19 56:14 73:6 81:9 97:21 114:6 129:12

**acute** 56:20,24 57:5 66:15 74:21

**added** 121:20

**addiction** 7:5 8:6,14 14:24 15:6 92:4,9 117:17

**addition** 7:5 8:14,16 18:16 86:13 134:8

**additional** 16:14 17:1 121:19

**address** 66:4 84:17 102:4 103:4 110:12 120:20

**addressed** 42:15 110:13,14, 17 111:4,5 129:24

**addresses** 84:22

**addressing** 117:9

**adds** 48:5

**adequate** 42:16,19 73:19 79:15 81:23 84:3 99:7

**administered** 29:22 121:19

**administrative** 114:23

**administratively** 117:9

**administrator** 26:4

**admission** 29:6 87:4,6 106:2

**admissions** 120:21

**admitted** 98:2 124:6,24

**admitting** 91:12,16,21 92:3,5, 8,13 98:25 99:4,5

**adrenal** 57:21,23 58:2

**adrenals** 72:13

**advance** 27:22 29:7

**advocate** 10:22,24 11:2,3,22 12:5,7

**affiliation** 10:20

**afternoon** 44:15 45:11,14 46:15 89:16 134:12

**agree** 22:12 23:25 33:4 34:12, 17,20 41:12 52:10 60:19 67:14 73:5,9 82:11,15 90:6,10 111:7 112:2

**agreed** 55:11 106:9

**ahead** 5:16 22:25 35:10 76:18 89:12

**AKI** 74:19,20

**alarm** 39:15

**alcohol** 8:7

**alert** 38:11

**allowed** 54:19

**amend** 16:24

**amended** 16:7 115:6

**amount** 37:6,11 38:4 59:5 109:22 110:15

**amounts** 43:3 58:11 59:3

**analysis** 55:4,5

**and/or** 45:18 80:21 123:25 135:12,16

**Angell** 4:12,14 5:4,10 12:1,9 16:2 27:5,9 29:25 30:3,21 32:1 37:4 40:16 44:9,11,13 49:6 50:22 51:1 52:6 59:22,23 67:21 68:1,7,20 69:1 74:10, 12,25 75:1 76:13,15 89:9 114:24 115:10 131:25 135:6, 19,24

**Anne** 121:12

**anosmia** 112:21

**anti-nausea** 34:23

**antibiotic** 22:7 81:10 87:3 90:2 99:20 100:5,8,21 101:22 102:13 103:19 104:2 124:9

**antibiotics** 22:10 73:2 76:24 81:7 87:6 99:11,13,18 102:10, 16 103:23 104:1,8,9,25 124:25

**antiemetic** 34:23

**antifungal** 102:21

**antiviral** 28:17

**any/all** 77:23

**anymore** 42:18

**anytime** 70:5 78:7

**apologize** 27:22 133:6

**apparent** 99:10

**apparently** 58:15 107:22 120:15

**appearance** 50:16

**appeared** 49:23

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

**appears** 34:13 51:8 60:10 133:8

**appropriately** 22:7,9 26:12

**approve** 126:4,10

**approves** 11:11

**approximate** 67:15

**approximately** 7:23 117:14 122:18

**April** 120:25

**area** 7:2 8:16 9:1

**areas** 103:2 108:15,17

**argue** 17:14 18:7 131:21

**ARNP** 114:16 119:8

**arrested** 59:9

**arrive** 43:18

**arrived** 24:4

**artfully** 114:19

**articulate** 34:21

**as-needed** 117:21

**assess** 43:18 46:3,6 85:12 94:2 99:9 111:22 113:17 134:15

**assessed** 46:12 64:2 79:9 110:17 123:24 134:20

**assessing** 79:13

**assessment** 23:8 34:16 37:16, 17,18,24 38:6,7,23 39:2,20 40:13,15,18,20,25 41:6,8 42:2,16,21 43:23,25 46:5,8,20 51:11 52:15,16,17,19 63:17 64:6 79:16,19 81:23 84:4 94:6 96:4,17 99:7,14 118:17,20 120:16

**assessments** 41:16 94:23 95:14

**assistance** 50:11

**assists** 41:21

**assume** 27:6 123:18 127:2,6, 14 128:12 135:23

**assuming** 126:15

**assumption** 27:10 113:18,20 126:16

**asymptomatic** 40:24

**Atripla** 27:25 28:13,15,25 29:10

**attach** 5:4

**attempt** 62:14

**attendance** 9:15

**attention** 66:11 79:24 133:18

**attorney** 6:20,21

**Augmentin** 21:25 22:5,13 48:12,13 89:19,23 90:2 100:5, 8,13,17 102:12 104:9 128:14

**August** 8:10 37:9 38:10 48:15 51:3 65:5 106:19 120:25 121:15 123:4,20 124:17

**authored** 16:4,19 92:21

**authorize** 54:19,21

**authorized** 44:17 54:18

**authorizing** 45:25

**automatically** 127:6

**autopsy** 54:24 87:20 88:10

**aware** 26:7,10,11,14,23 27:2,3 52:24 55:19 78:16 79:2 90:11

---

**B**

**back** 15:16 18:23 19:11 36:8 56:13 68:18 74:13 78:14 91:9 99:25 116:1 121:5 124:9 126:8,13

**bacteria** 74:3 80:5,7,15,16 81:8,9,13,14,15 86:21 89:1,3, 22 100:10 103:14 104:12,25 108:25 109:1,2 127:6,19 128:4,6,8 132:5,14

**bacterial** 104:20,24 127:3,5

**bad** 52:18 72:13,17 96:3

**ball** 49:22 112:17

**bandages** 119:20

**base** 17:19 122:2 131:16

**based** 17:2,7 22:16,18 26:20, 21 29:12 32:18 37:22 50:17 69:3 80:1 104:16

**baseline** 39:22

**bases** 41:20

**basic** 60:9

**basically** 10:22 41:21 53:12 57:24 69:10 76:21 117:6

**basis** 17:15 25:12 63:11 77:15 96:14 117:19,21

**Bates** 121:10

**bear** 121:3

**bed** 54:19,20 84:15 94:11,12 96:22,23 126:20

**beds** 8:8,24,25 9:2 20:10 21:2 125:7,13,14,18 126:17

**begins** 71:23

**belief** 96:14,15

**beneficial** 43:9

**Benoit** 6:14,20

**bilateral** 57:21

**bit** 17:18 31:18 53:24 79:7 86:3 88:18 93:16 103:19 124:16 125:11

**bite** 22:10,14 23:15 24:2 47:7, 13,18 71:4 72:1,2,3 75:13,18, 21 81:6 86:19 87:16,21 88:14, 20 96:21 100:9,10 108:23

**bites** 78:25 79:3,4 86:23

**black** 57:19

**bleed** 37:6 109:20

**bleeding** 57:14

**blood** 31:14,16 39:20 41:2,5 46:24 56:11 57:12,19,24 58:21,22,23,25 59:2 72:19,22 73:3 80:21 81:9 86:17 99:9,12 100:1 101:21 102:5,8 106:13 109:2 110:3 121:17 132:15

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Index: bloody..checked

**bloody** 31:17 37:12 38:5 110:15,19 111:9,12,16

**Blunt** 13:14

**board** 7:4 10:22 11:10,15,24 14:6,10,16,23 15:4,7,10 17:13 20:1 101:3

**bodies** 72:6

**body** 36:18 48:1 58:20 71:22, 24 72:8,11 80:16 87:13 101:24 105:12,15,24 108:6,7 109:1 110:2 130:8

**body's** 71:21 72:23 109:9

**bottom** 75:2

**bouncing** 93:16 114:18

**Bradford** 29:24 30:1 59:21 114:14,15 115:8,13,16,21,25 116:3 123:11,15,17 124:14 125:3 135:2

**brain** 72:19 113:2

**breach** 60:25 61:12

**breached** 61:8

**breaches** 22:21 30:5

**break** 74:9,13 82:1 114:9,11

**breathing** 39:25

**Brian** 89:16

**broad** 22:6 81:6 99:11,13,17 100:20 101:22 102:9,14,16 103:23 104:6

**brought** 113:23

**Buck** 16:11 22:9,19 24:3,6,15, 20 25:13 28:10,12 63:17 64:21,23 120:11

**Buck's** 22:17 24:24 82:4

**bug** 100:6

**building** 21:3

**buildings** 20:25 21:8,9

**bullet** 68:5 69:6 121:13,22 122:17

---

**C**

---

**C.V.** 4:22

**calculate** 91:9

**call** 9:24,25 10:2,5 12:24 23:21 31:17 41:19 42:5 52:8 53:23 62:1 72:16 80:13 88:6 97:25 98:6,14 117:3,5,25 118:3 119:6 126:3 135:20

**called** 7:14 10:3 15:1,8 41:10, 14 57:13 73:3 80:8 90:3 109:12 128:2

**calling** 40:15 118:16 119:1

**calls** 118:4 119:5

**camps** 21:13

**cannabinoid** 58:7 59:11,13

**capability** 41:15

**capable** 46:20

**capacity** 6:1 8:20 12:19 116:14

**capital** 115:21

**cardiology** 14:21

**care** 7:9 17:24 19:2,25 20:4,6 22:13,18,19,21 25:5,10,18 26:4 29:22 30:5 31:3,23 60:25 61:8,9,13,22 62:4,9,10,14,22 63:4 64:9 65:24,25 73:6 78:16 79:24 81:22 82:22,24 83:19, 21 84:7,9 85:2,8,10,12,13 90:20,24 91:2 93:3,7,12 97:25 99:3,16 104:15 107:13 111:2, 21 112:4 116:19 117:10 127:19 128:7,12 132:25 133:17,18

**carry** 25:7

**case** 4:16 5:20 6:5 13:4,6,15 16:15 23:22,23 24:24 27:12, 16 41:14,18 49:16 56:10 61:11,12,17 73:16 79:25 82:1 84:18,23 85:17,20 87:19 88:17 93:4 96:12,25 97:2,6 98:6 99:25 101:3 120:6 124:5 125:20 126:9 128:14 133:1

---

135:25

**cases** 5:20,21 6:1,16 7:8 10:4 12:23 61:16 126:3

**category** 47:2 62:10

**caused** 40:12 48:25 53:10 109:2,3 127:18

**causing** 80:5 86:19

**cautious** 52:18

**cautiously** 53:4

**CD4** 129:9,10 131:17

**cell** 51:13 54:16 67:1 70:9 94:19

**census** 8:21

**center** 7:7,11,13,15 8:7,15 18:17 90:25 91:3 116:15

**centers** 12:24

**certainties** 78:9

**certainty** 18:5 70:1 131:15 135:12,16

**certification** 14:16 15:4 20:1,2

**certifications** 92:2

**certified** 7:4 14:6,10,23 15:7, 10 17:13 19:24 101:4

**cetera** 9:21 38:24 107:4

**chain** 42:3

**chance** 69:16 74:14 77:2 78:3, 12

**change** 16:24 27:11 35:18 54:10 87:3 120:6,10 127:11

**changed** 5:15 33:20 36:17 82:5 124:9

**changing** 32:23 36:10

**charge** 13:21 25:15

**charging** 13:15

**chart** 63:22

**check** 51:12

**checked** 105:22

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                      Index: CI..contracts

**CI** 75:4

**circumstances** 43:14 98:16 120:10 126:4,6

**citing** 122:24

**Clairmont** 35:7 38:2 48:16,19, 25 50:14 51:8 52:8 54:15 64:8,16 89:17 93:19 95:3,5,16 112:19

**Clairmont's** 16:11 51:2

**clarification** 76:11 85:14 91:21

**clarify** 44:22 74:23 101:8

**clarifying** 133:11

**clear** 8:18 46:16 83:17 84:24 101:21 109:9 113:14 124:21 134:14

**clinic** 9:1 10:3,4,13,14 116:25 117:5,16

**clinical** 124:3

**clinically** 58:5,6,7,8,12

**close** 58:8

**closed** 87:22

**closely** 103:19

**closer** 66:11

**cloudy** 109:13

**CO's** 51:17

**co-owner** 8:16

**co-signed** 44:16

**co-signing** 44:21 45:24

**cocaine** 58:6,9,12,15,19 59:4, 8

**coffee** 57:15,17,18

**coli** 53:11 80:8,11 81:5 89:7, 23 99:24 100:6,10,13,16 102:15 103:16,24,25 131:25 132:1,4,14

**colleagues** 69:4

**collected** 126:17

**collection** 87:11,12,13,19 108:17

**college** 92:19,25

**color** 109:14

**combination** 40:22 104:11 112:1

**command** 42:3

**commen** 75:4

**comment** 54:14 129:9,11

**commented** 48:11 131:18

**comments** 54:15

**Commission** 20:3

**common** 51:21,24 56:12 75:3, 11,14 80:15 100:10,12 105:17 132:14

**commonly** 47:10 105:12

**community** 8:15 127:17

**community-acquired** 127:21 128:4

**company** 8:9,10

**competence** 20:5

**competency** 85:12

**competent** 84:5,12,13

**compiled** 18:19

**complained** 36:15

**complaining** 121:17

**complains** 38:12

**complete** 14:12,15,17

**completed** 15:3

**completely** 58:25

**compliance** 28:1,12,25

**comply** 84:16,19

**compound** 20:18,24

**computer** 116:11

**concern** 55:17 60:9 64:9 66:8 79:19 119:6

**concerned** 80:13 102:17,18

107:1 130:7

**concerns** 55:9 117:10

**conclusion** 24:20 60:23,24 61:4 64:17 70:23 71:5 132:24

**condition** 50:15,17 60:9 62:17,20 65:23 66:15 67:10 73:17 78:17,20,24 79:3 86:11 93:9 95:17,21 96:1 112:13,16, 21,24 124:3 132:19 133:4

**conditions** 69:19 81:24

**conduct** 49:16

**confinement** 29:16 30:12 55:13

**confounding** 118:15

**confused** 45:3

**confusion** 39:9

**conjunction** 82:4

**connected** 91:3 101:6

**connotates** 132:12

**considered** 11:1 20:25 36:24 95:16

**consistently** 81:25 83:3

**constitute** 65:20 84:8

**consult** 103:6

**consume** 107:19

**consumed** 42:21,25 43:1 58:16 59:4,8

**contact** 38:25 64:5 82:7 83:13 94:25 120:3 121:24,25 123:1, 4

**contacted** 122:20

**contained** 113:21

**context** 71:8 121:14

**continue** 35:13,15 42:9 89:5

**continued** 22:9

**continuing** 36:4

**contractor** 8:13 9:19

**contracts** 8:11

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

contributing 17:9 77:9,15

control 77:1 94:15

controlled 117:20

controlling 102:12

cooperate 84:5

cooperative 119:24

copies 115:25 123:9,15

copy 4:22 5:1,17 15:12,14,19
68:11,12,13,17,18

coroner 114:1,4,6

coroner's 114:2,3

correct 6:3 7:12 10:16,17,18,
19 16:13 17:21 18:13,14
19:18,20 22:2 26:19 28:9
31:20 32:14 39:3 45:21 46:25
54:17 60:18 63:9 64:11,12
66:16 70:23 73:2 76:16 77:11
79:4 80:3 81:20 83:19,24,25
85:3,15 97:10 105:5,6,8,10,18
106:22 107:11 109:11,18,24,
25 110:1,4,7,22 113:9 116:10,
16 117:2 118:23,25 119:3
128:19 130:14,17 131:5,8

corrected 72:23

correctional 7:8 12:20,25 13:5
19:25 20:4 23:4 51:20 52:13
53:19 82:17,21 85:4 94:15
112:8,12 128:11

Corrections 21:11 23:11 31:1

count 129:9,10

country 82:18

counts 86:17

county 4:15 6:12,15,19 7:14,
17 9:18,22 12:13,15 18:19
20:18 21:7,11,18 23:10 31:1
101:16 116:15 121:9 125:5
127:3 128:10

County's 6:19

couple 43:16 51:14 53:12
56:23 74:15 103:11

court 13:2 62:23 133:21

cover 103:25 104:11 115:14

coverage 9:8

covered 59:18 87:17

covering 24:13 41:20

creatinine 57:1

crisis 53:21

critical 37:25 38:1 39:13 49:8
51:5 54:2 66:21 107:6 112:9

criticism 112:12

criticisms 25:18 53:16,18
59:25 82:2

critique 46:7

critiques 44:21 69:6,8 83:1,7

CROSS 89:14 114:13 135:8

CT 99:14 101:24 102:24 103:3

culture 81:8,16 99:11,12,19,
22 101:23 103:8,11 104:13

cultured 80:23 101:20

cultures 100:1 102:8 103:8

culturing 80:21

curious 47:21

current 4:22 5:3

cut 57:12 87:20,22 88:8

_____

D

damage 72:14

damaged 113:2

dangerous 52:16 95:23

dash 75:8

date 72:1 110:12 120:24

day 9:8,13,25 10:1,2,6,14
23:12,24 24:3,4,12 26:6 31:2
33:25 34:6 35:4 44:16 45:24
48:10 63:19,25 64:7 97:23
98:8,9 100:1 110:14,17
117:22 118:1,3 121:23,25
123:2 125:13 126:9 134:1

dayroom 120:4 121:23

days 10:1,6,8,9 23:8 45:1 56:6
57:5,9 58:4,15,17,24 59:9
88:17,18,19,22 100:3 118:3
120:22 123:5 134:20

dayshift 51:16

daytime 23:17

dead 106:4,5,8

deal 36:21 85:6

dealt 55:12

death 17:21 24:17 29:8 55:12,
14 56:15 65:4 66:19,25 73:20
80:5 97:21,22 105:22 106:1

debris 87:12

decades 19:17

deceased 113:23

decision 119:4

decisions 125:5

deep 53:10,12 76:23 88:11
99:15 108:12,14,15,23

defendant 6:24 115:1 120:6

defendant's 116:8,12

defendants 4:16

defense 6:17 7:1 16:5,6,23
116:5

defer 18:1 67:12,14 131:22

definition 65:24 87:17,24 93:5

degree 18:5 39:2 56:25 61:7
65:21 78:10 131:14 135:11,15

degrees 61:22,23 62:4 105:3

dehydrated 47:24 130:5,7,13,
16,19

dehydration 47:24

deliberate 61:17 93:5 133:10

deliberately 24:21 61:14
62:12 132:18,22 133:13,22

delivered 25:5,10 94:3 116:20

delivering 20:6

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Index: demonstrate..document

**demonstrate** 20:5

**department** 18:16 22:8 23:19, 20 81:4 90:15,22,23,25 91:7, 18 99:8 100:23,24 101:6 106:3 113:22,25

**Department's** 18:20

**departure** 84:8

**depend** 118:25

**dependent** 107:2,3

**depending** 124:11

**depends** 10:13 109:19

**depo** 16:11

**deposed** 4:17

**deposition** 4:4 5:5,11,22,23 6:2,6 13:21 54:21 68:15 86:2 120:12

**depositions** 16:8,15,18,20

**Derek** 4:14

**derived** 18:11

**describe** 50:1 61:7 71:1 90:17

**describes** 38:3 49:25

**description** 31:13 33:6 38:6 49:20 88:9,10 110:15 119:22

**descriptions** 69:22

**designated** 125:13

**designed** 100:18

**detainees** 7:20

**detect** 80:6,18,19,20 81:1,2, 12,14 86:6,9 113:12,13 132:13

**detectable** 132:1,3,4,5

**detected** 65:15 112:16 113:15

**detecting** 112:22

**detention** 7:7,11,14,25 8:1 20:7,8 21:12 110:10 116:14

**deteriorating** 78:18

**determination** 43:23 61:4 96:3 103:1 124:11 125:16 126:13

132:21 133:15

**determinations** 10:24

**determine** 43:8 62:8 84:4 86:14 132:22

**determined** 34:10 46:13 124:4,7,8 132:24

**detox** 117:23

**detoxed** 117:21

**detoxing** 117:18

**develop** 57:8 73:22 88:17 128:7

**developed** 56:6 69:24 85:18 128:4

**developing** 32:10

**development** 70:13

**develops** 127:25

**deviation** 133:17

**diagnosable** 78:21

**diagnose** 86:20

**diagnosed** 70:19 71:14 132:11

**diagnoses** 46:18 47:3 52:14 63:23 64:1 95:14,15

**diagnosis** 52:15,22 53:3 95:11 96:19 98:18

**diagnostic** 99:14

**dictate** 99:3

**dictation** 116:11

**die** 56:21,22 70:4 72:24

**died** 29:14 55:19 57:2,20 69:24 129:14

**difference** 23:2 90:24 109:5 110:6 111:8,16,19 112:4 113:5 126:16 129:5,16

**differently** 25:24,25

**difficult** 70:14 80:6,18 81:1, 11,14

**digit** 73:20

**direct** 4:11 94:25 98:20 130:3

**directly** 9:20 19:22 42:2,5 111:19 119:19

**director** 7:6,10 9:22 25:3,16, 20 116:14,18 117:5 125:4

**Director's** 10:3

**disagree** 68:3,6 70:20 73:9 74:19 75:2,10,12 76:1 77:3, 12,16,18,20 78:4,5

**disagreement** 75:8

**disagreements** 55:9

**disciplinary** 51:18

**discussed** 28:15 44:11 64:18

**discussing** 85:9

**disease** 14:5,6,19 17:14 18:1 28:14 77:14 99:17 100:15

**diseases** 14:8,11,13,15,22 29:18

**dispute** 17:16

**disqualified** 13:3 93:13

**distant** 109:3

**distinction** 91:1

**distinctive** 49:24

**distinguishing** 127:23

**distress** 50:2

**district** 7:19

**dizziness** 38:13 40:22 43:5 44:24 45:2,5 46:5,23 121:17 129:23 130:18

**dizzy** 41:4 124:17 134:5

**doc** 101:3 135:20

**doctor** 4:13 8:6,15 14:14 22:22 24:1 41:17,22 42:2 47:9 53:2 65:25 89:9 100:24 103:21 117:17

**doctors** 69:3 88:3

**document** 27:13 63:16 68:8 113:17 119:23 122:2,8

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Index: documentation..Evans

**documentation** 27:24 54:11, 13

**documented** 27:14 67:7

**documenting** 26:12

**documents** 18:21 85:22 86:1 128:21

**dog** 22:10,14 23:15 24:2 47:7, 13,18 71:4,25 72:2,3 75:13, 18,21 78:25 79:3,4 81:6 86:19,23 87:16,21 88:14,20 96:20 100:9,10 108:23

**door** 51:10 93:25 94:2,7,9,10, 11

**dosage** 35:3

**dose** 35:12

**doubling** 88:25 89:6

**dozens** 55:23

**drafting** 129:2

**drainage** 31:8,14,16,17 37:6, 12 38:5 86:12 109:11,19,22 110:15,19 111:9,17 113:24

**draining** 47:8,13,19 71:4 75:13,25 87:18

**drains** 72:2

**dramatically** 39:18 40:10,11 105:7

**draw** 29:12 47:3 70:11 91:1

**drawing** 50:18

**drawn** 28:12 129:4

**dressing** 32:23 33:24 36:10, 14,17 45:17 84:12 109:25 111:18 122:15,21,23

**dressings** 111:12 120:1

**drew** 132:14

**drill** 4:19

**drink** 42:18

**drive** 21:21

**drop** 41:5

**drug** 8:7 12:24

**drunk** 107:21

**due** 47:11 48:10 71:24

**duly** 4:9

**dying** 57:10

**dysfunction** 71:23

---

### E

**earlier** 64:22 77:5 80:2 98:9 129:22

**earliest** 77:24,25 78:6

**early** 33:5 34:10 65:4

**easiest** 77:21

**easily** 86:23 132:13,14

**eating** 74:3

**effect** 72:8,21

**effective** 134:10,14

**effectively** 72:20

**effectiveness** 35:16

**effects** 72:15

**effort** 64:6 109:10

**elevated** 40:1 46:23 57:1 86:16,20 105:16,19,24 106:7, 21 130:11

**emanating** 113:18

**emergency** 7:4 14:7,20,23 15:1 17:22 18:16 22:8 23:19, 20 81:4 90:14,21,22,25 91:7, 14,15,17 92:7,16 98:22 99:8 100:19,23,24 101:6,19 106:2 113:21,25 117:25 118:1

**emesis** 57:18

**emit** 110:2

**emphasized** 122:23

**employ** 9:20

**employee** 8:12 9:18,22 26:2

**employees** 25:21 26:2

**encompasses** 85:15

**encounter** 123:1

**end** 52:20 60:7 72:21 85:16 135:3

**ended** 136:2

**engaged** 102:25

**enlarged** 88:5

**enlargement** 56:2

**ensure** 81:23 83:14 116:19

**ensuring** 84:2

**enter** 94:16

**entered** 49:2

**entertain** 96:6,11

**entire** 50:23 77:18

**entities** 85:10

**entry** 34:3

**equating** 110:19

**equivalent** 21:13

**ER** 90:18 101:3,4,17 103:21

**Escherichia** 80:8

**esophageal** 56:20 57:5 74:19

**esophagus** 56:21 57:10,13,20

**ESP** 75:23

**essentially** 8:20 10:4 21:3 25:4 29:4 48:25 49:1 55:11 57:12,19 58:10 63:15,23,25 87:12,20 89:2

**establish** 92:2

**estimate** 6:22,25

**estimates** 67:6

**et al** 6:15

**evaluate** 117:18

**evaluated** 44:18

**evaluation** 124:11

**Evans** 24:12 25:7 33:23,24 34:1,5 38:18 41:9,18 42:7,11, 17 43:12 44:14 45:9,10,15,20 48:19 49:3 60:7 63:8,16,18

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

98:7 107:23 114:16 119:8,12,
18 120:5,6,12,23 121:16,18,
23,24 122:3,7,14,15,20,22,24
123:1 132:17 133:7,24 134:17

**Evans'** 60:8 121:13 133:7

**evening** 9:10 23:4 38:9 67:3
78:8 97:25 110:18

**event** 78:7 98:16

**events** 67:3

**everyday** 80:16

**evidence** 24:19 35:14 42:25
59:3 64:1 65:15 67:4 90:3
108:24

**exact** 80:20 86:20,21 97:22

**exam** 124:4

**EXAMINATION** 4:11 89:14
114:13 135:8

**examiner** 55:10 56:16 108:19
114:6 129:8,9

**examiner's** 55:1 108:14
131:17

**exclude** 60:22

**excluded** 13:2 60:12

**exclusion** 46:18

**exclusive** 109:8

**exclusively** 12:22

**exertion** 107:4

**exhibit** 5:6,8,18 13:11 15:13,
25 68:14,23 74:24 114:23
115:8,11,13,22,23

**exist** 94:17

**existed** 82:9 94:14 102:4
104:12

**existence** 124:1

**expect** 36:11 38:6 41:4 42:4
59:8 61:13 81:19 88:18
105:13 106:7 107:20,24 108:2
110:5 111:7,11,25 112:3,19
113:4 114:17

**expected** 35:24 36:2,5 59:1

110:2

**expecting** 48:5

**expenses** 13:22

**experience** 7:6,24 17:22
19:13,17,22 28:19 29:15
51:20 55:13

**expert** 5:25 7:8 12:19 14:5
16:5,6 28:14 42:22 61:15 93:2
133:15

**expertise** 7:3 55:6

**experts** 48:11 54:15 115:1
116:5,8,12

**experts'** 16:23

**expired** 54:23

**explain** 47:22

**exponentially** 89:3

**extent** 46:7,19

**extra** 42:8,17,24 43:1,8

**exude** 110:3

**eyes** 96:12 120:23 122:4

---

### F

**face** 47:18 90:1

**facilities** 7:25 19:23 20:7,8,22,
25 21:15,17 29:16

**facilities'** 19:14

**facility** 7:18,22 8:1,17 9:3,11
12:20 19:18 20:11,16,17,21,
22 21:2,5,12 22:22 23:14,16
28:20 42:4 55:21 82:22 85:5,7
92:10,11,12 119:9,13 126:1,
15,18,22,24 127:3 128:11

**fact** 17:25 26:24 27:7 28:2
33:24 34:10 43:9 47:6 54:21
62:15 65:14 66:5 70:14 87:3
109:7 119:9 132:1,24 133:22,
25

**factor** 17:9 77:10,15

**factors** 64:15 119:2

**facts** 18:10

**faculty** 92:18,24

**fail** 72:12

**failed** 46:3 62:13 66:2

**failing** 93:8

**failure** 56:24 57:2 71:24 74:21
109:4

**failures** 61:24

**fair** 66:13,15 78:19 128:9
134:24

**fairly** 22:6 64:25

**fall** 63:8 83:18

**falling** 61:22 85:7

**familiar** 11:7,22 61:16 112:24

**farther** 6:14

**faster** 39:25

**federal** 7:18,20 11:5,14,17

**feel** 88:7 98:1 129:11

**feign** 51:21 52:4

**feigning** 51:18 52:2,9 54:1
95:9,17 98:18

**fell** 62:8,9

**fellowship** 14:13,15,17,25
15:11

**fever** 72:7,9 86:16

**field** 14:9 61:19

**fight** 109:10

**figure** 41:24

**file** 13:24

**find** 22:20 39:11 60:2 83:12
84:2 133:21

**finding** 17:8 28:10 58:1,3
105:9 106:11 108:14 131:17

**findings** 55:1,11 124:12,13

**fine** 27:9

**firm** 13:16

**flesh** 74:3 108:12 113:13

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Index: flip..handwritten

**flip** 59:19 64:20

**flipping** 59:18

**Florida** 41:23

**flow** 57:12,24

**fluctuant** 88:6

**fluid** 42:8,18,21,24 43:1,8 88:7
99:12 102:3,6 107:7 109:6,16
110:3,7 121:19 130:8

**fluids** 43:3,18 73:2 98:11,12
107:19 108:4 124:25

**folks** 60:2 117:23 127:2

**follow** 26:15 42:20 49:2 92:1
118:9 134:13 135:6

**forget** 15:24

**forgive** 88:1

**form** 27:1,8 29:23 30:13 31:24
36:25 40:7 48:22 50:20 51:22
68:4 85:21 88:14 93:21 94:18
96:8,16 97:4,8 98:4 99:1
100:22 111:10 112:11 123:23
124:19

**forward** 124:16

**foul** 49:24 53:6 112:5 113:15,
19

**found** 57:16 106:13,19 132:11

**Fowlkes** 4:8 114:15 115:17
135:4

**frequent** 117:19

**frequently** 30:10

**friable** 57:14

**Friday** 32:5 63:17,20 64:2
120:13,15 134:20

**front** 119:23

**full-time** 8:3 9:9

**fully** 58:19

**function** 71:24 72:13

**fungal** 80:14

**fungus** 102:20 104:19 105:1

---

### G

---

**Gail** 114:15

**gallon** 107:24

**gallons** 107:22

**Galloza** 31:6 32:20

**Galloza-gonzalez** 38:11 40:19
42:11,14 43:11 60:1,14,18
61:23 63:2 121:16 122:20
129:24

**garden** 81:15

**gastroenterology** 14:22

**gastrointestinal** 47:11 75:5

**Gatorade** 107:22,23,24 121:21
134:9

**gave** 5:1 17:11 35:12 51:14
91:9

**general** 4:19 12:6,7 30:20 40:6
42:6 44:17 45:25 46:9 48:17,
20 71:16 75:10 92:16 95:13
100:17 106:25 107:2,20
113:11,13 118:13 120:11
125:7 126:11,13,24 127:20

**generalize** 30:19

**GI** 75:5,12

**give** 4:4 34:25 42:17 43:18
93:2 94:6 96:10 99:11,12
102:10 106:14 107:23 117:18
118:18 135:2

**giving** 90:2 102:16 128:15
134:9

**glad** 96:11

**glands** 57:23 58:2

**Gonzalez** 35:12 45:18 119:16
122:12,13 134:1

**good** 4:13 65:2,6,11 89:16

**GP** 126:24

**grab** 5:16

**Gracia** 17:6,24 21:25 22:20
24:7,17 26:18 27:25 29:22

33:23,25 36:10 44:17,19
45:16 65:2 69:15,22 77:23
78:2,16 90:6,11 93:20 95:6,17
96:5 98:23 101:5,6,15 105:24
119:19 120:24 121:17,23,25
122:1,4,21,22,25 123:2,19
124:17 129:4,13,22 131:9

**Gracia's** 17:21 24:21 27:7
28:24 29:7 31:7 56:10 60:9
73:17 81:25 95:21 97:7,25
107:14 108:6 111:2 132:18

**Gram** 81:17 99:18,23 103:8,12
104:14 132:15

**Gram-negative** 99:24 103:15,
17,18 104:18

**Gram-positive** 103:15

**grandfathered** 15:8

**ground** 57:15,17,18 59:19

**grow** 89:3,5

**growth** 100:2

**guaranty** 114:18

**guess** 8:11 17:20 28:14 40:18
52:8 78:21 109:8 115:25
127:13 133:12

**guessing** 69:3

**guide** 104:15

**guidelines** 116:21

**guy** 73:13

---

### H

---

**half** 7:19

**hand** 109:16 116:1 121:5
129:12

**hand-on** 117:12

**handle** 117:6,8 118:2

**hands-on** 116:22

**handwriting** 69:2

**handwritten** 68:8 74:14 77:8
114:24 116:4,8

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Index: happen..impossible

**happen** 56:22 120:21

**happened** 55:20 79:12 84:18

**happening** 57:20 72:14

**happy** 27:19

**harbor** 85:17

**hard** 81:15,16

**Harter** 49:10 50:4,7 60:21 63:2 95:5,6 112:19

**Harter's** 49:15 61:11,24

**hate** 19:11 88:16

**healed** 108:13

**healing** 109:17

**health** 7:8 8:15,17 17:24 19:25 20:4,6 23:7 25:4 26:4 65:2,6, 11,16 78:16 94:15 111:21 112:4 116:19 117:10 127:19 128:7,12 132:18

**healthy** 30:11,16,20 70:17 72:25 73:13

**hear** 19:18

**heard** 57:18 74:2

**heart** 37:18 40:9 41:3 48:14 56:2 72:20 86:16,20 98:10 130:6,11,12 134:6

**hedge** 65:22

**hemorrhage** 57:21,25

**hemorrhaged** 58:2

**hey** 118:4

**hidden** 71:9 86:7,8 132:9,10, 12

**hierarchy** 41:25 42:6

**high** 47:14 56:11

**highest** 39:5

**highly** 127:7,12,15

**hindsight** 27:15 34:12,13 37:21 77:22

**hindsights** 98:14

**hired** 93:2

**history** 19:15 96:19 100:21 118:15

**HIV** 17:7 28:18 29:16 48:3 54:25 55:8 65:10,14,17,19 66:1,2,6,14 70:17 77:9 78:25 79:5 80:14 102:18 104:23 130:23,24,25 131:3,7

**hold** 9:24 10:3 15:23 45:3 64:16 93:20 117:2

**holding** 7:18 10:13,14

**holds** 9:23 10:2 117:4

**home** 73:14 74:5 128:5

**hospital** 11:13 43:20,22 46:14, 21 51:13 55:18,24 65:9 66:7 67:2 70:5,8,19,22 71:3 73:6 76:22 77:24 78:8 79:22 81:3, 19 86:22 87:4,6 91:4,5,8,13, 18,22 92:5,7,11,15 97:20 98:2,15,24 99:16 101:7 113:23 123:18,19,21,24 124:6,10,16,24 127:20 128:1, 2,11 134:7,15

**hospital-acquired** 127:21,24 128:3,13

**hospitalization** 91:5

**hospitals** 104:8

**hour** 10:14,15 13:17 99:25 117:15

**hourly** 13:16

**hours** 9:10,25 10:6 13:20 14:1 31:1 32:9,11 43:16 46:3 56:23 57:5,9,20 58:1,4 65:5 66:24 69:23 73:20 74:4,19 97:21 103:11 105:22 106:1 117:25 118:3 122:19

**housing** 26:22 48:16,25

**human** 113:8

**hydration** 40:25 129:24 130:3

**hypertrophy** 56:1,2

**hypothetical** 96:9,10 101:10

**Hypothetically** 36:20

─────────────

**I**

**i.e.** 79:14

**ICU** 74:4

**idea** 114:21

**identification** 5:9,19 16:1 68:24 81:18 100:2 115:12,24

**identified** 76:22 79:20 81:5,9 112:14 128:24

**identify** 47:10 53:20 54:6 62:20 65:9,12 81:4,16 86:19, 22 93:10

**ignorance** 88:1

**ignore** 133:24

**ignoring** 93:8 94:4 95:25 133:19

**II** 80:4

**II(2)** 17:20

**III** 81:21

**ill** 54:7 84:4,14,16

**illness** 24:21 51:19 52:9 54:1 98:18

**illnesses** 51:21 52:4 65:10

**imagine** 82:20

**imaging** 103:1

**immeasurable** 77:2

**immediately** 102:21

**immuno** 28:14

**immunocompromised** 17:7,8, 11,15,25 18:8 48:5 65:13,14 66:8,11,14 130:22 131:1,4,6, 10,16,19

**impact** 64:16

**importance** 122:23

**important** 28:2 47:6 56:19

**importantly** 86:13

**impossible** 27:15 55:22

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

improper 44:2

improved 77:2

inability 84:18

inartful 112:7

incalculable 69:16

incalculably 78:3,11

incarcerated 11:7 66:3

incarceration 58:17 90:8

incise 88:11

include 13:18 94:24

including 112:13

incorporated 129:18

incorrect 56:18 71:10

increase 42:8 69:16 105:12

incumbent 50:6 124:10 134:13

independent 8:13 9:19

independently 48:20,23 49:5

indication 43:2,3 109:9

indicative 48:8 53:7 56:9

indicator 105:20

indifference 60:11,17,22 61:1, 4,17 62:2,24 63:5,9 64:10 79:25 93:6 95:21 133:9

indifferent 24:21 61:6,10,14 62:11,15 132:18,23 133:2,14, 22

individual 4:15 25:18,19 132:22

infected 72:1,3 79:6 80:24 81:5 86:19 88:20 90:1

infection 28:18 32:3 33:3,6,7 34:11,12,14 37:13 41:7 47:25 48:2 53:10,13 65:3 66:17 72:4,5,7,8,11,12,15 73:25 74:6 75:16,17 79:21 86:5,9, 15,21,23,24,25 87:15 88:24 89:20 90:4,7,12 101:21 102:13 103:22 104:20,21,24 105:11,17,20 108:6,24 109:10

122:24 123:25 127:5,14,18 128:13,16,17 132:8,11

infections 55:16,23 66:12 80:14 90:5 102:19,20 104:22 127:3,11,13,16,21,22,23,24

infectious 14:5,6,7,10,13,15, 19,22 17:13 18:1 28:14 77:14 99:16 100:15

infer 63:24

infirmary 8:23,24 9:2 26:3,22 30:17 31:4 44:15 45:10 53:24 63:19 81:12 120:21 125:13,23 126:12

inflammation 128:10

informally 4:13

information 17:13 30:15 34:15 37:23 41:17 85:22 98:8,9,11 118:10,19,24 119:7 122:3,6 123:7

informed 122:21

initial 22:18 23:7 100:24

initiate 102:9

injury 74:21

inmate 7:21 8:19 12:5 22:23 23:5,7 24:1 30:10,11,16 31:4 36:20 49:22 50:18 53:7 85:6 94:25 112:17 128:10

inmates 11:18,20,24 20:16 30:20 52:4 94:3 116:20 121:20

innocent 95:24

inquire 28:11 29:11

inquired 27:25 41:10 134:2

inquiry 134:8

inside 87:12,23 88:11

insignificant 58:6,8,13

inspection 71:22

instance 42:1 43:15 117:17 125:16 126:6 127:17

instances 123:6

instant 105:21

institutional 10:21 11:10,15, 24

institutions 82:17

instruct 98:17

instructions 23:19

intake 22:1 42:8 80:23,25 107:8 108:5

intend 16:14,16 44:7 85:23 86:1

intended 28:5,6

intentionally 60:13

interchangeably 130:25

intercurrent 65:9

interest 11:23

interesting 52:21 106:10

internal 14:12,14,18

interpret 60:17

interpretation 36:13

interpreted 61:9 96:23

intervening 42:6

intervention 39:19

intravenous 102:10,13 104:10

intravenously 103:23 104:10

inverse 71:18

investigation 18:20

investigative 18:18 45:19 50:23 51:7 119:15,16 120:2 121:9

involved 11:12 95:5 111:2

involves 10:25 11:18,20 14:7

IRB 10:22,23 11:9

IRB's 11:8

issue 22:17 23:22 29:21 30:8 42:14 45:23 49:15 54:25 55:8 86:5 118:5 120:2

issued 135:15

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

**issues** 69:9

**items** 68:5 128:24 129:1,20

**IV** 73:2 87:6 99:12 124:24

---

### J

**Jackson** 6:12,19

**jail** 7:16,17,23 8:18,19,23 9:7, 15 10:6,8 12:10 18:14,15 19:14 20:18 21:18 24:8 28:20 29:19 51:25 55:15,16 58:16 59:4 94:16 101:9,16 125:5

**Jason** 74:25

**job** 8:3 116:19 133:15

**jobs** 8:4

**jokes** 69:3

**Joshua** 13:13

**Jr** 120:24 123:19 129:22 131:9 132:18

**judgment** 62:15 95:18,21 96:2,7

**jump** 27:21

**jumping** 60:4 131:23

**juvenile** 20:8

---

### K

**keeping** 33:23 122:23

**kidney** 57:2 72:12 74:21

**kidneys** 57:24

**kill** 100:5 104:25

**killing** 89:19

**kind** 36:4 37:16 43:7 48:2 51:11 52:3,5 76:9 126:12

**kinds** 36:16 65:21 104:22 127:16

**knew** 43:15 104:12

**knowing** 100:21 103:7,19 129:6

**knowledge** 13:1 20:5 28:24 29:1 82:18

---

### L

**lab** 29:5,6 89:2 124:3 129:4, 12,15

**label** 84:18

**labs** 28:12 29:12

**lack** 37:24,25 60:8 64:9 66:23 71:23 72:18 79:24 84:7 124:1

**Lafayette** 7:14 12:15,16,17 116:15 125:5 127:3 128:10

**laid** 120:23

**lake** 75:22

**language** 60:3

**large** 14:8 19:23 20:11 37:6,11 38:4 110:15

**largely** 18:11

**larger** 7:25 20:7

**law** 11:5,17 13:16

**lawyer** 27:10

**lawyers** 6:17 7:1 15:18 16:18 89:11

**lay** 54:5

**layperson** 62:19

**leads** 122:7

**leaps** 98:5

**learning** 88:1

**leave** 36:1

**leaving** 45:17 101:11 119:20, 25

**Lee** 6:11,18

**left** 35:11 47:6 56:1 74:17 101:25

**leg** 72:4 74:4 86:10 113:24 114:5

**legal** 61:4 132:24

**legs** 108:10

**length** 15:9 31:2

**level** 60:10 61:25 63:5,9 64:10 66:7 79:18,25 82:22 107:3 119:6 133:9,17,21

**licensed** 92:11

**life** 99:9

**light** 63:14

**lightly** 61:6 98:19

**likelihood** 47:20

**Likewise** 41:9 49:24 131:6

**limited** 13:4

**Lincoln** 6:15

**list** 5:12 6:23 13:7 27:17,20 47:5,14 48:6 68:5

**list/expert** 5:21

**listed** 5:20 19:7

**litany** 118:5

**literally** 114:11

**liters** 73:2

**liver** 72:14

**load** 29:3

**local** 7:16,17 72:3 86:11,15 101:17 103:4

**located** 108:25

**logarithmically** 89:4

**long** 10:11 11:1 56:4,6 58:12, 19 70:21,22 73:21 88:15 99:21 114:18

**longer** 8:12 23:13 65:10,14 72:20

**looked** 110:23 111:5,18 114:2 124:3 132:13

**lose** 93:17

**Loss** 113:1

**lost** 72:22 101:11

**lot** 12:18 59:18 104:19 131:24

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Index: lots..Mississippi's

**lots**  57:14 118:12

**Louisiana**  12:17

**lovely**  123:11

**low**  72:20 99:9 105:15 131:17

**lower**  62:10 94:10

**LPN**  41:16,21 42:1,4 49:11

**lump**  88:6

**lungs**  37:18 47:11

**lying**  41:1,3

**M**

**M-C**  115:21

**M-U-N-N**  115:21

**M.D.**  4:8

**made**  36:4 40:25 41:5,7 46:5
48:16,24 49:20 52:19 64:6
68:14 70:14 96:3,4,17 107:14
120:3 121:21 123:4 132:7

**major**  46:2 64:19

**majority**  12:25

**make**  17:19 19:12,15 25:11
41:20 43:25 52:14,16,17 53:3
57:4 62:6,14 63:3 68:17 79:10
83:17 95:12,13,14,15 98:5
103:1 118:20 119:4 121:24
123:9,15 124:11 125:5,9,21,
23 126:12,16 129:5,16 134:6,
8

**maker**  119:4

**makes**  25:22 41:16 125:15
129:8,11

**making**  10:24 68:19

**malingering**  52:14,21 85:6,9
95:8,11,17 96:20,24 98:19

**malpractice**  93:7

**man**  54:6

**management**  81:24

**mandate**  66:6

**mark**  5:17 15:13,23 68:20
115:22

**marked**  5:8,18 15:25 68:23
115:11,23

**markedly**  40:1,10 46:4 134:5

**Mary**  121:12

**mass**  39:13

**materials**  57:15

**matter**  56:23 85:25 114:23

**Max**  120:24 123:18 124:16
129:22 131:9 132:18

**Mcmunn**  115:20

**Mcmunn's**  115:18

**meal**  51:9,14 94:8

**meaning**  15:2 40:9 56:18
58:17

**means**  31:13,18 36:13 56:23
71:9 86:5 89:1 117:9

**measure**  14:8 107:14 108:3
128:18

**measured**  40:12 124:2

**measurement**  107:18 108:4

**mechanism**  84:20

**med**  95:4

**mediated**  135:24

**medical**  7:6 9:1,3,22 10:3
18:5,15,17 19:2,14 21:16 24:1
25:3,16,20 29:2 30:12 36:22
50:2,15,17 52:15,22 53:1,20
54:3 55:1,10 56:16 61:5
62:16,20 65:20,21,23 66:1,4
77:23 78:10,17,20,24 79:3
81:22,24 92:19,21 93:8,10
95:11,15 96:1 108:1,14,19
114:6 116:18 117:5 118:15
125:4 129:8,9 131:14,16
133:3 135:11,15

**medically**  112:15 113:5

**medication**  28:17 50:12

**medications**  9:21 23:22
29:17,19 49:14 51:10 84:11,

15 95:7 118:13

**medicine**  7:5 8:6,15 12:21,25
13:5 14:7,12,14,19,20,21,24
15:1,6 34:24 51:20 92:5
117:17

**medicines**  48:12 66:2 73:3
94:3 134:3,4

**meet**  82:22 83:20 85:1

**member**  92:18,24 94:16

**mental**  8:15,17 37:17 38:24
39:2

**mentioned**  53:5

**mere**  93:7 133:1

**met**  4:13 82:24 122:22

**metabolites**  58:24

**metabolize**  58:19

**metabolizes**  58:22

**microscope**  103:13

**middle**  36:17

**mild**  113:23,24

**milligrams**  34:5 35:3

**mind**  17:4 18:23 28:4 68:18
74:8 114:10 115:22 118:9
121:6

**mine**  15:20 69:3 121:12

**minor**  5:3

**minute**  135:2

**minutes**  56:23 57:3 58:3

**misdiagnosis**  95:24

**misinterpreted**  52:8

**misjudgment**  95:23

**mispronounce**  116:15

**missed**  64:24

**missing**  108:13

**Mississippi**  6:12 7:19 12:16
13:13 21:2

**Mississippi's**  11:20

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                Index: mistake..nurses

**mistake** 62:14 95:18,20 96:2

**mistaken** 96:7,15

**misunderstand** 103:21

**mixed** 45:12 56:17

**mixes** 45:1

**mixture** 31:16

**Moes** 11:9 76:11 89:15,16
93:23 94:20 96:13 97:1,11
98:21 101:1,12,13 106:12
111:14 112:23 113:3 114:7,19
135:7

**moment** 4:14 45:13 121:3
134:23

**Monday** 51:3 63:20 120:13

**money** 11:14

**monitor** 35:13,15,24 42:9

**monitoring** 36:4 39:20

**month** 12:17 59:7

**months** 12:22 29:4

**morning** 4:13 32:6 36:6 37:9
45:2,7 65:4 113:22 134:5

**mortalities** 67:15

**mortality** 67:6,12 69:20,21
71:18 73:11 97:3

**Moss** 89:21

**mouth** 133:5

**move** 124:15 125:22

**moved** 125:22

**moving** 33:13 34:3 125:6

**MRSA** 127:12,13

**multiple** 10:10 21:8,9 26:8,9,
10 47:7 50:24 71:4 75:13,21
78:25 100:11

**multiple-hour** 57:3

**muscle** 108:16

**mutually** 109:7

---

**N**

**narrative** 53:15

**narrow** 81:10 99:19 104:16

**National** 20:3

**nationally** 41:21

**nausea** 34:6 44:25 48:13

**NCCHC** 20:3

**necessarily** 44:2,3 47:10
50:10 66:14 72:10 81:4 84:16,
24 85:7 94:9 102:24 120:19
131:4,7

**necessitate** 94:25

**necrosis** 56:20 57:5 74:20

**necrotic** 108:10,13,20,23
111:25 112:5

**needed** 34:6 43:7,9 87:4,5
91:4 103:2,3 120:17 134:15

**negative** 24:23 25:12

**negligence** 60:10 61:2 133:1,8

**negligent** 63:3

**night** 35:25 36:17 94:1 95:1
114:2

**nighttime** 125:14

**nitrogen** 56:25

**non-medical** 49:21 50:1

**non-medically** 50:3 54:4
62:19 113:14 133:20

**non-specific** 34:19

**non-trained** 93:9

**normal** 27:18 31:3 39:13,17,
20,23,24,25 40:1,8 46:24 48:3
105:4 106:15,23,25 109:20,
21,22 121:18

**normalization** 83:14

**northern** 7:19

**notated** 48:20

**note** 21:25 23:19 35:25 40:21

---

48:24 49:1 51:2 63:20,22
105:3 110:21 120:14,15
123:21 124:18

**noted** 31:6 37:5 38:11 49:13
53:6 57:15 105:23,25 110:9
113:23,25 114:1,4

**notes** 22:16 32:25 74:14 77:8,
18 114:25 115:1,6,17 116:4,9,
11

**noticing** 32:23

**notified** 34:4 38:17 42:8
121:16

**noting** 35:7

**nowadays** 127:11

**number** 7:8 20:21 30:2 39:16
100:9 121:10

**numbers** 5:6 40:3

**Numeral** 59:25

**nurse** 9:1,4,5,6,9,10,11,13,17,
20,23 10:1 16:11 23:5,6,18,21
24:11 25:6 31:6 32:20 33:22,
24 34:1,4 35:7,12 36:21 37:1
38:2,11 40:18 41:9,13,16,17,
18 42:10,13,17 43:11 44:14
45:9,15,18,20 48:16,19,24
49:3,10,15 50:4,6,13 51:2,8,
16 52:7 53:1 54:14,15 60:1,6,
7,13,17,21 61:11,23 63:2,8,
16,18 64:8,16 89:17 93:19
95:3,4,5,6,16 96:24 98:7
107:22,23 110:6 111:1,8,16
112:18,19 113:4 115:6,18,20
117:3 118:4,6,16 119:1,5,12,
16,17,18 120:5,6,12,23
121:12,16,18,23,24 122:3,7,
11,13,15,20,22,24 123:1
126:3,8 129:23 132:17 133:7,
24 134:1,17

**nurse's** 26:6 42:24

**nurses** 9:20,24 25:7 26:8,23
27:6 28:11 35:17 39:7 52:13,
14 54:19 79:13 81:12 82:7
83:12 90:10 95:12,13 98:17
105:19 110:21 113:15 118:18
125:22

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Index: nursing..paragraph

**nursing** 52:15 73:14 74:5 92:22,25 93:3,11,12 94:15,23

---

**O**

**oath** 4:9

**Object** 27:1,8 29:23 30:13 31:24 36:25 40:7 48:22 50:20 51:22 68:4 93:21 94:18 96:8, 16 97:4,8 98:4 99:1 100:22 111:10 112:11 123:23 124:19

**objects** 27:11

**observable** 78:21

**observation** 8:25 54:18,20 98:20 125:7,14,18 126:7,17, 20

**observed** 111:1

**observing** 77:11

**obtain** 102:8

**obtained** 20:2 77:1

**obvious** 50:2,4,14 71:9,11 75:15,16 86:25 111:20 133:19

**OCC** 19:2 20:10 26:21 29:2 81:22 129:5

**occasion** 21:21

**occasionally** 12:23

**occasions** 18:18

**occult** 70:25 71:1,7,13 86:5,7 132:8,12,16

**occur** 29:14 49:4 57:3 58:3 81:19 104:23

**occurred** 52:12 74:18 79:22 95:1

**occurs** 51:24,25 56:4

**OCJ** 77:23

**odor** 49:24 53:6,11 111:23,24, 25 112:5,10,13,16,17,20,22 113:5,6,8,12,15,18

**odorous** 113:23,24 114:5

**offer** 28:6

**offering** 97:2,6

**office** 55:1 121:9

**officer** 23:4 49:21 53:15,16,19 54:2,5 112:8,12

**officer's** 94:12

**officers** 51:14 53:22 125:14

**Ole** 10:18

**oncoming** 36:3

**one's** 105:12

**ongoing** 65:9

**open** 51:9 87:21,23 88:8

**opening** 94:10

**opine** 18:4,25 66:17 106:13 133:7,16

**opined** 64:9 106:16

**opinion** 13:3,4 17:20 18:4,7 25:13 53:1 60:13 61:5,24 62:8 63:13 64:11 65:20 66:20,24 70:11,12,16 74:18 77:22 79:8 80:1 84:7 85:4 93:20 97:12,18 107:13,15,17 119:8 132:9

**opinions** 13:2 16:24,25 17:1,3 24:23 27:11 28:6,22 54:11 59:24 60:13 63:1 64:15 67:12 68:3,6 69:7,9 85:17,19 93:3, 11 97:2,6 120:5,11 129:5,17, 18 135:10,14

**opportunistic** 80:13 102:19 104:22

**opportunities** 51:15

**opposed** 6:6 71:19 91:6 113:19

**oral** 22:6,10 87:3 102:12

**orally** 103:24

**Orange** 4:15 18:19 20:18 21:7, 11,18 23:10 31:1 101:16 121:8

**order** 20:12 23:22 35:21 42:8 44:16,21 45:24 51:18 102:24 118:20 125:21,23 135:25

**ordered** 28:12 34:5 49:14 51:10 101:24 121:19

**ordering** 135:23

**orders** 23:20 41:15 98:3,25 99:4,5 101:7 117:18

**ordinarily** 63:3

**organ** 72:11 109:3

**organism** 80:20

**organisms** 103:15 105:1

**organization** 11:14

**oriented** 38:12 39:1,5,9

**Orlando** 18:17

**outcome** 52:18 78:1,8 87:5

**outpatient** 8:17 124:23

**output** 43:4 107:7,8,10,21 108:3,5 130:9,10

**outright** 119:7

**overnight** 9:10 37:8 126:7

**owned** 8:7

**Oxford** 10:16 12:11

**oxygen** 39:25

---

**P**

**p.m.** 32:6,18 35:23 48:15 49:10,14 123:21 136:2

**pages** 67:23

**paid** 12:3 14:2

**pain** 36:15

**painful** 75:24

**paper** 121:5

**papers** 68:22

**paragraph** 19:10 21:24 22:17 29:20 30:4 31:6 32:18 35:6 36:8 38:2,10 44:6,14 45:9 48:15 53:14 60:7 63:7,13 64:8,15,21 65:1 76:3,4,7 77:9, 18,19 83:10 84:1 105:2 133:6

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Index: paragraphs..potentials

**paragraphs** 54:9

**paraphrase** 69:11 76:10,18

**paraphrasing** 130:2

**parasite** 104:21

**pardon** 45:10

**part** 31:10 60:17 109:17 125:4

**part-time** 9:9

**participate** 21:16

**parts** 48:1 71:24

**pass** 15:16 36:2 89:12 95:1,4

**passed** 29:14

**passing** 121:23

**past** 6:22 32:11 118:15 124:25

**pathologist's** 17:8

**pathology** 17:20

**patient** 23:23 25:19 32:25
   38:11 49:13 63:19 96:18,20
   98:23 102:18 118:5 120:19

**patients** 12:7 26:13 29:16,18
   51:21 55:17 81:24 84:2
   104:23 116:23 120:13,17
   125:6

**paying** 133:18

**Pearson's** 115:6

**Pending** 101:23

**penultimate** 65:1

**people** 11:12 21:14 25:14
   49:21 50:24 52:4 55:23 57:18
   65:13 67:6 70:3 73:12,15 74:5
   80:14 92:4 113:2 117:20
   120:20 125:17,22

**perceived** 62:16

**percent** 6:25 67:18 69:20,21
   70:3 71:16,17 73:10

**percentage** 11:19 100:16

**perform** 51:11

**period** 23:13 56:4,6 57:25
   58:4 59:9 88:19 99:6 103:9,20
   109:21

**periodic** 109:25

**peripheral** 29:1,9

**person** 11:6,22 23:3 47:17
   48:3 50:1 54:5,19 62:19 66:10
   70:17,18 71:3 72:25 75:12
   86:21 91:4 93:10 98:20
   100:20 102:11 112:15 118:1,
   14 125:19,22 126:10 127:25
   128:5 133:20

**person's** 106:8 107:4

**personal** 7:24 62:3

**personally** 55:12

**personnel** 26:9 50:1,3 54:3

**persons** 54:5 84:10 113:15

**phone** 118:2,21

**phonetic** 89:22

**phrase** 36:11 37:2

**phrasing** 37:2

**physical** 9:15 36:21 94:25
   124:4

**physically** 24:16 120:7

**physician** 17:23 19:25 22:8
   35:8 36:9 91:15 97:24 98:22
   100:20 101:4,20 113:22,25

**physicians** 91:15 92:7,9,16

**pieces** 121:5

**pimple** 72:4 74:3

**pin** 57:7

**pinpoint** 37:23

**Pittsburgh** 15:5

**place** 19:1 26:4 73:23 81:22
   82:16,23,25 85:1,11 98:14

**placing** 41:15

**plaintiff** 6:23

**plaintiff's** 6:17,21 13:16

**pneumonia** 128:1,3,5

**point** 15:17 17:12 24:17 30:6
   32:2,4,11 33:19 37:20 40:17,
   20 46:11,21,22 49:19,25 54:7

58:9 66:21 68:5 69:6,23 70:6,
   7 73:7 78:19 79:17 80:12,17
   85:18 86:18 93:24,25 97:14,
   15 98:1 101:15 102:15 104:15
   106:4 116:1 121:13 124:5,8,
   21 125:1,2 131:22

**pointed** 89:22

**points** 79:16 122:17

**police** 22:14

**policies** 19:1,4,14 20:5 25:7,9
   26:3,15 30:17,23 81:21 82:3
   83:2,20 116:21 125:24

**policy** 26:22 82:6,9,11,12,16,
   25 83:12,21 84:2,7,21 85:5
   125:20,25

**policy/practice** 85:11

**polite** 119:24 122:25

**poorly** 35:7 36:10,12,19,24

**population** 7:21,22 11:6 30:20
   44:17 46:1,10 48:17,21 125:7
   126:14,25

**populations** 11:7

**portion** 94:10

**portions** 94:22

**position** 12:4

**positive** 29:17 65:19 66:2,14
   79:5 102:18 104:23 130:24,25
   131:3,7

**positivity** 65:10

**possibilities** 47:16

**possibility** 52:10,12 60:22
   69:17 73:8 77:2

**possibly** 48:10 53:7 56:11
   65:13 119:15

**postmortem** 55:4

**potential** 46:18 47:3 48:6
   79:10,14 85:24 130:12,15,18

**potentially** 29:13 33:5,8 34:14
   85:6 95:25 99:14,15 102:17

**potentials** 47:5

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                    Index: practice..question

**practice** 62:5 85:1

**practices** 92:22 93:12

**practitioner** 9:17,23 10:2
23:21 24:12 25:6 33:23,24
34:1,5 41:9,13,17,18,22 42:17
44:14 45:15,20 48:19 49:3
53:1 60:6,8 63:8,16,18 98:7
107:22 112:4 117:3 119:17

**practitioners** 9:20

**precautions** 100:19

**prefer** 62:13

**prescribe** 22:13

**prescribed** 21:25 22:7 100:5
101:22 104:3 117:20

**present** 9:13 31:8 37:6 38:5
44:15 45:10 112:18

**presently** 8:5 10:9

**press** 88:6

**pressers** 73:3

**pressure** 39:20 41:2,5 46:25
56:11 72:19 73:3 99:10 102:5
106:14 121:18

**presume** 21:19 28:19 30:7
127:11,18 128:2

**presuming** 23:17 98:16

**presumption** 73:10

**pretrial** 7:20

**pretty** 59:2 70:21 72:24 73:1
89:9 111:20

**prevent** 112:22

**preventative** 128:18

**previously** 49:4

**primary** 7:2 9:24 15:2 18:21
95:4 117:3,4

**prior** 29:2 33:15 39:21 40:12
58:16,17 59:10 78:8 85:24
97:21 105:22 106:1

**prisoner** 10:22,24 11:2,3

**prisoners** 10:25 11:6

**prisons** 20:8 82:17

**privileges** 91:12,16,21 92:3,5,
8,13,14,17

**probabilities** 67:13

**probability** 78:10 135:12,16

**problem** 10:4 32:10,21 34:7
35:3 36:22 42:10 46:2,9 68:14
83:22

**problems** 48:6 65:16 117:6,8
120:20

**procedure** 82:6 83:12 125:25

**procedures** 19:1,5 20:6 25:8,9
26:3 30:18,23 81:22 83:2,8,20
116:21 125:21,24

**proceed** 16:15

**proceeded** 6:5

**process** 14:25 23:1 57:3
109:17 125:9

**professional** 19:25

**profusion** 72:18

**progress** 74:1

**progression** 74:18 123:25

**progressively** 96:21

**prolonged** 57:25 109:21

**prongs** 82:1

**proper** 44:3,4

**Properly** 115:5

**prophylactic** 128:15

**prophylactically** 90:3,7,11

**protocol** 84:22,25 118:7,9

**protocols** 26:3 94:14,17 104:7

**provide** 27:17 62:21 96:14
118:24 119:7

**provided** 4:25 15:18 16:16
19:6 67:5 85:22 86:2 97:13
98:8

**provider** 17:24 23:12,21 24:11
38:17,25 40:15 41:15,19 42:5,
7,11 43:12 45:10 46:12 48:4

51:12 63:18 65:12 66:9 79:19,
20 82:7 83:13 98:6 111:21
120:12 122:14 125:15,18,21,
23 132:22

**providers** 25:6 26:11 95:15

**providing** 22:10

**proximity** 52:19

**prudent** 17:23 46:12 48:4
65:12 66:9 124:11

**publicly** 8:8,9

**pull** 67:23

**pulled** 36:15 68:9 126:7

**pulmonary** 75:4,12

**pulse** 39:17 40:1,4,11,21,23,
24 43:6 46:4,23 102:6 105:7
106:20

**pumping** 72:20

**purpose** 8:25

**purposes** 21:10

**pursuant** 123:21 124:18

**purulent** 109:12

**puss** 87:11,20,23 88:12
108:17,20 109:5,9 110:6,9,19,
21 111:1,9,13,17,23,24 112:1

**put** 17:18 26:4 28:3,9 39:16
40:3 83:18 115:13 133:5

**putting** 99:16 100:20

---

**Q**

**qualified** 80:1 95:12 111:8,16,
21 112:3 113:4

**qualifies** 65:11 108:18

**qualify** 92:2

**quantification** 108:2

**quantifying** 107:10

**quantities** 58:6,13

**quantity** 58:8

**question** 19:21 36:8 38:16

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

42:16 50:21 51:23 58:18
59:12 60:12,21 62:23 63:1
65:18 68:2 78:22,23 83:6,7
87:1 92:1 97:9,15 99:2 110:20
111:15 112:7 114:20 124:15

**questioned** 95:8

**questioning** 42:18

**questions** 64:23 74:15 93:15
114:17 118:6,23,25 123:14
135:4

**quick** 88:14 114:9

**quickly** 59:2 70:19 72:24 73:1
77:1 89:5 98:15

**quote** 75:3 133:8

**quoting** 130:3

---

**R**

**raise** 62:22 66:7

**raised** 79:18

**range** 8:22 39:23 58:18,23
105:4 106:15,23,25 121:18

**rapid** 130:6

**rare** 80:15

**rate** 13:16 39:17,23 40:2,5,9,
11 41:3 43:6 46:4,23 48:14
71:16 86:16,20 98:10 106:21,
24 107:3,5 130:6,11,12 134:6

**rationale** 17:11 131:20

**reach** 24:20

**reached** 60:24 66:21

**reacted** 36:18

**reaction** 72:6,10

**read** 18:11 38:13 50:9 51:4
64:21 74:14 76:18,19 77:21
84:2 121:13 135:19,21

**reading** 17:1 51:7 106:14
121:18 128:22 135:23

**reason** 11:16 32:3 52:11 56:19
89:24,25 131:21

**reasonable** 18:4 19:2 77:25
78:6,10 96:7,12 131:14,21
135:11,15

**reasons** 77:5

**reassessment** 43:8 98:11

**recall** 100:7 119:22 129:25
132:2

**received** 97:24 98:13 101:5
128:22 129:1,19

**receives** 11:14

**receiving** 98:22 101:19

**recently** 90:19 128:11

**receptive** 122:25

**RECKSIEDLER** 12:8 27:1,8
29:23 30:13 31:24 36:25 40:7
44:7,10 48:22 50:20 51:22
67:18 68:4 74:23 93:21 94:18
96:8,16 97:4,8 98:4 99:1
100:22 101:8 106:10 111:10
112:11 113:2 114:8 123:9,23
124:19 134:25 135:9,18,20,22
136:1

**recognizable** 77:24

**recognize** 71:12 118:22
133:14

**recognized** 71:12

**recollection** 13:25 64:18

**recommendation** 48:17 49:1

**recommendations** 125:10

**record** 26:25 27:3 38:14 42:25
44:18 74:11 83:24 105:24
111:1 112:20 114:12 121:1,2
123:16 134:25 135:1

**recorded** 32:11,13,15 33:3
35:13 38:22,24 84:3 107:9
112:18

**recording** 38:1 49:7 79:15
105:25 107:7

**records** 18:12,14,15,16 27:24
29:2 32:16 39:21 48:18 110:9
113:21

**red** 47:7,13 71:5 75:13,25

**redden** 37:6

**reddened** 31:7,11 33:5,15
37:11 38:3,4 47:18 72:2

**reddening** 33:7

**redness** 86:12

**reducing** 72:23

**refer** 15:15,20 67:25

**reference** 35:14

**referenced** 38:2 67:11

**references** 119:8 132:8

**referred** 125:6

**referring** 48:24 100:23,25
101:15 132:6

**refers** 45:12,14

**refusal** 49:14 50:9 84:16,19

**refuse** 84:5,13 85:12

**refused** 49:13 50:11

**refusing** 51:18 84:3,10,11
85:10 95:6

**regard** 94:4 116:7,12 120:5

**Regional** 18:17

**registered** 41:12,16

**regular** 71:13

**regularity** 73:24

**relate** 133:16

**related** 12:23 25:13 48:2,12
113:5

**relates** 13:5

**release** 44:17 45:25

**released** 126:10

**releasing** 46:9

**relevant** 16:21

**rely** 118:18

**relying** 54:3

**remains** 23:7

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                    Index: remember..scattered

**remember** 19:8 36:5 39:6
48:18

**remote** 71:25 72:8

**removal** 126:5

**removed** 122:21

**renal** 56:24 74:21

**rendered** 5:22 22:19 132:25
135:10

**repeat** 82:8 83:14 115:19

**rephrase** 97:5

**report** 15:12 16:10,19 17:3,20
18:11,22,24 19:7 21:24 27:23
28:3 29:2 33:21 35:20 42:1
43:13 45:19 50:23 51:6,8,18
54:24 63:15 67:16,24 68:21
69:18 76:7,14 78:15 83:11
85:16 105:2 107:10 114:2,3,
25 115:7 119:15 121:9 128:20
129:2 131:11,13 132:7 135:14

**reported** 35:1 37:7 50:8,11,12
71:17 95:6 110:5 112:10
123:20 124:17 129:23

**REPORTER** 4:3 115:19

**reports** 16:5,6,7,23 17:2 32:19
41:13,22 42:22 50:17,19
119:16 129:7

**represent** 4:14 89:17 93:19
114:16

**represents** 62:23 87:19 95:20

**request** 121:21

**requested** 128:21

**required** 11:15 40:14 46:20
82:6 107:14 108:22 120:18

**requirement** 23:25 24:5,16

**requires** 11:5,17 39:19 40:14
43:22 65:24 98:5

**requiring** 83:12

**research** 10:25 11:11,13,17,
20 13:20

**residency** 14:12 15:2,3

**residential** 92:12

**resistant** 89:23 100:17

**resistent** 127:7,12,15,18

**resisting** 36:23

**respirations** 46:24

**respiratory** 39:23 40:2,5
106:21,23 107:3,5

**respond** 118:1

**responded** 34:7 51:5

**responding** 43:11

**response** 43:12,17 44:1 49:3
71:22 128:16

**responses** 43:19

**responsibilities** 25:20

**responsibility** 25:14,21
118:23

**responsible** 25:4,5,8 119:4

**rest** 107:5

**restart** 29:13

**result** 17:1 18:19 43:4 58:1
72:12

**resulted** 129:13

**results** 55:9 99:18,22 101:23
103:8,9 104:12,14 129:4,7,11,
12,15

**resuscitate** 102:6

**resuscitation** 99:12 102:3

**retained** 5:25 6:17,19,20,23
7:1,7

**return** 24:16 66:21 73:7

**reversed** 73:1

**reversible** 73:17

**review** 10:5,21 11:10,15,24
13:18 16:3,14,17 19:4 29:2
63:23,25 82:13 86:1 105:23
110:25

**reviewed** 16:5,8,11 19:6 27:24
29:5 82:3

**reviewing** 16:22 26:5 27:15

**revised** 15:17

**rise** 61:25 133:9,20

**rises** 47:13,19 60:10 64:10
79:25

**rising** 63:4

**risk** 122:24

**RN** 41:13,21 42:3,6 50:7

**rod** 103:17,18 104:18

**rods** 99:24 103:16

**role** 11:25

**Roman** 59:24

**room** 51:9 98:22 101:19
126:21,22

**rotting** 113:12

**roughly** 106:19

**round** 63:19 103:16 120:13,19

**rounding** 26:12

**route** 102:11

**routinely** 121:20

**running** 107:4

**S**

**safe** 5:16

**sanguineous** 31:13 109:19,20

**saturation** 39:25

**Saturday** 32:17,18 44:23 45:1,
11,13,16,19 64:4 88:21
119:10,13,17,20,25 120:7,19,
24 122:4,8,10,19 134:21

**saved** 66:22

**Saves** 17:17

**scale** 39:12,15,17

**scan** 101:24 103:3

**scant** 31:7,18

**scattered** 126:22

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Index: scenario..source

scenario 52:1,3,5 96:6 101:5

scenarios 53:22

school 10:20

scope 18:24 55:5 81:10 90:17 99:20

screening 23:1

screens 23:3

section 28:5 69:9 79:24

send 43:20 51:12 86:21 91:5 134:7

sending 43:22

sense 19:15 63:3 79:10 112:10

sentence 32:19 35:12 65:1 79:23

sentenced 21:14

sepsis 37:15 46:13,16 47:9,10 55:13,14,22,24 67:6,8,15 69:18,20,22,25 70:4,18,25 71:6,13,14,15,19,21 72:16 73:22,25 74:1 75:4,11 78:1 79:10,14 80:5 81:6 86:16 96:25 99:10 109:3 124:1,5,6, 8,22 125:1

septic 55:16,18 56:16,19 67:5, 7,8,15 69:19,20,24 70:13 71:3,19,25 72:10,17 73:1,7, 12,14,21 74:1 105:13,14,15

series 114:17

sero 31:14

serosanguineous 31:8,9,13, 15 109:6,16 110:3,7

serous 31:14 109:18,19,22

serve 11:7 21:14

services 102:25

serving 10:23

set 9:14 33:11 34:9 98:16 120:10 128:3,6,8

setting 30:17 31:4 59:4 71:3 90:15,18,20 100:9 108:1 124:23 127:19 128:7,12

settings 20:7 51:25 55:13

severe 50:15,16 87:4

severely 54:7

severity 123:25

shapes 103:16

she'd 98:10

sheet 35:20

sheets 57:15

Sheriff's 18:20 121:9

shift 9:14 26:25 27:3,7 30:25 35:18 36:3 37:8 79:16 95:1 110:17,18 121:16

shifts 26:9,10 31:1 94:24

shock 56:3,13,16,18,19 58:1,2 67:5,7,8,15 69:19,20,24 70:13 71:20 72:17,22 73:1,7,14,21, 22 74:1 102:4 105:14,15

short 74:13 77:22 103:20 116:19 133:12

shortly 17:21 65:4 66:18 73:19 123:20

shot 72:21

show 58:12,14 99:23

showed 24:7 120:10

shower 122:22

showing 100:2

sick 9:24 10:2 24:12 117:3,4

side 74:17 126:21

sign 33:7 34:14 78:6 130:12, 15,18

significant 28:10 58:7

significantly 42:20

signs 26:8,9,17,24 27:7,18,20 30:7,18 32:8 33:3,12 34:10,11 35:15 37:7,15,19,24 38:1 40:8 41:1,6 49:7 51:12 70:15 71:9, 11,12 77:25 79:6,15 82:7,8 83:13,14 86:14,16 88:4,13 94:24 96:18 98:12 105:17 106:20 118:14 124:2,22

similar 23:2 104:9

Similarly 5:11 111:23

simple 91:2 111:15

simply 28:7 51:14 96:20 132:11

single 73:20 126:9

sir 5:5,11 97:17 121:4

sit 85:23

site 71:25 101:21 119:9,12 120:7 122:3,7

situation 72:22 125:12 126:12

size 23:11 126:15

skin 87:21 108:15,16 127:11, 13,14

skipped 33:2

skipping 44:7

slightly 38:4

slot 51:9 94:9

small 11:19 94:10

smaller 20:7

smart-alecky 88:16

smell 112:20 113:1

smelled 113:16

sold 8:8,9

solemnly 4:3

someplace 114:21

sooner 58:22

SOP 83:23

sort 40:18 47:8,21 55:4 65:24 66:22 73:23 109:7

sorts 34:18

sound 37:2

sounded 131:20

sounds 59:6,7

source 75:15,16 77:1 103:22 113:19

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018                                        Index: sources..systems

sources  28:25 75:4,11,14

speak  100:6

speaking  131:25

special  20:2 66:10 121:21

specialist  18:2 77:14 99:17
100:15

specialty  14:20 15:2,7

specific  83:21 108:2

specifically  39:19 49:22 53:10
103:24 132:3 133:25

specifics  96:10

specs  57:19

spectrum  22:6 81:7 99:11,13,
17 100:21 101:22 102:9,14,16
103:23 104:6

speculate  55:25 77:2 78:2
124:7

speculating  124:12

speculation  69:14

sped  23:10

speed  23:9

spell  80:9

spend  10:11

spent  13:23 52:13

spoke  33:22 119:17,19,20
122:14,22

spread  47:25 109:1

staff  21:16 30:12 77:23 78:16
79:2 92:14,17 94:15

staffing  9:3

stain  81:17 99:19,23 103:8,12
104:15 132:15

stamp  121:10

stand  49:23

standard  22:13,21 30:5,11,15
31:3,22 60:25 61:8,9,12,22
62:4,9,22 63:4 82:22,24
83:19,21 84:6,8 85:2,7,13
90:22 99:3 107:13 118:5,9

133:17,18

standards  93:3,12

standing  41:1

start  21:1 32:19 42:13 65:17
72:12,13,14

started  56:21,22

State  13:13

stated  35:13

statement  33:22 35:6 75:11
82:5 107:21 121:13 122:16
123:3 128:9

status  37:14,17 38:24 40:25
65:17 102:4 129:25 130:4

stay  48:9

step  38:19 44:20

sticker  115:8,14

stood  41:4

stop  114:20

strange  105:1

strep  72:9

strike  52:1,2

studies  19:22

study  19:14 20:2

stuff  57:17

submitted  15:19

subparagraph  58:5 60:4,6
64:20

subparagraphs  22:18

subspecialties  14:18,21

substances  117:20

substantive  16:3

subtleties  113:11

successfully  65:3 66:18

suffering  46:16 73:6 75:20
112:21

suggested  134:9

suicide  125:17

summarizes  64:25

summary  18:18 28:5,7 120:2

Sunday  37:8 44:25 45:2,4,7,
11,12,14,20 46:15 48:16 64:5
88:21 106:18 111:6 119:10,13
120:1,8,20 122:5,6,8,10
134:5,21

supplied  9:21

supposed  29:10

surgeon  99:17 103:1,6

surgery  108:22

surprise  20:15,19,20

survivability  97:7

survivable  67:10

survival  69:17 70:2 71:16 77:3
78:3

survive  73:13

survived  69:15 70:3,5,9 73:18
77:4 78:11,13 97:13,19

suspect  32:3 77:25 127:5

suspected  47:9

swab  103:12

swear  4:3

swollen  88:5

sworn  4:9 5:23 33:21 121:13
123:3

symbol  76:2

symptom  33:7 34:17,19

symptomatic  40:24

symptoms  33:3 43:5 47:2,17,
22 48:8 52:9

synonym  86:8

systematic  56:13

systemic  56:17,18 71:21 72:5,
15

systems  72:11

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

Index: tailor..true

## T

**tailor** 103:18

**takes** 58:23 125:18

**taking** 26:8,9 65:25 79:15 96:18 122:15 125:16 130:8

**talk** 4:20 45:14 51:12 60:6 63:7 64:21 76:5 86:3,5 89:11 117:6

**talked** 33:25 34:2 45:17 50:24 54:10,25 59:17,20 63:12 64:4, 13,22 70:6 74:15 77:5 83:15 85:15 114:24 119:25 122:9 123:6 129:16

**talking** 44:22,23 61:21 99:5 101:9,10 114:5 122:19 132:1

**TB** 81:13

**technically** 51:3

**temperature** 32:10 37:18 39:17 46:24 105:3,12,15,16, 20,24,25 106:7

**ten** 10:23 11:25 14:21 39:12, 13,17

**tend** 27:21

**term** 61:16,19 66:23 86:6 88:25 89:2 108:19,20 130:22, 23,25

**terminology** 62:3,13

**terms** 40:6 61:7 91:1 116:8 118:10,19

**territory** 39:13

**test** 15:10

**testified** 4:9 26:23 94:12 100:4 101:20 105:4,11 112:8 117:15 129:22 130:24 131:23

**testimony** 4:4 5:12,21,23 13:19 64:3 100:7 101:2 122:11 129:25 130:21 132:2,9

**testing** 15:4 20:3

**thing** 4:20 17:3 23:12 34:25 41:23 51:4 60:1 63:14 70:20

101:25 102:7

**things** 12:18 15:17 18:20 27:22 34:18 41:10,11 47:12, 14,21 48:10 64:13 67:22 72:13,14 75:16 98:13 99:9 102:1 104:19 130:6 134:13

**thinking** 25:2

**THOMAS** 4:8

**thought** 59:13 110:20 122:11

**thousand** 20:13 63:1

**threatening** 99:9

**throat** 72:9

**Thursday** 88:21

**time** 6:25 9:6 13:22,23 15:7,9 17:18 20:16 21:14 23:4,13 31:12 32:5 35:20 37:7 38:23 50:15 52:13 56:4,6 57:2,25 59:12 67:2 69:25 70:9,21,22 78:6 79:17 82:9 85:21 88:25 89:6 90:4 91:11 93:17 95:2 97:20,22 98:23 99:6 100:24 103:6,10,20 105:14 109:21 110:11,21 119:2 121:4,15 122:1 136:2

**timeframe** 88:23 101:14

**timeframes** 74:2

**timeline** 28:5,7 64:14 69:9 103:7 124:15

**times** 10:10 31:2 32:7 33:1 34:6 35:4,17,20 38:12 39:1,5, 6,7,8 55:20 63:1 69:10,17 134:4

**timing** 54:12,13 70:13

**tinge** 109:14

**tissue** 53:10,12 56:22 57:13 108:10,14,21,24 111:25 112:5

**today** 8:21,22 16:10 80:2 85:16 89:17 130:24 135:11

**told** 34:1 62:7 69:23 80:2 107:23 125:12

**tolerate** 43:2 107:19 108:4

**tolerated** 35:7 36:10,12,24 107:24 134:10

**tooth** 126:7

**top** 6:18 27:23 39:24 47:19 57:23 74:18 83:10 88:5

**total** 8:19 16:7

**totally** 12:18 14:9 39:12

**towels** 57:15

**trace** 58:11 59:2,5

**tract** 47:11,12 75:7 127:17

**traded** 8:9

**trained** 50:3 54:5 62:19 79:20 113:15 133:20

**training** 19:13 52:13

**transcriptionist** 56:17

**transcripts** 86:2

**transfer** 54:16,22 66:25 67:1 70:9

**transferred** 98:2,24 101:9,16 123:19

**travel** 13:18,22

**tray** 51:14

**treat** 80:6 81:7 93:8 100:13,18 102:21 103:23,24,25 116:22 127:13 128:15

**treatable** 67:9 73:17

**treated** 65:3 66:18 90:7,11 124:6,22 127:2

**treaties** 92:21

**treatment** 8:7 12:23,24 25:18 36:23 62:21 73:19 79:4 84:3, 5,10,19 87:2 92:12 97:13,20

**treatments** 134:9

**trial** 5:11,22,23 6:5,8 13:21 16:15 85:24

**trier** 132:24 133:22

**true** 14:16 41:21 47:12 48:18 55:2 59:10 92:4

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

**truth** 4:5,6

**turned** 96:24

**Turning** 105:2

**two-minute** 114:11

**type** 84:20,21 100:19

**typical** 9:16 10:11 52:3,4 88:24

**typically** 28:15 99:21

---

**U**

**Uh-huh** 75:24

**ultimately** 119:3

**unable** 94:1 96:22

**uncertain** 78:1,9

**underneath** 88:7 103:13 108:15

**understand** 19:12 21:7 25:11 43:21 44:5 47:20 49:11 50:16 57:4 62:7 70:17 71:15 78:23 80:17 83:5 98:18 108:1 112:6 129:13

**understanding** 18:10 24:10 26:17 29:9 30:25 61:3 82:10 83:23 94:8 95:3 132:23

**understood** 17:19

**undertake** 99:13

**undetectable** 29:4

**undiagnosed** 71:2,11

**unfamiliar** 14:9

**unit** 44:15

**universal** 85:17

**university** 11:12,13,19 15:5 92:25

**university's** 10:21

**unknown** 121:15

**unreasonable** 96:15

**untrained** 112:15

**untreated** 74:5

**unusual** 80:5,10,18 81:11

**updated** 5:1,2,13,14

**upwards** 59:15

**urgent** 90:20,24 91:2

**urinary** 47:12 74:6 75:7 127:17

**urinate** 43:4

**urinated** 107:25

**urine** 58:21 107:10,14

**UTI** 75:6,12

---

**V**

**Vargas** 49:21,24 50:17 53:6, 15,16 54:3,5 112:9,12,17

**variable** 74:7

**variables** 118:12

**varied** 74:7

**variety** 20:6 73:15 74:2 81:7, 15 84:11 104:4,5 119:1

**varying** 54:15

**vast** 12:25

**ventricular** 56:1

**verbalized** 34:7

**verbalizes** 32:25

**verbalizing** 34:4

**versus** 6:11,24 13:13

**vicarious** 25:13,17,21

**view** 24:6

**viewing** 129:15

**viral** 29:3

**virus** 65:15

**visible** 70:24 88:9

**visit** 10:8,11 100:25

**visual** 21:22 94:6

**vital** 26:8,9,17,24 27:7,18,20

30:7,18 32:8 33:11 34:9 35:15 37:7,15,19,24 38:1 40:8 41:1 49:7 51:12 70:15 79:15 82:7,8 83:13,14 94:24 96:18 98:12 106:20 118:14 124:2

**vitals** 30:23 38:13 39:11,14 45:5 83:24

**vitreous** 56:25 57:1

**volunteer** 12:2,4

**vomit** 57:18

**vomiting** 32:25 33:12 34:4,6, 8,17,19 35:1,14 47:1,2,23 48:11 78:7 79:17 98:9 123:20 130:9,10 134:2,3

**vulnerable** 11:5

---

**W**

**wait** 4:21 104:17 117:22 135:25

**waive** 135:19

**walk** 18:22 51:15,16 69:5

**waste** 113:8

**watch** 125:17

**water** 121:20

**ways** 118:24

**weak** 49:23,25 54:1 124:17 134:5

**weaker** 96:21

**weakness** 38:12 40:22 43:5 44:24 45:2,4 46:4,22 129:23 130:15

**week** 9:16,24 10:1,2,3,7,10 58:24 59:10 63:20 117:1,14 118:4

**weekend** 42:5

**weekends** 9:12

**weekly** 117:22

**weeks** 57:6,8 59:16 74:6

**whatnot** 19:23 67:13

WILLINE BRYANT, et al. vs ORANGE COUNTY, FLORIDA, et al.
THOMAS D. FOWLKES, M.D. on 11/12/2018

**white** 13:12

**wide** 73:15 81:7

**window** 66:22

**word** 31:9 71:7

**wording** 85:16

**words** 17:19 20:1 21:10,14 23:9,11 28:6 39:18 40:23 42:3 43:4 45:15 47:15 48:1,4 50:9 54:2 56:21 58:1 59:3 65:16,25 67:1 71:2,25 72:18 82:8 84:14 86:12,15,18 87:2,21 88:20 91:4 95:24 102:4,14,20 107:21 108:16,21 111:20 117:19 120:18 124:2 130:5,22 131:13 133:5

**work** 16:3 21:13 24:24 26:6 29:5,7 61:15 72:19 85:24 89:19 90:17 98:17 124:3 125:4

**worked** 8:1,10 15:9 90:14,20, 21 91:7 92:11 99:6

**working** 28:20 42:4 93:5

**works** 73:24 117:4 118:24

**workup** 99:7

**worse** 37:14,22 38:8

**worsening** 34:11,14 60:9 79:21 96:25

**worth** 58:2

**wound** 31:7,17 33:4,16,20 37:5,11 41:6 47:13 72:1,2,3 80:21 81:6,8 86:12,19 87:13, 21,22 88:2,3,20 99:15 102:8 103:12 109:22 111:4,5,13,19, 22 113:6,19,24 114:5

**wounds** 22:11 31:11,15 38:23 47:7,18 71:4 75:13,18,21 88:11 90:1 96:21 99:11 100:10 102:20 103:4 108:9, 10,12,23 110:12,13,16

**write** 51:17 63:20 120:14

**written** 18:12 19:4 82:2 83:2,8 84:21,25 118:7,8 120:16 126:3

**wrong** 47:16

**wrote** 13:11 38:17 63:15

---

**Y**

**year** 8:10 11:20 73:12,14

**years** 5:24 6:22 7:6,10 9:19,21 10:23 11:25 55:21 56:7,8 66:3 90:15,20 91:8,10

**yellow** 31:14,16

**yesterday** 38:8

**young** 70:17,18 72:25

---

**Z**

**Zawitz** 17:10 29:3 34:13 47:8 67:5,11 70:20 71:17 129:10 131:18,22 132:7

**Zawitz'** 18:7 29:1 68:21 69:7 76:13 114:25 129:8

**Zawitz's** 73:10

**Zofran** 34:5,22,23 44:16,21 45:23 119:18



**Thomas D. Fowlkes, M.D.**
1203 Medical Park Drive
P.O. Box 1955
Oxford, MS 38655
Cell: 662-801-7508
tom@drfowlkes.com

## SUMMARY OF QUALIFICATIONS

Seasoned Physician Board Certified in both Emergency Medicine and Addiction Medicine and with 20 years of practice in Correctional Medicine.

Accomplished expert witness with more than 10 years of experience at both deposition and trial in state and federal courts and before state regulatory bodies on behalf of plaintiffs/prosecutors/state boards as well as defendants in these matters.

Areas of expertise include:
- Correctional Healthcare
- Deaths in Custody
- Drug Abuse and Effects of Addiction
- Drug testing interpretation and effects of substances
- Urgent Care & Emergency Medicine

## CERTIFICATIONS

Board certified emergency physician (American Board of Emergency Medicine)- July 1993 - Dec. 2023

Board certified in Addiction Medicine (American Board of Addiction Medicine)- Dec. 2010 - Dec. 2020

Certified Correctional Healthcare Professional - Physician (CCHP-P) - July 2017 - June 2019

Certified Medical Review Officer for Drug/Alcohol Testing (MROCC) - Dec. 2012 - Dec. 2022

Unrestricted license to practice medicine in Mississippi since 1993

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 1998-Present | Medical Director at Lafayette County (MS) Detention Center, a 140-bed jail facility holding local and federal (US Marshal) detainees. From 1998-2015, as an independent contractor responsible for provision of all medical, nursing, medication and lab services at the facility. Responsible for all these health services as an employee of Lafayette County, MS since 2015 |
| 2011- Present | Medical consultant for Third Circuit Judicial District Drug Court, a felony drug court in Oxford, MS under the direction of Administrator Brandon Vance and Judge Andrew Howorth |
| 2007- Present | Prisoner Advocate Member, Institutional Review Board, Division of Research Integrity & Compliance, University of Mississippi |
| 2018- Present | Co-owner and Physician at Right Track Medical Group, an outpatient provider of mental health services in North Mississippi |



EXHIBIT _MD_
1

PENGAD 800-631-6989

11/12/18 FOWLKES

Updated 10/08/2018

**Thomas D. Fowlkes, M.D.**

## PROFESSIONAL EXPERIENCE (cont.)

| | |
|---|---|
| 1992-Present | Sole shareholder of Thomas D. Fowlkes, M.D., P.A. Contractor of emergency physician services to acute care facilities and emergency medicine/EMS consultant. Operated correctional medical facility at Lafayette County, MS Detention Center and conducted court ordered mental health, substance abuse & competency evaluations for Chancery Court in Lafayette County. Expert witness & litigation support practice |
| 1999-Present | Served as Deputy Medical Examiner Investigator for Lafayette County MS from 1999-2008 after completing 40-hour Death Investigation Certification Class. Since 2008 I have served as the medical consultant to the Lafayette County Coroner. |
| 2011-Present | Medical Director for A&D Services for Region IV Comm. Mental Health Center. 2011-2014 Detox Services at Tupelo CSU. 2017-Present at Corinth (Part-time) |
| 2015- 2018 | Director of Professional & Medical Relations/Addiction Physician for American Addiction Centers, a nationwide provider of addiction services, at Oxford Treatment Center (formerly The Oxford Centre) |
| 2009- 2017 | Owner of a primary care clinic in Oxford, MS. Provider of primary and urgent care and an office-based addiction medicine practice. Until 2015, I practiced as a solo-practitioner then in partnership with a nurse practitioner as Oxford Family Clinic, LLC |
| 2011- 2015 | Co-owner and Chief Medical Officer of The Oxford Centre, Inc. a 76-bed CARF accredited detox, residential and outpatient substance abuse treatment facility. Sold to American Addiction Centers, a publicly traded company, in August 2015 |
| 2008-2011 | Addiction physician for detox and residential unit at Haven House, substance abuse treatment facility in Oxford, MS operated by Region II CMHC (Part-time) |
| 2005-2009 | Urgent care physician at Robinsonville (MS) Urgent Care Clinic and part-time physician at the Harrah's Employee Health & Wellness Center |
| 1998-2001 | Private practice of Emergency Medicine with Oxford Emergency Group, P.A. Provided emergency physician services to Baptist Memorial Hospital-North Miss. and Tri-Lakes Medical Center |
| 1997-1998 | Chief Medical Officer for Rural-Metro Corporation's Mid-South region. Rural-Metro provides ambulance services and fire protection throughout the United States and internationally. |
| 1995-1997 | Chief Medical Officer, secretary/treasurer and co-owner of Priority EMS, an ambulance provider in north Mississippi and metropolitan Memphis. Corporation merged with Rural-Metro Corp., a publicly traded company |
| 1992-1994 | Private practice of Emergency Medicine as shareholder and officer in Mid-South Emergency Physicians, P.C. Provided emergency department services for St. Joseph Hospital in Memphis, TN |

# Thomas D. Fowlkes, M.D.

## EDUCATION

University of Pittsburgh Residency in Emergency Medicine
Pittsburgh, PA
1989-1992
Selected Chief Resident-1992
Served as medical command & on-scene physician for City of Pittsburgh, Dept. of Public Safety
Served as flight physician for STAT Med-evac helicopter program

University of Tennessee Medical School
Memphis, TN
M.D. 1989
Faculty Medal for Highest GPA
Alpha Omega Alpha Medical Honor Society

Rhodes College
Memphis, TN
B.S. in Psychobiology 1985
EMT with Shelby County Sheriff's Department, Division of Emergency Services
Psychiatric Technician at Memphis Mental Health Institute, an acute care psychiatric hospital

University of the South
Sewanee, TN
1980-1982
Community Volunteer Firefighter
Emergency Medical Technician (EMT-A)

## CURRENT MEMBERSHIPS/RECOGNITIONS

American College of Correctional Physicians
Fellow of the American Society of Addiction Medicine
Mississippi Society of Addiction Medicine
North Mississippi Medical Society/Mississippi State Medical Association/American Medical Association

## PUBLICATIONS

Fowlkes T. "Shortness of Breath." *Prehospital Systems and Medical Oversight*. 3rd ed. Ed. Kuehl A. Dubuque: Kendall/Hunt, 2002. 665-671. Print.

Fowlkes T. "Shortness of Breath." *Prehospital Medicine: The Art of On-Line Medical Command*. 1st ed. Eds. Paris, Roth, Verdile. Maryland Heights: Elsevier, 1996. 101-112. Print.

Fowlkes T, Verdile V. "Managing Gunshot Wounds." *The Journal of Emergency Services*. Vol. 23 (1990): 20-27. Print.

## PRESENTATIONS

"Safe Prescribing of Sedative-Hypnotics" at *MPHP Prescribers' Summit: Controlled Substance Update* June 22, 2018, Pearl, MS

"Safe Prescribing of Sedative-Hypnotics" at *MPHP Prescribers' Summit: Controlled Substance Update* April 13, 2018, Gulfport, MS

# Thomas D. Fowlkes, M.D.

## PRESENTATIONS (cont.)

"Safe Prescribing of Sedative-Hypnotics" at *MPHP Prescribers' Summit: Controlled Substance Update* March 9, 2018, Oxford, MS

"Case Studies in Controlled Substance Prescribing" at *MPHP Prescribers' Summit: Controlled Substance Update* October 13, 2017, Jackson, MS

"Case Studies in Controlled Substance Prescribing" at *Mississippi State Medical Association Foundation Prescribers' Summit* March 31, 2017, Oxford, MS
"Update on the Prescription Drug Epidemic, Disturbing New Trends & Drug Testing Basics" at *Lafayette County Bar Association's Continuing Legal Education Conference* October 20, 2016, Oxford, MS

" Benzodiazepines: An Update" at *North Mississippi Medical Center's 13th Annual Outcomes Conference* August 25, 2016, Pickwick, TN

"Sedative Hypnotics: Avoiding Prescribing Pitfalls" at *Mississippi Professionals Health Program Prescribers' Summit* June 24, 2016, Gulfport, MS

" Benzodiazepines: Update on Prescribing Trends" at *Mississippi State Medical Association Foundation Prescribers' Summit* April 1, 2016, Oxford, MS

"An Introduction to the Prescription Drug Epidemic", Guest lecturer, *Addiction Counseling Course in the Graduate School of Counselor Education, University of MS*, February 22, 2016, Oxford, MS

"Benzodiazepines: An Update" at *37th Annual Caduceus Retreat & Conference of MS State Medical Association Foundation*, July 11, 2015, Louisville, MS

"An Introduction to the Prescription Drug Epidemic", Guest lecturer, *Addiction Counseling Course in the Graduate School of Counselor Education, University of MS*, February 10, 2015, Oxford, MS

"Prescription Drug Epidemic: Trouble at Home" at *Annual FACT Conference*, November 7, 2014, Tupelo, MS

"Mental Health in the Primary Care Setting" Keynote Address at *North MS Medical Center Outcomes Conference*, August 22, 2014, Pickwick, TN

"Managing Opiate Addicts with Painful Conditions" at *North MS Medical Center Outcomes Conference*, August 21, 2014, Pickwick, TN

"Buprenorphine: The Rest of the Story" at *24th Annual MS Association of Addiction Professionals Conference*, July 22, 2014, Oxford, MS

"Prescription Drug Epidemic: Trouble at Home" at *24th Annual MS Association of Addiction Professionals Conference*, July 22, 2014, Oxford, MS

"Controlled Substance Update" at *MS State Medical Association Foundation Prescribers' Summit*, March 28, 2014, Oxford, MS

"Benzodiazepines: The Good News & Bad News" at *Northwest MS Regional Medical Center Staff Conference*, Dec. 10, 2013, Clarksdale, MS

**Thomas D. Fowlkes, M.D.**

## PRESENTATIONS (cont.)

"Benzodiazepine Update" at *Southern Medical Association Rules, Regulations, & Risks of Prescribing Controlled Substances,* November 15, 2013, Hattiesburg, MS

"Controlled Substances Update: Benzodiazepines" at *Singing River Health System Prescribers' Summit,* November 1, 2013, Moss Point, MS

"Controlled Substances Update: Benzodiazepines" at *MS Professionals Health Program Prescribers Summit,* October 18, 2013, Jackson, MS

"Managing Controlled Substances in MS: Benzodiazepines" at *North MS Medical Center Best Outcomes Conference,* August 22, 2013, Pickwick, TN

Appendix B

Thomas D. Fowlkes, M.D.

**CASE LIST/EXPERT TESTIMONY LAST 4 YEARS (AS OF 07/25/2018)**

Angela Anderson et al vs. Marshall County MS & BMH-DeSoto Hospital
Cause # 3:12-CV-92
US Federal District Court-No. Miss

State of Mississippi v. Shawn Hunt
Cause # CR2013-167SMD
DeSoto County (MS) Circuit Court

Gallion v. Hinds County et al.
Case # 3:12-CV-736
US District Court, Southern District MS

State of Mississippi v. Kimberly Dobbs
Third Judicial Circuit (MS) Court

State of Mississippi v. Brian Adams
Cause # LK11-40
Third Judicial Circuit (MS) Court

State of Mississippi v. Mark Tutor
Cause # Rankin 24,819
Third Judicial Circuit (MS) Court

State of Mississippi v. Cileste Donald
Cause # LK12-196
Third Judicial Circuit (MS) Court

State of MS v. Joshua Blunt
Cause # 2016-060-CR
Grenada County (MS) Circuit Court

MS Board of Medical Licensure v. Ikechukwe Okorie, MD
Hinds County, MS

MS Board of Nursing v. Justin Robbins
MS Board of Nursing v. Jennifer Robbins
Hinds County, MS

1



Appendix B

Thomas D. Fowlkes, M.D.

**CASE LIST/EXPERT TESTIMONY LAST 4 YEARS-CONTINUED**

Lee v. Jackson County MS et al.
Case # 1:13-CV-441
US District Court, Southern District MS

Paylan v. Teitelbaum et al.
Case # 1:15-cv-159
US District Court, Northern District FL

Bost v. Wexford et al.
Case # 1:15-cv-3278
US District Court, Maryland

Singleton  v. Southern Health Partners et al.
Case # 15-EV-000626
State Court of Fulton County, State of Georgia

E/O Filichia v. Correct Care Solutions et al.
Case # 2:16-cv-296
US District Court, Southern District OH

Ajibade v. John Wilcher et al.
Case # 4:16-cv-82
US District Court, Southern District GA

Benoit  v. Lincoln County et al.
Cause # 12L6-CC00060
Circuit Court of Lincoln County, State of Missouri

E/O Clark v. Hamilton County, NaphCare  et al.
Case # 1:15-cv-512
US District Court, Southern District OH

E/O Hays v. Prison Healthcare et al.
Case # 2:16-cv-384
US District Court, Northern District AL

Sparks v. Tooke et al.
Civil Action # 099912-A
District Court, 7th Judicial District, State of Wyoming

Appendix B

Thomas D. Fowlkes, M.D.

**CASE LIST/EXPERT TESTIMONY LAST 4 YEARS-CONTINUED**

Brooks (E/O Mixon) v. Wilkinson County et al.
Case # 5:17-cv-00033
US District Court, Middle District GA

3

Pursuant to Fed. R. Civ. P. 26(a)2(B), Thomas D. Fowlkes, M.D. submits the following Expert Report on behalf of Plaintiff, the Estate of Max Gracia Jr., II

**(i)     A complete statement of all opinions the witness will express and the basis and reasons for them.**

**Scope of report:**

(I.) The appropriateness of the medical care provided Mr. Max Gracia Jr., II (Mr. Gracia) while he was incarcerated at the Orange County Corrections (OCC) in August 2015 (II.) Whether Mr. Gracia's past medical history, on-going medical conditions and autopsy findings influence those opinions (III.) Whether the Policies & Procedures in place regarding medical care at the OCC are reasonable and appropriate.

My opinions are limited to those that I can offer to a reasonable degree of medical probability or likelihood.

**Factual Summary:** 1. Mr. Gracia was a 22 year-old male with a past medical history including:

a.     Seizure Disorder, maintained on Depakote.

b.     Human Immunodeficiency Virus (HIV) positive, maintained on Atripla, a combination anti-retroviral drug

2.     Mr. Gracia was arrested in the early morning hours of August 6, 2015 by the Orlando Police Department (OPD). During the arrest, Mr. Gracia received dog bite

1



wounds from a police canine. He was transported via Emergency Medical Services (EMS) to Orlando Regional Medical Center (ORMC).

3.      At ORMC Emergency Department (ED) Mr. Gracia's history of seizures and HIV was noted and he was evaluated and treated for multiple dog bites. He was discharged at approximately 07:00 on the morning of August 6, 2015 into the custody of OPD with discharge instructions and a prescription for Augmentin antibiotic.

4.      Mr. Gracia was booked into OCC on the morning of Thursday, August 6, 2015. His Receiving Screening noted the multiple dog bites to his legs and cuts to his fingers as well as the history of seizures and HIV. He was seen shortly after booking by Dr. Robert Buck, Medical Director for OCC. Dr. Buck noted Mr. Gracia's medical problems and the multiple dog bites. Dr. Buck also noted that Mr. Gracia was "in a lot of pain in his left leg." He admitted Mr. Gracia to the Infirmary at OCC and ordered:

     a.      Daily dressing changes

     b.      Augmentin 872-125 antibiotic twice a day

     c.      Ibuprofen 800 mg twice a day

     d.      Tylenol #3 three times a day as needed for pain for three days

     e.      To inquire about compliance with Atripla and possibly re-start it

     f.      Draw lab studies including CBC, CMP, CD-4 count and viral load

N.B. There is no documentation in the records I reviewed that anyone inquired of Mr. Gracia about his Atripla compliance. Nor is there any evidence that his Atripla was given. There is a note that the lab specimens were obtained but I did not see that any lab results were received before Mr. Gracia's death and I have not reviewed any antemortem lab results. There is no evidence in the record that Dr. Buck ever followed up on these orders. There is likewise no evidence in the record that Dr. Buck ever checked on or saw Mr. Gracia again after this initial encounter.

5.      On the evening of 8/6/2015 Mr. Gracia was seen by a nurse, his vital signs were taken and were within normal limits. He was noted to be unable to bear weight on his left leg and was given crutches and a urinal.

6.      On Friday, August 7, 2015 at 3:03 a.m. Mr. Gracia's vital signs were taken and found to be normal. His thigh was covered with a clean bandage and he was given pain medication for leg pain.

7.      For the remainder August 7, 2015 and on Saturday August 8, 2015 there were notes by Nurse Clairmont and Nurse Galloza-Gonzalez. There were no vital signs recorded. There was also a provider note written by Nurse Practitioner (NP) Maryanne Evans at 5:08 p.m. on 8/7/2015.

8.      On 8/7/2015 at 5:20 p.m. Nurse Galloza-Gonzalez noted that Mr. Gracia's wound was reddened with scant, serosanguineous drainage present. On 8/8/2015 at 11:38 a.m. she noted that "Pt took off bandage of all wounds. Bandage was

3

changed the day before 8/7/2015. Bandage was clean and dry. Pt verbalised (sic) he was taking a shower. Pt oriented for second time to keep bandage on all time until medical staff removed. Pt used socks to cover his wound. Pt oriented about risk of infection..."

9.      On Saturday, August 8, 2015 at 4:59 p.m. Nurse Galloza-Gonzalez changed Mr. Gracia's dressing and noted a reddened wound with scant serosanguineous drainage. She recorded: "No signs/symptoms of infection." At 5:13 p.m. that afternoon she noted: "Pt verbalizes vomiting X 2." She notified NP Evans who ordered Zofran 8mg three times a day as needed for nausea and vomiting. Nurse Galloza-Gonzalez gave a dose and noted: "Will continue to monitor."

10.     Overnight, Nurse Clairmont changed Mr. Gracia's dressing. She noted that he tolerated this poorly. She also noted the wound was reddened with a large amount of bloody drainage present. There were no vital signs recorded at any time on 8/8/2015 or on the overnight shift into Sunday morning, August 9, 2015.

11.     On Sunday, August 9, 2015 at 10:29 a.m. Nurse Galloza-Gonzalez noted "Pt alert, oriented X 3, complains of weakness and dizziness." She took Mr. Gracia's vital signs and recorded a temperature of 97.4, pulse of 131, blood pressure of 111/56, respiratory rate of 22 and oxygen saturation of 98%. According to her note: "Provider Evans notified, Order to increase fluid intake, extra fluid given. Will continue to monitor."

12.    There is no follow-up of this note recorded and no further vital signs recorded by Nurse Galloza-Gonzalez or any other healthcare staff. There is no indication that Nurse Galloza-Gonzalez monitored Mr. Gracia's condition.

13.    The record indicates that NP Evans was present in the infirmary unit that afternoon. She co-signed the order for Zofran from the day before and authorized the release of Mr. Gracia to general population. There is no record that she actually evaluated or saw Mr. Gracia.

14.    On 8/9/2015 at 7:48 p.m. Nurse Clairmont made a Housing Recommendation of General Population. There is no indication that she took any vital signs or followed up on Mr. Gracia's complaints or abnormal vital signs from earlier in the day.

15.    At 9:54 p.m. on 8/9/2015 Nurse Harter note "Pt refused to get up and take his PM medications as ordered, refusal done."

16.    At 3:13 a.m. on 8/10/2015 Nurse Clairmont documented: "9:00 pm Patient observed twisting himself and moaning loudly on bed during med pass when asked by staff to sit up for his pm meds. Patient cried, 'I can't do it,' and proceed to slide his body onto the floor near the foot of his bed. Patient refused all assistance and refused all care from nursing staff. Patient's dressings on the LL (sic) calf and upper left thigh are noted to be heavily soiled with dried, bloody drainage upon

5

assessment. Will encourage patient to allow wound care. Will continue to monitor."

17.    According to the Orange County Sheriff's Office Investigative report (page 11 of 35) a narrative report authored by Corrections Officer Vargas at 1:33 a.m. on 8/10/2015 said: "In summary, the report stated, at approximately 2145 hours on August 9, 2015, during medication rounds, Nurse Karen Clairmont interpreted Gracia's actions (i.e. lying on the floor, stating he could not get up) as an 'implicit refusal for medication.' Furthermore, the report stated, in Nurse Clairmont's opinion, Gracia was, 'faking or exaggerating his medical condition.'"

18.    As a result of this the security staff issued Mr. Gracia a Disciplinary Report (DR) which "listed two disciplinary charges: (1) failure to follow written or verbal order, and (2) malingering or feigning an illness."

19.    At 3:35 a.m. Nurse Clairmont documented: "Patient refusing to follow Correction's officers orders regarding pending move to 3B. Patient in now serving a DR and will remain in the infirmary to serve out this DR. Patient continues to lay on cell floor on his back, refusing all treatment."

20.    At approximately 5:15 a.m. on Monday morning, August 10, 2015 Mr. Gracia was found in cardiac arrest in his cell in the infirmary area of OCC. EMS was called and he was transported to ORMC where he could not be resuscitated

6

and was pronounced deceased at 6:09 a.m. The ED doctor reported: "very malodorous wounds left thigh and medial calf."

21.    An autopsy was performed. Findings included:

    a.    Mr. Gracia's death was due to "septic shock as a result of infected dog bite wounds."

    b.    The wound as well as lung cultures grew out E. coli bacteria. There was "also evidence of systematic (sic) shock (bilateral adrenal hemorrhage, acute esophageal necrosis and acute renal failure)."

    c.    It is "likely that HIV infection contributed to the death."

    d.    Left ventricular hypertrophy

    e.    There were ibuprofen and codeine metabolites present in the blood which reflect medications given at OCC. In addition, there were clinically insignificant quantities of cocaine and cannabinoid metabolites present in the blood.

    f.    Vitreous Urea Nitrogen was elevated at 58.4 mg/dL and Vitreous Creatinine was elevated at 2.61 mg/dL.

22.    An investigation was conducted by the Orange County Sheriff's Office. Findings in addition to those recorded above include:

7

a.     Inmate Dante Ball who assisted in moving Mr. Gracia from cell 15 to cell 19 on the evening of 8/9/2015 noted that Mr. Gracia was "in pain and "out of it." "He also noticed a distinct, foul odor emitting from Gracia." (pg. 13 of 35)

b.     Correctional Officer Vargas "recalled a distinct smell emitting from Gracia. He described the odor as that of 'decomposed blood or flesh.'" (pg. 17 of 35)

c.     Nurse Galloza-Gonzalez reported that on the afternoon of August 9, 2015, "the provider, Nurse Evans, was present and authorized Gracia to be moved to general population." Nurse Galloza-Gonzalez did not report taking Mr. Gracia's vital signs again after the abnormal pulse and respiratory rate earlier in the day. The investigators also reported that according to Nurse Galloza-Gonzalez: "At the end of her shift, Nurse Clairmont took verbal report from Nurse Galloza-Gonzalez. Nurse Galloza-Gonzalez apprised Nurse Clairmont on Gracia's claim of dizziness and the provider's subsequent order for fluid increase." (pg. 19 of 35)

d.     NP Evans reported to investigators about the events of August 9, 2015: "Later in the day, Nurse Evans saw Gracia, in passing, in the dayroom. She did not make contact with him." The investigator also wrote: "Nurse Evans ultimately authorized Gracia to be moved." (pg. 20 of 35)

e.     Nurse Harter was also interviewed by investigators. She reported Mr. Gracia "simply shook his head 'no' when she asked him to take his medication."

8

She "relayed Gracia's refusal to accept his medication to Nurse Clairmont." The investigators do not report that Nurse Harter rendered Mr. Gracia any additional aid that evening or attempted to get him additional treatment.

**Opinions:** The following are my opinions to a reasonable degree of medical probability on each of these areas based upon my training, experience, and a review of the records in this case:

I.     The actions taken by the medical staff of OCC in their assessment and treatment of Mr. Gracia during August 2015 while he was incarcerated at the OCC were far below the acceptable standard of care for healthcare within a detention facility. Specifically:

1.     Nurse Galloza-Gonzalez's care of Mr. Gracia fell far below the standard of care in a number of ways, including:

    a.     She noted that Mr. Gracia was vomiting on 8/8/2015 and she received an order for a prescription anti-emetic medication from NP Evans. The pain and vomiting were likely signs and symptoms of worsening infection. Yet, Nurse Galloza Gonzalez did not document the response to the medication or make any additional inquiry into his nausea and vomiting or underlying infection.

    b.     On 8/9/2015 she recorded a very abnormal heart rate and an elevated respiratory rate. These were signs of worsening infection and sepsis. She called the provider, NP Evans, but when she received orders only for increasing fluid she did

9

not question whether Mr. Gracia needed some additional testing or treatment; neither did she even record that Mr. Gracia was able to take any additional fluid, much less quantify it nor did she ever repeat the clearly abnormal vital signs.

      c. Instead, she had NP Evans authorize Mr. Gracia's transfer out of the infirmary to general population without any additional assessment or treatment.

2.    Nurse Harter was on duty the evening of August 9, 2015 when his clinical condition was clearly deteriorating and he was unable to even take his medication. Mr. Gracia's condition at the time Nurse Harter attempted med pass was such that he was too weak to get up from his bed and likely was too weak even to speak. Nurse Harter reported that he "simply shook his head 'no.'" She simply documented that he refused his medication and notified Nurse Clairmont. Her failure to make additional assessment of Mr. Gracia's condition or his need for immediate treatment was a breach of the standard of care for a Licensed Practical Nurse in a correctional setting.

3.    NP Evans was aware that Mr. Gracia had HIV and that he was being treated with antibiotics in the infirmary for multiple dog bites. She was also made aware that Mr. Gracia was vomiting and then on the day before his death she was notified that he was very tachycardic and was tachypneic. Yet she did not order him to be sent to the hospital or order any additional testing/treatment except giving him fluids to drink. Instead, when she saw him on the afternoon before his death she

10

ordered him transferred out of the infirmary without even assessing him. NP Evans actions and her lack of even the most basic concern for Mr. Gracia's worsening condition appears to go beyond negligence and rises to the level of indifference.

4.     Nurse Clairmont's actions regarding Mr. Gracia are very disturbing to me. Nurse Clairmont was also aware of Mr. Gracia's immunocompromised state and that he had multiple infected dog bites. She was also informed of his worsening clinical condition when she began her shift on the evening of 8/9/2015. Nurse Clairmont attempted to transfer Mr. Gracia out of the infirmary when he was clearly clinically worse. When Mr. Gracia was too weak to be able to stand or take his medication, Nurse Clairmont told the security staff that she felt he was faking and had him written up for a disciplinary infraction. She made no nursing assessment of Mr. Gracia whatsoever, did not take his vital signs, did not send him to the hospital or even contact a provider about his clearly worsened condition. In my opinion her lack of care and concern for Mr. Gracia goes beyond negligence and rises to the level of indifference.

5.     It is noteworthy that Mr. Gracia was known to be immunocompromised, had multiple serious dog bites and was housed in an infirmary, with round-the-clock nurses present, yet he did not have his vital signs taken except one time in the 72 hours before his death. Each of the healthcare staff on duty failed to ensure that Mr. Gracia was monitored for signs of sepsis. The one nurse who did check his

11

vital signs during those three days got very abnormal results yet failed to re-assess Mr. Gracia or get him treatment.

6.     Dr. Buck was the Medical Director for OCC and he was responsible for all medical care given in that facility. His responsibilities included having adequate policies and procedures in place to ensure that the nursing staff and providers adequately monitor, assess and treat patients housed in the infirmary, that vital signs are checked regularly, that patients are not transferred out without adequate assessment and that the staff monitors for the development of worsening conditions that require hospital treatment. He was also responsible for the training and supervision of the healthcare staff to ensure that they follow the policies and procedures of OCC. That was not done in this case.

7.     As a direct result of the multiple, significant breaches of the standard of care, Mr. Gracia died. His dog bites became progressively more infected. The infection spread to the rest of his body and caused multiple organ systems to fail, resulting in septic shock and death. Even though Mr. Gracia was likely somewhat immunocompromised as a result of his HIV, his infection was due to a common bacteria which could have been easily treated with adequate doses of appropriate antibiotics.

Mr. Gracia was otherwise in good health and his infection could have been treated successfully up until shortly before his death in the early morning hours of

12

August 10, 2015. Had NP Evans sent Mr. Gracia to the hospital when he had early signs of sepsis on the morning of 8/9/2015 or had she assessed him on the afternoon of 8/9/2015 she would have more likely than not found that he was septic and would have sent him to the hospital where he would have been successfully treated.

Mr. Gracia's condition was still treatable and he would more likely than not survived had Nurse Harter and Nurse Clairmont performed an adequate assessment on the evening of 8/9/2015 and determined that he needed to go to the hospital. Instead, it appears that Nurse Clairmont concluded that Mr. Gracia was faking without adequately assessing him and she chose not to give him any medical assistance.

Even the medically untrained inmate workers knew that Mr. Gracia appeared to be weak and ill. There were multiple reports in the record of persons who came in contact with Mr. Gracia reporting a foul odor from his wounds, yet Nurses Clairmont and Harter chose to ignore the clearly apparent signs of worsening infection and sepsis. Instead of getting medical treatment for Mr. Gracia, Nurse Clairmont's words and actions resulted in Mr. Gracia being written up for failing to obey an order and feigning an illness.

8.    The healthcare staff were aware that Mr. Gracia had a serious medical condition and that his condition was deteriorating. Even an untrained layperson

would have been able to recognize that Mr. Gracia needed immediate medical attention, yet they chose not to assess or treat him. The lack of care and attention in this case rises to the level of indifference.

II.     Mr. Gracia's autopsy findings influence my opinions as follows:

1.     I agree that the cause of death is septic shock due to infected dog bite wounds. The pathological findings of adrenal hemorrhage, esophageal necrosis, passive congestion of the liver and renal failure indicate that the sepsis and his death did not occur suddenly but developed over a period of time (hours to a few days).

2.     Although Mr. Gracia may have been somewhat immunocompromised by HIV, the bacteria causing his sepsis and death was not unusual or difficult to detect or treat. Rather than a rare pathogen seen only in immunocompromised patients, it was instead one of the more common bacteria.

3.     There were no other pathologic findings that contributed to or caused his death. The trace amounts of metabolites of cannabinoid and cocaine did not play a causative role in his death.

III.     The Policies & Procedures in place regarding medical care at the OCC were either not adequate to ensure assessment and management of patients with serious medical conditions or they were not consistently followed in Mr. Gracia's case. Specifically:

14

1.    I did not find any policy or procedure requiring the nurses to contact a provider with abnormal vital signs or to repeat abnormal vital signs to ensure normalization.

2.    Even though the Nursing SOP 300.36 on Infirmary Housing required that patients housed in the Infirmary for medical reasons have vital signs documented once each shift, this policy was not followed by multiple personnel in this case.

3.    I did not find a policy ensuring that patients who were recorded as refusing treatment have an adequate assessment to determine that they are not too ill to cooperate and are competent to refuse treatment.

These opinions are expressed as requested to a reasonable degree of medical probability or likelihood. I reserve the right to review additional materials as noted or as they become available and to amend or modify these opinions based on the review of additional materials.

 **(ii)    The facts or data considered by the witness in forming these opinions.**

 To assist me in forming these medical opinions I have reviewed records in this case, including:

1. Second Amended Complaint

2. OCC Medical Records

3. ORMC ED Records 08/06/2015

4. ORMC ED Records 08/10/2015

5. Orange County Sheriff's Office Investigative Report

6. Autopsy Report

7. Orlando Police Department Report of Arrest 08/06/2015

8. OCC Policies on:

    a. Medical Emergency Response by Correction Health Services and OCC

    b. Treatment Plan

    c. Infirmary Housing

    d. Health Services Objectives

9. Depositions of:

    a. Dr. Robert Buck

    b. Nurse Karen Clairmont

I have also requested the following documents which I have not yet received:

1. Any videotape from the OCC showing Mr. Gracia

2. All deposition transcripts

3. Any mortality review and incident reports done by Dr. Buck and healthcare staff at OCC

4. Lab results drawn while Mr. Gracia was at OCC

5. The personnel and training files of the healthcare defendants in this case

    **(iii)  Any exhibits that will be used to summarize or support these opinions.**

None at this time other than the documents listed above.

(iv)     **The witness's qualifications, including a list of all publications authored in the previous 10 years.**

See Appendix A for my current CV.

(v)     **A list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition.**

See Appendix B for my case list from the last four years.

(vi)     **A statement of the compensation to be paid for the study and testimony in the case.**

See Appendix C for my fee schedule.

*Thomas D. Fowlkes, MD*

Thomas D. Fowlkes, M.D.

Appendix A



# Thomas D. Fowlkes, M.D.
1203 Medical Park Drive
P.O. Box 1955
Oxford, MS 38655
Cell: 662-801-7508
tom@drfowlkes.com

## SUMMARY OF QUALIFICATIONS

Seasoned Physician Board Certified in both Emergency Medicine and Addiction Medicine and with more than 19 years of practice in Correctional Medicine.

Accomplished expert witness with more than 10 years of experience at both deposition and trial in state and federal courts and before state regulatory bodies on behalf of plaintiffs/prosecutors/state boards as well as defendants in these matters.

Areas of expertise include:      Correctional Healthcare
Deaths in Custody
Drug Abuse and Effects of Addiction
Drug testing interpretation and effects of substances
Urgent Care & Emergency Medicine

## CERTIFICATIONS

Board certified emergency physician (American Board of Emergency Medicine)- July 1993 - Dec. 2023

Board certified in Addiction Medicine (American Board of Addiction Medicine)- Dec. 2010 - Dec. 2020

Certified Correctional Healthcare Professional - Physician (CCHP-P) - July 2017 - June 2019

Certified Medical Review Officer for Drug/Alcohol Testing (MROCC) - Dec. 2012 - Dec. 2022

Unrestricted license to practice medicine in Mississippi since 1993

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2015- Present | Director of Professional & Medical Relations/Addiction Physician for American Addiction Centers, a nationwide provider of addiction services, at Oxford Treatment Center (formerly The Oxford Centre) |
| 1998-Present | Medical Director at Lafayette County (MS) Detention Center, a 140-bed jail facility holding local and federal (US Marshal) detainees. From 1998-2015, as an independent contractor responsible for provision of all medical, nursing, medication and lab services at the facility. Responsible for all these health services as an employee of Lafayette County, MS since 2015 |
| 2011- Present | Medical consultant for Third Circuit Judicial District Drug Court, a felony drug court in Oxford, MS under the direction of Administrator Brandon Vance and Judge Andrew Howorth |
| 2007- Present | Prisoner Advocate Member, Institutional Review Board, Division of Research Integrity & Compliance, University of Mississippi |

# Thomas D. Fowlkes, M.D.

## PROFESSIONAL EXPERIENCE (cont.)

| | |
|---|---|
| 1992-Present | Sole shareholder of Thomas D. Fowlkes, M.D., P.A. Contractor of emergency physician services to acute care facilities and emergency medicine/EMS consultant. Operated correctional medical facility at Lafayette County, MS Detention Center and conducted court ordered mental health, substance abuse & competency evaluations for Chancery Court in Lafayette County. Expert witness & litigation support practice |
| 1999-Present | Served as Deputy Medical Examiner Investigator for Lafayette County MS from 1999-2008 after completing 40-hour Death Investigation Certification Class. Since 2008 I have served as the medical consultant to the Lafayette County Coroner. |
| 2009- 2017 | Owner of a primary care clinic in Oxford, MS. Provider of primary and urgent care and an office-based addiction medicine practice. Until 2015, I practiced as a solo-practitioner then in partnership with a nurse practitioner as Oxford Family Clinic, LLC |
| 2011- 2015 | Co-owner and Chief Medical Officer of The Oxford Centre, Inc. a 76-bed CARF accredited detox, residential and outpatient substance abuse treatment facility. Sold to American Addiction Centers, a publicly traded company, in August 2015 |
| 2011-Present | Medical Director for A&D Services for Region IV Comm. Mental Health Center. 2011-2014 Detox Services at Tupelo CSU. 2017-Present at Corinth (Part-time) |
| 2008-2011 | Addiction physician for detox and residential unit at Haven House, substance abuse treatment facility in Oxford, MS operated by Region II CMHC (Part-time) |
| 2005-2009 | Urgent care physician at Robinsonville (MS) Urgent Care Clinic and part-time physician at the Harrah's Employee Health & Wellness Center |
| 1998-2001 | Private practice of Emergency Medicine with Oxford Emergency Group, P.A. Provided emergency physician services to Baptist Memorial Hospital-North Miss. and Tri-Lakes Medical Center |
| 1997-1998 | Chief Medical Officer for Rural-Metro Corporation's Mid-South region. Rural-Metro provides ambulance services and fire protection throughout the United States and internationally. |
| 1995-1997 | Chief Medical Officer, secretary/treasurer and co-owner of Priority EMS, an ambulance provider in north Mississippi and metropolitan Memphis. Corporation merged with Rural-Metro Corp., a publicly traded company |
| 1992-1994 | Private practice of Emergency Medicine as shareholder and officer in Mid-South Emergency Physicians, P.C. Provided emergency department services for St. Joseph Hospital in Memphis, TN |

## EDUCATION

University of Pittsburgh Residency in Emergency Medicine
Pittsburgh, PA
1989-1992
Selected Chief Resident-1992
Served as medical command & on-scene physician for City of Pittsburgh, Dept. of  Public Safety
Served as flight physician for STAT Med-evac helicopter program

**Thomas D. Fowlkes, M.D.**

## EDUCATION (cont.)

University of Tennessee Medical School
Memphis, TN
M.D. 1989
Faculty Medal for Highest GPA
Alpha Omega Alpha Medical Honor Society

Rhodes College
Memphis, TN
B.S. in Psychobiology 1985
EMT with Shelby County Sheriff's Department, Division of Emergency Services
Psychiatric Technician at Memphis Mental Health Institute, an acute care psychiatric hospital

University of the South
Sewanee, TN
1980-1982
Community Volunteer Firefighter
Emergency Medical Technician (EMT-A)

## CURRENT MEMBERSHIPS/RECOGNITIONS

American College of Correctional Physicians
Fellow of the American Society of Addiction Medicine
Mississippi Society of Addiction Medicine
North Mississippi Medical Society/Mississippi State Medical Association/American Medical Association

## PUBLICATIONS

Fowlkes T. "Shortness of Breath." *Prehospital Systems and Medical Oversight.* 3rd ed. Ed. Kuehl A.
Dubuque: Kendall/Hunt, 2002. 665-671. Print.

Fowlkes T. "Shortness of Breath." *Prehospital Medicine: The Art of On-Line Medical Command.* 1st ed.
Eds. Paris, Roth, Verdile. Maryland Heights: Elsevier, 1996. 101-112. Print.

Fowlkes T, Verdile V. "Managing Gunshot Wounds." *The Journal of Emergency Services.* Vol. 23 (1990):
20-27. Print.

## PRESENTATIONS

"Safe Prescribing of Sedative-Hypnotics" at *MPHP Prescribers' Summit: Controlled Substance Update*
June 22, 2018, Pearl, MS

"Safe Prescribing of Sedative-Hypnotics" at *MPHP Prescribers' Summit: Controlled Substance Update*
April 13, 2018, Gulfport, MS

"Safe Prescribing of Sedative-Hypnotics" at *MPHP Prescribers' Summit: Controlled Substance Update*
March 9, 2018, Oxford, MS

"Case Studies in Controlled Substance Prescribing" at *MPHP Prescribers' Summit: Controlled Substance
Update* October 13, 2017, Jackson, MS

"Case Studies in Controlled Substance Prescribing" at *Mississippi State Medical Association Foundation
Prescribers' Summit* March 31, 2017, Oxford, MS

**Thomas D. Fowlkes, M.D.**

## PRESENTATIONS (cont.)

"Update on the Prescription Drug Epidemic, Disturbing New Trends & Drug Testing Basics" at *Lafayette County Bar Association's Continuing Legal Education Conference* October 20, 2016, Oxford, MS

" Benzodiazepines: An Update" at *North Mississippi Medical Center's 13th Annual Outcomes Conference* August 25, 2016, Pickwick, TN

"Sedative Hypnotics: Avoiding Prescribing Pitfalls" at *Mississippi Professionals Health Program Prescribers' Summit*  June 24, 2016, Gulfport, MS

" Benzodiazepines: Update on Prescribing Trends" at *Mississippi State Medical Association Foundation Prescribers' Summit*  April 1, 2016, Oxford, MS

"An Introduction to the Prescription Drug Epidemic", Guest lecturer, *Addiction Counseling Course in the Graduate School of Counselor Education, University of MS*, February 22, 2016, Oxford, MS

"Benzodiazepines: An Update" at *37th Annual Caduceus Retreat & Conference of MS State Medical Association Foundation*, July 11, 2015, Louisville, MS

"An Introduction to the Prescription Drug Epidemic", Guest lecturer, *Addiction Counseling Course in the Graduate School of Counselor Education, University of MS*, February 10, 2015, Oxford, MS

"Prescription Drug Epidemic: Trouble at Home" at *Annual FACT Conference*, November 7, 2014, Tupelo, MS

"Mental Health in the Primary Care Setting" Keynote Address at *North MS Medical Center Outcomes Conference*, August 22, 2014, Pickwick, TN

"Managing Opiate Addicts with Painful Conditions" at *North MS Medical Center Outcomes Conference*, August 21, 2014, Pickwick, TN

"Buprenorphine: The Rest of the Story" at *24th Annual MS Association of Addiction Professionals Conference*, July 22, 2014, Oxford, MS

"Prescription Drug Epidemic: Trouble at Home" at *24th Annual MS Association of Addiction Professionals Conference*, July 22, 2014, Oxford, MS

"Controlled Substance Update" at *MS State Medical Association Foundation Prescribers' Summit*, March 28, 2014, Oxford, MS

"Benzodiazepines: The Good News & Bad News" at *Northwest MS Regional Medical Center Staff Conference*, Dec. 10, 2013, Clarksdale, MS

"Benzodiazepine Update" at *Southern Medical Association Rules, Regulations, & Risks of Prescribing Controlled Substances,* November 15, 2013, Hattiesburg, MS

"Controlled Substances Update: Benzodiazepines" at *Singing River Health System Prescribers' Summit,* November 1, 2013, Moss Point, MS

"Controlled Substances Update: Benzodiazepines" at *MS Professionals Health Program Prescribers Summit,* October 18, 2013, Jackson, MS

"Managing Controlled Substances in MS: Benzodiazepines" at *North MS Medical Center Best Outcomes Conference*, August 22, 2013, Pickwick, TN

Appendix B

Thomas D. Fowlkes, M.D.

**CASE LIST/EXPERT TESTIMONY LAST 4 YEARS (AS OF 07/25/2018)**

Angela Anderson et al vs. Marshall County MS & BMH-DeSoto Hospital
Cause # 3:12-CV-92
US Federal District Court-No. Miss

State of Mississippi v. Shawn Hunt
Cause # CR2013-167SMD
DeSoto County (MS) Circuit Court

Gallion v. Hinds County et al.
Case # 3:12-CV-736
US District Court, Southern District MS

State of Mississippi v. Kimberly Dobbs
Third Judicial Circuit (MS) Court

State of Mississippi v. Brian Adams
Cause # LK11-40
Third Judicial Circuit (MS) Court

State of Mississippi v. Mark Tutor
Cause # Rankin 24,819
Third Judicial Circuit (MS) Court

State of Mississippi v. Cileste Donald
Cause # LK12-196
Third Judicial Circuit (MS) Court

State of MS v. Joshua Blunt
Cause # 2016-060-CR
Grenada County (MS) Circuit Court

MS Board of Medical Licensure v. Ikechukwe Okorie, MD
Hinds County, MS

MS Board of Nursing v. Justin Robbins
MS Board of Nursing v. Jennifer Robbins
Hinds County, MS

Appendix B

Thomas D. Fowlkes, M.D.

**CASE LIST/EXPERT TESTIMONY LAST 4 YEARS-CONTINUED**

Lee v. Jackson County MS et al.
Case # 1:13-CV-441
US District Court, Southern District MS

Paylan v. Teitelbaum et al.
Case # 1:15-cv-159
US District Court, Northern District FL

Bost v. Wexford et al.
Case # 1:15-cv-3278
US District Court, Maryland

Singleton  v. Southern Health Partners et al.
Case # 15-EV-000626
State Court of Fulton County, State of Georgia

E/O Filichia v. Correct Care Solutions et al.
Case # 2:16-cv-296
US District Court, Southern District OH

Ajibade v. John Wilcher et al.
Case # 4:16-cv-82
US District Court, Southern District GA

Benoit  v. Lincoln County et al.
Cause # 12L6-CC00060
Circuit Court of Lincoln County, State of Missouri

E/O Clark v. Hamilton County, NaphCare  et al.
Case # 1:15-cv-512
US District Court, Southern District OH

E/O Hays v. Prison Healthcare et al.
Case # 2:16-cv-384
US District Court, Northern District AL

Sparks v. Tooke et al.
Civil Action # 099912-A
District Court, 7th Judicial District, State of Wyoming

Appendix B

Thomas D. Fowlkes, M.D.

**CASE LIST/EXPERT TESTIMONY LAST 4 YEARS-CONTINUED**

Brooks (E/O Mixon) v. Wilkinson County et al.
Case # 5:17-cv-00033
US District Court, Middle District GA

3

Appendix C

Thomas D. Fowlkes, M.D.

**FEE SCHEDULE**

I am being paid $500 per hour for review, study & testimony in this case plus travel expenses.

Notes on Dr Zawitz Amended Report

Summary of Occ Med. Recs. Section

- Is a mixture of timeline events & his opinions
- Bottom of pg 7: It would only be speculation...
    - I disagree - a reasonably prudent provider at the hospital would have undertaken a diagnostic work-up, initiated Rx & he would have, more likely than not, survived.
- Middle, pg 8 - "markedly abnormal" pulse, RR "slightly elevated" at 22
    - "more clear indication that something was wrong"
    - "Need for a medical provider to assess him in-person"
- pg 9, top - I disagree that "it still would only be speculation...
    - on pg 10 he gives mortality rates of 25-30% for sepsis, thus he more likely than not would have survived
- pg 9 middle - he puts refused in " " & "It was her interpretation of his action/behavior that he was possibly feigning"
    "In hindsight he was more likely than not too weak due to a progression of his occult sepsis."
    I disagree with the use of term occult, it was not hidden, it was merely undiagnosed & unassessed.
    - Next to last ¶ This Δ "more likely than not add'l signs of progression..."

[margin note: Fails to note that NP has there order but failed to assess.]

Summary of Opinions Section

pg 10 - He doesn't believe HIV was a contributing factor
    - Mortality rates of sepsis
pg 11 - top - "In my opinion this progression occurred over only a few hours" I disagree b/c the AKI & esophageal necrosis
    Middle - I disagree that one has to speculate about how long it would take the ER to ID severe infection.
    bottom - I disagree that "it is well known that the most common sources of sepsis are pulmonary, GI & UTI "
    - Not in someone who is suffering from multiple, serious dog bite wounds p̄ being in lake. Esp ones which are painful, red & draining.
pg 12 - I disagree c̄ 1ˢᵗ ¶
pg 13 - 2ⁿᵈ ¶ unlikely HIV was contributing factor
pg 15 - I disagree with entire last paragraph

EXHIBIT MD
4
11/12/18 Fowlkes
PENGAD 800-631-6989

Items in Nurse Pearson's Amended Report with which I disagree
or requires special comment:

Section VII   p7 - last ¶ - started Augmentin (Not Amoxicillin)
        p14 - 2ND ¶ - "provided extra fluidss... which he consumed" - No doc.
Section VIII   p13 - 1ST ¶ - "None of these nurses had any subjective    of that
        awareness that Mr Gracia had a serious medical need..."
        - Nurse Gonzalez - Failed to √ & rev VS
                - N/V on 8/8
                - HR = 131, weak, dizzy
                - Gave Zofran on 8/9
        - Nurses Clairmont & Harter - distinctive foul odor
                - weakness & ↓MS apparent to non-medically trained person
                - Failed to check VS
        p14 - ¶2 - No c/o N/V - Gave him Zofran (prn med) then
        p15 - ¶2&3 - Nurse Clairmont - "No information or indication
                his cond. anything but improving"
                - she failed to round on him, examine him,
                take VS, he was so weak it was noted by
                non-medical personnel
        p16 - top - "No subjective awareness..."
                She did ignore him, presumed he was faking,
                did not examine him & disregarded
                an obviously serious condition
        p18 - last ¶ - foul odor noted by 2 non-medical personnel
                would mean that the nurses would have smelled it
                also unless they suffer from anosmia. They simply ignored
                & did not document it.
        p19 - ¶2&3 - Not true that Nurse Clairmont had nothing to do with
                the transfer to cell 19. She made that decision (Clairmont depo pg 86)
                & then he remained in her duty area on a monitor
        p20 - ¶3 - I disagree that "Nurse Clairmont was functioning &
                acting according to NCCHC standards"
        p21 - ¶2 - Re: ED doctor Not diagnosing sepsis - Signs & sx of sepsis
                are present in living persons. It is not something
                you can see in dead people & Mr Gracia was dead
                when taken to ED

PENGAD 800-631-6989
7/12/18 Fowler
EXHIBIT
5.
M.D

Notes on Nurse McMann's Report (Pages aren't numbered.)
- I disagree with essentially his whole discussion section
    - She was present in facility & had contact with
       Mr Grocia all 3 days of 8/7, 8/8 & 8/9 yet
       She failed to do or document an adequate
       assessment.
- I disagree that NP Evans was "Not aware of any serious
       Medical Need"

From Dr Buck's depo:
   p 17 - Provider rounds 7 days/week
       - Policy to see pt ā released from infirmary
   p 19 - Supposed to round on all pts M-F; No Note Friday or Sun.
   p 21/22 - NP Evans given written reprimand
       & subsequently terminated
   p 22/23 - Criticism of Nurse Clairmont
   p 45 - Lost NCCHC Accreditation
   p 48 - Admits tx below SOC



EXHIBIT MD
6
11/12/18 Fowlkes
PENGAD 800-631-6989