**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

WILLINE BRYANT a/k/a WILLINE GRACIA
and MAX GRACIA SR., as
Co-Personal Representatives of
the Estate of MAX GRACIA JR., II,

Plaintiffs,                                        CASE NO:   6:17-CV-1423-ORL-31-LRH

v.

ORANGE COUNTY, FLORIDA,
ROBERT J. BUCK, III,
MARYANNE EVANS,
KAREN CLAIRMONT,
ELSA GALLOZA-GONZALEZ, and
LYNN MARIE HARTER,

Defendants.

_____/

## PLAINTIFFS' CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

COME NOW, Plaintiffs, by and through their undersigned counsel, and file this Consolidated Response to the Motions for Summary Judgment filed by Defendants ROBERT J. BUCK, ELSA GALLOZA-GONALEZ, LYNN MARIE HARTER (Doc. 88) and KAREN CLAIRMONT (Doc. 85). In furtherance thereof, undersigned counsel state as follows:

### INTRODUCTION

**A. Procedural History**

This is a wrongful death action predicated upon medical malpractice and a violation of Title 42 U.S. Code §1983 arising out of the care and treatment of decedent,

Max Gracia, Jr., ("Gracia") while he was awaiting trial at Orange County Corrections in August 2015. The Second Amended Complaint filed on January 18, 2018 (Doc. 47) is the operative complaint. Its predecessor, the [First] Amended Complaint filed on September 18, 2017 (Doc. 29), after a thorough analysis by this Court (Doc. 44), was sustained in all respects other than Count I (§1983 violation against Orange County) which was dismissed with leave to amend (Doc. 44, pp. 16-17).

The Second Amended Complaint followed but the Court granted the re-filed motion by Orange County to dismiss the restated §1983 violation against it in Count I (Doc. 56). In all respects beyond Count I, other than a consented-to-amendment to add a claim of punitive damages against each individual defendant, the [First] Amended Complaint (Doc. 29) and the Second Amended Complaint (Doc. 47) are similar in their respective factual and legal allegations.

On February 15, 2019, Defendant Evans was voluntary dismissed by joint stipulation due to her pending bankruptcy in the U.S. Bankruptcy Court for the Western District of Pennsylvania (Doc. 87).

**B. Pending Motions for Summary Judgment**

Plaintiffs do not oppose the Motions for Summary Judgment filed by Defendants Gonzalez and Harter with respect to their alleged violations of §1983 (Counts VI [*sic*, should be V] and VI of Doc. 47, pp. 31-34 ) without prejudice to Plaintiffs' right to argue the relevance of their conduct as supportive of the §1983 violation

alleged against Defendant Roberts Buck in his supervisory capacity as Medical Director of Orange County Corrections Health Services.

Defendant Orange County has not filed a motion for summary judgment with respect to Count VII, which alleges ordinary negligence and medical malpractice as against the County under the doctrine of *respondeat superior* (Doc. 47, pp. 34-35). Thus, the pending motions, however resolved, will not result in a dismissal of the entirety of this case, which is currently set for jury trial in the August 5, 2019 trial term.

## C. Standard of Review

As this Court has held, "[a] claim for relief under §1983 requires that the Plaintiff allege a 'deprivation of an actual constitutional right,'"citing *McElligot v. Foley,* 182 F. 3d 1248, 1254 (11th Cir. 1999) (Doc. 44, p. 7). Under *McElligot,* the deliberate indifference to serious medical needs of prisoners constitutes a violation of the Eighth Amendment and, by extension, to pre-trial detainees under the Fourteenth Amendment. This Court has already held that the Complaint herein sets forth such a claim (Doc. 44, pp. 7, 16-17). The elements of this claim require sufficiently pleaded allegations of (1) a serious medical need; (2) deliberate indifference to that need by the defendant; and (3) a causal connection between the defendant's deliberate indifference and plaintiff's injuries. This Court has held that these requisite

allegations against the individual defendants have been set forth in the operative Complaint. *Id.*

The more narrow question now before this Court is whether Defendant Buck and/or Defendant Clairmont are/is entitled to summary judgment based upon the state of the record. Under Fed. R. Civ. P. 56(a), summary judgment shall be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

As presumably recognized but misstated by Orange County defense counsel (Doc. 88, p. 3), "the court must view the evidence and the inferences from that evidence in the light most favorable to the [non]movant. *Stein v. Ala. Sec'y of State,* 774 F. 3d 689, 692 (11th Cir. 2014) [added]. "A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact-finder to return a verdict in its favor." *Id.*

Given the facts set forth below to be offered at trial, neither Defendant Buck nor Defendant Clairmont is entitled to summary judgment and a reasonable jury would be permitted to return a verdict against those defendants for a violation of §1983.

# FACTS

## A. Decedent's Medical Treatment while at Orange County Corrections

This Court is familiar with the underlying factual allegations regarding the lack of care and treatment of decedent at Orange County Corrections ("OCC") which led to his tragic and unnecessary death on August 10, 2015. *See* Order on Motions to Dismiss (Doc. 44).

A detailed summary of the medical records and nursing notes provided by Orange County in connection with the care and treatment rendered to Gracia during his incarceration at OCC in early August 2015 through the time of his death on August 10, 2015 is set forth in the Expert Witness Report and Affidavit of Lori E. Roscoe, DNP, APRN, ANP, CCHP-RN, Plaintiffs' correctional health care expert and, by reference, is incorporated herein ("Roscoe Report" or "Roscoe Affidavit") (Doc. 98, Exhibits A and B, respectively).

### (1) Dr. Buck's role and involvement in decedent's care

Gracia was admitted to OCC on August 6, 2015 after being treated at the Orlando Regional Medical Center for dog bites to his legs and hands incurred during his arrest earlier that day. Defendant Robert Buck, the supervising doctor and the medical director of Corrections Health Services ("CHS"), evaluated Gracia at the time of his admission to the infirmary. He was the medical provider in charge of decedent's care. Dr. Buck noted that Gracia had multiple dog-bites with severe

flesh involvement and his immunocompromised status. *See* Roscoe Report at 3 (Doc. 98, Exhibit A) .

Dr. Buck's diagnoses included multiple dog bites, HIV+, and exposure to syphilis. Dr. Buck also noted that Gracia was put back on his Depakote for seizures. Other medications ordered include Augmentin, an antibiotic, ibuprofen, a pain medication; and Tylenol #3, a pain medication. Dr. Buck documented that nursing staff needed to verify Gracia's Atripla (an HIV medication) to see if he had been in compliance in the community. If he was compliant, Dr. Buck directed, the Atripla was to be ordered. There is no documentation in the health record that this verification occurred, and the Atripla was never ordered for Gracia. Laboratory studies were ordered to include a complete blood count, a comprehensive metabolic panel, a CD 4 count, a viral (HIV) load, and an RPR (test for syphilis) and a urine test for gonorrhea and chlamydia. *See* Roscoe Report at 3 (Doc. 98, Exhibit A).

Dr. Buck never saw or inquired about his patient again despite the known and obvious risks of infection and his role as decedent's admitting medical provider. He was the only medical doctor ever to lay eyes or hands on decedent during his stay at OCC. In his deposition, Dr. Buck also stated that he was in charge of setting policy and providing training and supervision of the medical staff at OCC but blamed insufficiently trained and inadequately supervised staff members under him (who admittedly *were known by Buck to have received no training* regarding

6

identifying and treating sepsis until Gracia's death) for the poor treatment afforded

Gracia. *See* Buck transcript at 22, lines 17-21; at 48,  lines 10-16 (Doc. 99).

**(2) Decedent's condition manifestly worsens yet medical care withheld**

Over the course of the next two days, August 7 and 8, no vital signs were

taken or recorded and no physical assessment was done, even though Gracia had

complained of vomiting twice. *See* Roscoe Report at 4-5 (Doc. 98, Exhibit A).

On August 9, RN Clairmont documented that Gracia's dressing on his left

posterior thigh wound was changed at 0635 hours. She documented that the wound

was reddened *with a large amount of bloody drainage*. The technique used was

non-sterile and poorly tolerated by Gracia. *Id.* at 5.

On August 9, at 1029 hours RN Gonzalez documented that Gracia com-

plained of weakness and dizziness. Vital signs were obtained that include tachycar-

dia of 131, blood pressure of 111/56, respirations of 22, oxygen saturation of 98%

into temperature of 97.4°F. No physical assessment was done. Gonzalez notified

ARNP Evans, who ordered and increased oral fluid intake. No further action was

taken. *Id.*

Later that day, August 9 at 2154 hours, LPN Lynn Marie Harter documented

that decedent refused to get up for his evening medications. No vital signs were

obtained and there is no signed refusal by decedent in the medical records. It was

at this point that no further medical services were provided to decedent prior to his death. *Id.* at 5-6.

After the last medical entry by LPN Harter at 2154 hrs. on August 9, there were no contemporaneous nursing notes or entries made by RN Clairmont, who relieved Harter, or any other medical provider about what had transpired during the late evening hours of August 9 or early morning hours of August 10.

On August 10 at 0802 hours, RN Clairmont documented that an officer had notified her at approximately 0515 hours that Gracia was not breathing. When she arrived, Gracia was lying supine in the boat bed without pulse and respiration. Cardiopulmonary resuscitation efforts were initiated and continued until EMS arrived and assumed Gracia's care. *Id.* at 6.

On August 10, Gracia was brought to the Orlando Regional Medical Center by EMS at 0548 hours where he was pronounced deceased at 0609 hours.

On August 10, 2015 at approximately 1100 hours an autopsy was performed. It was  conducted by Chief Medical Examiner in the District Nine Office of the Medical Examiner who stated that the cause of death was septic shock complicating infected dog bite wounds of lower extremity with human immunodeficiency virus infection as a contributory factor. The manner of death was listed as homicide due to his incarceration. *Id.* at 6-7.

## ARGUMENT AND LEGAL MEMORANDUM

Orange County defense counsel misconstrues the testimony of one of Plaintiffs' expert, Dr. Thomas D. Fowlkes, and totally ignores the opinion of their other expert, Nurse Practitioner Lori E. Roscoe, a Certified Correctional Health Professional–Registered Nurse with Doctorates in both Nursing Practice and Healthcare Administration.

### Expert Testimony of Dr. Thomas D. Fowlkes

With respect to Defendants Gonzalez and Harter, Dr. Fowlkes did *not* find that their level of care and treatment of decedent was adequate. To the contrary, Fowlkes found both Gonzalez and Harter (whose motions for summary judgment on their personal §1983 liability counts are not being opposed) to have acted below the standard of care but not to the degree in which their conduct could be considered deliberate indifference, as he did with respect to their fellow nurses, Defendant Clairmont and former Defendant Evans. *See* Fowlkes transcript at 63, lines 1–5 (Doc. 95).

### "A Fish Rots From the Head Down"

Contrary to Orange County counsel's contention, Dr. Fowlkes *did* find fault with the conduct of Defendant Robert Buck. While he could find no problem with Dr. Buck's direct and limited interface with Gracia on August 6, 2015 at the time

9

of admission to the infirmary (Fowlkes transcript at 24, lines 23-25) (Doc. 95), Fowlkes was highly critical of Medical Director Buck's discharge of his responsibilities as a supervisor:

"He [referring to Dr. Buck] was the medical director, and as such is responsible for all healthcare that's delivered there. He is responsible for seeing that his other providers, so Nurse Practitioner Evans, and the nurses carry out the policies and procedures that are there, and [he] is responsible for seeing that those policies and procedures are followed and that the care that's delivered is appropriate... He was the medical director, so I think that's different than vicarious…I believe that his responsibilities as medical director are something more than vicarious responsibility for employees. ... I believe that he should be aware if he has nurses who are not taking vital signs on multiple shifts, multiple personnel not taking vital signs on multiple shifts, he should have been aware of that and he should have been aware of his providers not appropriately documenting and rounding on these patients." (Fowlkes transcript at 25, lines 3–25; at 26, lines 1-13) (Doc. 95).

"A fish rots from the head down" is an often used expression but one of uncertain origin which has been associated with Sir James Porter's work published in 1768 entitled "*Observations on the Religion, Law, Government, and Manners of the Turks*" (*The Idioms*, self-proclaimed as the largest idioms dictionary).

Whatever its source, this familiar expression certainly applies here. Consider that the four (4) healthcare providers who attended decedent in the last 48 hours of his life (Gonzalez, Evans, Harter, and Clairmont) while he was in obvious medical and mental decline, failed to either take or record vitals; to assess and evaluate him; or, in the case of Evans, who authorized Gracia's discharge from the infirmary for

which no written records were found, to have even seen him, were all acting under the supervision of Dr. Buck. All four of these healthcare providers were found by Dr. Fowlkes to have deviated from the standard of care, and in the case of Clairmont and Evans, to have evinced a deliberate indifference to the health and safety of decedent. Indeed, the fish does rot from the head down.

### Expert Opinion and Affidavit of Lori E. Roscoe

Nurse Practitioner Roscoe, Plaintiffs' corrections healthcare services expert, whose deposition was not taken by the defense, opined as follows on the subject of supervisory liability:

Orange County Corrections Health Services (CHS) was in charge of the healthcare program. As such, it was responsible to ensure that the care provided to the individuals at the Orange County jail was appropriate and timely, administered according to its policies and procedures, and provided by staff that were properly trained. CHS failed in these responsibilities when the care rendered to Mr. Gracia fell significantly below the standard of care and *demonstrated indifference* to a serious medical condition. CHS failed to provide staff that were properly trained in assessment and identification of serious medical conditions. A complete assessment by nursing staff or by the provider was not conducted on Mr. Gracia when he was complaining of vomiting; when his vital signs deviated significantly from normal; when the condition of his wound was clearly worsening; and when his mental status had changed. CHS failed to appropriately supervise their staff to ensure that they were adhering to the policies and procedures of CHS. (Roscoe Report at 9-10) (emphasis added) (Doc. 98, Exhibit A).

In a supplemental affidavit, Nurse Practitioner Roscoe stated as follows:

11

[M]y use of the phrase "demonstrated indifference" in my report in describing the failure of Orange County Corrections Health Services ("CHS") to provide adequate supervision, training and monitoring of the medical staff was intended by me to connote a degree of discernible indifference by CHS and those individuals responsible for providing such supervision and monitoring, most notably CHS medical director, Dr. Buck, that was deliberate or willful in nature and in reckless disregard of the likely outcome, while not necessarily intending such outcome. (Roscoe Affidavit at par. 6) (Doc. 98, Exhibit B).

The needless and tragic antagonistic turn of events which occurred on the evening of August 9, 2015, through no fault whatsoever of decedent, cannot be emphasized enough as an indicator of the lack of adequate supervision and training at OCC which should have been apparent to Dr. Buck, then well into his 3 1/2 year tenure as Medical Director at the time of the events which led to Gracia's death. Buck admitted in his deposition that at no time prior to decedent's death was there any training or supervision given to the medical staff regarding sepsis (Buck transcript at 22, lines 17-21) (Doc. 99), despite sepsis being a likely occurrence in a jail environment. *See* Joseph A. Bick; Infection Control in Jails and Prisons, *Clinical Infectious Diseases,* Vol. 45, Issue 8, 15 Oct. 2007, pp. 1047-1055 *https//doi.org/10.86/521910*

As earlier noted, on August 9, at 2154 hours, LPN Harter documented in a Nursing Note that Gracia refused to get up for his evening medications. She unilaterally documented that a "refusal" was done, without any signed refusal by the patient, as though Garcia was being intentionally non-compliant as opposed to simply

12

being too weak to get off his bed and take his medications, as was in fact the case. No vital signs were obtained that evening by either of the attending nurses, Defendants Harter and Clairmont, even though his vital signs obtained by another nurse, Defendant Gonzalez, eleven (11) hours earlier on August 9th were clearly problematic and indicative of tachycardia and the onset of sepsis.

Incredulously, nothing whatsoever was done by any CHS medical provider to further evaluate Gracia's medical status, provide care and treatment or elevate him to a higher level of care at an outside medical facility. It was clear, as was obvious to the CHS medical staff on August 9th, from his abnormal vital signs and the worsening appearance of the wound which were indicative of the onset of sepsis, that Gracia was declining rapidly. This conduct or failure to act by any of the CHS medical staff, including its medical director, Dr. Buck, both deviated from the appropriate standard of care and evinced a deliberate indifference to the safety and health of Decedent. *See* Roscoe Report at 7-10; Roscoe Affidavit at par. 6 (Doc. 98).

Rather than act as his healthcare providers, the CHS medical staff chose to adopt the role of decedent's adversary and refused or deliberately failed to provide any further medical attention until he was found eight (8) hours later in his cell with no detectable pulse or respiration by an officer during breakfast service.

13

This collective failure by CHS medical staff bespeaks of a systemic problem that can be traced directly to a lack of appropriate supervision and training by Dr. Buck, the medical director of CHS, who acknowledged in deposition that he is in charge of policymaking as well as training and supervision. *See* Buck transcript at 6, lines 1-6 (Doc. 99). It was inadequate training and supervision which permitted this across-the-board failure to render the most basic care to decedent.

Furthermore Dr. Buck was personally aware of this risk when he admitted the immunocompromised Gracia with severe flesh wounds to the infirmary and did *nothing whatsoever* to follow up.  Instead, Dr. Buck blindly relied upon a medical staff which he knew was not adequately trained in identifying patients in medical or mental decline with acute needs, especially the rapid onset of sepsis. *See* Buck transcript at 22, lines 17-21 (Doc. 99). There is no indication in the record whatso-ever that Dr. Buck spoke to any member of the medical staff or even reviewed the nursing records regarding the condition of his otherwise abandoned and immuno-compromised patient, Gracia.

**Clairmont's Motion for Summary Judgment should be denied**

Shortly before midnight on August 9, 2015, a correctional officer and two su-pervisors came to the cell which housed Gracia to effect his transfer from the infir-mary to a general population housing unit, 3B. According to reports by both Officer

Vargas and his tour supervisor, Cpl. Garrett, produced by Orange County, Garcia was lying on the floor groaning in a lethargic manner and appeared unresponsive to their commands.

Defendant Clairmont was present for this interface. She rendered no medical assistance or evaluation whatsoever, even though she noted that his dressings were "heavily soiled with dried, bloody drainage." *See* Roscoe Report at 6 (Doc. 98, Exhibit A). Instead, according to the furnished reports by officers, she advised that Gracia was "faking or exaggerating his medical condition and inability to get up."

Eventually, with the help of two inmate workers, according to the reports produced by Orange County, Officer Vargas was able to move Gracia to an adjacent cell (#19) in the Medical 1B unit "where a recording camera [had been] installed in order to better ascertain the validity of his proclaimed illnesses," according to the report filed by Vargas. This occurred at approximately 2316 hours on August 9th without any force or resistance from the lethargic Gracia who was noted as being "compliant" to whatever extent his physical abilities permitted.

Even after the move, according to the video produced by Orange County, neither Clairmont nor any other medical staff member made any attempt to assess or evaluate the medical condition of Gracia and never entered cell #19 to check upon

him  At that point a decision had been made to file disciplinary charges against Gracia and apparently terminate all medical assistance.

Approximately three hours later, on August 10th at 0258 hours, a corrections investigator attempted to interrogate Gracia in cell #19 regarding this matter but Gracia was unable to reply.  It is not known whether Gracia was dead or alive at that point and no one attempted to ascertain his condition. Nonetheless, during the five hours Gracia was in cell #19 being monitored by camera, neither Clairmont nor any other medical staff member made any attempt to attend or assess their medical patient until it later was reported at 0511 hours on August 10th that Gracia was no longer breathing.

On August 10th at 0313 hours, Clairmont retrospectively documented that at 2100 hours on August 9th, Gracia was observed twisting himself and moaning loudly on the bed. He stated that he "can't do it" and slid to the floor. *See* Roscoe Report at 6. Again, there is no explanation in the records as to why no care or treatment was rendered to Gracia in those fateful eight (8) hours.

Less than 25 minutes later, at 0335 hours on August 10th, Clairmont retrospectively created a second document, a Nursing Progress Note dated August 9, regarding Gracia's alleged behavior—refusing to follow corrections officers' orders re-

garding a pending move to 3B— which resulted in the filing of a "DR" (Discipli-

nary Report) against Gracia. She claimed that Gracia continued to lie on the floor

on his back, "refusing all treatment." *Id.* At a minimum, while Clairmont was gen-

erating these retrospective notes at 3 o'clock in the morning on August 10th, she

could have been attending or looking in on her patient.

The care and treatment or lack thereof provided by Clairmont to decedent from

August 8 to August 10, 2015 while he was incarcerated at the jail deviated from the

acceptable nursing standard of care, and rose to the level of deliberate indifference

given what Clairmont knew of Gracia's declining medical condition from August

8th at approximately 5 PM when he started vomiting through the early morning

hours of August 10th when he was found dead in his cell after being totally unat-

tended by medical staff for nearly eight (8) hours during which time he was under

the direct care of Clairmont. *See* Roscoe Report at 8-9 (Doc. 98, Exhibit A).

Clairmont lamely argues in her Motion that her "failure to properly recognized

that Gracia was becoming septic based on the symptoms that he was displaying

while under her care, even if negligent, is insufficient to establish a claim of delib-

erate indifference." (Doc. 85, p. 16). In response, this Court said it best: "While the

Decedent lay dying in a cell on August 10th, the camera rolled as the Defendants

pursued their diagnosis of malingering. Faced with objective evidence of a serious

medical need, an unfounded diagnosis of malingering is the epitome of deliberate indifference (Doc. 44, pp. 16-17). Nothing more need be said.

### Buck's Motion for Summary Judgment should be denied

To be sure, supervisory liability under §1983 cannot rest upon vicarious liability. A supervisor, however, may be liable where it is shown "that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions [or, as here, his deliberate failure to act] and the alleged constitutional violation." *Keith v. DeKalb City,* 749 F. 3d 1034, 1047-48 (11th Cir. 2014). [Added]. "Alternatively, the causal connection may be established when a supervisor's custom or policy results in deliberate indifference to constitutional rights." *Cottone v. Jenne,* 326 F. 3d 1352, 1360 (11th Cir. 2003) (citations omitted).

Here, a causal connection can be shown by Dr. Buck's chosen course of inaction in the face of known risk or his policy or custom which results in deliberate indifference. Apparently, Dr. Buck has a policy or custom of not reviewing any of the medical records generated by the medical staff he supposedly supervises, including those of patients known by him to be at serious risk, as likely was the case here. Rather, it appears that he awaits getting bad news by telephone before he gets involved. Consider the following:

Q. So if I understand, then, you saw Mr. Gracia when he was admitted to the infirmary, and after that point, in your mind, you had no further obligation to Mr. Gracia from a medical provider standpoint because Nurse Evans was going to take charge; is that correct?

A. Correct. Now, I will say that I am available by phone at all times to my providers and to the nurses. And the providers know if they ever have any questions or if they ever have any concerns, they can call me. I will come down there. I'll see the patient. The nurses know that my phone is on 24/7. (Buck transcript at 15, lines 14-25; at 16, lines 1-4) ( Doc. 99).

This is hardly meaningful supervision. At best, "call me 24/7 if you must" is a form of passive intervention equivalent to deliberate indifference which creates a causal nexus to the constitutional injury. As this Court already observed, "Buck need not have been continuously aware of updates to the Decedent's condition to have been deliberately indifferent to a serious risk of harm to the Decedent, because he already knew of the severe wound and the HIV positive status, which together constituted the serious risk of harm." (Doc. 44, p. 15).

More critically, despite the knowledge of serious risk of harm, Buck deliberately chose to do nothing further... no conferring, no monitoring, no review of the medical records and no inquiries. Nothing. In other words, he remained deliberately indifferent to the outcome.

**WHEREFORE,** Plaintiffs respectfully request that Motions for Summary Judgment by Defendants Buck and Clairmont be denied.

*/s/* **Jason J. Recksiedler, Esquire**
JASON J. RECKSIEDLER, ESQ.
Florida Bar No.:  092060
NEJAME LAW, P.A.
189 S. Orange Avenue, Suite 1800
Orlando, FL  32801
Telephone:  407-500-000
Facsimile:  407-802-1709
Email for service (FL R.Jud.Admin.2.516):
Primary email:      Jason@nejamelaw.com;
Secondary email:  Bianca@nejamelaw.com;
                            Litigation@nejamelaw.com

*/s/* **Stephen J. Calvacca, Esquire**
STEPHEN J. CALVACCA, ESQUIRE
Florida Bar No.:  561495
NEJAME LAW, P.A.
189 S. Orange Avenue, Suite 1800
Orlando, FL  32801
Telephone:  407-500-000
Facsimile:  407-245-2980
Email for service (FL R.Jud.Admin.2.516):
Primary email:      civilservice@nejamelaw.com;
Secondary email:  Stephen@nejamelaw.com;
                            Darlene@nejamelaw.com

## CERTIFICATE OF SERVICE

   I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of

the Court and a true and correct copy of the foregoing has been furnished through

the CM/ECF portal of the Middle District of Florida to opposing counsel and that

I have sent same by U.S. mail to both Max Gracia, Sr., and Willine Bryant a/k/a

Gracia at their respective addresses on file on this 11th day of March, 2019.

*/s/ Stephen J. Calvacca*, **Esquire**