## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**WILLINE BRYANT and MAX GRACIA, SR.,**

    **Plaintiffs,**

v.                                                       Case No: 6:17-cv-1423-Orl-31LRH

**ORANGE COUNTY, FLORIDA, ROBERT J. BUCK, III , KAREN CLAIRMONT, ELSA GALLOZA-GONZALEZ and LYNN MARIE HARTER,**

    **Defendants.**

## ORDER

This Matter comes before the Court without a hearing on Defendant Buck's Motion for Summary Judgment (Doc. 88), Defendant Clairmont's Motion for Summary Judgment (Doc. 85), the Plaintiff's Response (Doc. 100) and the Defendants' Replies (Docs. 101 and 102).[1]

### I. Background

#### A. Facts as Alleged in the Complaint[2]

During his arrest on August 6, 2015, Max Gracia, Jr. suffered dog bite wounds to his hands and legs. Second Amend. Compl., Doc. 47, ¶ 21. Although Gracia suffered multiple dog bites on

---

[1] Although other Defendants also moved for summary judgment, the Plaintiffs do not oppose summary judgment for Defendants Gonzalez and Harter. (Doc. 100 at 2).

[2] Of course, the Court does not take the Plaintiffs' allegations as true at this stage. The Court uses allegations from the Complaint solely to provide context for later discussion. Because the questions at hand are narrow, the Complaint provides more comprehensive background information than does the evidence cited by the parties for purposes of the instant motions.

both his hands and legs, at least some of which were severe, the Plaintiffs do not seek any relief with respect to the initial dog bite injuries themselves.[3] After receiving some treatment for those wounds at Orange County Regional Medical Center, Gracia was admitted to the Health Services Department, also known as Corrections Health Services ("CHS") of Orange County Corrections ("OCC"). *Id.*

Gracia's injuries resulted in an assignment to the Infirmary at OCC. *Id.* ¶ 22. Around the time of Gracia's admission to the Infirmary, Defendant Robert Buck III, M.D. ("Buck") evaluated him and noted that he "had multiple dog bites with severe flesh involvement." *Id.* Buck put Gracia back on his seizure medication, prescribed antibiotics and pain medication, including ibuprofen and Tylenol #3,[4] and noted that, upon verification that Gracia "had been compliant in the community," Atripla[5] should be ordered. *Id.* ¶ 22-23. Buck did not order Atripla for Gracia, and "Buck never saw or inquired about [Gracia] again." *Id.* ¶ 23.

On August 7, 2015, Gracia's "wounds were cleaned and dressed" by Elsa Galloza-Gonzalez ("Gonzalez").[6] *Id.* ¶ 25. At that time, at least one of his wounds was "reddened with scant serosanguineous drainage present." *Id.* Later, Defendant Karen Clairmont ("Clairmont") allegedly saw Gracia but did not obtain his vital signs or perform any physical assessment.[7] *Id.* ¶ 26.

---

[3] The Plaintiffs filed suit as co-personal representatives of the estate of Gracia.

[4] Tylenol #3 contains acetaminophen and codeine. *Acetaminophen and Codeine*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/acetaminophen-and-codeine-oral-route/description/drg-20074117 (last accessed April 18, 2019).

[5] Atripla is an antiviral medication used to treat HIV infections. (Doc. 95-1 at 28).

[6] This was recorded in a Nursing Treatment Note, completed at 5:20 p.m. on August 7, 2015.

[7] This was recorded in a Nursing Progress Note, completed retroactively at 7:07 a.m. on August 8, 2015.

On August 8, 2015, Gracia was educated about the risk of infection and was told to increase his fluid intake.[8] *Id.* ¶ 27. Gracia's wound dressing was changed, and Gonzalez again noted that the wound on his left leg was "reddened with scant serosanguineous drainage."[9] *Id.* ¶ 28. That afternoon, Gracia vomited twice, but his vital signs were not taken. Gracia was later given odansetron, an anti-nausea drug.[10] Although the wound was reddened and Gracia complained of vomiting, Gonzalez recorded that he showed "no signs or symptoms of infection." *Id.* ¶ 28, 29; *see also* Doc. 83-1 at 42.

On August 9, 2015, at 6:35 a.m., the dressing on Gracia's left leg wound was changed. The wound was reddened and had "a large amount of bloody drainage."[11] *Id.* ¶ 30. Gracia complained of dizziness and weakness, and at some point that morning his vital signs were recorded (for the first time in fifty-five hours), revealing tachycardia[12] of 131 and a respiratory rate of 22. *Id.* ¶ 32. In response to this abnormality, Evans ordered an increased fluid intake.[13] *Id.* Gracia's vital signs

---

[8] This was recorded by Gonzalez in a Nursing Progress Note, completed at 11:38 a.m. on August 8, 2015.

[9] This was recorded in a Nursing Treatment Note, completed at 4:59 p.m. on August 8, 2015.

[10] This was recorded by Gonzalez at 5:13 p.m. on August 8, 2015. Maryanne Evans ("Evans") co-signed the order for odansetron at 5:00 p.m. on August 9, 2015. It is unclear whether Gracia was given odansetron before or after the order was co-signed.

[11] This was recorded by Clairmont in a Nursing Progress Note, completed at 6:38 a.m. on August 9, 2015. The Note had the exact same language as the one recorded by Clairmont on the previous day. *Id.* ¶ 31.

[12] "Tachycardia occurs when an abnormality in the heart produces rapid electrical signals that quicken the heart rate, which is normally about 60 to 100 beats a minute at rest." *Tachycardia*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/tachycardia/symptoms-causes/syc-20355127 (accessed April 17, 2019).

[13] This was recorded by Gonzalez in a Nursing Progress Note, completed at 10:29 a.m. on August 9, 2015. Thus, it appears that Evans ordered the increased fluid intake prior to co-signing the odansetron order. *See supra* n.10 and accompanying text. There is no indication that the

were never taken again. *Id.* At 9:00 p.m., Gracia twisted and moaned loudly in bed, said that he "can't do it," and fell to the ground.[14] *Id.* ¶ 37. At some point prior to 9:54 p.m., Gracia allegedly "refused to get up for his evening medications."[15] *Id.* ¶ 33.

At around 11:16 p.m. on August 9, 2015, an officer and two supervisors came to transfer Gracia to a camera-monitored cell.[16] *Id.* ¶ 35. At the time, Gracia was unresponsive, groaning lethargically, and laying on the floor. *Id.* Clairmont was present and, although she disputes this, the Plaintiffs claim she told the officers that he was "faking or exaggerating his medical condition and inability to get up."[17] *Id.* The officer and two inmate workers physically moved Gracia to a cell with a recording camera. *Id.* Gracia was documented as compliant. *Id.* However, a disciplinary report was filed against Gracia because he "refus[ed]" to follow orders in connection with the transfer; instead, Gracia lay on his back on the floor and "refus[ed] all treatment."[18] *See id.* ¶ 38.

On August 10, 2015, at 2:58 a.m., a corrections investigator allegedly tried to "interrogate" Gracia with respect to the disciplinary report. *Id.* ¶ 36. According to the Plaintiffs, Gracia was unable to reply to the corrections investigator. *Id.*

---

nursing staff ever checked to see if Gracia had increased his fluid intake.

[14] This was recorded by Clairmont at 3:13 a.m. on August 10, 2015.

[15] This was recorded by Lynn Marie Harter ("Harter") in a Nursing Note, completed at 9:54 p.m. on August 9, 2015.

[16] Clairmont testified that she decided to move Gracia in order to keep an eye on him.

[17] In support of this, the Plaintiffs mention reports by Officer Vargas and his tour supervisor without including them or citing to them more specifically.

[18] This was recorded by Clairmont in a Nursing Progress Note, completed at 3:35 a.m. on August 10, 2015.

At approximately 5:15 a.m., an officer informed Clairmont that Gracia was not breathing.[19] *Id.* ¶ 39. Clairmont observed Gracia on his back in bed, with no pulse or respirations. Efforts to revive Gracia began and continued until EMS arrived and transported Gracia at 5:48 a.m. *Id.* At 6:09 a.m., Gracia was pronounced deceased at Orlando Regional Medical Center. *Id.* ¶ 40. An autopsy report concluded that the manner of his death was homicide, due to his incarceration, and that the cause of death was "septic shock complicating infected dog bite wounds" with HIV as a contributory factor. *Id.* ¶ 41.

**B. Procedural History**

On September 18, 2017, the Plaintiffs filed the Amended Complaint (Doc. 29). Count I alleged a § 1983 claim against Orange County, Count II alleged a § 1983 claim against Buck, Count III alleged a § 1983 claim against Evans, Count IV alleged a § 1983 claim against Clairmont, Count V alleged a § 1983 claim against Gonzalez, Count VI alleged a § 1983 claim against Harter, and Count VII alleged a medical malpractice claim against Orange County.

Clairmont and Evans each filed motions to dismiss on October 2, 2017. Docs. 31, 32. That same day, Orange County, Buck, Gonzalez, and Harter filed a collective motion to dismiss. Doc. 33. The Court granted Orange County's motion but denied the others. Doc. 44. On January 18, 2018, the Plaintiffs filed the Second Amended Complaint. Doc. 47. Orange County filed a Motion to Dismiss Count I of the Second Amended Complaint on February 8, 2018. Doc. 54. The Court granted Orange County's motion and dismissed Count I of the Second Amended Complaint with prejudice.

---

[19] This was recorded by Clairmont in a Nursing Progress Note, completed at 8:02 a.m. on August 10, 2015.

Evans, Buck, Clairmont, Gonzalez, and Harter later filed motions for summary judgment. (Docs. 82, 85, and 88). In their Consolidated Response, the Plaintiffs indicate that they do not oppose summary judgment as to Defendants Gonzalez and Harter.[20] (Doc. 100). Accordingly, only Defendants Buck and Clairmont remain at issue for purposes of summary judgment.

## II. Legal Standards

### A. Summary Judgment

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). A court "must draw all reasonable inferences in favor of the non-moving party, and it may not make credibility determinations or weigh the evidence." *Hinson v. Clinch County, Ga. Bd. Of Educ.*, 231 F.3d 821, 826-27 (11th Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000)).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the nonmoving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who fails to make

---

[20] The Plaintiffs' claims against Evans were voluntarily dismissed on February 19, 2019. (Doc. 90). Evans's Motion for Summary Judgment (Doc. 82) is therefore moot.

- 6 -

a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value"). The Court must consider all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255.

### B. Qualified Immunity and Section 1983

"Qualified immunity shields 'government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Taylor v. Hughes*, No. 17-14772, 2019 WL 1461316, at *2 (11th Cir. Apr. 3, 2019) (internal quotation marks omitted). Relief under § 1983 requires the "deprivation of an actual constitutional right." *McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999). It is well settled that the deliberate indifference to serious medical needs of prisoners constitutes a violation of the Eighth Amendment. *Id.* To succeed on a claim in this context under § 1983, the Plaintiff must show (1) a serious medical need, (2) deliberate indifference to that need by the Defendants, and (3) a causal connection between Defendant's deliberate indifference and Plaintiff's injuries. *See Hatten v. Prison Health Services, Inc.*, 2006 WL 4792785 (M. D. Fla. Sept. 13, 2006).

While § 1983 does not permit *respondeat superior* liability, a supervisor can be held liable where a plaintiff shows that the supervisor "either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." *Keith v. DeKalb Cty.*, 749 F.3d 1034, 1047-48 (11th Cir. 2014). The

Plaintiffs can show a causal connection by showing that "the supervisor's policy or custom resulted in deliberate indifference." *Franklin v. Curry*, 738 F.3d 1246, 1249 (11th Cir. 2013) (internal quotation marks omitted).

Because, in this particular case, the analyses for whether the Defendants are entitled to qualified immunity and whether the Plaintiffs have failed to state a claim for relief under § 1983 both turn on whether the Plaintiffs have properly alleged the violation of a constitutional right, the Court combines its discussion of the two issues.

### III. Analysis

#### A. Defendant Buck

As a threshold matter, deliberate indifference requires subjective knowledge. Buck argues that he did not have subjective knowledge of Gracia's problems. In support of this, he points to the conclusions reached by the Plaintiffs' expert, Dr. Thomas Fowlkes.[21] However, based on his initial interaction with Gracia, Buck knew that he was at risk for infection (sepsis) and that "if no action [was] taken, the detainee face[d] a 'substantial risk of serious harm.'" *Taylor v. Hughes*, No. 17-14772, 2019 WL 1461316, at *3 (11th Cir. Apr. 3, 2019) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

---

[21] Fowlkes did state that he did not see evidence from which he could reach a conclusion that Buck was deliberately indifferent. Doc. 88-2 at 4. However, deliberate indifference is a legal conclusion – one that Fowlkes is not qualified to reach. *See* Doc. 95-1 at 24,61. Even in the portion of the Fowlkes deposition attached to the instant motion, Fowlkes expressed discomfort with the Defendants' repeated requests for him to make a determination of whether the medical staff acted with deliberate indifference, stating that it "is more a legal conclusion rather than a medical opinion," and that he "usually describe[s] it in terms of . . . the degree to which they breached the standard of care." Doc. 88-2 at 5-6. Fowlkes describes the collective action taken by the OCC medical staff as "far below the acceptable standard of care for healthcare within a detention facility." Doc. 95-1 at 182.

Buck's Motion emphasizes the brevity of his interaction with Gracia, theorizing that, because he never again saw Gracia after intake, he could not have acted in deliberate indifference to his serious medical need. But his failure to follow up is itself evidence of indifference. Writing off his role as direct medical provider to a "single, brief evaluation," Buck attempts to recharacterize the issue as one of supervisory liability. Doc. 88 at 8-9. That characterization, however, simply illuminates Buck's indifference: He viewed his role as that of a mere supervisor[22] of the nursing staff rather than as the sole treating physician of Gracia. The Court will not disregard Buck's indifference as a medical provider simply because he was also a medical director.

The motion goes so far as to state that "[a]t no time after this interaction did Buck have a direct treatment relationship with Mr. Gracia. Rather, *his treatment was overseen and provided by various other medical providers*." *Id.* at 8 (emphasis added). However, none of the "various other medical providers" who were "overseeing" Gracia were his treating physician; Buck was.[23] Buck acknowledged that the only reason he ever saw this patient – who was obviously unable to see any other doctor due to his incarceration – was because a nurse had called in sick. Buck knew that the infirmary had a burdensome nurse-to-patient ratio,[24] and he knew that the environment of a corrections infirmary was demanding.[25] Nevertheless, Buck examined an HIV positive patient

---

[22] At least, he acted as a supervisor to the extent that being on call 24/7 in order to potentially advise a nurse to have a patient taken to the emergency room can be called supervising. *See* 88-3 at 41-42 (acknowledging that Buck had never returned to the jail to perform an examination after being called by a nurse and instead had only instructed nurses to send patients to the ER on occasion).

[23] All of the other providers were nurses of varying levels and not medical doctors.

[24] *See* Doc. 85-1 at 101-102 (Clairmont describes chronic understaffing and unique challenges of corrections infirmaries). When asked, Buck stated that there was no nurse-patient ratio standard that was followed, or that if there was one, he did not remember. Doc. 88-3 at 42.

[25] Buck "served at corrections from 2011-2015." Doc. 88-3 at 45.

with a severe dog-bite wound and deliberately declined to play any active role in his subsequent treatment. Viewing the facts in the light most favorable to the Plaintiffs, that behavior is the very essence of deliberate indifference.

Furthermore, there remain material questions of fact as to whether, as a supervisor, Buck's policies and customs resulted in deliberate indifference. In his deposition, Buck indicated that as medical director, he (along with others, although it is not clear who else) reviewed "policy every year on a month-to-month basis." Doc. 99 at 9. Despite Buck's claim that he was on call 24/7 (*Id.* at 18-19), Clairmont testified that she was not taught that she could call a doctor and have them come in, and she never saw a doctor examine an inmate during the night shifts, which were the shifts that she worked. Doc. 85-1 at 58-59. Other evidence indicates that there was little to no distinction made between medical doctors and nurses for purposes of treatment policy. For example, Galloza-Gonzalez refers to Evans as a "doctor," and she reached out to Evans rather than Buck when Gracia showed early signs of sepsis. Doc. 83-2 at 57-58. Buck testified that it was typical for a nurse practitioner, rather than a medical doctor, to admit patients to the infirmary. Doc. 99 at 15.

Clairmont also testified that she would only have been able to handle half of the twenty-three patients for whom she was responsible in the infirmary. Doc. 85-1 at 101. She explained that putting only one registered nurse with the especially sick patients that would likely be in a corrections department infirmary – citing examples of a beaten-up patient who had lost an eye, and a patient "with wired jaws that you may have to snip" – "just doesn't make any sense." *Id.* at 102. She further noted that in an emergency department, a ratio of even one registered nurse to six patients would be considered "ridiculous." *Id*. Based on policy, which Buck regularly reviewed and approved, one registered nurse could have been responsible for as many as forty patients. *Id.* at 104. Clairmont acknowledged that she never expressed concerns to Buck about the understaffing, but she also stated

that she did not have an opportunity to do so. *Id.* at 108. She further noted that no one from Orange County had ever checked with her to see if there was sufficient staff to treat the patients in the infirmary. *Id.* at 111. While understaffing alone may not be sufficient to show a custom or policy resulting in deliberate indifference, a jury could conclude that persistent, extreme understaffing, when coupled with the failure to involve doctors, would be. The Plaintiffs have met their burden of showing genuine issues of material fact as to deliberate indifference by Defendant Buck both as a medical provider and director.

### B. Defendant Clairmont

The Plaintiffs assert that Clairmont failed to treat Gracia because she believed without justification that he was faking his condition, and there is credible evidence to support this assertion. Clairmont's own Progress Note described Gracia as "refus[ing] all assistance and refus[ing] all care from nursing staff." Doc. 85-7. As stated in Clairmont's Motion, when she observed Gracia, who had a wound dressing she described as "heavily soiled with dried bloody drainage," "twisting himself and moaning loudly," crying "I can't do it," and sliding to the floor when offered his nightly medication, she wrote that he "refused all assistance." *See* Doc. 102 at 5. Refusing assistance would only be a reasonable description of what Gracia did if she believed he was malingering. Ignoring an apparently serious medical condition because of an unfounded belief that the patient is malingering can certainly constitute deliberate indifference. *See, e.g.*, *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002) (in § 1983 case involving prisoner, reversing entry of summary judgment on qualified immunity grounds and stating, "[t]he fact that Nurse Dunbar and Dr. Benjamin may have based their refusal to treat Walker's pain on a good-faith belief that he was malingering, that he was not in pain but merely trying to get high with the narcotic painkiller, is an issue for the jury.").

Assuming Clairmont did believe Gracia's suffering was real, as she claims in her motion, the Plaintiffs' case is even stronger. Clairmont was an experienced nurse with specific knowledge of Gracia's injury and HIV positive status. There is evidence that indicates Gracia's condition worsened steadily, giving numerous opportunities for Clairmont to act. Dr. Fowlkes explained that "[Gracia's] tissue had started to die, and that doesn't happen in a matter of minutes or even a couple of hours; that means it's been going on for a while." Doc. 95-1 at 56. According to Fowlkes, the kidney failure and adrenal hemorrhage suffered by Gracia also would have taken multiple hours to occur. *Id.* at 57-58. Not only did Gracia's worsening condition allow time for a proper response; it also produced some readily visible evidence. "[L]ots of coffee ground materials" were found on Gracia's towels and sheets, which Fowlkes said indicated that he was vomiting blood due to the disintegration of his esophagus. *Id.* at 57. After Gracia was transferred to the cell for observation, Clairmont never physically entered his cell to look at him, although she did testify that she looked at him on the camera monitor.[26] Doc. 85-1 at 88. She never saw him moving around the cell, although that is apparently why she was watching the monitor: to see if he was moving. *Id.* at 88-89.

If Clairmont believed what she put in her Progress Note, she knew that Gracia was suffering with a serious medical condition and her refusal to provide any intervention would be classic indifference. Conversely, if she decided to ignore his complaints as malingering, that too could amount to deliberate indifference. Either way, the Plaintiffs have met their burden of showing that a reasonable jury could render a verdict against Clairmont under Section 1983 for deliberate indifference to a serious medical need. Clairmont is not entitled to summary judgment.

---

[26] Defendant Clairmont also testified that the monitors for Gracia's cell were not located inside the nurses' station, although they could be seen from the window. Doc. 85-1 at 98.

## IV. Conclusion

For the foregoing reasons, the Defendants' Motion for Summary Judgment (Doc. 88) is **GRANTED** as to Defendants Harter and Gonzalez and **DENIED** as to Defendant Buck. Defendant Clairmont's Motion for Summary Judgment (Doc. 85) is **DENIED**. Defendant Evans's Motion for Summary Judgment (Doc. 82) is **DENIED** as **MOOT**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on April 24, 2019.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party